IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICA'S CHOICE, INC., | ) | |
| | ) | **Case No. 07-CV-00428** |
| | ) | **Judge Emmet Sullivan** |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SANDRA BUSH BIENVENU, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |
| | ) | |

## MOTION TO ENLARGE DISCOVERY PERIOD
## AND TO COMPEL CONTINUED DEPOSITION

**NOW INTO COURT**, through undersigned counsel, comes Plaintiff/Counter-Defendant AMERICA'S CHOICE, INC., and moves this Court for an order briefly enlarging – until July 31, 2008 – the discovery period set by this Court in order to allow for the completion of the deposition of Defendant/Counter-Plaintiff SANDRA BUSH BIENVENU as well as any other discovery necessary in that connection and compelling the continued deposition of that deponent.

### Statement of Points and Authorities

I.    Relevant Procedural History

AMERICA'S CHOICE, INC. ("ACI") filed this action on March 5, 2007, and issue was first joined on April 27, 2007. Thereafter, regular case management proceedings were held. The parties filed their case management statement on May 31, 2007, and the Court entered the first scheduling order on June 1, 2007. That scheduling order provided that discovery was to be

completed by October 30, 2007.  Defendant/Counter-Plaintiff SANDRA BUSH BIENVENU ("Bienvenu") filed an amended answer and counterclaim on July 27, 2007, and ACI filed its reply to counterclaim that same day.  The parties completed their initial disclosures in due course, served written discovery in the form of document requests and interrogatories, and both sides responded to the written discovery.  Documents were produced by both sides.

In early October 2007, the parties filed, and the Court granted, a consent motion to extend the discovery deadline to January 31, 2008.  Depositions had been scheduled to commence shortly thereafter.  Just before October 18, 2007, ACI lost its access to its chief executive officer, Judy Codding, as the result of a tragedy that befell her family.  It contacted the Court to address this matter, and upon its informal motion for a protective order and with the consent of Bienvenu's counsel, the Court stayed all deposition discovery for a period of ninety (90) days or until January 14, 2008.  (This was accomplished by a minute order in Chambers; the stay is not reflected on the Court's docket.)  The discovery period was later enlarged to May 30, 2008, by minute order dated March 31, 2008.

On May 22, 2008, ACI filed a motion, again on consent, to briefly extend the discovery period by one month.  By minute order, the Court granted that consent motion, and the depositions of Ms. Codding and ACI's chief financial officer, John Wozniak, were completed in the interim.  The parties also completed the deposition of Cecil Harris, the plaintiff in a related case pending in the United States District Court for the Middle District of Louisiana.  (*Cecil Harris v. America's Choice, Inc.*, Docket No. 3:07-cv-195)  (The parties in both these actions have stipulated that the depositions from one action may be used in the other, related case so as to obviate the need to take certain depositions twice.)  The deposition of another ACI officer,

2

Jason Dougal, originally scheduled for June 13, 2008, was postponed by agreement of the parties after a last-minute medical emergency.  Due to scheduling conflicts, the parties could not reschedule Mr. Dougal's deposition until July 8, 2008.  On oral consent motion, the Court extended the discovery deadline until July 11, 2008, to accommodate this deposition.

Counsel for ACI commenced the deposition of Defendant/Counter-Plaintiff Bienvenu in its New York offices on June 25, 2008.  The deposition commenced at 9:44 a.m. and concluded at 5:30 p.m.  With lunch and breaks, examination consumed 5 hours and 19 minutes.  Over 240 pages of testimony had been taken.  ACI's counsel declared the deposition adjourned for the day at 5:30 p.m.  While counsel for Bienvenu indicated that he and his client were prepared to stay until completion, counsel for ACI believed that continuing after a full day of strenuous examination would not be reasonable, and declined that suggestion.

The deposition was not concluded that day in major part because of the deponent's repeated resistance to examination and repeated obstreperous speaking objections made by the deponent's counsel.  Examination, as a result, was impeded and slowed.  (ACI attaches hereto, as Ex. A, a condensed transcript of the deposition, and respectfully refers the Court, as merely one example of this type of misconduct, to page 71, line 21 through page 92, line 13.)

On July 2, 2008, counsel for ACI served a Notice of Continued Deposition on Bienvenu's counsel, seeking to complete Bienvenu's deposition on the afternoon of July 8, 2008 (after the completion of Mr. Dougal's deposition, held in the Washington, D.C. offices of Bienvenu's local counsel that same day, and prior to the close of discovery as set by the Court).  Local counsel for Bienvenu objected to the notice via e-mail, stating that Bienvenu was not available on the day

noticed, and also noted that New York counsel for Bienvenu would address the matter further with counsel for ACI.

On July 3, 2008, counsel for ACI contacted New York counsel for Bienvenu by telephone.  While counsel for Bienvenu first continued his objection to the continuation of the deposition, he rapidly changed his position, agreeing that the deposition would continue to the 7-hour mark, apparently in exchange for ACI's counsel's commitment that the deposition would be taken in the location most convenient for Bienvenu.  Ultimately, counsel for Bienvenu indicated and agreed that he would contact his client so that the parties could schedule the balance (less than 2 hours) of her deposition at a location and time most convenient for her.

Counsel for ACI confirmed this exchange on July 7, 2008, and by responsive e-mail counsel for Bienvenu confirmed that his office had "tried various forms of communication to no avail as yet," noting that Bienvenu's unavailability could be related to the long holiday weekend. (The e-mail exchange is annexed hereto as Ex. B.)  It is of course noteworthy that Bienvenu's counsel did not object to ACI's counsel's characterization of the discussion on July 3.

Following this exchange, ACI's counsel heard nothing further from Bienvenu's counsel on this subject.  On the evening of July 9, 2008, at 8:29 p.m., having heard nothing and as required by Local Civil Rule 7(m), ACI's counsel sent an earlier draft of this application to counsel for Bienvenu to confirm that they would consent to the motion to extend the time for discovery to complete the Bienvenu deposition.  Counsel did not have the courtesy to respond in any fashion.  (A true copy of the transmittal e-mail is annexed as Ex. C.)

However, at approximately 2:30 p.m. on July 10, 2008, counsel for ACI received a letter, dated *Monday*, July 7, 2008 and delivered solely by first class mail, from counsel for Bienvenu

which suggests that, after the telephone call and e-mail exchange of July 3 and July 7, respectively, counsel for Bienvenu had a "change of heart" and had reneged on the commitment he had made to continue the deposition.  (A true copy of that letter is annexed hereto as Ex. D.) Counsel provided no explanation as to why that "change of heart" had not been promptly communicated to counsel for ACI.  (This is an especially egregious failure in view of the fact that Washington, D.C. counsel to Bienvenu spent most of *Tuesday* of this week examining (and sometimes berating) ACI's general counsel, Mr. Dougal, while she knew of but failed to communicate this changed position, and that New York counsel to Bienvenu knew that ACI's counsel was waiting for his response on the date that he had promised to obtain.  This is simply not acceptable conduct.)

With the discovery deadline set to expire tomorrow, July 11, 2008, ACI hastens to advise the Court of this remaining discovery, of its need to enlarge the discovery period for the limited purpose of accommodating taking the balance of Bienvenu's deposition, and of the reasons for the failure to complete the deposition during its first day.  While the foregoing does not necessarily suggest that Bienvenu and her counsel will be cooperative in promptly scheduling the balance of the deposition, ACI does not believe that a limited and short extension to July 31, 2008, will or should require the rescheduling of the status conference scheduled for July 24, 2008.

II.     Standard of Law

Rule 16(b) of the Federal Rules of Civil Procedure and Local Rule 16.4(a) both provide that the discovery deadlines of a scheduling order may be modified at any time "upon a showing of good cause."  *Myrdal v. District of Columbia*, Civil  Action No. 05-02351 (RCL), 2007 WL

1655875, at *2 (D.D.C. June 7, 2007) (Lamberth, J.), citing Fed.R.Civ.P. 16(b); LCvR 16.4(a). The primary consideration of the "good cause" standard is the diligence of the party or parties seeking the amendment. *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, Civil Action No. 05-2115 (CKK), 2007 WL 1589495, at *6 (D.D.C. June 1, 2007) (Kollar-Kotelly, J.)(quotations and citations omitted). A scheduling order may be modified if, as here, "it cannot reasonably be met despite the diligence of the party seeking the extension." *Id*.

Pursuant to Rule 30(d)(1) the Federal Rules of Civil Procedure, a deposition is limited to 7 hours. Under the rule, the "court must allow additional time consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination." This is especially true where, as here, an examiner's questioning has been frustrated or delayed by a witness or opposing counsel. *See* Fed. R. Civ. P. 30(d) note (1993) ("Depositions frequently have been unduly prolonged, if not unfairly frustrated, by lengthy objections and colloquy, often suggesting how the deponent should respond").[1]

This Court has considerable discretion in managing discovery and in determining motions to compel, and its decision to permit or deny discovery is reviewable only for an abuse of discretion. *See Food Lion, Inc. v. United Food & Comm'l Workers Int'l Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997) (citing *Brune v. Internal Revenue Service*, 861 F.2d 1284, 1288 (D.C. Cir. 1988)). With respect to a discovery dispute such as this, two guiding principles

---

[1] It should be noted that Mr. Benowitz's letter of July 7, 2008 (Ex. D) inaccurately and unfairly characterizes the duration of the deposition because it does not account for reasonable breaks. *See* Fed. R. Civ. P. 30(d) note (2000) (noting that the 7-hour time limit "contemplates that there will be reasonable breaks during the day for lunch and other reasons, and that the only time to be counted is the time occupied by the actual deposition").

should be noted: "first, courts construe the scope of discovery liberally to ensure that litigation proceeds with "'the fullest possible knowledge of the issues and facts before trial,'" *Moore v. Hartman*, 241 F.R.D. 59, 63 (D.D.C. 2007) (citing *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S. Ct. 385, 91 L. Ed. 451 (1947)); "second, courts should balance the need for discovery against the burden imposed" on the producing party. *Id.* (citing *Katz v. Batavia Marine & Sporting Supplies, Inc.*, 984 F.2d 422, 424 (Fed. Cir. 1993)).

As set forth above, ACI was unable to finish the deposition of Defendant/Counter-Plaintiff Bienvenu in New York in one business day. While the deponent was made available for that one day, her resistance to examination – repeatedly, for example, feigning lack of comprehension of common terms – and her evasive responses to questions slowed the pace of examination substantially, and counsel was unable to complete questioning critical to the case. The conduct of defending counsel in repeatedly making speaking objections impeded the examination all the more.

As a party to this action, Bienvenu's knowledge is obviously of the utmost importance to her adversary, and knowing what she will testify to as well as fixing her testimony on matters central to the case is obviously critical. Moreover, permitting ACI's counsel the less than two hours needed to complete her deposition, at a time and place of her choosing – an accommodation to which her counsel has already agreed, before he reneged on his agreement – poses minimal burden on Bienvenu. Balancing these factors, and considering that the full allotment of time to depose Bienvenu was never exhausted, the Court should compel this limited discovery.

Finally, ACI has acted with diligence and with dispatch in bringing this matter before the Court.

As noted above, in accordance with Local Civil Rule 7(m), ACI and its counsel have made the required effort to ascertain whether Bienvenu would oppose this application, but to no avail. ACI therefore assumes the motion is opposed.

III.    <u>Conclusion</u>

For the foregoing reasons, ACI respectfully requests that the instant motion be in all respects granted.

Dated: July 10, 2008

                     Respectfully submitted,

                     KATTEN MUCHIN ROSENMAN LLP

By:    /s/ John Rosans
        Ugo Colella (D.C. Bar No. 473348)
        1025 Thomas Jefferson Street, NW
        East Lobby, Suite 700
        Washington, D.C. 20007
        Phone: (202) 625-3755
        Fax: (202) 295-1174

        John Rosans (D.C. Bar No. 474180)
        1025 Thomas Jefferson Street, NW
        East Lobby, Suite 700
        Washington, D.C. 20007
        Phone: (202) 625-3639
        Fax: (202) 339-8267

Of Counsel:

Martin E. Karlinsky, Esq.
(D.C. Bar No. 447859)
KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, NY 10022-2585
Phone: (212) 940-8800

*Counsel for Plaintiff/Counter-Defendant*
*America's Choice, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 10, 2008, a copy of the foregoing MOTION TO ENLARGE DISCOVERY PERIOD AND TO COMPEL CONTINUED DEPOSITION was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

<u>      /s/                </u>
John A. Rosans

# Exhibit A

# In The Matter Of:

*CECIL HARRIS v.*
*AMERICA'S CHOICE, INC., et al.*

---

## SANDRA BIENVENU
*June 25, 2008*

---

# *MERRILL LEGAL SOLUTIONS*

*25 West 45th Street – Suite 900*
*New York, NY 10036*
PH: 212-557-7400 / FAX: 212-692-9171

BIENVENU, SANDRA - Vol. 1

Page 1

SANDRA BIENVENU

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

------------------------------x

CECIL HARRIS,

            Plaintiff,


      v.                    No. 07-195-JVP-SCR


AMERICA'S CHOICE, INC.,


            Defendant.

------------------------------x

UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

------------------------------x

AMERICA'S CHOICE, INC.,

            Plaintiff/Counterdefendant,

      v.                    No. 07-CV-00428

SANDRA BUSH-BIENVENU,

            Defendant/Counterplaintiff.

------------------------------x



                        June 25, 2008

                        9:44 a.m.



            Deposition of SANDRA BUSH-BIENVENU,

taken by Plaintiff/Counterdefendant America's Choice,

Inc., at the offices of Katten Muchin Rosenman LLP,

575 Madison Avenue, New York, New York, before Brandon

Rainoff, a Federal Certified Realtime Reporter and

Notary Public of the State of New York.

Page 2

```
              SANDRA BIENVENU
1
2   A P P E A R A N C E S:
3
4   KATTEN MUCHIN ROSENMAN LLP
5   Attorneys for America's Choice, Inc.
6        575 Madison Avenue
7        New York, NY 10022-2585
8   BY:    MARTIN E. KARLINSKY, ESQ.
9
10  RICK STEINER FELL & BENOWITZ, LLP
11  Attorneys for Sandra Bienvenu
12       90 Broad Street, 25th Floor
13       New York, NY 10004
14  BY:    ROBERT J. BENOWITZ, ESQ.
15
16  RHORER LAW FIRM
17  Attorneys for Cecil Harris
18       10566 Airline Highway
19       Baton Rouge, Louisiana 70816
20  BY:    S. BRADLEY RHORER, ESQ.
21
22
23  ALSO PRESENT:
24  JASON S. DOUGAL, ESQ., America's Choice, Inc.
25  ROBERT GIBBS, Videographer
```

Page 3

```
1              SANDRA BIENVENU
2        (Time noted:  9:44 a.m.)
3        THE VIDEOGRAPHER:  Good morning.  This
4   is the video operator speaking, Robert Gibbs of
5   Merrill Legal Solutions, 25 West 45th Street,
6   New York, New York 10036.  Today is June 25 of
7   2008 and the time is 9:44 a.m.
8        We are at the offices of Katten Muchin
9   Rosenman, LLP, 575 Madison Avenue, New York
10  City, New York.  To take the videotape
11  deposition of Ms. Sandra Bienvenu in the matter
12  of Cecil Harris versus America's Choice, Inc.,
13  in the United States District Court, Middle
14  District of Louisiana, Civil Action
15  07-195-JVP-SCR; caption two, America's Choice
16  Incorporated versus Sandra Bush-Bienvenu in the
17  United States District Court for the District of
18  Columbia, Case No. 07-CV-00428.
19       Will counsel please introduce
20  themselves for the record.
21       MR. KARLINSKY:  Martin Karlinsky of
22  Katten Muchin Rosenman LLP on behalf of
23  America's Choice, Inc., in both cases.  To my
24  right is Jason S. Dougal, general counsel of
25  America's Choice, Inc.
```

Page 4

```
1              SANDRA BIENVENU
2        MR. BENOWITZ:  Robert Benowitz, Rick
3   Steiner Fell & Benowitz on behalf of the witness
4   and defendant in this action.
5        MR. RHORER:  Brad Rhorer, counsel for
6   Cecil Harris in the Louisiana case.
7        THE VIDEOGRAPHER:  Will the court
8   reporter, Brad Rainoff of Merrill Legal
9   Solutions, please swear the witness.
10  SANDRA BUSH-BIENVENU,
11       having been duly sworn, was examined
12       and testified as follows:
13  EXAMINATION
14  BY MR. KARLINSKY:
15       Q.   Ms. Bienvenu, would you just state
16  your address for the record, please?
17       A.   4721 Seastar Vista, Destin, Florida
18  32541.
19       Q.   Now, Ms. Bienvenu, you and I have been
20  introduced before?
21       A.   Yes, sir.
22       Q.   And you know that I am counsel to
23  America's Choice in the Bienvenu action, the
24  case brought against you and as well the Harris
25  case, do you know it?
```

Page 5

```
1              SANDRA BIENVENU
2        A.   Yes.
3        Q.   You do have an understanding of what
4   that process is today, this deposition process?
5        A.   Yes, sir.
6        Q.   You have attended several depositions
7   in this case or the related Harris case?
8        A.   Yes, sir.
9        Q.   You attend the depositions taken in
10  Little Rock, Arkansas, at the end of May?
11       A.   I did.
12       Q.   And you also attended the deposition
13  of Cecil Harris in New Orleans last week?
14       A.   I did.
15       Q.   And you were also present in my office
16  yesterday during the course of the deposition of
17  Judy Codding, were you not?
18       A.   I was.
19       Q.   You have had a chance to prepare for
20  this deposition?
21       A.   Yes.
22       Q.   I take it you met with counsel in
23  connection with that preparation?
24       A.   Yes.
25       Q.   I take it you also reviewed some
```

Page 6

SANDRA BIENVENU

1  documents in order to prepare?
2  A.  Yes.
3  Q.  Were any of those documents documents
4  other than ones that had been marked as
5  deposition exhibits in these matters?
6  A.  I don't believe so.  I did find some
7  extra documents that were in file folders as I
8  was cleaning out my office and I believe I
9  provided those for my attorney day before
10  yesterday.
11  Q.  Those were the ones that were
12  delivered to me yesterday?
13  A.  Yes, sir.
14  MR. KARLINSKY:  Let me just stop for a
15  second and just talk about some housekeeping.
16  We should probably have the same
17  stipulations we discussed yesterday on the
18  record as well and those relate to the use
19  of this deposition as well as the protocol of
20  marking exhibits and the use of exhibits marked
21  in the Harris action.
22  We've agreed, and I would ask counsel
23  to so stipulate, that all of the exhibits
24  previously marked in the Harris case may be

*(Note: lines renumbered 1–25 as in original)*

Page 8

SANDRA BIENVENU

1  Q.  How about Tommy Harris?
2  A.  I think I did see it, I'm not sure I
3  read --
4  Q.  You are not certain you read it?
5  A.  I'm not sure I read the whole --
6  Q.  With respect to the ones you
7  mentioned, Solinger, Codding, Wozniak, Dougal,
8  Cecil Harris when did you review the transcripts
9  of those depositions?
10  A.  Yesterday afternoon for some of them.
11  I think the John Wozniak, Jason Dougal, I was
12  sent those and I read those at home.
13  Q.  Those depositions were taken in early
14  February if memory serves me right and you
15  provided them at or about that time?
16  A.  I think it was about a month, maybe a
17  month and a half, two months afterwards.
18  Q.  After they were taken?
19  A.  Yes.
20  Q.  So sometime perhaps between the middle
21  of March and the middle of April?
22  A.  In that springtime.
23  Q.  Are you on any medications --
24  MR. BENOWITZ:  Excuse me, can I -- I

Page 7

SANDRA BIENVENU

1  deemed marked in the Bienvenu action?
2  MR. BENOWITZ:  So stipulated.
3  MR. KARLINSKY:  Brad, is that good?
4  MR. RHORER:  Sure.
5  MR. KARLINSKY:  We have also agreed
6  that we'll continue to use the same marking
7  protocol that was used in the Harris action with
8  respect to the exhibit so that exhibits will be
9  sequentially marked today beginning with 107.
10  MR. BENOWITZ:  That's correct.
11  MR. KARLINSKY:  Good?
12  MR. RHORER:  Good, yes.
13  MR. KARLINSKY:  This deposition is
14  actually being taken in both actions and was
15  noticed in both actions, so perhaps we don't
16  even need to stipulate about use, but we can
17  deal with that off the record later.
18  Q.  Ma'am, have you also reviewed
19  deposition testimony given by other witnesses in
20  this case?
21  A.  Yes, sir.
22  Q.  Whose testimony have you reviewed?
23  A.  Nick Solinger, Judy Codding, John
24  Wozniak, Jason Dougal, Cecil Harris.

Page 9

SANDRA BIENVENU

1  would just like to ask her --
2  MR. KARLINSKY:  Sure.
3  (Pause)
4  A.  I probably need to correct myself.  I
5  did review some of the Arkansas depositions,
6  too.
7  Q.  I take it that was yesterday?
8  A.  They may have been sent to me earlier,
9  after, but I was present --
10  Q.  You were present at the depositions
11  and read them as well or reviewed them?
12  A.  Yes, I did.
13  Q.  Ma'am, are you on any medications that
14  affect your memory or your ability to testify?
15  A.  No medications, I'm just getting
16  older.
17  Q.  As we all are.
18  Is there any reason that you can't
19  testify today fully and forthrightly in this
20  matter?
21  A.  I see no reason.
22  Q.  You were sitting through the Harris
23  deposition, Cecil Harris deposition so you heard
24  my rules, but I'm going to give them to you

| | |
|---|---|
| Page 10 | Page 12 |

**Page 10**

SANDRA BIENVENU

1
2  anyway.
3      A.  Please do.
4      Q.  First rule.  I only have two rules
5  which are easy to remember.  First rule, if you
6  answer a question, you will assume that you have
7  understood it, good?
8      A.  Good.
9      Q.  And you agree to that?
10     A.  I agree to that.
11     Q.  Secondly, you must answer questions
12 orally, not by gesturing or saying hm-hmm, got
13 it?
14     A.  I have it.
15     Q.  Is there any document in particular
16 that you reviewed that stands out in your
17 memory?
18     A.  Not any one particular one that would
19 stand out.
20     Q.  Did you meet with anyone other than
21 counsel in anticipation of this deposition?
22     A.  I'm not sure I really know what you
23 are asking.
24     Q.  Well, you met with, I take it, Mr.
25 Benowitz in connection with your preparation for

**Page 12**

SANDRA BIENVENU

1
2  with Cecil Harris?
3      A.  Yes.
4      Q.  On how many occasions, ma'am?
5      A.  Cecil and I are friends.  We probably
6  talk once or twice a week every week.
7      Q.  So would it be fair to say that over
8  the course of the last year and a half since on
9  or about the first week of January of 2007, you
10 and Mr. Harris have spoken maybe a hundred fifty
11 times?
12     A.  I didn't do the math but we have
13 spoken regularly.
14     Q.  Have you spoken about your case and
15 his case regularly?
16     A.  Not specifically.  Generally about the
17 unfairness of what is happening.
18         (Pause)
19     A.  So would you reread the question for
20 me?
21     Q.  The question was, have you spoken
22 about your case and his case regularly?
23     A.  We speak regularly.  We don't always
24 discuss this case.
25     Q.  When was the last time you spoke to

**Page 11**

SANDRA BIENVENU

1
2  this deposition?
3      A.  I did.
4         (Pause)
5      Q.  My question, then, was in addition to
6  Mr. Benowitz to prepare for the deposition, did
7  you meet with anyone else?
8      A.  Raymond Lew was present yesterday.
9  Jay -- Jay Rick was present yesterday.  Janet
10 DeCosta was not present yesterday but she was
11 with me in New Orleans.
12     Q.  And you did some preparation work with
13 her as well?
14     A.  Just talking about the --
15         MR. BENOWITZ:  Just say yes or no.
16     A.  Yes.
17     Q.  And I take it that was talking about
18 the facts of the case?
19     A.  Yes.
20     Q.  Did you have any discussions with
21 Cecil Harris in connection with your preparation
22 for this deposition?
23     A.  Not in preparation for my deposition,
24 no.
25     Q.  You've discussed the case generally

**Page 13**

SANDRA BIENVENU

1
2  Nick Solinger?
3      A.  Within the past couple of months I
4  called to inquire about his wife's pregnancy.
5      Q.  Aside from that subject, did you and
6  he discuss anything related to this case?
7      A.  It might have been mentioned but it
8  wasn't a large part of the conversation.
9      Q.  Since the time you terminated your
10 employment with America's Choice, have you had
11 other discussions with Nick Solinger?
12     A.  Yes.
13     Q.  How many?
14     A.  Maybe three, four.
15     Q.  Were those related to this case?
16     A.  The first couple definitely were.
17     Q.  When were they?
18     A.  I can't be specific, but shortly after
19 I left America's Choice I called Nick and told
20 him that I had left and told him that I was
21 thinking about bringing charges because I felt
22 what they had done was very unfair.
23     Q.  Is that the extent of the conversation
24 you had with him on that occasion?
25     A.  I asked him if he had any remembrance

Page 14

SANDRA BIENVENU

1             SANDRA BIENVENU
2 of the things that he had said to me and if he
3 had any documents that related to that.
4    Q.  Is that all you said to him during the
5 course of that call?
6    A.  I can't be sure that that was
7 everything that I said.
8    Q.  That is the most you remember right
9 now?
10   A.  That's the most that I can recall
11 right now.
12   Q.  Did he tell you -- did he say anything
13 in response to what you asked him?
14   A.  Yes.
15   Q.  With respect specifically to any
16 recollection that he had of matters that he had
17 discussed with you, what did he say?
18   A.  He reiterated what he had told me when
19 we were discussing my employment to begin with
20 before I was ever employed.  He talked about you
21 achieve quota credit when contracts are signed
22 and you get paid when the company gets paid, and
23 that's what I remembered, that's what I had been
24 operating under and that's what Nick confirmed.
25 And he says it more eloquently than I do.

Page 15

SANDRA BIENVENU

1             SANDRA BIENVENU
2   Q.  Do you recall the specific words he
3 used when he told you about the achievement of
4 quota credit?
5   A.  You accrue quota credit and
6 commissions earned on signing of contracts.  You
7 are not paid until the company is paid.
8   Q.  What particular contracts--
9   A.  That's the gist of it.
10   Q.  I'm sorry, I didn't hear the end of
11 that.
12   A.  That is the gist of it.
13   Q.  Okay.  What specific contracts did he
14 mention to you on the occasion that you talked
15 about this with him in early 2007?
16   A.  Well, I was specifically talking about
17 the Arkansas contract.
18   Q.  Did you ask him about the Arkansas
19 contract?
20   A.  No, because he was gone by then.
21   Q.  So you had a conversation in early
22 2007, January of 2007?
23   A.  Yes, sir.
24   Q.  You didn't ask him specifically about
25 the Arkansas contract because the Arkansas

Page 16

SANDRA BIENVENU

1             SANDRA BIENVENU
2 contract came after the time Mr. Solinger had
3 left the company?
4   A.  Yes.
5   Q.  Was it your understanding that when he
6 said to you that you achieved quota credit based
7 on the signing of a contract, he was referring
8 to contracts other than the Arkansas contract?
9     MR. BENOWITZ:  Objection, I don't
10 think she said that.
11   A.  Any contract.
12   Q.  In other words, he didn't make it
13 specific to Arkansas?
14     MR. BENOWITZ:  Excuse me, do you
15 understand what conversation he is referring to?
16 I'm not sure.
17     MR. KARLINSKY:  Mr. Benowitz, if you
18 have an objection please place it on the record.
19 Place your objection on the record, please.  To
20 start giving a speech about what she understands
21 or what you understand is not an objection.  If
22 you have an objection, state it, please.
23     MR. BENOWITZ:  I object.  Why don't
24 you rephrase the question so she knows what time
25 period you are referring to so you are not

Page 17

SANDRA BIENVENU

1             SANDRA BIENVENU
2 trying to trick the witness.
3     MR. KARLINSKY:  I'm not trying to
4 trick the witness.
5   Q.  We are talking about the conversation
6 that you and Mr. Solinger had in January of
7 2007.  You are clear on that, aren't you?
8   A.  After I quit --
9   Q.  After you quit America's Choice.
10   A.  Yes.
11   Q.  That's what we are talking about.
12   A.  Yes, I am clear.
13   Q.  And my question to you was, was it
14 your understanding that Mr. Solinger was talking
15 about the Arkansas contract when he explained to
16 you what his view of quota credit was?
17     MR. RHORER:  Object to the form.
18   A.  I asked Nick what he had told me when
19 I was being hired for America's Choice, and he
20 gave me the statement.  Later in the
21 conversation I told him why I was upset and that
22 it was over mainly the Arkansas contract, but
23 there were others.
24   Q.  Ms. Bienvenu, just to be clear about
25 this, when you called Mr. Solinger in January of

Page 18

SANDRA BIENVENU

1
2 2007, you were no longer employed by the
3 company, correct?  By America's Choice?
4     A.   Correct.
5     Q.   And he was no longer employed by
6 America's Choice?
7     A.   Correct.
8     Q.   In fact, Mr. Solinger had left the
9 employ of America's Choice over a year before
10 that time?
11     MR. BENOWITZ:  Is that a question or a
12 statement?
13     A.   I think Mr. Solinger left in December
14 of 2005.
15     Q.   So it would have been over a year
16 before the time of --
17     A.   Yes, sir.
18     Q.   -- the call that you are describing?
19     Now, is there anything else that you
20 recall of that particular conversation with
21 Solinger in January of 2007?
22     A.   We talked about a lot of things, what
23 he was doing, talked about his son, talked about
24 my grandchild.
25     Q.   Anything else on the subject of

Page 19

SANDRA BIENVENU

1
2 America's Choice?
3     A.   The conversation of the unfairness,
4 why I quit, and what he had told me when he
5 hired me and what he told me up until the day he
6 left.
7     Q.   You stated the conversation of the
8 unfairness.  What do you mean by that?
9     A.   That I worked very hard for America's
10 Choice, I did what my employment required.
11     Q.   Let me stop for a second and interrupt
12 you.  What I really meant to ask you was you
13 said the conversation of the unfairness.
14     What did you say to him and what did
15 he say to you in that regard?
16     A.   I don't recall exact words.
17     Q.   Substance?
18     A.   I can tell you the substance of the
19 conversation.
20     Q.   Please do.
21     A.   I was very upset that America's Choice
22 had not paid me commissions on contracts that
23 were executed during my employment, and I
24 thought it was extremely unfair that I did a
25 great job for them and they did not respect that

Page 20

SANDRA BIENVENU

1
2 or honor that by paying what they should have
3 paid.
4     Q.   Do you recall when this conversation
5 was with any specificity other than the fact
6 that it was in January of 2007?
7     A.   I know it was after I left.
8     Q.   How soon after you left, ma'am?
9     Actually, let me ask you a more
10 specific question, perhaps it will assist you.
11     Your resignation was effective January
12 20 of 2007, would you agree with that?
13     A.   It was in the mid-January time.  I
14 think I wrote it on the 15th, 16th, 17th,
15 somewhere around there.
16     Q.   Whenever you wrote it, I believe you
17 made your resignation effective on January 20?
18     A.   I don't remember the exact date but it
19 was definitely in the middle of January.
20     Q.   With respect to the date of the
21 effectiveness of your resignation, about how
22 long after that was your call with Mr. Solinger
23 that you are talking about?
24     A.   I don't recall the exact time.
25     Q.   Do you know if it was within a week?

Page 21

SANDRA BIENVENU

1
2     A.   I don't recall the exact time.
3     Q.   Two weeks?
4     A.   I do not recall.
5     MR. BENOWITZ:  I think she has
6 answered your question.
7     Q.   Three weeks?
8     MR. BENOWITZ:  Objection.  She has
9 answered your question.  How many more times can
10 you ask her?
11     A.   I don't recall.
12     Q.   Do you know if it was within a
13 month of the time you quit?
14     A.   I do not recall.
15     Q.   You told me before that the
16 conversation was in January of 2007.  I'm trying
17 to ask you when.
18     A.   I believe it was --
19     MR. BENOWITZ:  Excuse me, objection.
20 You have asked this question five times.  Excuse
21 me, I am allowed to make my objection, am I not,
22 Mr. Karlinsky?
23     MR. KARLINSKY:  Mr. Benowitz, that's
24 not an objection, that's a speech.  If you have
25 an objection, make it.

Page 22

SANDRA BIENVENU

1    SANDRA BIENVENU
2    MR. BENOWITZ: You are asking the same
3  question five times. She has answered your
4  question five times. You want to continue
5  asking the same question, go ahead. You are
6  going to get the same answer.
7  BY MR. KARLINSKY:
8    Q.  Do you know about how long after the
9  effective date of your resignation your call
10  with Mr. Solinger was?
11    A.  It was sometime after I quit the
12  company in January. I do not recall the exact
13  date.
14    Q.  Do you believe it was within a month
15  of the time you quit?
16    A.  I do not know when I made the call.
17    Q.  You have phone records?
18    A.  Probably.
19    Q.  From where did you make this telephone
20  call to Mr. Solinger?
21    A.  I was at my home, but I don't remember
22  if I used my home phone or my cellphone.
23    Q.  Could you give me your home phone
24  number and your cellphone number, please, at
25  that time?

Page 23

SANDRA BIENVENU

1    SANDRA BIENVENU
2    A.  850-269-0200.
3    Q.  That's the home phone?
4    And the cellphone?
5    A.  890-217-2887.
6    Q.  What are your respective service
7  providers?
8    A.  At that time I think my home phone was
9  with Embarq or Sprint, E-M-B-A-R-Q, or Sprint.
10  I'm really not positive.
11    Q.  How about your cellphone?
12    A.  Cellphone has always been with
13  Cingular, which is now AT&T.
14    Q.  You also told me before in answer to
15  my question about the substance of the
16  conversation relating to America's Choice that
17  you discussed with Mr. Solinger why you had
18  quit.
19    Could you explain to me what was
20  discussed in that regard?
21    A.  I told him that I quit America's
22  Choice because they didn't pay me the
23  commissions that I had earned. It was very
24  unfair and I no longer could work for a company
25  that I did not trust.

Page 24

SANDRA BIENVENU

1    SANDRA BIENVENU
2    Q.  Did he respond to you in any way?
3    A.  I'm sure he did.
4    Q.  Tell me about that.
5    A.  I don't remember his exact response.
6    Q.  What was the substance of his
7  response?
8    A.  I understand, I don't blame you.
9    Q.  Anything else you can recall?
10    A.  I couldn't work for a company that I
11  didn't trust.
12    Q.  Did you ask Mr. Solinger to provide
13  any documents to you, Ms. Bienvenu?
14    A.  I believe in subsequent conversations
15  I did. I don't recall that it was that first
16  conversation.
17    Q.  How many conversations have you had
18  from the conversation you have just related in
19  January of 2007 to the present time with Mr.
20  Solinger in which you and he or either of you
21  discussed the question of America's Choice or
22  any matter related to this case?
23    A.  I probably have not had more than
24  three to five conversations with Nick since he
25  left.

Page 25

SANDRA BIENVENU

1    SANDRA BIENVENU
2    Q.  My question to you was conversations
3  with Mr. Solinger that relate to the issues in
4  this litigation, do you understand that?
5    A.  I do.
6    Q.  Is that your answer, that you had
7  something like three to five conversations with
8  Mr. Solinger since he left the company in
9  connection with this litigation?
10    A.  I had three to five conversations with
11  Mr. Solinger, and I had not finished my
12  response.
13    Q.  I'm sorry, go ahead.
14    A.  I probably mentioned America's Choice
15  in at least three of those five.
16    Q.  Can you tell me when those were?
17    A.  Absolutely not. I have no idea.
18    Q.  They were sometime between January of
19  2007 and the present date?
20    A.  Yes.
21    Q.  When was the last conversation you had
22  with Mr. Solinger?
23    A.  Within the past two to three months.
24  That was to inquire about his wife's pregnancy
25  which was a very difficult one.

8 (Pages 26 to 29)

| Page 26 |
| --- |

SANDRA BIENVENU

1
2    Q.   Let's leave that on the side.  I want
3  to just stay with the conversations about
4  America's Choice and the issues related to this
5  litigation.
6          Can you tell me when the last
7  conversation you had with him on those subjects
8  was?
9    A.   Not specifically.  It's been months.
10   Q.   To the extent -- it's been months
11  since now, since the present time?
12   A.   Yes, sir.
13   Q.   In the three conversations --
14  actually, let me just see if we can get a little
15  bit more clarity on the first of the
16  conversations.  Then we'll go on to what else
17  you can recall.
18          Yes.  So you had told me in your
19  answer before, I had asked you anything else on
20  the subject of America's Choice, and what you
21  answered was the conversation of the unfairness,
22  why I quit, and what he had told me when he
23  hired me and what he told me up until the day he
24  left.
25          Is there anything else specifically

| Page 27 |
| --- |

SANDRA BIENVENU

1
2  that you recall him saying in that conversation
3  related to any of those matters?
4    A.   Not specifically, but we were
5  discussing all of the conversations that we had
6  had during the recruiting process when I was
7  being recruited by America's Choice.
8    Q.   Is there anything about that subject
9  that you now recall?
10   A.   Not specifically.
11   Q.   How about generally?
12   A.   Well, generally we talked about the
13  benefit package, we talked about --
14   Q.   No, you and I are not on the same
15  page.  I don't want to go back to the
16  conversations at the time of your recruitment
17  because we will talk about that separately.  I
18  just want to talk about what you can now recall
19  of the discussion that you had with Solinger at
20  or about the time that you resigned your
21  employment with America's Choice.
22          So my question to you is, is there
23  anything else that you recall about that
24  discussion that you have not yet told me?
25   A.   That's what I was trying to tell you.

| Page 28 |
| --- |

SANDRA BIENVENU

1
2  We discussed the benefit package because one of
3  my questions to Mr. Solinger was if he recalled
4  telling me that there were cost of living raises
5  that were included in the benefit package.
6          So I was asking him to reconfirm the
7  things that he had told me when he hired me, and
8  it was mostly about why I quit.  And I asked him
9  why he quit.
10   Q.   Let's stay with the first subject
11  matter you just mentioned.  On the subject of
12  the benefits packages and cost of living raise,
13  what did you say and what did he say?
14   A.   I asked about the cost of living
15  raise, if it was supposed to be included because
16  it was part of the benefit package that I
17  signed, and then later Judy Codding announced to
18  the whole company that everyone would get cost
19  of living raises but not the salespeople because
20  the salespeople were getting other compensation.
21          So my question to Mr. Solinger was,
22  did he remember that that was supposed to be
23  part of the package.
24   Q.   And what did he respond if anything?
25   A.   He didn't remember the full benefit

| Page 29 |
| --- |

SANDRA BIENVENU

1
2  package.
3    Q.   Are you seeking recovery of any
4  additional salary which would have been derived
5  as a result of a cost of living increase in this
6  litigation?
7    A.   No, I was curious.
8    Q.   What did Mr. Solinger say about why he
9  quit America's Choice?
10   A.   I believe he told me that the travel
11  had become too much away from his family, that
12  when he started he understood there was going to
13  be an office in LA and he just could not commute
14  back and forth to DC any more.
15   Q.   Anything else on that subject?
16   A.   On which subject?
17   Q.   On the subject of Mr. Solinger's
18  resignation from America's Choice?
19   A.   Not that I recall.
20   Q.   Anything else that you can recall
21  about that discussion with him now?
22   A.   I told you to the best of my knowledge
23  all that I can recall.
24   Q.   With respect to the two other
25  conversations that you mentioned having with Mr.

Page 30

SANDRA BIENVENU

1    SANDRA BIENVENU
2    Solinger in which America's Choice was discussed
3    or any subject related to this litigation was
4    discussed, what can you tell me about those
5    discussions?
6        A.    I called him and asked him if -- I
7    asked him if he would provide me with any
8    documentation that he had and I believe I asked
9    him if he would talk to my attorney.
10       Q.    Did he respond?
11       A.    He did.
12       Q.    What did he say?
13       A.    He would be happy to look for
14   documents and he would talk to my attorney.
15       Q.    Did you do something as a result of
16   that discussion with him?
17       A.    I'm not sure I understand what you are
18   asking.
19       Q.    For example, did you put your counsel
20   in touch with him?
21       A.    I did call my counsel and give him
22   Nick's phone number, yes.
23       Q.    Do you know if your counsel contacted
24   Mr. Solinger?
25       A.    I know that he tried and I think they

Page 31

SANDRA BIENVENU

1    SANDRA BIENVENU
2    did eventually connect.  I'm not sure.
3        Q.    Is it your understanding that your
4    counsel discussed -- had a discussion with Mr.
5    Solinger?
6        A.    I believe they did talk, I'm not sure.
7        Q.    Which counsel did you put in touch
8    with Mr. Solinger?
9        A.    Mr. Benowitz.
10       Q.    Did Mr. Solinger also provide
11   documents following that discussion you had with
12   him?
13       A.    Yes, he did.
14       Q.    And he provided those directly to you?
15       A.    I don't remember if he sent them to me
16   or to my counsel.
17       Q.    Have you produced them in connection
18   with this litigation?
19       A.    Yes, sir.
20       Q.    Is there anything else you recall
21   about this particular telephone discussion with
22   Mr. Solinger?
23       A.    No, sir.
24       Q.    So aside from what you told me, there
25   was no substantive discussion?

Page 32

SANDRA BIENVENU

1    SANDRA BIENVENU
2        A.    I don't believe so.  To the best of my
3    knowledge Mr. Solinger was in a meeting and I
4    called it and it had to be short and sweet.
5        Q.    That's two conversations you have now
6    told us about.  There was a third?
7        A.    I believe.
8        Q.    What can you tell me about that one?
9        A.    I can't tell you anything because I
10   don't remember it.
11       Q.    Don't have a recollection of it?
12       A.    No.
13       Q.    Aside from speaking to Mr. Solinger,
14   have you had any communications with other
15   employees of America's Choice whether current or
16   former since the time you left?
17       A.    Yes.
18       Q.    Who?
19       A.    Lewie Hartley, Gerry Miller,
20   Washington Cole, James Williams, Shou-Shou
21   Pohill -- her name is Loretta Pohill -- Lynn
22   Barbour, Jason Dougal, Marc Tucker -- not Marc,
23   Josh Tucker, Judy Codding, Cindy Fielder, John
24   Fryer.
25           What is Larry's last name?

Page 33

SANDRA BIENVENU

1    SANDRA BIENVENU
2        MR. DOUGAL:  Molinaro?
3        A.    Larry Molinaro.  Oh, my goodness, I
4    just lost her name.  Down in Texas.
5        MR. DOUGAL:  Lewis?
6        A.    No.
7        MR. DOUGAL:  Oh, Sally Hampton?
8        A.    Sally Hampton.  Sorry.
9           To the best of my knowledge, those are
10   the only people.
11       Q.    With respect to the 13 names you have
12   mentioned, did you have a discussion with any of
13   them that was in any way related to this
14   litigation?
15       A.    Oh, did I mention Eric Hoagland?
16       Q.    No.
17       A.    Sorry.
18       Q.    That's 14.  You have my question in
19   mind?
20       A.    Pardon?
21       Q.    Do you have my question in mind?
22       A.    I do.
23       Q.    Okay.
24       A.    Eric and I have talked extensively
25   about our experience with America's Choice.  I

Page 34

SANDRA BIENVENU

1   SANDRA BIENVENU
2   didn't put Cecil Harris on this list although I
3   did tell you formerly that Cecil and I have
4   talked often. Most of those people I ran into
5   at conferences or meetings of some sort and the
6   conversation was more we miss you, we wish you
7   were back, I miss you all, that sort of thing.
8       My conversations with Eric Hoagland,
9   we discussed America's Choice. I don't recall
10  specific information that was shared between me
11  and any of the rest of them.
12      Q.   Related to this litigation?
13      A.   Related to this, no.
14      Q.   So Hoagland you did have discussions
15  with related to matters -- strike that --
16  relating to matters -- you had specific
17  discussions with Mr. Hoagland relating to the
18  subject matter of this litigation?
19      A.   Related to the subject matter, yes,
20  sir.
21      Q.   And also with Mr. Harris, Cecil
22  Harris?
23      A.   Yes, sir.
24      Q.   Aside from them, with none of the rest
25  of the people you have identified?

Page 35

SANDRA BIENVENU

1   SANDRA BIENVENU
2       A.   I don't recall any discussions about
3   the litigation. Excuse me, did I put Jason's
4   name on there?
5       Q.   Yes.
6       A.   Okay.
7       Q.   Ms. Bienvenu, I'm just going to read a
8   list of names to you. You have already talked
9   about a lot of these people but I just want to
10  make sure we are all on the same page here. If
11  you don't know who any of these people are,
12  please tell me so.
13      A.   Okay.
14      Q.   Because we'll be mentioning these
15  names probably in the course of the deposition
16  today.
17      A.   Nick Solinger, Cecil Harris, Tommy
18  Harris, John Wozniak, Marietta Palmer, Judy
19  Codding, Judy Aronson, Jason Dougal, Wade Davis,
20  Eric Hoagland, Sam Esparza, Loretta Polhill,
21  Patricia Harvey, Marty Monroe, people related to
22  or employed by the Arkansas Department of
23  Education, Becky Dalton, Estelle Mathis, Dr.
24  Diana Julian, Dr. Bobby Davis, Jannine Riggs,
25  Kenneth James.

Page 36

SANDRA BIENVENU

1   SANDRA BIENVENU
2       Q.   You know all those people?
3       A.   I know who they are, yes, sir.
4       Q.   And common abbreviations that we may
5   be using in the course of this deposition so
6   that, again, we are on the same page, ACI is
7   America's Choice, of course?
8       A.   Yes.
9       Q.   And ACI School Design, ACI SD, you
10  understand what that means and what that refers
11  to?
12      A.   ACI School Design?
13      Q.   Yes.
14      A.   Yes.
15      Q.   And NCEE you are familiar with that
16  abbreviation?
17      A.   Yes, sir.
18      Q.   Also --
19           MR. DOUGAL:  We usually say ACSD?
20      A.   Sorry.
21      Q.   ACSD is what I meant to say.
22      A.   Yes, sir.
23      Q.   And NISL, you are familiar with that?
24      A.   I'm not sure what it stands for but I
25  do know what NISL -- the organization, yes.

Page 37

SANDRA BIENVENU

1   SANDRA BIENVENU
2       Q.   And frequently we have talked about
3   business development directors, that was your
4   actual title at America's Choice, was it not?
5       A.   Yes, it was.
6       Q.   And if I say a BDD, you'll understand
7   that?
8       A.   I will.
9       Q.   And the people that reported to you
10  were business development managers, true?
11      A.   Yes.
12      Q.   And we sometimes call them BDMs?
13      A.   Yes.
14      Q.   Arkansas Department of Education we
15  frequently refer to as ADE?
16      A.   Yes.
17      Q.   And finally CPD, you understand what
18  that is?
19      A.   Continuing professional development,
20  yes, sir.
21      Q.   You understand what a fiscal year is,
22  do you not?
23      A.   I do.
24      Q.   What was or what is for that matter
25  America's Choice's fiscal year?

Page 38

SANDRA BIENVENU

1     SANDRA BIENVENU
2        MR. BENOWITZ:  Objection.
3        A.    I believe that America's Choice's
4     fiscal year was from June 1st through -- July
5     1st through June 30.
6        Q.    Have you been involved, Ms. Bienvenu,
7     in any prior litigation involving employment?
8        A.    Are you asking me if I have brought
9     charges or someone has brought charges against
10    me about employment?
11       Q.    Both questions.  Have any involvement
12    whatsoever in prior litigation involving
13    employment?
14       A.    No, sir.
15       Q.    So you haven't sued an employer at any
16    time in the past?
17       A.    Never.
18       Q.    And you have never had any involvement
19    as a witness or a subject in any litigation?
20       A.    Not as it related to my employment,
21    no, sir.
22       Q.    Have you been involved in litigation
23    generally?
24       A.    Yes.
25       Q.    What was that?

Page 39

SANDRA BIENVENU

1     SANDRA BIENVENU
2        A.    It was SEC versus Kenney.
3        Q.    Kenney, K-E-N-N-E-Y?
4        A.    I think that's how it is spelled.
5        Q.    What was your involvement in
6     connection with that matter?
7        A.    I was a witness.
8        Q.    Did you testify in a deposition or
9     trial?
10       A.    In a deposition.
11       Q.    Kenney was the name of an individual?
12       A.    Martin Kenney.
13       Q.    K-E-N-N-E-Y?
14       A.    It is either K-E-N-N-Y or K-E-N-N-E-Y
15    and I don't know which way.
16       Q.    Was Mr. Kenney affiliated with some
17    company?
18       A.    Mr. Kenney was the CEO of Compass
19    Learning.
20       Q.    Were you an employ of Compass
21    Learning?
22       A.    Yes, I was.
23       Q.    What was your position there?
24          MR. BENOWITZ:  I would just like, I
25    think, to make a correction for the record.  I

Page 40

SANDRA BIENVENU

1     SANDRA BIENVENU
2     think Mr. Kenney was a CEO of a company called
3     WRC Media, Inc.
4          MR. KARLINSKY:  WRC Media, Inc.?
5          MR. BENOWITZ:  Right, of which Compass
6     Learning was a subsidiary.
7     BY MR. KARLINSKY:
8        Q.    What was your position with Compass
9     Learning?
10       A.    Area vice-president for sales.
11       Q.    Were you represented by counsel in
12    connection with the testimony you gave in that
13    case?
14       A.    Yes.
15       Q.    Who was your counsel?
16       A.    Mr. Benowitz.
17       Q.    Same individual that represents you in
18    this matter?
19       A.    Yes, sir.
20       Q.    How many occasions did you testify in
21    that case?
22       A.    I had one videotaped deposition and
23    two other meetings with the SEC.
24       Q.    Was testimony taken at the other
25    meetings?

Page 41

SANDRA BIENVENU

1     SANDRA BIENVENU
2        A.    I believe so.
3        Q.    Can you tell me when the testimony
4     was?
5        A.    I can tell you generally it was
6     2005-2006, somewhere in that range.
7        Q.    What was the nature of your
8     involvement in that matter?
9        A.    I was the area vice-president for
10    sales for a certain region.  There was a sale
11    that was made in my region that Mr. Kenney was
12    involved in so I was asked questions about it.
13       Q.    What was the sale in your region, how
14    would you identify it?
15       A.    In December, I think it was 2002, it
16    was the end of the year.  Pushed to get business
17    in, superintendent signed an order agreement
18    that was pending school board approval and so it
19    should not have been counted in that year's
20    business but I believe it was, and through
21    financial reporting or whatever it is that it
22    was not supposed to be reported as income and it
23    was and it was never taken off the books even
24    though the board had never approved it.  And so
25    that was the issue.

Page 42

SANDRA BIENVENU

1
2    Q.   What was the order for?
3    A.   For Compass Learning's integrated
4  learning system.
5    Q.   What was that composed of?
6    A.   Professional development, software,
7  installation. I believe it was training of
8  teachers, professional development of district
9  staff, technology installation and software. I
10  believe that was all.
11    Q.   At Compass Learning did you receive
12  credit for that particular sale?
13    A.   I did.
14    Q.   Was that later paid or reversed or
15  what happened with it?
16    A.   I received credit for it. I was paid
17  a commission, and once we realized that it
18  wasn't supposed to be, I paid the commission
19  back.
20    Q.   Ms. Bienvenu, would you give me your
21  educational background, please?
22    A.   I have a Bachelor of Science from the
23  University of Tennessee in elementary education
24  with a minor in mathematics. I have a master's
25  from Georgia State University.

Page 43

SANDRA BIENVENU

1
2    Q.   An MS degree or an MA degree?
3    A.   Hadn't thought about it. I believe it
4  was an MS.
5    Q.   What was that in?
6    A.   Reading diagnosis and correction with
7  a minor in something and I swear I don't
8  remember.
9    Q.   When did you receive your two degrees?
10    A.   You really do want to know my age,
11  don't you.
12    Q.   Give me the decade.
13    A.   I graduated from University of
14  Tennessee in June of 1970, I believe, and I
15  graduated from Georgia State University for the
16  Master's in 1972.
17    Q.   If it makes you feel any better, we
18  are in the same decade.
19    A.   It doesn't.
20    Q.   Nor me.
21    A.   I wanted to be in Jason Dougal's
22  decade.
23    Q.   I'm with you.
24        What did you do after completing your
25  education?

Page 44

SANDRA BIENVENU

1
2    A.   After which education?
3    Q.   Well, did you have a job, a regular --
4  did you have any regular employment after you
5  received your undergraduate degree?
6    A.   Yes.
7    Q.   Where was that?
8    A.   The summer after I graduated I worked
9  at a savings and loan in Atlanta, Georgia, and
10  then began my teaching career in Atlanta public
11  schools in August 1970.
12    Q.   And you taught in the Atlanta,
13  Georgia, public education system?
14    A.   I did.
15    Q.   For how long a period of time?
16    A.   I don't remember the exact number of
17  years.
18    Q.   Generally?
19    A.   Somewhere in five, six, in that range.
20    Q.   Did you return to school to obtain
21  your Master's after that period?
22    A.   No, I actually returned to school to
23  get my Master's while I was working.
24    Q.   After you -- I take it that at some
25  point you left the Georgia -- the Atlanta,

Page 45

SANDRA BIENVENU

1
2  Georgia, public school system?
3    A.   I did.
4    Q.   What did you do next?
5    A.   So where did I go from there? I left
6  Georgia and moved to Baton Rouge, Louisiana, and
7  taught in Baton Rouge, but I believe I was at a
8  private school then. I would have to go back
9  and look, but I think I was at a private school
10  then.
11    Q.   When was that, sometime in the late
12  seventies?
13    A.   Sometime in the late seventies. And I
14  had one child who was a couple months old when I
15  went back to teaching in Baton Rouge. Then we
16  moved to Waco, Texas, and I did not work. We
17  moved from Waco, Texas, to Bloomington,
18  Illinois, and I did not work. Moved from
19  Bloomington to Cincinnati, I did not work. I
20  had two kids by this time.
21    Q.   So you were working if you had two
22  kids.
23    A.   I was working but I was not getting
24  paid, let me put it this way.
25    Q.   Right.

Page 46

SANDRA BIENVENU

2     A.    Then moved from Cincinnati back to
3  Slidell, Louisiana, and I went to work in sales,
4  in educational sales at that time, and that was
5  about 1979, '80, in that range.
6     Q.    For whom did you go to work at that
7  time?
8     A.    A company called Interstate School
9  Supply.
10    Q.    What did you do for that company?
11    A.    I was a sales rep.
12    Q.    What were you selling?
13    A.    Classroom furniture, bleachers,
14  lockers, and educational materials like books,
15  supplementary books, reading programs, math
16  programs, and then when computers came out the
17  next year, selling computerized assisted
18  learning systems.
19    Q.    How long have you worked for
20  Interstate?
21    A.    I believe it was two to three years.
22    Q.    What did you do after that time?
23    A.    One of my prior customers decided to
24  open a computer-assisted instruction company and
25  recruited me to work with him and his partner.

Page 47

SANDRA BIENVENU

2     Q.    In what capacity?
3     A.    As a salesperson and a trainer.
4     Q.    How long did you remain in the employ
5  of that company?
6     A.    Ten years.
7     Q.    What was the name of it?
8     A.    Micro Instructional Systems.
9     Q.    Where was it located?
10    A.    Chalmette, Louisiana.
11    Q.    Can you tell me what time -- strike
12  the question.
13        Can you tell me what year it was you
14  left the employ of that company?
15    A.    I believe it was '92, '93. '92, I
16  think.
17    Q.    Why did you leave?
18    A.    Because I had a better job offer and
19  the gentleman who owned the company had run for
20  public office. He was now a state
21  representative and I didn't want to run the
22  company alone.
23    Q.    Where did you go in 1992?
24    A.    Jostens Learning Corporation.
25    Q.    What was the business of that company?

Page 48

SANDRA BIENVENU

2     A.    Educational software.
3     Q.    Did it sell any services?
4     A.    Yes.
5     Q.    What were they?
6     A.    Both professional development for
7  teachers and administrators as well as technical
8  services.
9     Q.    Were you a commissioned salesperson
10  for Jostens?
11    A.    Yes, I was.
12    Q.    At that company how did you receive --
13  did you work against a quota there?
14    A.    Yes.
15    Q.    At that company, how did you receive
16  quota credit?
17        MR. BENOWITZ: Objection. You can
18  answer.
19    A.    I received quota credit when either
20  contracts were signed or purchase orders were
21  signed, and I was paid at that time within a
22  couple months or a month. I believe way back
23  then we were paid monthly commissions, I'm not
24  absolutely certain.
25    Q.    How long did you stay in the employ of

Page 49

SANDRA BIENVENU

2  Jostens?
3     A.    Jostens became Compass Learning. I
4  was there for 12, 13 plus years.
5     Q.    Until sometime in or about 2004 or
6  2005?
7     A.    No. I left them to go to work for
8  America's Choice.
9     Q.    So you would have been there right up
10  through the spring of 2005?
11    A.    2005.
12    Q.    Did your position ever change at
13  Jostens or Compass?
14    A.    Yes.
15    Q.    What positions did you hold there?
16    A.    I was a sales rep until -- to the best
17  of my knowledge, it was 2000 or 2002, and I'm
18  really not sure of the exact date. I was named
19  area vice-president when my boss became the
20  national VP of sales.
21    Q.    Who did you answer to?
22    A.    I answered to a great number of them.
23  The last person was Glenn Chapin.
24    Q.    Was that your direct report?
25    A.    Yes.

14 (Pages 50 to 53)

Page 50

SANDRA BIENVENU

1
2    Q.   Glenn Chapin?
3    A.   Glenn Chapin.
4    Q.   Where was Compass Learning and Jostens
5    before it located?
6    A.   It was in -- right outside of San
7    Diego, and I don't remember the town.
8    Q.   Where did you work from?
9    A.   Louisiana.
10   Q.   But its headquarters were somewhere
11   right outside of San Diego?
12   A.   Yes, sir.
13   Q.   And you left Compass Learning I think
14   you just said to enter the employ of America's
15   Choice?
16   A.   Yes, I did.
17   Q.   For what reason did you leave Compass
18   Learning?
19   A.   I was recruited to go to work for
20   America's Choice by Nick Solinger.
21       MR. KARLINSKY:  This is a convenient
22   stopping point so why don't we take a break.
23       THE VIDEOGRAPHER:  Here now marks the
24   end of tape one of the deposition of Ms. Sandra
25   Bienvenu.  The time is 10:48 a.m.  We are now

Page 51

SANDRA BIENVENU

1
2    off the record.
3        (Recess)
4        THE VIDEOGRAPHER:  Here now marks the
5    beginning of tape two of the deposition of
6    Sandra Bienvenu.  The time is 11:01 a.m.  We are
7    now back on the record.
8    BY MR. KARLINSKY:
9    Q.   Ms. Bienvenu, the last thing you told
10   me was that you had been recruited to go to work
11   for America's Choice by Nick Solinger, so I
12   think that would be a good place to pick up
13   again.
14        I take it that you knew something
15   about America's Choice before you ever had any
16   contact with Mr. Solinger?
17   A.   I had heard of America's Choice
18   through my travels in Mississippi, but I didn't
19   know a whole lot about it.
20   Q.   How is it that Mr. Solinger contacted
21   you?
22   A.   Actually Mr. Solinger did not contact
23   me.  In the beginning a headhunter -- I want to
24   say DHR, it was initials, they contacted me
25   first and told me that I had great

Page 52

SANDRA BIENVENU

1
2    qualifications and they had a job that they
3    thought matched my qualifications.
4    Q.   Can you tell me when that was?
5    A.   February of 2005, I believe, January
6    or February, in that early part of 2005.
7    Q.   With whom at America's Choice did you
8    have contact before the commencement of your
9    employment?
10       MR. BENOWITZ:  Objection.
11   A.   I'm not sure I understand what you are
12   asking.
13   Q.   Who did you have any communications
14   with at America's Choice before you actually
15   became an employee?
16       MR. BENOWITZ:  Objection to form.
17   A.   I interviewed with Nick Solinger, Bob
18   Petit, Steve Niederman, Loretta Polhill.
19   Q.   Steve Niederman?
20   A.   Niederman.  Don't ask me to spell it.
21   There were two or three more.  I was flown to DC
22   and I had eight hours of straight interviews
23   with no lunch, and I don't remember every person
24   that I spoke with.  But that was the first time
25   I spoke with --

Page 53

SANDRA BIENVENU

1
2    Q.   Did you speak with Nick Solinger on
3    that occasion, too?
4    A.   Yes.
5    Q.   How about Judy Codding?
6    A.   No.
7    Q.   That was one occasion, that is one day
8    of eight hours?  That's a lot of interviews.
9    A.   Yes, it was.
10   Q.   Right.  What do you recall of it?
11   A.   They put me a small conference room
12   much smaller than this, and every hour or hour
13   and a half a different person came in to talk
14   with me.
15   Q.   On that first occasion, was there any
16   discussion about terms and conditions of your
17   employment?
18   A.   As I recall those discussions, it was
19   more like they were trying to sell me on the
20   company, telling me what the company was about,
21   what they did, what I would be responsible for,
22   talking about the position of business
23   development director and what those
24   responsibilities were.  That's generally the
25   conversations.

Page 54

SANDRA BIENVENU

1
2    Q.   Anything mentioned during the course
3    of that day about compensation?
4    A.   No, sir.
5    Q.   When was the first discussion that you
6    can recall on the subject of compensation?
7    A.   I still had several phone interviews
8    after that where compensation was never
9    mentioned. I believe once I passed all the
10   interviews, I want to say sometime in the April,
11   March-April timeframe, the discussions began to
12   get serious about actual territories'
13   compensation.
14   Q.   With whom were the discussions in the
15   March-April timeframe?
16   A.   Mainly between me and the headhunter
17   because they were the intermediaries, I guess.
18   Q.   I would like to know about your
19   discussions with people at the company on the
20   subject of compensation, so let's leave the
21   headhunters off to one side for a moment and
22   move to the point at which you had discussions
23   with people at the company on the subject of
24   compensation.
25   A.   I believe in the March-April timeframe

Page 55

SANDRA BIENVENU

1
2    Nick and I did have a couple of phone
3    conversations and some e-mails back and forth
4    about what they were offering and what I was
5    willing to take.
6    Q.   Tell me about those.
7    A.   I don't remember the first salary that
8    they offered me. I remember countering and
9    telling them that I wouldn't leave the company
10   that I was with for less than 150 a year.
11   There was discussion about where I
12   would be based and I believe that Nick told me I
13   needed to be based in Atlanta after the position
14   said that I could live in Florida. When I first
15   started interviewing he told me I needed to be
16   based in Atlanta and if I wasn't that I would
17   have to pay my own travel back and forth to
18   Atlanta, but I had to be in Atlanta so many days
19   a week.
20   And I refused and said that I wasn't
21   interested in working that way. And I believe
22   at one point in one of those e-mails I said:
23   This is ridiculous. I don't travel just because
24   I love to live in hotels, and that I really
25   didn't want to work for a company that I

Page 56

SANDRA BIENVENU

1
2    couldn't trust or that couldn't -- didn't feel
3    like they could trust me. Something to that
4    effect. So those were my first conversations.
5    Q.   When·was the first conversation you
6    had with Mr. Solinger on the subject of
·7    commissions?
8    A.   Sometime during those initial --
9    sometime during those initial negotiations. I
10   don't recall the exact moment in time.
11   Q.   Without regard to when it was, can you
12   tell me what Mr. Solinger said in connection
13   with that communication and what you said to
14   him?
15   A.   That I would be paid commissions on
16   sales that were made and the territory that I
17   was responsible for. My quota would be, I
18   believe -- I believe in the beginning he was
19   talking about a higher quota. I don't recall
20   the exact numbers. I believe we settled on 2.5.
21   Q.   2.5 percent?
22   A.   No, 2.5 million as quota. I know that
23   I asked if commissions were paid quarterly and
24   he didn't know that information at that
25   particular time. He gave me a sample of what

Page 57

SANDRA BIENVENU

1
2    the quota commission percentages would be and --
3    and I think at that time I said, so it's going
4    to be like most other companies in this
5    industry, quota credit is given when the PO or
6    contract or whatever way they do business is
7    signed, and then you get paid sometime after
8    that. That's why I was asking if they paid
9    quarterly.
10   Q.   What did Mr. Solinger say in response
11   to that?
12   A.   He had a very succinct way of saying
13   this sentence and I don't think I'm going to say
14   it exactly right, but you accrue quota credit
15   and commissions on the signing of contracts and
16   then he said this company pays after they are
17   paid.
18   Q.   Anything else you can recall about
19   that?
20   A.   Not specifically.
21   Q.   Can you recall when he told you that?
22   A.   It was in the beginning as we were
23   still negotiating.
24   Q.   Did you have any discussions other
25   than what you have already related to me with

Page 58

SANDRA BIENVENU

1  Mr. Solinger concerning commissions, quotas,
2  quota credit, anything related to that prior to
3  the time you signed your offer letter?
4      A.   Not that I recall.
5          (Pause)
6      Q.   Ms. Bienvenu, I show you what's been
7  marked previously in the course of this
8  litigation as Exhibit 58.
9          Could you identify Exhibit 58 for us,
10  Ms. Bienvenu.
11      A.   It appears to be my offer letter along
12  with a letter that welcomes me to America's
13  Choice and tells me about my benefits.
14      Q.   Let me see if I can be more specific
15  here.  The first two pages of Exhibit 58 are a
16  letter directed to you dated April 25, 2005?
17      A.   Yes, sir.
18      Q.   If you look with me to the Bates stamp
19  numbers at the bottom right of the page?
20      A.   Yes, sir.
21      Q.   You'll see that this is a document
22  produced by America's Choice where it says ACI
23  DC 03260, do you see that?
24      A.   Yes, sir.

Page 59

SANDRA BIENVENU

1
2      Q.   If we turn to the second page, this
3  copy of this document is signed, is it not?
4      A.   Yes, it is.
5      Q.   It bears your signature?
6      A.   Yes, it is.
7      Q.   Doesn't seem to bear any signature on
8  the part of the company?
9      A.   No, sir.
10      Q.   Do you know why that is?
11      A.   No, sir.
12      Q.   Is this the form in which you received
13  Exhibit 58?
14      A.   To the best of my knowledge, yes.
15      Q.   You did sign it, that's your
16  signature, correct?
17      A.   Yes, I did.
18      Q.   It is dated to the right of your
19  signature.  Is that your handwriting?
20      A.   Yes, it is.
21      Q.   And it says April 29, 2005, is that
22  correct?
23      A.   That is true.
24      Q.   If we look to the continuing two
25  pages, these are pages that were produced by you

Page 60

SANDRA BIENVENU

1
2  in connection with this litigation which you can
3  tell by the Bates number in the lower right, it
4  says SB00270028, see that?
5      A.   Yes, sir.
6      Q.   Now, this would appear, that is, 27
7  and 28, the third and fourth pages of Exhibit 58
8  would appear to be the same document as the
9  first two pages, am I correct?
10      A.   It seems to be.
11      Q.   With one exception, I believe, and
12  that is that there is a handwritten alteration
13  on the page Bates stamped 03260 which is the
14  first page of the exhibit?
15      A.   Yes, sir.
16      Q.   Where it says:  "Your start date is,"
17  in printing, "9 May, 2005."  There appears to be
18  a strike out and what looks to be the numeral 2
19  is written in, do you see that?
20      A.   It's not very clear but there is
21  something written there.
22      Q.   And to the right of it there are what
23  might be initials, do you see that?
24      A.   I do.
25      Q.   Do you know whose initials those are?

Page 61

SANDRA BIENVENU

1
2      A.   I do but I have just forgotten her
3  name.
4      Q.   Cindy Williams?
5      A.   Oh.  No.  She works in human
6  resources.  I don't remember.
7      Q.   Cordelia Williams?
8      A.   Yes.
9      Q.   When you placed your signature on the
10  first document?
11      A.   Yes, sir.
12      Q.   Second page of the first document
13  which is part of Exhibit 58, was that alteration
14  in the document, that is, the date alteration
15  with those initials?
16      A.   I don't believe so but I'm not sure.
17      Q.   If we look at the second document
18  which is part of Exhibit 58, again, this is the
19  document that was produced by your files in
20  connection with this litigation, and turn to the
21  second page of it, you'll see that your
22  signature appears on that page?
23      A.   Yes, sir.
24      Q.   It is your signature?
25      A.   Yes, it is.

Page 62

SANDRA BIENVENU

1
2    Q.   And to the right a date is written and
3    that would appear to be your handwriting?
4    A.   Yes, it is.
5    Q.   That date is May 9, 2005?
6    A.   Yes, it is.
7    Q.   Which, of course, is different than
8    the date on the first document?
9    A.   Yes, it is.
10   Q.   Can you explain that to me?
11   A.   As I recall, I had agreed to begin on
12   May 9 and I believe Nick called and asked me if
13   I would start on May 3rd because he wanted me to
14   fly to San Francisco and have either a two or a
15   three-day meeting with him and I believe that's
16   why the dates changed.
17   Q.   So in fact was your start date May 2
18   of 2005?
19   A.   I always thought it was May 3rd.  So I
20   don't know.
21   Q.   Did you in fact sign the two letters
22   that are part of Exhibit 58 on two separate
23   days?
24   A.   I did.
25   Q.   Did you sign two copies of the

Page 63

SANDRA BIENVENU

1
2    document, that is, the letter of April 25?
3    A.   I don't remember.
4    Q.   Who gave you Exhibit 58?
5    A.   Which part of Exhibit 58?
6    Q.   Either of the two documents that
7    constitute the exhibit.
8    A.   America's Choice sent them to me.
9    Q.   Let's not pay any regard right now to
10   the alteration by hand.  I'm just talking about
11   the printed letter itself.
12   A.   America's Choice sent it to me.
13   Q.   And you -- I take it from Mr.
14   Solinger?
15   A.   No, sir.
16   Q.   From whom?
17   A.   Marietta Palmer.
18   Q.   Did you have any discussions with
19   Palmer about Exhibit 58?
20   A.   If I am not mistaken, I did have a
21   conversation with her before this document
22   reached my house, I think.
23   Q.   Tell me about that conversation,
24   please.
25   A.   I believe that she called to give me

Page 64

SANDRA BIENVENU

1
2    basically what would be contained in my offer
3    and wanted to know if I did in fact agree that I
4    wanted to receive an offer, I think.
5    Q.   Do you recall any details of that
6    telephone call?
7    A.   No more than what I have just told
8    you.  I do recall one detail.
9    Q.   Yes, go ahead, please.
10   A.   Marietta went to talk to me because at
11   that time she knew that I had lived in Louisiana
12   and had sold in Louisiana and she wanted to know
13   if I knew her brother or brother-in-law.  That's
14   as much as I remember.
15   Q.   Nothing besides that?
16   A.   I don't believe.
17   Q.   I take it you told Ms. Palmer that you
18   wanted to receive an offer?
19   A.   Yes, I did.
20   Q.   You then received Exhibit 58 from her?
21   A.   Yes.
22   Q.   Did you discuss Exhibit 58 with anyone
23   after you received it?
24   A.   I'm not sure what you are asking me.
25   Q.   Did you have any discussions with

Page 65

SANDRA BIENVENU

1
2    anyone about it?
3    A.   I don't -- I don't believe.  I don't
4    know.
5    Q.   I take it Exhibit 58 was acceptable to
6    you?
7    A.   It must have been, I signed it.
8    Q.   In your view did it reflect the
9    discussions that you had had with Mr. Solinger
10   up to that point?
11   A.   Up to that point, yes.
12   Q.   It did?  Yes?
13   A.   Yes.
14   Q.   I see that in the first -- I'm sorry,
15   the second paragraph it is indicated that you
16   would have an annual salary of $150,000 plus a
17   sales compensation plan currently set at 75,000
18   for reaching your full quota.
19       I read that correctly?
20   A.   Yes, you did.
21   Q.   It goes on to say:  As explained, the
22   final parameters of the plan are in proposal
23   form and must receive board of directors
24   approval.  Then it continues again:  Upon
25   approval of the structure, your final quota will

Page 66

SANDRA BIENVENU

1  be set based on territory planning.
2  I read that correctly as well, did I
3  not?
4  A.  You did.
5  Q.  At the time that you signed Exhibit
6  58, what was your understanding about your
7  quota, that is, the level of your quota?
8  A.  At the time that I signed?  I'm not
9  sure we had determined the exact level, but it
10  was supposed to be in the -- somewhere between 2
11  and 4 million.  I don't remember the exact
12  number.
13  Q.  That's what your recollection is, that
14  it was between 2 and 4 million?
15  A.  That was my recollection.
16  Q.  Mr. Solinger has testified in this
17  case that he believed your discussions reflected
18  a quota in the range of as much as 7 or 9
19  million at the outset.  Do you not recall that?
20  A.  I recall that that -- we did talk
21  about some higher quotas, but it depended on the
22  number of states that I was going to be
23  responsible for.  I believe in the beginning I
24  was only supposed to do a couple or three states
25

Page 67

SANDRA BIENVENU

1  and then it was increased to 10 or 14.  It
2  changed.
3  Q.  When was the first time you recall
4  receiving a definite quota?
5  A.  Sometime in August, September, October
6  timeframe of 2005.
7  Q.  What was that definite quota that you
8  were advised of at that time?
9  A.  I believe it was 2.5.
10  Q.  Now, was that after the Hurricane
11  Katrina catastrophe?
12  A.  Yes.
13  Q.  Was it after the Hurricane Rita storm
14  as well?
15  A.  I believe so.
16  Q.  Your claim in this case is based upon
17  a quota of $2.5 million, is that correct?
18  A.  I believe so.
19  Q.  Do you have any doubt of that?
20  A.  I haven't looked at that document in a
21  long time but I believe it was 2.5.
22  Q.  We'll look at it together.
23  A.  I think at one point I thought that
24  Nick had lowered it lower than that but I was
25

Page 68

SANDRA BIENVENU

1  mistaken.
2  Q.  I take it the question of commissions
3  was important to you in connection with agreeing
4  to employment with America's Choice?
5  A.  Absolutely, every salesperson depends
6  on commissions.
7  Q.  Did you read Exhibit 58 before you
8  signed it?
9  A.  I believe I did.
10  Q.  Did you have any questions about it?
11  A.  I did question the commissions, the
12  territory, the compensation plan overall.  Nick
13  assured me that it would be up to my standards
14  and I trusted Nick.
15  Q.  You said you questioned -- let me
16  clarify this with you, I'm sorry.
17  You had a discussion with Mr. Solinger
18  concerning Exhibit 58?
19  A.  Not necessarily Exhibit 58.
20  Q.  That was my question to you.
21  A.  Okay, I'm sorry.
22  Q.  I asked whether you had any questions
23  about Exhibit 58, about the offer letter itself.
24  A.  No, because Mr. Solinger and I had
25

Page 69

SANDRA BIENVENU

1  discussed that this second paragraph was not
2  finalized.
3  Q.  Right.  Did Exhibit 58 to the extent
4  that -- strike the question.
5  Was Exhibit 58 at that time you signed
6  it consistent with what Mr. Solinger had
7  discussed with you?
8  A.  At that time yes.
9  Q.  Ms. Bienvenu, you understood your
10  employment with America's Choice to be what is
11  known as at will employment?
12  A.  Yes, I did.
13  Q.  You understood that that meant that
14  you could terminate your employment at any time?
15  A.  Yes, I did.
16  Q.  For any or for no reason?
17  A.  Yes, I did.
18  Q.  And likewise that the company could
19  terminate your employment at any time?
20  A.  Yes.
21  Q.  For any or no reason?
22  A.  Yes.
23  Q.  You also understood that your
24  employment at will status could only be modified
25

Page 70

SANDRA BIENVENU

1
2    by a written agreement that was signed by you
3    and an officer of America's Choice?
4        A.   I need you to restate that.
5        Q.   Sure.  My question was, you also
6    understood that your employment at will status
7    could only be modified by a written agreement
8    that was signed by you and an officer of
9    America's Choice?
10       A.   Okay.  I'm not sure that I understand
11   exactly what you are asking.  I understood that
12   America's Choice could terminate me at any time
13   with reason or without reason and they could
14   notify me and I didn't necessarily have to sign
15   anything.
16       Q.   Ms. Bienvenu, you noted to me before
17   that you had located some additional documents?
18       A.   Yes, sir.
19       Q.   Recently?
20       A.   Yes, sir.
21       Q.   And that those had been, as I
22   indicated, those had been produced to me
23   yesterday?
24       A.   Yes, sir.
25       Q.   Where were those documents that you

Page 71

SANDRA BIENVENU

1
2    located?
3        A.   Misfiled in a different file folder
4    from America's Choice.  And I'll have to digress
5    for a moment.  I keep my files in alphabetical
6    order.  If I am not mistaken, that was in the
7    file that said Alabama, not in the America's
8    Choice file.
9        Q.   How is it that you found those
10   documents?
11       A.   I was trying to clean out my office
12   and throw things away that weren't pertinent to
13   my present employment and I came across those.
14       MR. KARLINSKY:  I need to take a
15   three-minute break.
16       THE VIDEOGRAPHER:  The time is 11:33
17   a.m.  We are now off the record.
18       (Recess)
19       THE VIDEOGRAPHER:  The time is 11:38
20   a.m.  We are now back on the record.
21   BY MR. KARLINSKY:
22       Q.   Ma'am, you still have Exhibit 58 in
23   front of you, do you not?
24       A.   I do.
25       Q.   Are there any terms and conditions of

Page 72

SANDRA BIENVENU

1
2    your employment with ACI as you understood it
3    that are not reflected or contained in Exhibit
4    58?
5        A.   I'm not sure I understand what you are
6    asking.
7        Q.   My question was, you know what a term
8    and condition of employment is or a term --
9    strike that.
10       Do you know what a term or condition
11   of employment is?
12       A.   I'm not sure.
13       Q.   Well, Ms. Bienvenu, let's say that we
14   define it together as the contractual
15   obligations that America's Choice owed to you
16   and that you owed to America's Choice.
17       Those are the terms and conditions of
18   your employment, is that fair?
19       A.   Yes, sir.
20       Q.   Are there any terms or conditions of
21   your employment that are not contained or
22   reflected in Exhibit 58?
23       A.   Probably.
24       Q.   And what would those be?
25       A.   At this point --

Page 73

SANDRA BIENVENU

1
2       MR. BENOWITZ:  Well, I would object.
3    You are asking her to make a legal conclusion.
4    She's not an attorney.
5        Q.   Proceed, please.
6        A.   At this point there is not really a
7    final quota, there is -- the compensation plan
8    had not been approved by the board of directors.
9    In my limited experience that's --
10       Q.   So Ms. Bienvenu, your understanding
11   was -- actually, let me do this a little bit
12   differently, okay?
13       I understand that Exhibit 58 says as
14   we have discussed before that the final
15   parameters of the compensation plan are in
16   proposal form and must receive board of
17   directors approval.  That's what the document
18   states, does it not?
19       A.   Yes, it does.
20       Q.   My question to you wasn't whether
21   there are terms or conditions of your employment
22   that later came to be applicable to you, my
23   question was at the time you signed Exhibit 58,
24   was there any term or condition of your
25   employment as you understood those terms or

Page 74

SANDRA BIENVENU

1
2  conditions that was not then reflected in the
3  contract that you signed?
4        MR. BENOWITZ:  Objection.
5    A.   I'm not sure I even know how to answer
6  the question.
7    Q.   Why not?
8    A.   I am so confused.
9    Q.   What's confusing to you?
10   A.   Terms and conditions is just not
11 something that I use every day, so --
12   Q.   Well, you do understand contractual
13 obligations, do you not?
14       MR. BENOWITZ:  Objection.
15   A.   Yes.
16   Q.   That's an obligation in this
17 particular case that was owed by you to the
18 company or that the company would owe to you.
19 We are on the same page?
20   A.   Okay.
21   Q.   And what I said to you before was that
22 terms or conditions of employment are the same
23 things, we are talking about the contractual
24 obligations that are owed by either side in a
25 contract of employment.  You'll accept that

Page 75

SANDRA BIENVENU

1
2  definition?
3        MR. BENOWITZ:  Objection.
4    A.   Okay.
5    Q.   So that I asked you -- I will ask you
6  the question again.
7        At the time that you signed Exhibit
8  58, was there any contractual obligation on the
9  part of America's Choice to you or on your part
10 to America's Choice as you understood the
11 relationship that you were about to enter into
12 that is not reflected in Exhibit 58?
13       MR. BENOWITZ:  Objection.
14   A.   Sure.
15   Q.   Tell me what that is, please?
16   A.   A definition of the compensation plan
17 as it was to be approved by the board of
18 directors.
19   Q.   Yes.  And as you told me before, Mr.
20 Solinger had explained the commission plan to
21 you, correct?
22   A.   Yes, he did.
23   Q.   Is it your contention in this case,
24 Ms. Bienvenu, that what Mr. Solinger and you
25 discussed are additional terms and conditions of

Page 76

SANDRA BIENVENU

1
2  your employment?
3        MR. BENOWITZ:  Objection.
4    A.   Additional?
5    Q.   Yes.  In addition to the matters that
6  are contained in Exhibit 58.
7        MR. BENOWITZ:  Mr. Karlinsky, I object
8  to this line of questioning.
9    A.   I don't even -- I am very confused.
10       MR. BENOWITZ:  Let me state my
11 objection.
12       THE WITNESS:  Okay.
13       MR. BENOWITZ:  The witness is not an
14 attorney.  You keep asking her the same question
15 over and over which she has answered to the best
16 of her ability as a nonattorney.  I think should
17 you switch to a different line of questioning.
18 She is not an attorney and is not qualified to
19 answer this question.  You can give her all the
20 definitions you want.
21 BY MR. KARLINSKY:
22   Q.   Ms. Bienvenu, at the time that you
23 entered into Exhibit 58, as you understood it,
24 were there obligations of ACI that were owed to
25 you and that were not reflected in Exhibit 58?

Page 77

SANDRA BIENVENU

1
2        MR. BENOWITZ:  Objection.  I'm going
3  to direct you not to answer the question.
4    A.   I don't know how to answer the
5  question.
6        MR. BENOWITZ:  You have her answer on
7  the record.  I am directing her not to answer
8  the question.
9        MR. KARLINSKY:  On what grounds?
10       MR. BENOWITZ:  Or ask her a different
11 question.  It's been asked and answered.
12       MR. KARLINSKY:  That's not the grounds
13 for a direction to a witness --
14       MR. BENOWITZ:  Fine, that's my
15 direction to my witness.  Ask her a different
16 question.
17       MR. KARLINSKY:  All right.  We'll mark
18 that and we'll go to the court for a ruling.
19   Q.   Ms. Bienvenu, is it your understanding
20 that the company's obligation to pay you a
21 commission on the signing of a contract was a
22 term of your employment?
23       MR. BENOWITZ:  Objection.
24   A.   I don't know what you mean a term of
25 my employment.

Page 78

SANDRA BIENVENU

1
2     Q.   Was it a contractual obligation that
3  America's Choice owed to you?
4          MR. BENOWITZ:  Objection.
5     A.   I don't know.  I'm not an attorney.  I
6  don't know what --
7     Q.   I am asking for your understanding,
8  ma'am.
9          Did you believe at the time you signed
10  Exhibit 58 that if you or people who were
11  answerable to you in connection with your
12  employment at America's Choice were responsible
13  for securing a contract, that on that contract
14  America's Choice would owe you a commission?
15     A.   Yes.
16          MR. BENOWITZ:  Objection.
17     Q.   Would you point me to where in Exhibit
18  58 I might find that particular provision?
19          MR. BENOWITZ:  Objection.
20     A.   It's not finalized by Exhibit 58.
21     Q.   It is not in Exhibit 58, correct?
22     A.   It was not finalized.
23     Q.   Ma'am, I asked you a question.  I
24  asked you whether --
25     A.   And I'm answering your question.

Page 79

SANDRA BIENVENU

1
2     Q.   -- what you just told me was in
3  Exhibit 58.
4          MR. BENOWITZ:  Objection.
5     Q.   That's all I asked you, is it in
6  Exhibit 58?
7          MR. BENOWITZ:  Could you repeat what
8  you are asking her?
9          MR. KARLINSKY:  Certainly.
10          MR. BENOWITZ:  Thank you.
11     Q.   Do you need me to repeat it?
12     A.   Yes, I do.
13     Q.   The question was, did you believe at
14  the time you signed Exhibit 58 that if you or
15  people who were answerable to you in connection
16  with your employment at America's Choice were
17  responsible for securing a contract, that on
18  that contract America's Choice would owe you a
19  commission?
20          MR. BENOWITZ:  Objection.
21     Q.   Your answer to the question was yes?
22     A.   Yes.
23     Q.   Then I asked you would you point me to
24  where in Exhibit 58 I might find that particular
25  provision.

Page 80

SANDRA BIENVENU

1
2          Is that provision in Exhibit 58?
3     A.   I will point you to the sentence that
4  says:  As explained, the final parameters of the
5  plan are in proposal form and must receive board
6  of directors approval.
7     Q.   So the answer to my question is that
8  contractual undertaking on the part of America's
9  Choice is not reflected in Exhibit 58, is that
10  correct?
11          MR. BENOWITZ:  Objection.
12     A.   Do you want me to read the sentence
13  again?
14     Q.   No, ma'am, I want you to either say
15  yes or no in response to my question.
16          MR. BENOWITZ:  Objection.
17     Q.   Which calls for a yes or no answer.
18          MR. BENOWITZ:  What's the question
19  again?
20     Q.   Is that provision in Exhibit 58?
21          MR. BENOWITZ:  Which provision?
22     Q.   Do you know what I'm asking?
23     A.   I'm not positive, no.
24     Q.   Well, let me ask it again, then.
25          You've told me that you believe that

Page 81

SANDRA BIENVENU

1
2  the company had an obligation to pay you
3  commission based on contracts that you secured
4  that were signed either by you or by people who
5  reported to you, your salespeople, correct?
6     A.   Yes.
7     Q.   Where is that obligation reflected in
8  Exhibit 58?
9          MR. BENOWITZ:  Objection.
10     A.   That obligation was discussed --
11     Q.   That wasn't what I asked you, ma'am.
12  I'm asking you where --
13          MR. BENOWITZ:  You may not like her
14  answer but let her give you an answer.
15     A.   I am not --
16     Q.   You are not going to answer?
17     A.   I don't know how to answer you.
18     Q.   Where in the document is it reflected,
19  ma'am?
20     A.   As explained, the final parameters of
21  the plan are in proposal form and must receive
22  board of directors approval.
23     Q.   So your understanding, ma'am, was that
24  that particular undertaking to you by the
25  company to pay that commission was not contained

22 (Pages 82 to 85)

Page 82

SANDRA BIENVENU

1
2   in Exhibit 58 but would be contained in some
3   later document?
4       MR. BENOWITZ: Objection.
5       A.   According to my discussions with the
6   man who hired me, yes, that was --
7       Q.   Your understanding was that you would
8   receive some later document, is that right?
9       A.   My understanding was that I would be
10  paid a commission based on the contracts that
11  were signed within my territory with my sales
12  reps, yes.
13      Q.   And my question to you again was where
14  is that set forth in Exhibit 58?
15      A.   This was an offer letter.
16      Q.   Yes.
17      A.   Offer letters don't usually spell out
18  all of the details.
19      Q.   You don't regard Exhibit 58 as a
20  contract between you and the company?
21      MR. BENOWITZ: Objection.
22      A.   I regard it as an offer letter for my
23  employment.
24      Q.   My question was do you regard it as a
25  contract between you and the company?

Page 83

SANDRA BIENVENU

1
2       MR. BENOWITZ: Objection.
3       A.   I am not an attorney.
4       Q.   I'm asking for your understanding,
5   ma'am.
6       A.   My understanding --
7       Q.   Not a legal opinion. I'm asking for
8   your understanding. Do you understand that
9   Exhibit 58 was a contract between you and
10  America's Choice?
11      MR. BENOWITZ: Objection.
12      A.   I understand that it was an employment
13  offer that I accepted.
14      Q.   In your understanding, is the offer of
15  employment and the acceptance of employment by
16  an employee a contract?
17      MR. BENOWITZ: Objection.
18      A.   I've never heard it called a contract,
19  but it's an employment agreement.
20      Q.   It's an employment agreement. Is that
21  somehow different than a contract?
22      MR. BENOWITZ: Objection.
23      A.   I'm not an attorney.
24      Q.   I'm not asking you for a legal
25  opinion, ma'am, I'm asking you for your

Page 84

SANDRA BIENVENU

1
2   understanding.
3       When you tell me that you regarded
4   Exhibit 58 as an employment agreement, is that
5   somehow different than a contract?
6       MR. BENOWITZ: Mr. Karlinsky, I must
7   object to the continuing questioning of a
8   nonattorney as to the distinction between an
9   employment agreement and a contract which are
10  obviously terms that a layman may not be able to
11  distinguish.
12      I think this witness has clarified for
13  you that she is not capable of making that
14  distinction. But if you want to continue asking
15  these questions, go right ahead, but we continue
16  our objections to this line of questioning.
17      Q.   My question, Ms. Bienvenu, was you
18  have told me that you regarded Exhibit 58 as an
19  employment agreement, is that right?
20      A.   Yes.
21      Q.   Is an employment agreement somehow
22  different than a contract?
23      MR. BENOWITZ: Objection.
24      A.   I don't know.
25      Q.   You don't know? Do you intend it --

Page 85

SANDRA BIENVENU

1
2   when you say employment agreement, do you intend
3   that to carry some meaning?
4       MR. BENOWITZ: Objection.
5       Q.   Different than employment contract?
6       MR. BENOWITZ: I object. I am
7   directing her not to answer the question. First
8   of all, you are not accurate in your question.
9   She has said that it is an offer letter is what
10  she said. Then you have coerced her into
11  somehow saying she thinks it might be an
12  employment agreement. Now you are trying to
13  make her distinguish between an offer letter, an
14  employment agreement, a contract. She is not an
15  attorney. She doesn't have to answer any more
16  of these questions. Go on to something
17  different. If you want to get a court order get
18  a court order.
19      MR. KARLINSKY: Mr. Benowitz, coaching
20  a witness and making speeches like that on the
21  record is extremely inappropriate and I urge you
22  to contain yourself to objections. That's not
23  an objection.
24      Q.   Ms. Bienvenu, I asked you several
25  questions before and I want a clear answer on

Page 86

SANDRA BIENVENU

1    SANDRA BIENVENU
2    the record. Did you understand that Exhibit 58
3    is an employment agreement between you and
4    America's Choice?
5        MR. BENOWITZ: Objection.
6        A.   I understand, if you will look on page
7    2, the paragraph that starts: "This letter,
8    together with your assignment agreement, forms
9    the complete and exclusive statement of your
10   employment agreement with America's Choice,
11   Inc., ACI."
12       Q.   So you understood that Exhibit 58 is
13   an employment agreement, did you not?
14       MR. BENOWITZ: Objection.
15       A.   It is an employment agreement.
16       Q.   Thank you. Is that somehow different
17   than a contract?
18       MR. BENOWITZ: Objection.
19       A.   I don't know.
20       Q.   You don't know? Do you intend it,
21   when you say employment agreement, do you intend
22   that to carry a meaning other than an employment
23   contract?
24       MR. BENOWITZ: Objection.
25       Q.   Just asking you if you see a

Page 87

1    SANDRA BIENVENU
2    distinction between the two?
3        A.   I don't know the difference between an
4    employment agreement, an employment contract.
5    It is semantics as far as I am concerned.
6        Q.   You understand, ma'am, that you were
7    bound by the terms of Exhibit 58, do you not?
8        MR. BENOWITZ: Objection.
9        A.   Until they changed.
10       Q.   Is your answer yes, you understand
11   that you were bound by those terms?
12       MR. BENOWITZ: Objection.
13       A.   I was bound by those terms until they
14   changed.
15       Q.   If they did not change you were bound
16   by the terms of Exhibit 58, were you not?
17       A.   Yes.
18       MR. BENOWITZ: Objection.
19       A.   But it plainly states that the final
20   parameters were going to change.
21       Q.   Ms. Bienvenu, I asked you the question
22   if they did not change you were bound by the
23   terms of Exhibit 58, were you not? Is your
24   answer --
25       MR. BENOWITZ: Objection.

Page 88

1    SANDRA BIENVENU
2        Q.   -- yes or no?
3        MR. BENOWITZ: She doesn't have to
4    give you a yes or no answer, she has answered
5    your question.
6        A.   I am trying to answer you to the best
7    of my knowledge.
8        Q.   You are not trying to answer me --
9        MR. BENOWITZ: Mr. Karlinsky --
10       Q.   -- you are trying to evade the
11   question.
12       MR. BENOWITZ: -- she is trying to
13   provide an answer.
14       A.   No, I am not.
15       Q.   I asked you the following question:
16   If your terms and if the terms and conditions of
17   your employment were not changed, were you bound
18   by Exhibit 58, the employment agreement that you
19   signed?
20       MR. BENOWITZ: Objection. You know,
21   we object to this line of questioning. You are
22   asking her for a legal conclusion. She's not an
23   attorney. I don't know how many more times I
24   have to state the same objection.
25       A.   What it looks like in here is ACI is

Page 89

1    SANDRA BIENVENU
2    offering me benefits, an annual salary, a quota
3    and comp plan to be determined, that I should
4    not use any of their proprietary information,
5    disclose it, that I may terminate any time, they
6    can terminate me.
7        Are those terms? I am asking you.
8        Q.   Is there something about my question
9    that you don't understand?
10       A.   Yes, absolutely.
11       Q.   My question to you is, do you
12   understand that upon signing Exhibit 58 you were
13   bound by it?
14       MR. BENOWITZ: Objection.
15       A.   I understand that I accepted their
16   offer of employment by signing Exhibit 58.
17       Q.   Do you understand that you were bound
18   by the terms that are contained in Exhibit 58?
19       MR. BENOWITZ: Objection.
20       A.   Would you explain to me what are terms
21   in here?
22       Q.   I have explained that to you at least
23   five times.
24       A.   Using this document, would you point
25   out what is a term?

24 (Pages 90 to 93)

Page 90

SANDRA BIENVENU

1
2    Q.   Everything that is in Exhibit 58 is a
3  term, ma'am.  Everything that is contained in
4  that document is a term of the employment
5  agreement.
6        My question to you is --
7        MR. BENOWITZ:  Objection, it is not an
8  employment agreement.
9    Q.   -- are you bound by those terms?
10       MR. BENOWITZ:  You are characterizing
11 the document, Mr. Karlinsky, for the witness.
12 Let the witness tell you what her response is
13 without putting words in her mouth.
14       (Pause)
15       MR. BENOWITZ:  Is there an outstanding
16 question?
17       MR. KARLINSKY:  Yes.
18       MR. BENOWITZ:  Could you repeat the
19 question?
20 BY MR. KARLINSKY:
21    Q.   You know what the question is, ma'am?
22    A.   You are asking me about terms and
23 conditions and if I knew that I had agreed to
24 them?
25    Q.   Ms. Bienvenu, my question was, are you

Page 91

SANDRA BIENVENU

1
2  bound by the terms contained in Exhibit 58 which
3  you have testified was your employment
4  agreement?
5        MR. BENOWITZ:  Objection.  I don't
6  think she testified it was her employment
7  agreement.
8    A.   It is an employment offer letter that
9  gives me benefits.  Am I bound by those?  I
10 don't understand what I would -- I don't
11 understand what you mean by bound by those.
12 What are you asking me?  I have no idea.
13   Q.   Whether the company, America's Choice,
14 may enforce the terms of Exhibit 58 against you,
15 ma'am?
16       MR. BENOWITZ:  Objection.
17   Q.   Do you understand that?
18       MR. BENOWITZ:  Objection.
19   A.   I don't see terms that -- I don't
20 understand what you are talking about, that they
21 may enforce the terms, that they may terminate
22 at any time?  I answered to you yes and I could,
23 too.  Would they offer these benefits?  Yes.
24 Would I accept them?  Yes.
25       I'm not sure I understand what you are

Page 92

SANDRA BIENVENU

1
2  asking me I'm going to be bound on.
3    Q.   I am going to ask it once more in a
4  different way.
5    A.   Okay.
6    Q.   Is Exhibit 58 as it stood on the date
7  you signed it an agreement of employment between
8  you and America's Choice?
9        MR. BENOWITZ:  Objection.  You are
10 asking for a legal conclusion.
11   A.   At the date that I signed it it was an
12 offer letter.  It was an offer letter that I
13 agreed I'm going to go to work for them.
14       MR. KARLINSKY:  I would ask the court
15 reporter to mark for identification as Exhibit
16 107 a pleading in the America's Choice versus
17 Bienvenu case titled Answer to the Complaint and
18 Amended Counterclaims.  Let the record reflect I
19 am handing counsel a copy.
20       (Exhibit 107, Answer to the Complaint
21 and Amended Counterclaims, marked for
22 identification)
23 BY MR. KARLINSKY:
24   Q.   Do you have a copy of what's been
25 marked as Exhibit 107 in front of you?

Page 93

SANDRA BIENVENU

1
2    A.   Yes, I do.
3    Q.   Can you identify that document, ma'am?
4    A.   The title, Answer to the Complaint and
5  Amended Counterclaims.
6    Q.   Yes.  Have you ever seen Exhibit 107
7  before?
8    A.   Yes.
9    Q.   When did you see it?
10   A.   The first time?
11   Q.   Sure.
12   A.   Before it was filed, I guess.
13   Q.   You understand this to be an answer on
14 your part to America's Choice's complaint in the
15 action against you as well as your amended
16 counterclaims against America's Choice in that
17 same action?
18   A.   I believe so.
19   Q.   Is Exhibit 107 to the best of your
20 knowledge true and correct?
21   A.   To the best of my knowledge, I relied
22 on my counsel to word it.
23   Q.   My question to you was, to the best of
24 your knowledge, ma'am, is Exhibit 107 factually
25 true and correct?

Page 94

SANDRA BIENVENU

1       SANDRA BIENVENU
2    A.   To the best of my knowledge.
3    Q.   And you authorized your counsel to
4  file Exhibit 107 with the U.S. District Court
5  for the District of Columbia, correct?
6    A.   Yes.
7    Q.   Turn to page 4 of Exhibit 107, please.
8  Actually turn to page 3 first.  You see page 3?
9    A.   Yes.
10   Q.   That's where your counterclaim starts.
11 You do see that, correct?
12   A.   Yes.
13   Q.   And you understand, ma'am, that your
14 counterclaim is a statement of your legal claim
15 against America's Choice?
16   A.   Yes.
17   Q.   Turn to paragraph seven of the
18 counterclaim which appears on the next page.  It
19 states: "Pursuant to the terms of an employment
20 agreement dated April 25, 2005 which was signed
21 and accepted by plaintiff" -- that refers to
22 America's Choice -- "on May 9, 2005,
23 defendant" -- that refers to you -- "commenced
24 her employment with America's Choice on or about
25 May 9, 2005, and was employed continuously by

Page 95

1       SANDRA BIENVENU
2  plaintiff until January 20, 2007 when defendant
3  voluntarily resigned."
4      I read that correctly, did I not?
5    A.   Yes, sir.
6    Q.   And you understood that your counsel
7  was making a claim on your part that the
8  document which we have been talking about
9  identified as Exhibit 58 was an employment
10 agreement?
11   A.   Yes.
12   Q.   That you entered into?
13   A.   Yes.
14      MR. KARLINSKY:  I want to take a quick
15 break at this point.  We'll be back on fairly
16 quickly.
17      THE VIDEOGRAPHER:  Here now marks the
18 end of tape two of the deposition of Ms. Sandra
19 Bienvenu.  The time is 12:05 p.m.
20      (Recess)
21      THE VIDEOGRAPHER:  The time is 12:11
22 p.m.  We are now back on the record.
23 BY MR. KARLINSKY:
24   Q.   Ms. Bienvenu, you have Exhibit 58 in
25 front of you still and I wanted to go through a

Page 96

1       SANDRA BIENVENU
2  couple of specifics in it.  If you look with me
3  to the second paragraph, that indicates that you
4  have an annual salary of $150,000, correct?
5    A.   Yes.
6    Q.   Did you understand that the company
7  was obligated thereby to pay you that salary?
8    A.   Yes.
9      MR. BENOWITZ:  Objection.
10   Q.   If we go down below to the third
11 paragraph, there is a description of provisions
12 of the benefits package that ACI was offering,
13 correct?
14   A.   Yes.
15   Q.   Was it your understanding that ACI was
16 obligated by Exhibit 58 to provide those
17 benefits set forth in the letter to you?
18      MR. BENOWITZ:  Objection.
19   A.   I guess.
20   Q.   Do you have any doubt about that?
21      MR. BENOWITZ:  Objection.
22   A.   I trusted that they would do that.
23   Q.   I'm sorry?
24   A.   I trusted that they would give me
25 those things.

Page 97

1       SANDRA BIENVENU
2    Q.   Ma'am, I asked you if you understood
3  that ACI was obligated to give you those things?
4      MR. BENOWITZ:  Objection.
5    Q.   Did you understand that?
6    A.   I don't know that I understood
7  obligated, but I understood they were offering
8  it.
9    Q.   Well, you have worked for other
10 companies besides America's Choice, have you
11 not?
12   A.   Yes.
13   Q.   And you understand that those
14 companies also had some kind of benefits package
15 that they had offered to you?
16   A.   Yes.
17   Q.   Do you understand, ma'am, that you
18 were able to enforce that package that was
19 offered to you?
20      MR. BENOWITZ:  Objection.  Which
21 package are you talking about?
22      MR. KARLINSKY:  Any package
23 whatsoever.
24   A.   By enforce you mean --
25   Q.   Sue for enforcement, ma'am.

Page 98

SANDRA BIENVENU

1    SANDRA BIENVENU
2        MR. BENOWITZ: Objection.
3        A.   I never really thought of it.  I never
4    sued a company before --
5        Q.   Ms. Bienvenu, are you suing under
6    Exhibit 58?
7        MR. BENOWITZ: Objection.
8        A.   Yes.
9        Q.   Ms. Bienvenu, when was Exhibit 58 ever
10   changed?
11       A.   I don't know that the whole thing was
12   ever changed.
13       Q.   Were the terms and conditions of your
14   employment with America's Choice ever changed
15   after the time you signed Exhibit 58?
16       A.   I don't understand terms and
17   conditions.  There was a new -- there were
18   final -- there was a final compensation plan
19   that was given to me August, September, October
20   timeframe of 2005 which according to this
21   document had to be approved by the board of
22   directors, so that part did change.
23       Q.   Did any other parts of Exhibit 58
24   change?
25       A.   Not to my knowledge.

Page 99

SANDRA BIENVENU

1    SANDRA BIENVENU
2        Q.   What was given to you, physically what
3    was given to you in the timeframe of August
4    through October of 2005 that constituted a
5    change to the employment agreement, Exhibit 58?
6        A.   A spreadsheet that said annualized
7    comp rate and had my base salary with an 80,000
8    bonus at commission -- sorry, strike that -- at
9    quota with a 20 percent bonus for reaching quota
10   and a sliding scale of percentages that would be
11   paid at X number of dollars and you had to --
12   you had to put the amounts of the sales in.
13       Q.   You have the books in front of you, I
14   believe.  Would you turn to Exhibit 35, please?
15       Can you identify Exhibit 35, Ms.
16   Bienvenu?
17       A.   That was the first comp plan that I
18   received, and I believe somewhere close to this
19   timeframe, I don't remember exactly.  This was
20   the first one.
21       Q.   When you say this was the first one,
22   what does that mean?  Were there others?
23       A.   Yes.
24       Q.   So in other words this was not the
25   final version of the plan?

Page 100

SANDRA BIENVENU

1    SANDRA BIENVENU
2        A.   No.
3        Q.   That you received?
4        A.   No, sir.
5        Q.   Would you look with me -- actually
6    I'll have to give you an additional exhibit so
7    bear with me for a second.
8        By the way, what about Exhibit 35
9    changed between its terms and your so-called
10   final compensation plan?
11       A.   The target commissions.
12       MR. BENOWITZ: Are we talking about --
13   what year are we talking about?
14       MR. KARLINSKY: Only 2006.
15       MR. BENOWITZ: Okay.
16       A.   The target commissions, on the new
17   plan there was a $20,000 bonus for reaching
18   quota.  And I believe, and I'm not exactly sure
19   because I would have to compare them, but I
20   believe these percentages on this sliding scale
21   for the commission rates changed.
22       Q.   I hand you a document that is Bates
23   labeled beginning with SB0001 and continuing,
24   although it is not sequential, this document is
25   SB0001, 2, 5, 6, 8, 9 and 10, and I hand that

Page 101

SANDRA BIENVENU

1    SANDRA BIENVENU
2    to -- actually let me have the court reporter
3    mark that as Exhibit 108.
4        (Exhibit 108, Document Bates Stamped
5    SB 001, 2, 5, 6, 8, 9 and 10, marked for
6    identification)
7    BY MR. KARLINSKY:
8        Q.   You have Exhibit 108 in front of you?
9        A.   I do.
10       Q.   Would you identify it?
11       A.   An e-mail from Nick to me.
12       Q.   That's the first page, SB 0001?
13       A.   Yes.
14       Q.   And Mr. Solinger in that e-mail which
15   is dated February 10, 2007, says to you:
16   "Sandra attached is the final compensation plan
17   spreadsheet that I had provided you on October
18   7, 2005," is that right?
19       A.   That's true.
20       Q.   And the next page of Exhibit 108 is
21   what?
22       A.   Saturday, February 10.
23       Q.   That's another e-mail from Mr.
24   Solinger to you?
25       A.   It is.

Page 102

SANDRA BIENVENU

1
2    Q.   Let's just skip that, we are going to
3 come back to it later.  What I really want to
4 direct your attention to is the third page which
5 is Bates labeled 0005.
6    A.   Yes.
7    Q.   And ma'am, would you identify that
8 page for us?
9    A.   That is the -- a copy of the final
10 comp plan that Nick had given me obviously in
11 October.
12    Q.   And you agree that SB 05 is in fact
13 the final compensation plan for fiscal year 2006
14 that was provided to you?
15    A.   I believe it was, yes.
16       (Pause)
17    Q.   Ms. Bienvenu, in addition to that page
18 of Exhibit 108 that we have just identified
19 that's SB 5?
20    A.   Yes, sir.
21    Q.   Was anything else given to you in
22 October of 2005 that constituted your
23 compensation plan?
24    A.   No, sir.
25    Q.   It was just this one sheet?

Page 103

SANDRA BIENVENU

1
2    A.   Just this one sheet.
3    Q.   Would it be fair to say, then, that
4 Exhibit 58, that's the employment letter,
5 together with this compensation plan,
6 constituted the full statement of your
7 employment with America's Choice?
8       MR. BENOWITZ:  Objection.
9    A.   As far as I know.
10    Q.   Let's stay with SB 005 or SB 5, part
11 of Exhibit 108 for a moment and let's just make
12 sure we are all understand it together.
13       It is titled:  Director south
14 annualized comp plan, correct?
15    A.   Yes.
16    Q.   And it shows target commissions of
17 $80,000 with a bonus at 100 percent of $20,000?
18    A.   I'm sorry, I didn't understand what
19 you said at the very end.
20    Q.   I said with a bonus of 100 percent of
21 $20,000?
22    A.   The bonus at 100 percent of quota
23 would be $20,000.
24    Q.   That was my next question to you.
25 Your understanding is that referred to a bonus

Page 104

SANDRA BIENVENU

1
2 to be paid at reaching 100 percent of quota?
3    A.   Yes.
4    Q.   So if you reached quota for fiscal
5 year 2006, you would receive commissions plus
6 bonus of $100,000?
7    A.   Yes.
8    Q.   On top of your salary for that year of
9 $150,000, correct?
10    A.   Yes.
11    Q.   In Exhibit 158, page SB 5, there is
12 also a line which is headed quota, do you see
13 that row?  It is not a line, it is a row of the
14 spreadsheet.
15    A.   Yes.
16    Q.   And that says that your quota is
17 $2,500,000, correct?
18    A.   Yes, it does.
19    Q.   And if I understand this correctly, at
20 specified percentages of quota, you would
21 receive the commission payments that are
22 indicated below in the box that is labeled
23 commission rates based on percentage of annual
24 quota achievement?
25    A.   That was my understanding, yes.

Page 105

SANDRA BIENVENU

1
2    Q.   Then for illustration purposes, as I
3 understand it, the total annualized
4 compensation, depending on various scenarios, is
5 set forth in the last row of the spreadsheet?
6    A.   I need you to --
7    Q.   Did I make myself clear?
8    A.   You lost me.
9    Q.   All right.  I'll try it again.
10       If we look at the last row of the
11 spreadsheet?
12    A.   The last row or the last column?
13    Q.   Last row.
14    A.   Okay.
15       MR. BENOWITZ:  Reading from left to
16 right?
17       MR. KARLINSKY:  Well, you wouldn't be
18 reading a row from left to right.
19       MR. BENOWITZ:  Well, I would --
20       MR. KARLINSKY:  We would be going
21 across the columns from left to right.
22       MR. BENOWITZ:  Going down case eight,
23 case seven --
24 BY MR. KARLINSKY:
25    Q.   At the moment we are looking in the

Page 106

SANDRA BIENVENU

1
2 first column and the last row of what is a
3 spreadsheet.
4     A.    Okay.
5     Q.    It says total annualized compensation.
6     A.    I see that.
7     Q.    We all agree that's the first column?
8     A.    That's the first column.
9     Q.    If we look across that particular row
10 from left to right, there are a number of cases
11 or scenarios or hypotheticals set forth, agreed?
12     A.    Yes.
13     Q.    For example, the first one indicates
14 minimum sales and is based on sales of
15 1,750,000, agreed?
16     A.    Yes.
17     Q.    That would be 70 percent of the quota?
18     A.    Yes.
19     Q.    And that would yield a commission
20 payment of $43,077?
21     A.    Yes.
22     Q.    Which together with salary would
23 aggregate $193,077 for the year?
24     A.    Yes.
25     Q.    And if we look at the column that is

Page 107

SANDRA BIENVENU

1
2 headed fulfill quota?
3     A.    Yes.
4     Q.    We can see that at 100 percent of
5 quota the commission would be $80,000?
6     A.    Yes.
7     Q.    Which represents the target
8 commissions under this plan?
9     A.    Yes.
10     Q.    And then if that was achieved, the
11 salary plus that target commission would yield
12 $250,000 of commission plus salary?
13     A.    No, sir.
14     Q.    That's inclusive of a bonus?
15     A.    Inclusive of the $20,000 bonus.
16     Q.    Yes, inclusive of the bonus that
17 applies at reaching the 80,000 figure?
18     A.    Yes.
19     Q.    It aggregates $250,000?
20     A.    Yes, sir.
21     Q.    And if you had a terrific year and you
22 had -- if we look down to the case eight, the
23 last column?
24     A.    Yes.
25     Q.    If there were $9,600,000 of sales, you

Page 108

SANDRA BIENVENU

1
2 see that?
3     A.    Yes, I do.
4     Q.    That would be the equivalent of 384
5 percent of quota?
6     A.    Yes.
7     Q.    Or almost four times quota?
8     A.    Almost, yes.
9     Q.    And that would yield a commission of
10 $600,000 which together with bonus and salary
11 would aggregate 770,000?
12     A.    That's correct.
13     Q.    Ms. Bienvenu, just to be clear about
14 this, Exhibit 58, the employment agreement, plus
15 SB 5 which is part of Exhibit 108, to your
16 knowledge constituted the entire statement of
17 your employment with America's Choice as of the
18 time you received SB 5?
19         MR. BENOWITZ:  Objection.
20     A.    It was the entire written statement,
21 yes.
22     Q.    Was there anything besides the written
23 statement that you understood to constitute part
24 of your employment?
25     A.    When Nick gave me this compensation

Page 109

SANDRA BIENVENU

1
2 plan, he explained the compensation plan.
3     Q.    What is it that Mr. Solinger said to
4 you at that time that you believe constituted a
5 part of your employment arrangement with the
6 company?
7     A.    First of all, we went through an
8 explanation much like what you just did, and he
9 also said the sales that you will be given
10 credit for are those for which you get a
11 contract signed, that is when we count your
12 quota credit, you will get paid when the company
13 gets paid.
14         So you accrue quota credit and accrue
15 the commissions at the time of the signing, and
16 then we pay you when the company gets paid.
17     Q.    When did you and Mr. Solinger have a
18 discussion about SB 5, part of Exhibit 108?
19     A.    When he gave it to me the first time.
20     Q.    When was that specifically?
21     A.    According to Exhibit 108, SB 0001, he
22 provided to it me on October 7 in 2005.
23     Q.    Does that accord with your
24 recollection, ma'am?
25     A.    As I told you before, it was sometime

Page 110

SANDRA BIENVENU

1  August, September, October timeframe. I wasn't
2  really sure.
3      Q.  Do you have any reason to doubt that's
4  when in fact it was provided to you?
5      A.  I have no reason to doubt, according
6  to this e-mail at the bottom, it shows that he
7  sent it to me on October 7.
8      Q.  Now, Ms. Bienvenu, at the time that
9  you left your employment with America's Choice,
10  did you have a copy of SB 5 and Exhibit 108?  Or
11  just SB 5, let's keep it that way, part of
12  Exhibit 108.  SB 5 is the plan, single sheet.
13     A.  I thought I had lost it which is why I
14  asked Nick for a copy of it.
15     Q.  Had you in fact lost it?
16     A.  I don't remember if I found it or if I
17  used the copy that he sent me.  I don't recall.
18     Q.  Ms. Bienvenu, would you look with me
19  to the next page of Exhibit 108 after SB 5?
20     A.  Yes.
21     Q.  In fact, let's do something a little
22  bit different for half a moment.  Let me mark
23  for identification Exhibit 109.  This is a
24  10-page document -- yes, this is a 10-page

Page 110

SANDRA BIENVENU

1      SANDRA BIENVENU
2  August, September, October timeframe. I wasn't
3  really sure.
4      Q.  Do you have any reason to doubt that's
5  when in fact it was provided to you?
6      A.  I have no reason to doubt, according
7  to this e-mail at the bottom, it shows that he
8  sent it to me on October 7.
9      Q.  Now, Ms. Bienvenu, at the time that
10  you left your employment with America's Choice,
11  did you have a copy of SB 5 and Exhibit 108?  Or
12  just SB 5, let's keep it that way, part of
13  Exhibit 108.  SB 5 is the plan, single sheet.
14     A.  I thought I had lost it which is why I
15  asked Nick for a copy of it.
16     Q.  Had you in fact lost it?
17     A.  I don't remember if I found it or if I
18  used the copy that he sent me.  I don't recall.
19     Q.  Ms. Bienvenu, would you look with me
20  to the next page of Exhibit 108 after SB 5?
21     A.  Yes.
22     Q.  In fact, let's do something a little
23  bit different for half a moment.  Let me mark
24  for identification Exhibit 109.  This is a
25  10-page document -- yes, this is a 10-page

Page 111

SANDRA BIENVENU

1      SANDRA BIENVENU
2  document which is Bates labeled SB 1 through SB
3  10.
4      A.  So do you want me --
5      Q.  Put that aside for half a moment.  I
6  just want to ask you some logistical questions.
7          (Exhibit 109, Document Bates Stamped
8  SB 001 through 0010, marked for identification)
9  BY MR. KARLINSKY:
10     Q.  Ma'am, take a moment and look at
11  Exhibit 109 in its entirety.  I don't know that
12  you need to read through it in its entirety, but
13  just read through it, tell me if you can
14  identify it.
15          You have done that?
16     A.  I have looked through it, yes.
17     Q.  Can you identify the document which
18  has been marked Exhibit 109?
19     A.  By identify you mean tell me what
20  each page was?
21     Q.  Well, why don't we do that.  Let's
22  start with the first page.  The first page is an
23  e-mail you received from Mr. Solinger?
24     A.  From Nick.
25     Q.  The same one we identified before

Page 112

SANDRA BIENVENU

1      SANDRA BIENVENU
2  dated February 10, 2007?
3      A.  Yes.
4      Q.  By the way, was that the date that you
5  had the conversation with him that you related
6  to us earlier in this deposition?
7      A.  It probably was but --
8      Q.  February 10 of 2007?
9      A.  I can't guarantee that, no.
10     Q.  But you think it might have been?
11     A.  Might have been.
12     Q.  Second page is another e-mail from Mr.
13  Solinger, again dated February 10, 2007?
14     A.  Yes.
15     Q.  And the third page seems to be a
16  letter addressed to Judy?
17     A.  Yes.
18     Q.  Tell us what that is.  Just identify
19  it for us.
20     A.  It was a letter that I sent to Judy
21  trying to get her to pay me the commissions that
22  I felt the company owed me.
23     Q.  To Judy Codding?
24     A.  Yes.
25     Q.  The next page is another spreadsheet.

Page 113

SANDRA BIENVENU

1      SANDRA BIENVENU
2  Can you identify that?
3      A.  From my handwriting on it, it says
4  original comp plan.
5      Q.  Yes.
6      A.  So I must have found it.
7      Q.  I'm not certain I understand that.
8  What does original comp plan signify to you?
9      A.  It's the one that America's Choice had
10  provided or Nick had provided in October.
11     Q.  So do you think that -- or is it your
12  understanding that SB 4, which is the fourth
13  page of this document, is identical to SB 5
14  which is the next page of this Exhibit 109?
15     A.  It is identical with one caveat.
16     Q.  And what's that?
17     A.  Case eight, column eight is different,
18  so obviously I had been putting -- trying to put
19  sales numbers in to see how much I was going to
20  make.
21     Q.  That's my question.  In other words,
22  this -- page 4, that is, SB 4 of Exhibit 109?
23     A.  Yes.
24     Q.  You received as an Excel spreadsheet?
25     A.  Yes.

Page 114

SANDRA BIENVENU

1
2     Q.    And you made some changes in it
3  yourself?
4     A.    All of the cells are locked with the
5  exception of a few where I could determine how
6  much money I was going to make on a specific
7  sales number, yes.
8     Q.    I'm not certain I really understand
9  that answer.  What changes did you make on SB 4
10  as compared to SB 5?
11     A.    Case eight, sales for 2006, on SB 4 it
12  looks like I was experimenting with 7.5 million
13  and on SB 5 it looks like I was experimenting
14  with 9.6 million.
15     Q.    Did you make the change in Exhibit
16  109, SB 5?  In other words, did you change the
17  numbers in case eight as well?
18     A.    I don't know if I did or if Nick did.
19     Q.    Was $9.6 million in sales contained in
20  the original compensation plan that you received
21  from Mr. Solinger?
22     A.    If I'm not mistaken, there were only
23  seven cases on the original.  I think I added
24  the eighth one to try to experiment and see --
25     Q.    You added the eighth case or Mr.

Page 115

SANDRA BIENVENU

1
2  Solinger added the eighth case?
3     A.    One of us did, yes.
4     Q.    Where did you get the number $9.6
5  million in sales?
6     A.    By trying to determine the Arkansas
7  sale and other sales that were made within my
8  territory during the time of this comp plan.
9     Q.    What other sales constituted the
10  $9.6 million?
11     A.    There were a lot --
12     Q.    Let's start -- we start with Arkansas,
13  correct?
14     A.    Right.
15     Q.    According to your contention?
16         MR. BENOWITZ:  Can we take a
17  three-minute break?
18         MR. KARLINSKY:  All right.
19         THE VIDEOGRAPHER:  The time is 12:42
20  p.m.  We are now off the record.
21         (Recess)
22         THE VIDEOGRAPHER:  The time is 12:46
23  p.m.  We are now back on the record.
24  BY MR. KARLINSKY:
25     Q.    Ms. Bienvenu, I want to get some

Page 116

SANDRA BIENVENU

1
2  clarity.  I'm not going to mark this quite yet,
3  I'll just refer to it by Bates numbers so we
4  have a clear record.
5         So what I am handing to you is
6  America's Choice, that is ACI DC 03552 through
7  554, and let me give you a copy.  Let's look
8  together at the second page of this document.
9  Actually let's start -- sorry let's look at the
10  first page.
11         The first page is an e-mail from Mr.
12  Solinger to you dated October 7, 2005, is that
13  right?
14     A.    Yes.
15     Q.    And if we turn to the -- I'm sorry,
16  stay with it for a second.  It says:  Subject:
17  Sandra Bienvenu comp plan XLS and there is an
18  indication that there is an attachment which
19  consists of that very file, Sandra Bienvenu comp
20  plan XLS?
21     A.    Yes.
22     Q.    Turn to the second page of this
23  document which is ACI 0553 together?
24     A.    Yes.
25     Q.    That would appear to be the document

Page 117

SANDRA BIENVENU

1
2  that you have described to me and identified as
3  your final comp plan as given to you on October
4  7 of 2005, correct?
5     A.    Yes.
6     Q.    Just this single page, that is, the
7  page 3553?
8     A.    No, actually it appears that it is
9  both pages.
10     Q.    That is your recollection, in fact,
11  that it is both pages that comprise the plan?
12     A.    I believe.
13     Q.    So there were in fact eight cases in
14  the original final comp plan that you were
15  given, fair to say?
16     A.    Fair to say, yes.
17     Q.    And what Mr. Solinger used as an
18  assumption in the eighth case differed from the
19  document we were talking about before because it
20  included a hypothetical $5 million of sales, is
21  that right?
22     A.    Yes, it included a hypothetical 5
23  million which would have been 200 percent of
24  quota, yes.
25     Q.    Let's have the court reporter mark

Page 118

SANDRA BIENVENU

1
2    that exhibit, hand it back to him, as Exhibit
3    110.
4          (Exhibit 110, Document Bates Stamped
5    ACI-DC-03552 through 03554, marked for
6    identification)
7    BY MR. KARLINSKY:
8       Q.   Ms. Bienvenu, so that we are clear
9    once again and we have a clear record, you'll
10   agree that Exhibit 110 is in fact in its
11   entirety the transmittal and the final
12   compensation plan you were provided by America's
13   Choice for fiscal year 2006?
14      A.   To the best of my knowledge, yes, sir.
15      Q.   We were in the middle of talking about
16   Exhibit 109, so let's go back to it.
17      A.   Okay.  So I don't need 110?
18      Q.   You can leave it right in front of you
19   but you don't need it right now.  Let's talk
20   about 109.  You were on the page that is SB 4.
21          Again, as I understand it, you took
22   the original spreadsheet that you had got at
23   some point and you made these modifications in
24   it?
25      A.   Yes.

Page 119

SANDRA BIENVENU

1
2       Q.   The one reflected in SB 4?
3       A.   Yes.
4       Q.   For example, I see in the left column
5    eight rows down, you put in the words 4/2006?
6       A.   I don't believe I did that.  I don't
7    recall doing that but I -- it's there.
8       Q.   It's not in the final comp plan you
9    got from Mr. Solinger which we have identified
10   as Exhibit 110, correct?
11      A.   It doesn't appear to be.
12      Q.   And, of course, there are changes as
13   between SB 4, part of 109 and Exhibit 110 in the
14   case eight column?
15      A.   Yes.
16      Q.   Let's continue with Exhibit 109.  If
17   we go to the page following which is SB 5?
18      A.   Yes.
19      Q.   Where did you receive a copy of SB 5
20   from?
21      A.   I believe from Nick but I'm not
22   absolutely positive.
23      Q.   Do you know when?
24      A.   After I left America's Choice, so I'm
25   assuming sometime in February.

Page 120

SANDRA BIENVENU

1
2       Q.   Of 2007?
3       A.   2007.
4       Q.   Let's turn to SB 6, the next page.
5    This document also came from your files?
6       A.   This was also from Nick because up
7    until that time I don't believe I had ever seen
8    it.
9       Q.   To the best of your recollection, did
10   you receive SB 6 from Mr. Solinger in or about
11   February of 2007?
12      A.   I can't say for certain but it could
13   have been part of what he sent me.
14      Q.   Let's look together at SB 7, the next
15   page.  From whom did you receive SB 7?
16      A.   Let me go back.  I either received
17   these documents directly from Nick or I received
18   them through my attorney and he received them
19   from Nick and I'm not absolutely certain which
20   way it was.
21      Q.   One way or the other, these documents
22   including SB 7 came from Mr. Solinger whether
23   they came through someone else --
24      A.   They came through someone else, Nick
25   or someone else because I would never have had

Page 121

SANDRA BIENVENU

1
2    this during my employment.
3       Q.   Well, can you suggest who the someone
4    else might be?
5       A.   I don't know.  It must have been Nick
6    or my attorney.
7       Q.   Is it your best recollection that you
8    got SB 7 from either Mr. Solinger or your
9    counsel?
10      A.   To the best of my knowledge, yes.
11      Q.   Ms. Bienvenu, you say that you never
12   saw SB 7 prior to the time you resigned from
13   America's Choice?
14      A.   No, sir.
15      Q.   That's correct, you did not?
16      A.   I did not.
17      Q.   And SB 7 reflects salary information
18   for other employees of America's Choice who were
19   at your level?
20      A.   Yes, it does.
21      Q.   Other business development directors
22   within the company?
23      A.   Yes, it does.
24      Q.   Did you understand that SB 7 was a
25   confidential document, Ms. Bienvenu?

32 (Pages 122 to 125)

Page 122

SANDRA BIENVENU

1  SANDRA BIENVENU
2      MR. BENOWITZ: Objection.
3      A.   It wasn't marked confidential, so --
4      Q.   How about SB 8, where did you receive
5  that from, where or from whom?
6      A.   Obviously from the same place.
7      Q.   Either from Mr. Solinger or your
8  counsel who then received it from Mr. Solinger?
9      A.   I would assume so, yes.
10     Q.   And the same with respect to SB 9 and
11  10?
12     A.   Yes, sir, I couldn't figure out what
13  those were.
14     Q.   Well, join the club because I can't
15  either.
16         Ms. Bienvenu, where are you currently
17  employed?
18     A.   I work for Scientific Learning
19  Corporation.
20     Q.   Where are you based?
21     A.   I work out of my home, but Scientific
22  Learning Corporation is actually based in
23  Oakland, California.
24     Q.   Oakland?
25     A.   Yes, sir.

Page 123

1  SANDRA BIENVENU
2      Q.   What is Scientific Learning
3  Corporation?
4      A.   We provide brain fitness software for
5  children to improve their brain processing so
6  they can benefit from instruction better.
7      Q.   When did you first interview with
8  Scientific Learning Corporation for a job?
9      A.   About 2004.
10     Q.   I take it that you did not accept
11  employment with that company at that time?
12     A.   The gentleman who was vice-president
13  of sales was my former vice-president of sales
14  at Compass Learning. He had been trying to
15  recruit me ever since he went to there -- it
16  wasn't a formal interview but we talked and, no,
17  I did not.
18     Q.   When was your next interview with
19  Scientific Learning Corporation?
20     A.   Formal interview?
21     Q.   Formal or informal.
22     A.   Oh, informal, he probably called me
23  once every two to three months.
24     Q.   I take it, then, he kept in contact
25  with you in an attempt to interest you in

Page 124

1  SANDRA BIENVENU
2  employment there?
3      A.   Yes, and we were friends.
4      Q.   When did you first have a formal
5  interview with him, or anyone else there?
6      A.   Around the end of December 2006 or the
7  first of January 2007.
8      Q.   Where was that interview?
9      A.   Via telephone.
10     Q.   Did you have an in person interview
11  after that?
12     A.   I -- it wasn't really an interview. I
13  ran into their regional sales director at a
14  Florida conference.
15     Q.   When was that?
16     A.   That may have actually been before my
17  phone interview, so it was sometime in December
18  I ran into her and she introduced herself and
19  told me that she had heard about me and would I
20  be interested in coming to work for America's
21  Choice. But I don't recall exactly when that
22  conference was.
23     Q.   You meant Scientific Learning
24  Corporation?
25     A.   Pardon?

Page 125

1  SANDRA BIENVENU
2      Q.   Your last answer you said that she
3  asked you whether you would be interested in
4  coming to work for America's Choice?
5      A.   No, I'm sorry, for Scientific
6  Learning.
7      Q.   For Scientific Learning?
8      A.   I'm confused, sorry.
9      Q.   What was the conference in December in
10  which you ran into her?
11     A.   It was some Florida conference, I
12  don't remember.
13     Q.   What next happened in connection with
14  your employment by Scientific Learning
15  Corporation?
16     A.   Glenn called me again in December --
17     Q.   Glenn's name is what?
18     A.   Chapin, C-H-A-P-I-N. Glenn called me
19  in December, wanted to know if I would be
20  interested, and I said yes, that I wasn't really
21  happy where I was and I definitely would be
22  interested in talking to them.
23         I then talked with Gina Larue, their
24  human resources person via telephone. I don't
25  recall exactly when it was. Gina and I talked

Page 126

SANDRA BIENVENU

1
2  several times on the phone.  I talked several
3  times to Kim Whitten, several times to Glenn
4  Chapin.
5      Q.   Spell Gina's name, please?
6      A.   G-I-N-A, L-A-R-U-E.
7      Q.   And another name that you mentioned --
8      A.   Kim Whitten.
9      Q.   Kim Whitten?
10     A.   Kim Whitten, W-H-I-T-T-E-N, Tom
11 Whitten's sister-in-law.
12     Q.   Anyone else you spoke to before you
13 went to work there?
14     A.   You know, I don't remember -- yes, I
15 did, yes, I did.  Marty Monroe.
16     Q.   When did you accept an offer of
17 employment from Scientific Learning Corp.?
18     A.   Sometime in the middle of January.  I
19 don't remember the exact date.
20     Q.   Was it before or after you resigned
21 from America's Choice?
22     A.   It was all about the same time, within
23 the same week.
24     Q.   Have you advised your current
25 employer, Scientific Learning Corporation, about

Page 127

SANDRA BIENVENU

1
2  the pendency of this litigation?
3      A.   They knew about it when I was actually
4  interviewing -- no, they did not, not when I was
5  interviewing.  When did I tell them?  I guess
6  when I had to take some time off.
7      Q.   Who did you inform?
8      A.   Well, Glenn Chapin would have been the
9  first one.  Glenn has since left the company.
10 My direct boss now is Andy Myers, so I would
11 have had to inform him while I was taking PTO
12 especially in the last quarter of -- the last
13 work of the quarter.
14     Q.   M-Y-E-R-S?
15     A.   I believe it is.  He hasn't been with
16 us very long, so --
17     Q.   When did you commence your employment
18 with Scientific Learning Corporation?
19     A.   Sometime in the second or third week
20 of January 2007.  I can't give you an exact date
21 because I just didn't even -- I don't know.
22     Q.   All right.
23     MR. KARLINSKY:  Why don't we take our
24 lunch break right here.
25     THE VIDEOGRAPHER:  The time is 1:03

Page 128

SANDRA BIENVENU

1
2  p.m.  We are off the record.
3      (Lunch recess)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 129

SANDRA BIENVENU

1
2
3      AFTERNOON SESSION
4
5      THE VIDEOGRAPHER:  The time is 2:02
6  p.m.  We are back on the record.
7  BY MR. KARLINSKY:
8      Q.   Ms. Bienvenu, up until the time that
9  you were provided with your final 2006
10 compensation plan by Mr. Solinger, did you have
11 any communication with anyone at ACI on the
12 subject of quota credit?
13     A.   Other than Mr. Solinger?
14     Q.   Other than Mr. Solinger, yes.  You
15 have told us about those already.
16     A.   Not that I specifically recall, no.
17     Q.   That you generally recall?
18     A.   Not really, no.
19     Q.   During the entire course of your
20 employment at America's Choice, did anyone ever
21 contradict what Mr. Solinger told you in that
22 period from when you first began speaking to him
23 and up until October 5 of 2005 relating to quota
24 credit?
25     MR. BENOWITZ:  Could you read back the

34 (Pages 130 to 133)

| Page 130 |
| --- |

SANDRA BIENVENU

1
2  question?
3      Q.   During the entire course of -- let me
4  do it a little differently.
5          I want to book end this period of
6  time.  I want to talk about the entire
7  employment, so we are talking about all the
8  discussions you had with Mr. Solinger -- let's
9  strike that and withdraw, let me start all over
10  again.
11         You have told us at this point that
12  you began having conversations with Mr. Solinger
13  at some point prior to April of 2005.
14     A.   Yes, sir.
15     Q.   Beginning at that period of time when
16  you started to have those communications with
17  him and right up until the time that you quit in
18  January of 2007, did anyone in the employ of
19  America's Choice contradict what Mr. Solinger
20  had told you about quota credit?
21     A.   I don't recall.
22     Q.   You don't recall anyone doing so?
23     A.   I don't recall.
24     Q.   Let me ask you to look at Exhibit 16.
25     A.   Okay.

| Page 131 |
| --- |

SANDRA BIENVENU

1
2      Q.   Ms. Bienvenu, can you identify Exhibit
3  16 for us?
4      A.   Yes, sir.  It is an e-mail that I sent
5  to Judy Aronson with a copy to Jason Dougal on
6  Friday, April 14th at 9:29 a.m.
7      Q.   And it has an attachment to it, does
8  it not?
9      A.   Yes, sir, it does.
10     Q.   Ms. Bienvenu, who gave that name,
11  newform.doc to the attachment, that file name?
12     A.   I honestly do not know.
13     Q.   Did you yourself put that file name on
14  it?
15     A.   No, sir.
16     Q.   So you received it in that fashion?
17     A.   I must have.
18     Q.   Next question for you, then, from whom
19  did you receive a copy of newform.doc?
20     A.   It would have been someone within the
21  Arkansas State Department.
22     Q.   Of education?
23     A.   Of education, I'm sorry.
24     Q.   Do you know who within ADE?
25     A.   I don't remember if Becky Dalton had

| Page 132 |
| --- |

SANDRA BIENVENU

1
2  started by this time.
3      Q.   Let's mark as Exhibit 111, a
4  single-page document dated April 14, 2006.  For
5  the record, I should identify that as ACI 02621.
6          (Exhibit 111, Document Bates Stamped
7  ACI-DC-02621, marked for identification)
8  BY MR. KARLINSKY:
9      Q.   Ms. Bienvenu, Exhibit 111 is an e-mail
10  message dated April 14, 2006 at 12:51 p.m. from
11  you to Jason Dougal.
12         You say in part directed to Mr.
13  Dougal:  "Jason, I gave Dr. Becky Dalton your
14  cell number so she could find someone in their
15  legal department to talk with you."
16         Does that refresh your recollection --
17     A.   Yes, it does.
18     Q.   -- as to whether Dalton was employed
19  at ADE at that time?
20     A.   Yes, it does.
21     Q.   And she was?
22     A.   She was, obviously, yes.
23     Q.   Does looking at Exhibit 111 also
24  refresh your recollection that you received
25  newform.doc?

| Page 133 |
| --- |

SANDRA BIENVENU

1
2      A.   From Dr. Dalton, yes, sir.
3          MR. RHORER:  Marty, for the record,
4  that is also Exhibit 16A.  If it is not could
5  you tell me what -- it is the same Bates No.
6          MR. KARLINSKY:  Let's stay on the
7  record for this.  We had a problem with that.
8  When we looked back at our master exhibit list,
9  because I thought you and I talked about that,
10  we both thought it was 16A but we don't find a
11  record of that, so I wanted to mark it
12  separately.
13         MR. RHORER:  But it is the same
14  document?
15         MR. KARLINSKY:  It is the same
16  document.  It is the last page of Exhibit 16.
17         MR. RHORER:  We have agreed it is
18  apparently two separate documents.
19         MR. KARLINSKY:  That's correct, that's
20  why I marked it separately.
21     Q.   Let's stay with Exhibit 111 for a
22  moment, ma'am.  This was also sent on the same
23  Friday that you sent newform.doc to Judy Aronson
24  and Jason Dougal, correct?
25     A.   Yes, sir.

Page 134

SANDRA BIENVENU

1
2    Q.   Why did you direct it to these
3    particular individuals, Judy Aronson and Jason
4    Dougal?
5    A.   As I recall, Judy Aronson was special
6    assistant to Judy Codding and she had worked
7    with me for a couple of days in Arkansas and I
8    sent it to Judy with a copy to Jason because
9    Jason was the person that signed contracts.
10   Q.   Did you have any discussion with Ms.
11   Dalton about Exhibit 16, prior to the time you
12   sent it -- and by that I mean the attachment to
13   Exhibit 16 to the e-mail -- prior to the time
14   you sent it to Aronson and Dougal?
15   A.   I'm sure there was conversation.
16   Q.   Tell me about that conversation,
17   please.
18   A.   I don't recall the specific
19   conversation other than Becky needed this signed
20   and she wasn't sure why.  And as I recall, the
21   reason I hesitated to say it came from Becky,
22   Becky had just been hired at the Arkansas
23   Department of Education and I don't think she
24   knew what the form was intended for at that
25   time.  She was brand new.

Page 135

SANDRA BIENVENU

1
2    Q.   Did you know what the form was
3    intended for?
4    A.   It was a professional services
5    contract.
6    Q.   Yes, but did you know what it was
7    intended for?
8    A.   I thought I did, yes, sir.
9    Q.   What was that?
10   A.   The contract between the Arkansas
11   State Department of Education and America's
12   Choice for work that was to be done in their
13   schools that were in improvement years three,
14   four and five, I believe.
15   Q.   Let me just clarify for half a moment.
16   Did you ask Ms. Dalton why Arkansas needed the
17   form?
18   A.   I don't believe I asked her.  By this
19   time an RFP had been opened on April 12.
20   Q.   A request for proposal?
21   A.   A request for proposal.  I was at the
22   bid opening.  There were maybe two or three
23   additional vendors there.  They did not award
24   the bid or the RFP to us on that particular day.
25   I don't believe they could on that particular

Page 136

SANDRA BIENVENU

1
2    day, they had to get approval.  So afterwards
3    when she sent me this, no, I didn't ask her.
4    Q.   Did you assume, Ms. Bienvenu, that
5    this form that she sent you was in effect the
6    acceptance of the proposal from America's
7    Choice? ·
8        MR. BENOWITZ:  Objection.
9    A.   I honestly don't know what I assume at
10   that point.
11   Q.   Without regard to that, you did send
12   the form on to Aronson and Dougal, correct?
13   A.   I did.
14   Q.   With whom did you have a conversation
15   about the form?
16       MR. BENOWITZ:  Objection.
17   A.   I don't know what you are asking me.
18   Q.   Did you hear from either Aronson or
19   Dougal about the form that you had sent to them?
20   A.   I think Jason called and asked me some
21   questions that I couldn't answer, so I gave
22   Becky his cell number.
23   Q.   What do you recall Mr. Dougal asking
24   you?
25   A.   I don't.

Page 137

SANDRA BIENVENU

1
2    Q.   You recall nothing about it?
3    A.   I don't remember those -- I have
4    hundreds of conversations in my work.  That was
5    a couple years ago, three years ago.  I have no
6    idea.
7        MR. BENOWITZ:  Could you just let her
8    answer, please.
9    Q.   Do you remember anything that Mr.
10   Dougal said to you, Ms. Bienvenu?
11   A.   No.  I really don't.
12   Q.   Did you read Mr. Dougal's testimony
13   about the discussion he had with you concerning
14   the form document?
15   A.   I read his testimony, yes.
16   Q.   Do you have any reason to suggest that
17   the testimony was not accurate?
18       MR. BENOWITZ:  Objection.
19   A.   I have no reason to even know what it
20   was all about at that time.  It's been too long
21   ago.
22   Q.   I don't know what you are saying.
23   What's been too long ago, ma'am?
24   A.   The conversation with Jason was too
25   long ago.  I can't say that what he testified is

Page 138

SANDRA BIENVENU

1    true or false. I just don't know.
2        Q.   Well, did you understand that the
3    newform.doc that was sent to you was an
4    essential step in getting a contract in place
5    with Arkansas?
6        A.   Well, it was my understanding it was
7    the contract that we -- that we, meaning
8    America's Choice, had to sign and they had to
9    sign.
10       Q.   So you would understand and you would
11   agree with me that it was a critical step in
12   putting that contract in place, correct?
13           MR. BENOWITZ: Objection.
14           MR. RHORER: Object to the form.
15       A.   I'm really not an attorney --
16       Q.   I didn't ask you if you were an
17   attorney, ma'am. Didn't you understand that
18   getting this document signed was critical to
19   advancing the Arkansas project?
20       A.   This document that you are referring
21   to --
22       Q.   The newform.doc?
23       A.   Says professional consultant services
24   contract.

Page 139

SANDRA BIENVENU

1        Q.   And my question to you, ma'am, is did
2    you understand that getting this document signed
3    was an important step in moving the Arkansas
4    project ahead?
5            MR. BENOWITZ: Objection.
6        A.   It was important to get the contract
7    signed, yes, sir.
8        Q.   In part because you believed that you
9    would receive commission?
10           MR. BENOWITZ: Objection.
11       Q.   If the contract was signed, correct?
12           MR. BENOWITZ: Objection to form.
13       A.   Well, yes. Why would I not be
14   working --
15       Q.   Ms. Bienvenu, do you not recall
16   anything that Mr. Dougal told you when you
17   talked about newform.doc with him?
18           MR. BENOWITZ: Objection. Question
19   asked and answered.
20       A.   I'm not an attorney. I was relying --
21       Q.   Ms. Bienvenu, we can have a
22   stipulation on the record, ma'am, that you are
23   not an attorney. You have now said that at
24   least thirty times. I don't need to be told

Page 140

SANDRA BIENVENU

1    that. I know very well you are not an attorney.
2            My question to you was, do you not
3    remember anything Mr. Dougal said about this
4    document that you sent to him?
5            MR. BENOWITZ: Objection.
6        A.   I do not remember.
7        Q.   Do you remember anything that Ms.
8    Aronson said about this document that you sent
9    to him?
10           MR. BENOWITZ: Objection.
11       A.   I don't remember whether Judy and I
12   even discussed this document.
13       Q.   Fine. Did you have a conversation
14   concerning the document that you transmitted by
15   Exhibit 16 with Judy Codding?
16       A.   The only conversation I recall having
17   with Judy Codding about any part of this was
18   when I called Judy to tell her that Arkansas was
19   a done deal.
20       Q.   Ms. Bienvenu, I asked you whether you
21   had a discussion with Ms. Codding about the
22   document that you forwarded to Judy Aronson and
23   Jason Dougal. That question can be answered yes
24   or no.

Page 141

SANDRA BIENVENU

1            Did you have such a discussion with --
2            MR. BENOWITZ: Mr. Karlinsky, she has
3    answered the question. You are badgering the
4    witness.
5        Q.   Did you have such a discussion with
6    Ms. Codding?
7        A.   Not that I recall.
8        Q.   You recall no discussion on the
9    telephone with Jason Dougal and Judy Codding, is
10   that correct?
11           MR. BENOWITZ: About this document,
12   correct?
13       A.   About this document?
14       Q.   That's correct.
15       A.   I don't remember the conversation with
16   Jason about this document. I don't believe that
17   I discussed it with Judy Codding.
18       Q.   What happened next after you sent the
19   newform.doc document to Aronson and Dougal?
20       Q.   What happened next?
21       Q.   Yes.
22       A.   What did I do next?
23       Q.   What happened next?
24       A.   I really don't understand what you are

Page 142

SANDRA BIENVENU

1  asking me. I need you to be more specific.
2  Q.  Ms. Bienvenu, I'm asking you about the
3  Arkansas project. What happened with respect to
4  the Arkansas project after you sent newform.doc
5  to Judy Aronson and Jason Dougal?
6  A.  Jason signed it and sent it back. I
7  mean, do you have something that will refresh my
8  memory? I have no idea of what you are --
9  Q.  Well, I'll ask you to look at Exhibit
10  16 with me. Go to the third page of Exhibit 16.
11  This is a copy of the document that as you have
12  told me you sent to Aronson and Dougal, correct?
13  A.  Yes.
14  Q.  It is a blank form document, is it
15  not?
16  A.  Yes.
17  Q.  Is there anything filled out in it?
18  A.  No.
19  Q.  Was someone responsible for filling
20  out this form document?
21  A.  I would assume that Judy Aronson or
22  Jason Dougal or both would be responsible for
23  that. That's who I sent it to.
24  Q.  Did you yourself have any involvement
25

Page 143

SANDRA BIENVENU

1  in filling out this form document?
2  A.  I had no involvement in filling out
3  the form. I had done work before that Judy
4  Aronson had and I don't know if Jason did in the
5  form of spreadsheets, pricing, laying out of the
6  plan for Arkansas, etc., dating back to -- all
7  the way back to February.
8  Q.  Did you receive a copy of the blank
9  form after it was filled out?
10  MR. BENOWITZ: Objection to form.
11  A.  I think the first time I saw it after
12  it was filled out was after this litigation
13  began.
14  Q.  Did you understand the form had been
15  filled out and signed and returned to Arkansas?
16  MR. BENOWITZ: Objection.
17  A.  Yes.
18  Q.  How did you learn that?
19  A.  Because Becky and I began to plan
20  everything that was going on. I believe Becky
21  may have told me that.
22  Q.  What next steps did you take in
23  connection with the Arkansas contract after you
24  learned that?
25

Page 144

SANDRA BIENVENU

1  A.  We began to schedule the training,
2  Dottie Whitlow and Marietta Palmer put together
3  an advertisement for people in Arkansas to work
4  on the project. They hired the people. I was
5  back in Arkansas, and I can't remember the exact
6  dates, but I believe it was early May where we
7  actually started refining the details of exactly
8  what was going to happen with the project and
9  how it was going to be laid out. I don't
10  remember those exact dates.
11  Q.  Would you look at Exhibit 23, please.
12  You've seen Exhibit 23 before, ma'am?
13  A.  In preparation for this I think I did
14  see it.
15  Q.  Had you not seen it before?
16  A.  Before the litigation began?
17  Q.  Yes.
18  A.  It wasn't copied to me.
19  Q.  I asked you if you had seen it before?
20  A.  Not to my knowledge.
21  Q.  Do you have any knowledge about Mr.
22  Harris getting in touch with Mr. Dougal to tell
23  him to contact Davis at ADE to coordinate
24  finalizing the America's Choice contract?
25

Page 145

SANDRA BIENVENU

1  A.  I know that Cecil went back and spoke
2  with Diana Julian and Bobby Davis on his own one
3  time and I wasn't involved in those meetings.
4  In the meeting in early May --
5  Q.  Let me stop you right there. How do
6  you know that Mr. Harris went back to Arkansas,
7  had a meeting with Davis and the Julian?
8  A.  Because Cecil and I talked every day.
9  Q.  What did he tell you about that
10  meeting?
11  A.  I'm trying to explain to you how this
12  all came about.
13  Q.  I'm asking you a question, ma'am.
14  What did he tell you about that meeting?
15  MR. BENOWITZ: If anything.
16  A.  I don't know that he gave me any
17  details about the meeting other than he went to
18  see Bobby Davis, I thought to go ahead and get
19  an invoice because Diana Julian had told us that
20  she had money to pay immediately.
21  Q.  You thought Mr. Harris went to
22  Arkansas to get an invoice?
23  A.  He went to Arkansas and talked with
24  Bobby Davis about an invoice. I don't know if
25

Page 146

SANDRA BIENVENU

1    SANDRA BIENVENU
2  that was this particular meeting. I have no
3  idea.
4     Q.   Why would Mr. Harris have to go to
5  Arkansas to talk to Davis and Julian about an
6  invoice?
7        MR. BENOWITZ: Objection.
8        MR. RHORER: Object to form.
9     A.   I don't know.
10     Q.   What's your understanding?
11        MR. RHORER: Object to the form.
12     A.   My understanding was Diana Julian had
13  told us in the May meeting that they had money
14  that they could pay upon signature on the
15  contract.
16     Q.   Which May meeting are you referring
17  to?
18     A.   It was sometime in early, mid May. It
19  was a meeting in the State Department. Judy
20  Aronson, Dottie Whitlow, Cecil and I met with
21  the Arkansas team. Diana Julian, Becky Dalton,
22  I believe Annette Barnes was there, I believe --
23  I think Bill Nielson was there where we were
24  laying out exactly how the project was going to
25  be run.

Page 147

SANDRA BIENVENU

1    SANDRA BIENVENU
2     Q.   What did Julian say specifically in
3  that May meeting on the subject of having money
4  that they could pay?
5     A.   She identified the funding source as
6  school improvement dollars, and I believe the
7  school improvement dollars were tied to Title 1,
8  and I believe that she told me that they had
9  money that had to be encumbered within the 2006
10  fiscal year of the State Department and that
11  they needed to be invoiced immediately. That's
12  my recollection.
13     Q.   What did you do in connection with
14  obtaining an invoice?
15     A.   I didn't do anything.
16     Q.   Why not?
17     A.   Because the salesperson that I managed
18  who covered Arkansas was going to be in
19  Arkansas, and I traveled over a hundred thousand
20  miles anyway a year and I didn't want to be
21  there again.
22     Q.   I guess I'm trying to understand
23  specifically what occurred, Ms. Bienvenu. You
24  were told that America's Choice could be paid a
25  substantial sum of money, is that right?

Page 148

SANDRA BIENVENU

1    SANDRA BIENVENU
2     A.   Yes.
3     Q.   If only it were to send an invoice to
4  the Arkansas Department of Education?
5     A.   After the contract was signed.
6     Q.   Which contract, ma'am?
7     A.   The Arkansas professional services
8  contract.
9        MR. BENOWITZ: What are you referring
10  to?
11     A.   Professional consultant services
12  contract under six, tab 16.
13     Q.   Well, tab 16 is a blank document, is
14  it not?
15     A.   Yes.
16     Q.   When was the tab 16 document in fact
17  signed?
18     A.   To the best of my knowledge, sometime
19  in the April timeframe after it was sent to
20  Jason and Judy.
21     Q.   Well, ma'am, don't you know that it
22  was in fact signed and returned to the Arkansas
23  Department of Education on the Monday following
24  the Friday that you transmitted it to them? You
25  know that, don't you?

Page 149

SANDRA BIENVENU

1    SANDRA BIENVENU
2        MR. BENOWITZ: Objection.
3     A.   I know that it was signed, I believe
4  it was April 16, 17.
5     Q.   I'll represent to you that it was
6  signed on April 17.
7     A.   Okay. I did not know that it was the
8  Monday after the Friday of the time that I sent
9  this.
10     Q.   April 17 was before the meeting that
11  you have now been testifying about which you
12  have told me was in early to mid May.
13     A.   Right.
14     Q.   Okay. So this professional services
15  document, whatever it was, was signed at the
16  time of that meeting?
17     A.   Yes, it was.
18     Q.   And did neither you nor Mr. Harris say
19  at that meeting that it's already been signed?
20        MR. BENOWITZ: Objection.
21     A.   Why would I say that?
22     Q.   Well, you told me before that Ms.
23  Julian said that you could or America's Choice
24  could invoice the Arkansas Department of
25  Education as soon as the contract was signed?

Page 150

SANDRA BIENVENU

1
2    A.   I don't believe that they had signed
3    it by April 17.
4    Q.   They hadn't signed it?
5    A.   I don't believe.  I don't know.
6    Q.   Do you know who had signed it?
7    A.   Jason Dougal.
8    Q.   That was it to your knowledge at that
9    point?
10   A.   To my knowledge.
11   Q.   So who else had to sign that document?
12   A.   Someone in the Arkansas State
13   Department in their procurement office was my
14   understanding.
15   Q.   Now, what if anything did you do in
16   order to push that forward to get that document
17   signed prior to June 30 of 2006?
18   A.   I didn't do anything.
19   Q.   Did you direct Mr. Harris to do
20   anything, Cecil Harris?
21   A.   To get the document signed?
22   Q.   Did you direct Mr. Harris to do
23   anything in connection with that document?
24   A.   I don't remember directing him to do
25   anything, but he was in the meeting also about

Page 151

SANDRA BIENVENU

1
2    the money being allocated being encumbered for
3    2006.
4    Q.   What is your understanding of what Mr.
5    Harris in fact did in order to get America's
6    Choice to generate an invoice?
7         MR. BENOWITZ:  Objection to form.
8    A.   I'm not sure I know the details of
9    what he did.
10   Q.   Do you know anything about what he
11   did?
12   A.   I know he met with Diana Julian and
13   Bobby Davis but, I mean, I wasn't there so I
14   don't know the conversation.
15   Q.   And he did not report to you on that
16   conversation?
17   A.   I don't recall him giving me details
18   of that conversation.
19        MR. KARLINSKY:  Stop here.
20        THE VIDEOGRAPHER:  Here now marks the
21   end of tape three of the deposition of Ms.
22   Sandra Bienvenu.  The time is 2:32 p.m.  We are
23   now off the record.
24        (Pause)
25        THE VIDEOGRAPHER:  Here now marks the

Page 152

SANDRA BIENVENU

1
2    beginning of tape four of the deposition of Ms.
3    Sandra Bienvenu.  The time is 2:35 p.m.  We are
4    now back on the record.
5    BY MR. KARLINSKY:
6    Q.   Ma'am, would you look at Exhibit 17 in
7    the exhibit book?  Do you recognize Exhibit 17?
8    A.   Yes.
9    Q.   What is it?
10   A.   Looks like an e-mail from Jason Dougal
11   to Rebecca Dalton at the Arkansas Department of
12   Education on Monday, April 17, with an
13   attachment that says 0062-001.PDF.  And it
14   appears to be a professional consultant services
15   contract that is now filled out.
16   Q.   And signed, is it not?
17   A.   And signed by Jason -- well, I guess
18   it is Jason's signature and T. Kenneth James'
19   signature.
20   Q.   Both signatures dated April 17 of '06?
21   A.   Yes, it is.
22   Q.   Under this document that we are
23   looking at, what schools was America's Choice to
24   provide its services at?
25        MR. BENOWITZ:  Objection to form.

Page 153

SANDRA BIENVENU

1
2    A.   You want me to name schools?  I can't
3    do that --
4    Q.   On this document, I'm asking you,
5    ma'am.
6    A.   I can read to you paragraph six.
7    Q.   I'm not asking you to read it to me, I
8    am asking you under this document which schools
9    would America's Choice provide services at?
10        MR. BENOWITZ:  Objection.
11   A.   The school improvement schools that
12   were in years three, four and five.
13   Q.   But the schools are not identified in
14   the document Exhibit 17, is that correct?
15   A.   That's correct.
16        MR. RHORER:  Object to the form.
17   Q.   And if we had nothing else to go on
18   other than Exhibit 17, America's Choice wouldn't
19   know which schools to provide materials to or
20   services to, true?
21        MR. BENOWITZ:  Objection.
22   A.   If there is nothing else, yes.
23   Q.   Please look at Exhibit 24.  Exhibit 24
24   is an e-mail that you authored dated June 13,
25   2006, is that right?

Page 154

SANDRA BIENVENU

1
2    A.  Yes.
3    Q.  To which is attached something, a
4  document called Arkansas -- ARK, rather,
5  proposed budget may.xls, is that right?
6    A.  Yes.
7    Q.  That's a spreadsheet that's attached
8  to the e-mail?
9    A.  Yes.
10   Q.  And you sent the e-mail to Jason
11 Dougal and Judy Aronson?
12   A.  I did.
13   Q.  For what purpose?
14   A.  Because I started working on this
15 particular spreadsheet way back in February,
16 March, and we had made some changes to it.
17   Q.  I am a little bit confused by that.
18 You started working on this particular
19 spreadsheet, you mean that the document that you
20 sent to them, Dougal and Aronson, via Exhibit 24
21 was a modification of an earlier document that
22 you had prepared?
23     MR. BENOWITZ:  Objection.
24   A.  It was -- there were many variations
25 on this spreadsheet done over the course of

Page 155

SANDRA BIENVENU

1
2  several months.
3    Q.  Over what period of time?
4    A.  I think the first time I started
5  talking with the Arkansas people about pricing
6  was sometime early January, February of 2006.
7    Q.  For how long did those discussions
8  continue?
9    A.  They went all the way through until
10 the first week of training in July 11.
11   Q.  So the pricing wasn't determined until
12 July 11?
13     MR. BENOWITZ:  Objection --
14   A.  No.
15     MR. BENOWITZ:  -- to form.
16   A.  Wrong.
17   Q.  Wrong?
18   A.  Wrong.
19   Q.  When was the pricing determined?
20   A.  The pricing was determined in the RFP
21 that was opened on April 12.  The price never
22 changed from 6,095,000.
23   Q.  Did the allocation of services and the
24 pricing with respect to those allocations change
25 during the period of time February of 2006

Page 156

SANDRA BIENVENU

1
2  through July of 2006?
3     MR. BENOWITZ:  Could you read that
4  back, please?
5    Q.  Did the allocation of services and the
6  pricing with respect to those allocations change
7  during the period of time February of 2006
8  through July of 2006?
9     MR. RHORER:  Object to the form.
10   A.  The refinement of the details changed.
11   Q.  What do you mean by refinement of the
12 details?
13   A.  Number of classrooms, number of
14 teachers, number of DRA kids, those things.
15   Q.  I'm sorry, you used an initial, an
16 acronym there.
17   A.  Directed reading assessment is I
18 believe what DRA stands for.  That was pulled
19 out of long term memory.
20   Q.  So, in other words, when you first
21 began discussions with Arkansas about the
22 Arkansas project, you were advised that Arkansas
23 had $6,095,000 available for the project, is
24 that right?
25     MR. BENOWITZ:  Objection.

Page 157

SANDRA BIENVENU

1
2    A.  Yes.
3    Q.  That number never changed?
4    A.  Never changed.
5    Q.  From beginning to end?
6    A.  Never changed.
7    Q.  Never changed.  But what did change
8  was how that total contract value was to be
9  allocated to various parts of the contract, is
10 that right?
11     MR. BENOWITZ:  Objection to form.
12     MR. KARLINSKY:  What's the form
13 objection?
14     MR. BENOWITZ:  She never said it was
15 part of the contract, not part of the contract.
16     MR. KARLINSKY:  I'll take the answer.
17   Q.  Do you want to hear it again?
18   A.  Hm-hmm.
19   Q.  My question was:  But what did change
20 was how that total contract value was to be
21 allocated to various parts of the contract, is
22 that right?
23     MR. BENOWITZ:  Continue the objection.
24   A.  The refinements changed, yes.
25   Q.  Is the answer to my question yes?

Page 158

SANDRA BIENVENU

```
 1         SANDRA BIENVENU
 2         MR. BENOWITZ: Objection.
 3    A.   I think so, yes.
 4    Q.   Would you look at Exhibit 25, please.
 5  You received a copy of Exhibit 25, ma'am?
 6    A.   I did.
 7    Q.   It is an e-mail dated June 14, 2006
 8  from Jason Dougal to you and Cecil Harris, also
 9  cc to Pat Whiteaker and Judy Aronson?
10    A.   It is.
11    Q.   At least the first document on the
12  page is.  If you look below it appears there is
13  a preceding e-mail from you to Mr. Dougal, is
14  that right?
15    A.   Yes.
16    Q.   Dated June 13, 2006?
17    A.   Yes.
18    Q.   In this document, Exhibit 25, you --
19  why don't we read it for the record because it
20  is quite difficult to make out.  On the bottom
21  it seems to be a -- grayed out from the e-mail
22  resend or something.
23         It says: "Jason" -- and correct me if
24  I'm wrong, ma'am -- "Jason, when calculating the
25  number of middle schools, I included the high
```

Page 159

SANDRA BIENVENU

```
 1  schools that had the six through 12 and seven
 2  through 12 configurations in the number and the
 3  K through eight elementary school."
 4         Correct?
 5    A.   Yes.
 6    Q.   Then you also said: "We are $666" --
 7    A.   No.  $660.
 8    Q.   "$660 over the amount of the contract,
 9  but I couldn't find a way to reduce it so I
10  leave that to you and Judy A."
11    A.   Yes.
12    Q.   Then there looks like a smile right
13  next to that, is that right?
14    A.   Yes.
15    Q.   That's a smile symbol?
16    A.   Yes.
17    Q.   "The rest of the numbers in the
18  additional cost section are my best educated
19  guesses"?
20    A.   Yes.
21    Q.   So you were guessing at some of the
22  numbers that you put in?
23         MR. BENOWITZ: Objection.
24    Q.   You were making educated guesses?
```

Page 160

SANDRA BIENVENU

```
 1         SANDRA BIENVENU
 2    A.   I was making educated guesses on the
 3  additional cost.
 4    Q.   You said that was because you didn't
 5  have firm·numbers from Becky?
 6    A.   Yes.
 7    Q.   That was referring to Becky Dalton?
 8    A.   Yes.
 9    Q.   And Mr. Dougal responded to you by way
10  of his e-mail of June 14, 2006, correct?
11    A.   Yes.
12    Q.   In the e-mail he said, among other
13  things, I am actually looking at the third
14  sentence: "I just wanted to give you both a
15  heads-up because this contract is going to take
16  a little bit longer to get out of our offices
17  than I originally told Cecil."
18    A.   That's what it says.
19    Q.   Did you understand what contract Mr.
20  Dougal was referring to?
21    A.   I understood that Mr. Dougal was
22  working on a scope of work to be sent to the
23  Arkansas State Department that would be attached
24  to the original contract which was their
25  professional services contract.
```

Page 161

SANDRA BIENVENU

```
 1         SANDRA BIENVENU
 2    Q.   The original contract, you are talking
 3  about the April 17 document?
 4    A.   Yes.
 5    Q.   That didn't contain a scope of work,
 6  correct?
 7    A.   It contained a scope of work but not a
 8  very detailed scope of work.
 9    Q.   Did it contain any detail whatsoever
10  with respect to the scope of work?
11         MR. RHORER: Object to the form.
12    A.   That was number 16?
13    A.   17.
14    A.   17.
15    Q.   You know what?  I'll withdraw the
16  question.  You don't have to answer that.
17    A.   I'll be happy to.
18    Q.   You don't have to answer that.
19         Did you respond to Mr. Dougal's June
20  14 e-mail, Exhibit 25?
21    A.   I don't think that I did.
22    Q.   You didn't ask Mr. Dougal what
23  contract he is referring to?
24         MR. BENOWITZ: Objection.
25    A.   I don't recall asking him which
```

42 (Pages 162 to 165)

Page 162

SANDRA BIENVENU

1             SANDRA BIENVENU
2  contract. I assumed that I knew that he was
3  working on the scope of work simply because he
4  mentions the scope of work in here.
5     Q.  Ms. Bienvenu, didn't you understand
6  that Mr. Dougal was working on a contract?
7     MR. BENOWITZ: Objection.
8     A.  I understood that Mr. Dougal was
9  working on the scope of work that would define,
10  further define the contract, yes.
11     Q.  Why was it necessary to further define
12  the contract?
13     MR. BENOWITZ: Objection.
14     A.  Only necessary for America's Choice.
15     Q.  Why was that?
16     A.  Because that's what they wanted to do.
17     Q.  Who wanted to do that?
18     A.  America's Choice.
19     Q.  Why did they want to do that?
20     MR. BENOWITZ: Objection.
21     A.  They wanted to refine the details so
22  that they knew exactly what the scope of work
23  would be.
24     Q.  In order to be able to perform their
25  obligations under the agreement with Arkansas,

Page 163

SANDRA BIENVENU

1             SANDRA BIENVENU
2  correct?
3     MR. BENOWITZ: Objection.
4     A.  I guess.
5     Q.  Mr. Jason also said -- Mr. Dougal also
6  said in Exhibit 25: "When I spoke to Cecil I
7  was under the impression that all of this work
8  was our boilerplate intensive design work." And
9  he goes on to say: "It is clear from Sandra's
10  spreadsheet that there are some services for
11  which we do not have boilerplate scopes of
12  work."
13     You see that?
14     A.  I see that.
15     Q.  Did you understand what he meant by
16  that?
17     A.  No, because I thought the boilerplate
18  scopes of work were -- were there. I mean, I
19  didn't realize that there was a huge difference.
20     Q.  Did you dispute that?
21     A.  No.
22     Q.  Did you respond to Mr. Dougal in
23  respect of that?
24     A.  I don't recall responding.
25     Q.  You also see where Mr. Dougal says:

Page 164

SANDRA BIENVENU

1             SANDRA BIENVENU
2  "In addition" -- it is the fourth line from the
3  bottom -- "in addition, given the size of this
4  contract, Judy C." -- that's a reference to Judy
5  Codding -- "wants to give the contract a quick
6  once over after Judy A. has reviewed it."
7     A.  I see that.
8     Q.  Did you have any understanding as to
9  what he meant by that?
10     MR. BENOWITZ: Objection.
11     MR. RHORER: Object to the form.
12     A.  Didn't have anything to do with me.
13  I'm not sure I even questioned it.
14     Q.  You didn't interpose any objection to
15  the contract being given a quick once over?
16     MR. BENOWITZ: Objection.
17     A.  Judy Codding was the CEO. I didn't
18  question.
19     MR. KARLINSKY: Let's mark this
20  document, it is SB 12 through 19 as Exhibit 112.
21  Ms. Bienvenu, if you would give a copy of that
22  to your counsel I would appreciate it.
23     (Exhibit 112, Document Bates Stamped
24  SB 0012 through 0019, marked for identification)
25  BY MR. KARLINSKY:

Page 165

SANDRA BIENVENU

1             SANDRA BIENVENU
2     Q.  Can you identify Exhibit 112?
3     A.  It looks like a form that was sent out
4  on a regular basis, and I don't know how often,
5  to the regional services directors on the
6  contracts that were going on in their
7  territories.
8     Q.  Exhibit 112, ma'am, was produced from
9  your files, was it not?
10     A.  Right.
11     Q.  Is this the only copy of this form
12  that you retained?
13     A.  I'm not sure what you --
14     Q.  Did you keep these forms when they
15  were sent? You just told me that this was a
16  report, a form of report that was sent out
17  periodically?
18     A.  It was sent out periodically but I
19  wasn't always copied on it.
20     Q.  To the extent that you were copied did
21  you keep them?
22     A.  This was one that I requested, I
23  believe, of Joe Murphy, and because I was trying
24  to figure out what contracts had been done
25  within my territory, and at that time I covered

Page 166

SANDRA BIENVENU

1           SANDRA BIENVENU
2    both the south and the southeast.
3        Q.    As of what date is Exhibit 112?
4        A.    It says status as of June 19, 2006.
5        Q.    Why were you trying to determine what
6    sales had been done in your territory as of that
7    date?
8        A.    Because the company had no tracking
9    system for salespeople, did not send out any
10   statements to salespeople, and I wanted to know
11   what was done in June of -- in the 2006 year.
12       Q.    Was salesforce.com used to track
13   sales?
14       A.    At the time that I was there,
15   salesforce.com was used to track client
16   relationships.
17       Q.    Not sales?
18       A.    You could not get the information off
19   of salesforce.com to track the sales.
20           MR. KARLINSKY:  Let's mark as Exhibit
21   113 this document.
22           (Exhibit 113, Document Bates Stamped
23   ACI-DC-02635 through 02638, marked for
24   identification)
25   BY MR. KARLINSKY:

Page 167

SANDRA BIENVENU

1           SANDRA BIENVENU
2        Q.    Ms. Bienvenu, can you identify Exhibit
3    113?
4        A.    Looks like an e-mail from me to Jason
5    Dougal and Rebecca Dalton, Arkansas pricing,
6    Arkansas schools and pricing to .xls.
7        Q.    This is another example of the
8    refinements that you were in the process of
9    making working with Mr. Dougal?
10           MR. BENOWITZ:  Objection.
11       A.    This was a refinement of the schools
12   as I was working with Rebecca Dalton.
13       Q.    I am missing the point, I think.  Is
14   it not the work that you were doing with Dalton
15   and Dougal --
16       A.    Yes.
17       Q.    -- in an effort to arrive at final
18   pricing?
19       A.    Not at final pricing.
20       Q.    At the allocations of pricing?  In
21   other words, how the pricing would be spread as
22   to the work to be done?
23           MR. BENOWITZ:  Objection.
24           MR. RHORER:  Object to the form.
25       A.    I think I understand your question and

Page 168

SANDRA BIENVENU

1           SANDRA BIENVENU
2    I think the answer is yes.
3        Q.    With respect to salesforce.com, whose
4    responsibility at America's Choice was it to
5    enter the sales data relating to sales completed
6    contracts and revenue from those --
7           MR. BENOWITZ:  Objection to form.
8        A.    I have no idea.
9        Q.    Was it not yours?
10       A.    To say --
11       Q.    To use salesforce.com to track
12   revenues produced through you and your sales
13   team?
14       A.    No.
15           MR. KARLINSKY:  Let's mark as Exhibit
16   114 --
17       A.    Could I clarify the last answer?
18       Q.    Sure, go ahead.
19       A.    To my knowledge, salesforce.com was
20   used to track pipeline for the salespeople.  It
21   was not my responsibility to put in there that
22   contracts were signed or orders were placed.  I
23   would not have had that information.
24       Q.    What do you mean by pipeline for the
25   salespeople?

Page 169

SANDRA BIENVENU

1           SANDRA BIENVENU
2        A.    When salespeople are calling on
3    customers and they determine that it is a
4    customer who -- or a potential customer who may
5    do business with America's Choice, they were to
6    enter that name in there with pertinent
7    information, telephone numbers, contact person.
8           When they got to the proposal stage
9    they were to do a proposal for the services, the
10   materials that were going to be delivered, and
11   that was to be put in also.
12       Q.    Did you record the Arkansas project in
13   salesforce.com?
14       A.    It would have been Cecil's
15   responsibility to put Arkansas in.  It was his
16   account.
17       Q.    Did he?
18       A.    You know, I honestly don't know.
19       Q.    Did you ever check?
20       A.    I don't remember.  But I think it was
21   in sales force.  I can't say for sure.
22           MR. KARLINSKY:  Let's mark this
23   document as 114.
24           (Exhibit 114, Document Bates Stamped
25   ACI-DC-02639 through 02642, marked for

44 (Pages 170 to 173)

Page 170

SANDRA BIENVENU

1
2  identification)
3  BY MR. KARLINSKY:
4     Q.   Can you identify 114, please.
5     A.   E-mail from me to Becky Dalton and
6  Jason Dougal on June 14, looks like an hour or
7  so of that last one.
8     Q.   On the same subject of the Arkansas
9  schools and pricing?
10    A.   Yes.
11          MR. KARLINSKY:  All right.  Why don't
12  we take a break right there.
13          THE VIDEOGRAPHER:  Time is 3:00 p.m.
14  We are off the record.
15          (Recess)
16          THE VIDEOGRAPHER:  The time is 3:08
17  p.m.  We are back on the record.
18          MR. KARLINSKY:  Let me ask the court
19  reporter to mark for identification as Exhibit
20  115 an e-mail dated July 7, 2006.
21          (Exhibit 115, Document Bates Stamped
22  ACI-DC-02651 through 02654, marked for
23  identification)
24  BY MR. KARLINSKY:
25    Q.   Ma'am, Exhibit 115 is an e-mail dated

Page 171

SANDRA BIENVENU

1
2  July 7, 2006, is that correct?
3     A.   Yes.
4     Q.   It is from Jason Dougal to a bunch of
5  people including yourself, is that right?
6     A.   Yes.
7     Q.   And among the other people it is
8  directed to are Cecil Harris?
9     A.   Yes.
10    Q.   As well as Judy Codding, is that
11  right?
12    A.   Yes.
13    Q.   The text of the e-mail reads:
14  "Attached please find the spreadsheet for the
15  Arkansas work as agreed to by Sandy and me.  Pat
16  will amend the contract and get it out to
17  Arkansas (after Judy C. reviews it) ASAP."
18          I read that correctly?
19    A.   You read that correctly.
20    Q.   First of all, did you receive this
21  e-mail?
22    A.   I'm sure I did.
23    Q.   Did you respond to it?
24    A.   I honestly don't know the answer to
25  that.

Page 172

SANDRA BIENVENU

1
2     Q.   Did you take exception to anything in
3  it?
4     A.   I'm not sure what you are asking me.
5  Did I take exception to it?
6     Q.   Yes, did you tell anyone that it
7  wasn't right?
8          MR. BENOWITZ:  The e-mail or the
9  attachment or anything?
10          MR. KARLINSKY:  Either.
11    A.   I am very un-- what are you talking
12  about, which one --
13    Q.   Did you tell anyone in writing by
14  e-mail or otherwise that Mr. Dougal's e-mail to
15  you was incorrect in any manner?
16    A.   No, I don't believe --
17    Q.   Do you know who the Pat that's
18  referred to in the text of the e-mail is?
19    A.   I am assuming Pat Whiteaker.
20    Q.   What was Ms. Whiteaker's role at
21  America's Choice?
22    A.   I think she worked for Jason but I
23  don't really know.
24    Q.   Didn't you understand she was in
25  contract administration?

Page 173

SANDRA BIENVENU

1
2          MR. BENOWITZ:  Objection.
3     A.   I thought that's what Jason did and I
4  thought she worked for him.
5     Q.   Did you know what contract Mr. Dougal
6  was referring to in Exhibit 115?
7     A.   I assumed he was talking about the
8  professional services professional consultant
9  contract that Arkansas gave to us and we signed.
10    Q.   So you are assuming that somehow
11  America's Choice had the right to amend that
12  contract?
13          MR. BENOWITZ:  Objection.
14    A.   They did not have the right to amend
15  the amount of the contract.  They had the right
16  to refine the details of the contract.
17    Q.   Where did America's Choice get that
18  right from, ma'am?
19    A.   I don't know.
20    Q.   Well, how do you know that it had the
21  right, then?
22    A.   I don't know.
23    Q.   Did someone tell you that?
24    A.   I don't know.  I knew that we had
25  to -- we had to refine the details, but I don't

Page 174

SANDRA BIENVENU

1    know who told me that we had the right to do it.
2    Q.   In point of fact, this effort to
3    refine the details of the contract took well
4    over a month of time, correct?
5    A.   It's my understanding that there were
6    details that were refined much longer over a
7    longer period of time.
8    Q.   Even than that?
9    A.   It's my understanding that a contract
10   was refined even up through January of 2007.
11   Q.   In what sense was it refined in
12   January of 2007?
13   A.   I think that I heard a refinement that
14   was done -- and I believe I heard it in Diana
15   Julian's testimony.
16   Q.   What refinement are you referring to?
17   A.   I believe the contract was extended
18   through 2009.
19   MR. KARLINSKY:  Let's mark this
20   document as Exhibit 116.
21       (Exhibit 116, Document Bates Stamped
22   SB 0083 through 0085, marked for identification)
23   BY MR. KARLINSKY:
24   Q.   Please identify Exhibit 116 for us.

Page 175

SANDRA BIENVENU

1    A.   That is the agenda for the first week
2    of training of the Arkansas principals,
3    teachers, coaches.  I believe these were the
4    documents that I found later on.
5    MR. KARLINSKY:  Let's mark as our next
6    exhibit which will be 117 a July 13 e-mail.
7        (Exhibit 117, Document Bates Stamped
8    ACI-DC-02655 through 02657, marked for
9    identification)
10   BY MR. KARLINSKY:
11   Q.   Exhibit 117, ma'am, is an e-mail dated
12   July 13 of 2006 from Becky Dalton to Jason
13   Dougal, copied to you, is that right?
14   A.   Yes.
15   Q.   And there would appear to have been --
16   no, there is no attachment to it, I take that
17   back.  Then there are some following e-mails,
18   too, is that right?
19   A.   Yes.
20   Q.   These were actually preceding it, at
21   least one of them was a preceding e-mail.
22       In Exhibit 117 Ms. Dalton, directing
23   her comments to Jason Dougal, says: "Jason, I
24   have reviewed everything on the agreement and

Page 176

SANDRA BIENVENU

1    talked to Sandy and Dottie about a couple of
2    things.  Everything is fine except on page 37
3    under materials it lists elements of
4    reading-vocabulary-grades K through three twice.
5    I think the second one should be grades four?
6    It's not a big deal, I just thought you might
7    want to know."
8        Then she says:  "I am sending the
9    document to Dr. Julian to sign and then we'll
10   get the accounting department to get a check
11   issued."
12   A.   Okay.
13   Q.   I read that correctly?
14   A.   You did.
15   Q.   And you received a copy of this?
16   A.   I did.
17   Q.   Did you know what agreement Ms. Dalton
18   was referring to?
19   A.   It is actually the refinement of the
20   details, the scope of work that was to be
21   attached to the original contract.
22   Q.   Were you privy to that document that
23   she is referring to?
24   MR. BENOWITZ:  Did you mean --

Page 177

SANDRA BIENVENU

1    A.   I don't know if I saw it before
2    this --
3        MR. KARLINSKY:  I am asking her if she
4    has seen a copy of this.
5        MR. BENOWITZ:  Okay.
6    A.   I don't know that I saw it before
7    this, but obviously I saw it at this point if
8    there was an attachment.
9    Q.   Well, there wasn't an attachment to --
10   A.   It says attachment.
11   Q.   That attachment is just an html copy
12   of the e-mail.
13   A.   Then the answer to the question is I
14   don't know.
15   Q.   You don't know.  Okay.
16       Let's look at our next exhibit, then,
17   and that will be 118.
18       (Exhibit 118, Document Bates Stamped
19   ACI-DC-00234 through 00237, marked for
20   identification)
21   BY MR. KARLINSKY:
22   Q.   Exhibit 118, Ms. Bienvenu, is an
23   e-mail dated July 13, 2006, from Pat Whiteaker
24   to Becky Dalton, copy to Elizabeth Middlemiss,

Page 178

SANDRA BIENVENU

1
2  Sandy Bienvenu, Cecil Harris and Jason Dougal,
3  is that correct?
4      A.   Yes.
5      Q.   That one does seem to contain an
6  attachment which is designated
7  Arkansas424July13.pdf, correct?
8      A.   It appears to be so, yes.
9      Q.   If you look at the text of it, it
10 says: "Becky, you were right, the grade range
11 on the second item should read 4-5.  Attached is
12 a corrected document.  Sorry for the
13 inconvenience.  Pat."
14         You see that correctly?
15     A.   I do see that.
16     Q.   That would appear to be responding to
17 the Dalton e-mail which we have marked as 117
18 which apparently was forwarded to Ms. Whiteaker?
19 It appears below on the page.
20         MR. BENOWITZ:  Is that a question?
21         MR. KARLINSKY:  Yes, that is a
22 question.
23         MR. BENOWITZ:  Okay.
24         MR. KARLINSKY:  Had a question mark at
25 the end.

Page 179

SANDRA BIENVENU

1
2      A.   I need you to repeat it because I
3  didn't take it as a question, I'm sorry.
4      Q.   Sure.  The Exhibit 118, the top e-mail
5  of July 13, 2006?
6      A.   Yes.
7      Q.   In fact responds to the e-mail which
8  we have already marked as 117 which is also
9  reprinted at the bottom of 118, do you see that?
10     A.   Yes, I do.
11     Q.   You would agree with me that it
12 responds to that?
13     A.   Yes.
14     Q.   The attachment to 118 would appear to
15 be Exhibit E, correct?
16     A.   It appears to be, yes, sir.
17     Q.   That would appear to be if you look
18 with me to that exhibit, page 37 and 38 of a
19 41-page document?  You can tell if you look at
20 the footer?
21     A.   That's what it says on the footer,
22 yes, sir.
23         MR. KARLINSKY:  Let's then mark as
24 Exhibit 119.
25         (Exhibit 119, Document Bates Stamped

Page 180

SANDRA BIENVENU

1
2  ACI-DC-02658 through 02699, marked for
3  identification)
4  BY MR. KARLINSKY:
5      Q.   Okay.  You have Exhibit 119 in front
6  of you?
7      A.   I do.
8      Q.   Exhibit 119 is an e-mail dated
9  Thursday July 20, 2006 from Pat Whiteaker to
10 Becky Dalton, is it not?
11     A.   It is.
12     Q.   And it was carbon copied from Mr.
13 Dougal to Ms. Middlemiss to yourself and Mr.
14 Harris, correct?
15     A.   Yes.
16     Q.   And there appears to be a subject line
17 on Exhibit 119 that says America's Choice
18 revised contract?
19     A.   It does.
20     Q.   And the attachment is indicated to be
21 Arkansas424July20.pdf?
22     A.   That's what it says, yes, sir.
23     Q.   And you received a copy of Exhibit 119
24 and its attachment?
25     A.   According to this e-mail I did.

Page 181

SANDRA BIENVENU

1
2      Q.   Do you recall receiving it?
3      A.   I don't, but I don't usually read
4  every single thing that is attached to my
5  e-mails, so.
6      Q.   Do you read your e-mails?
7      A.   Most of them.
8      Q.   This particular e-mail had to do with
9  the Arkansas contract which was a matter you
10 were pretty keenly interested in, correct?
11     A.   Yes.
12     Q.   So it would be fair to say that you
13 read this one, wouldn't it?
14         MR. BENOWITZ:  Objection.
15     A.   It would be fair to say I probably
16 read the e-mail.  I doubt that I opened the
17 attachment and read all of those pages.
18     Q.   You don't think you opened the
19 attachment?
20         MR. BENOWITZ:  Objection.
21     A.   I might have opened it but I doubt
22 that I read it all.
23     Q.   The attachment, in fact, if we turn to
24 it together beginning on the second page is a
25 document headed ACI contract 424, America's

Page 182

SANDRA BIENVENU
1
2  Choice, Inc., agreement with State of Arkansas,
3  Department of Education, Little Rock, Arkansas
4  date May 30, 2006, correct?
5      A.   That's what it says, yes, sir.
6      Q.   Were you not aware that this document
7  was sent to the Arkansas State Department of
8  Education on July 20 of 2006?
9      A.   Well, according to this e-mail, yes,
10  it was. It was sent to Dr. Dalton.
11      Q.   I asked you whether you were aware of
12  it at the time.
13      MR. BENOWITZ:  That it was sent to Dr.
14  Dalton?
15      MR. KARLINSKY:  Yes.
16      A.   I don't recall.
17      Q.   You don't recall that you were aware
18  of it at the time?
19      A.   I was copied on the e-mail, but if you
20  are asking me if I can sit here and say I
21  absolutely saw this document on July 20, I don't
22  recall.
23      Q.   You think it more likely than not that
24  you did?
25      A.   I probably did.

Page 183

SANDRA BIENVENU
1
2      Q.   Without regard to the document itself,
3  were you aware that the document was sent to the
4  Arkansas Department of Education?
5      MR. BENOWITZ:  At what time, on that
6  date?
7      MR. KARLINSKY:  Yes.
8      A.   If I opened my e-mail at that
9  particular time, yes, I was aware.
10      Q.   I'm saying something a little bit
11  different.
12      A.   Okay, then I am not understanding.
13      Q.   Without regard to having seen the
14  e-mail, were you aware that it was being sent to
15  the Arkansas Department of Education at that
16  time?
17      A.   I don't remember.
18      Q.   You don't remember having a
19  conversation with anyone at America's Choice
20  about the final contract going out to the
21  department of education?
22      MR. BENOWITZ:  Objection to form.
23      Q.   On July 20?
24      MR. BENOWITZ:  Objection.
25      A.   I have no specific recollection of

Page 184

SANDRA BIENVENU
1
2  that, no, sir.
3      Q.   Did you ever hear that the agreement
4  that accompanied Exhibit 119 was signed by
5  Arkansas and America's Choice?
6      A.   I actually saw it signed I believe for
7  the first time, saw Dr. Julian's signature on it
8  during her deposition.
9      Q.   When was the first time you heard that
10  it had been signed?
11      MR. BENOWITZ:  Objection.
12      A.   I don't know. I didn't realize that
13  the scope of work would have to be signed. The
14  contract was already signed so I don't know
15  that -- I just don't remember that.
16      Q.   Were you involved in the generation of
17  an invoice to the State of Arkansas?
18      A.   No, sir.
19      Q.   Did you know that an invoice had been
20  generated?
21      A.   According to this particular e-mail on
22  Exhibit 119: "An invoice for the first
23  installment will be faxed to you this
24  afternoon." If I read the e-mail then I was
25  aware.

Page 185

SANDRA BIENVENU
1
2      Q.   But as you sit here now you can't tell
3  me whether you had read the e-mail?
4      A.   I'm assuming that I read the e-mail.
5      Q.   So you were aware at the time that an
6  invoice was going to be going out at that time?
7      MR. BENOWITZ:  Objection.
8      A.   According to this invoice, yes.
9      Q.   And an e-mail had not gone out?
10      MR. BENOWITZ:  Could you do me a
11  favor, just let her answer the question?
12      MR. KARLINSKY:  I thought she had
13  answered the question.
14      Q.   Had you completed your answer?
15      MR. BENOWITZ:  Well, you cut her off,
16  actually.
17      MR. KARLINSKY:  You know something? I
18  didn't hear her talking.
19      MR. BENOWITZ:  That's fair, that's
20  fair.
21      A.   I have a very soft voice, sorry.
22      Q.   Had you completed your answer is the
23  question?
24      A.   No.
25      Q.   Go ahead.

48 (Pages 186 to 189)

Page 186

SANDRA BIENVENU

1   SANDRA BIENVENU
2   A.   According to this e-mail I would have
3   known that an invoice was to be faxed to them
4   that day.
5   Q.   Ms. Bienvenu, you told me before in
6   your testimony that you had first heard about an
7   invoice during the course of that early May to
8   mid May meeting with the folks at the Department
9   of Education of the State of Arkansas?
10  A.   Yes, I did.
11  Q.   Ma'am, it took two months for that
12  invoice to be generated?
13      MR. BENOWITZ:  Objection.
14  A.   At the time of the early May meeting,
15  Dr. Julian said we need to get this invoiced so
16  that we can pay it, we have to encumber the
17  funds.
18  Q.   My question to you was from the time
19  you first heard about an invoice in connection
20  with the Arkansas project until the time that
21  America's Choice in fact invoiced Arkansas was a
22  period of about two months?
23  A.   Okay.
24  Q.   In fact, it may have been even more
25  than two months?

Page 187

1   SANDRA BIENVENU
2       MR. BENOWITZ:  Is that a question?
3   Q.   Correct?
4   A.   Correct.
5   Q.   Did you ask during that period of time
6   where the invoice was?
7   A.   I don't remember if I asked or if
8   Cecil asked, but I believe Cecil was taking care
9   of those details.  It was his account.  I was
10  his manager.  I didn't always get involved in
11  all the minute details.
12  Q.   Were you concerned that the invoice
13  had not gone out?
14  A.   Obviously not because you may have
15  e-mails from me asking about it if I were
16  concerned.
17  Q.   The answer to my question was that you
18  were not concerned, is that right?
19  A.   Obviously not.  I don't know.
20  Q.   Why were you not concerned?
21  A.   I had -- let's see, at that time
22  either had 7 or 14 other states and other reps
23  to take care of.  I didn't necessarily take care
24  of all the minute details.
25  Q.   Did you know whose responsibility it

Page 188

1   SANDRA BIENVENU
2   was to generate the invoice?
3   A.   Someone within America's Choice.
4   Q.   Yes.  My question was can you identify
5   someone within America's Choice whose
6   responsibility it was to generate the invoice?
7   A.   I'm assuming it was Pat Whiteaker.
8   Q.   Why would you assume that?
9   A.   Because on this e-mail she said that
10  she would fax an invoice for the first
11  installment to Becky Dalton.
12  Q.   Do you think it was Jason Dougal's
13  responsibility to generate the invoice?
14      MR. RHORER:  Object to form.
15  A.   Jason or Pat Whiteaker if they were in
16  contracts, I would assume so.
17  Q.   You knew that Mr. Dougal was the
18  general counsel of the company, correct?
19  A.   I did.
20  Q.   Under Exhibit 17, ma'am, you want to
21  turn back to it for a moment?
22      MR. BENOWITZ:  117?
23      MR. KARLINSKY:  No, 17.
24  Q.   Before you look at that document,
25  ma'am, let me ask you a different question.

Page 189

1   SANDRA BIENVENU
2       You just told me before in response to
3   my questions about the generation of an invoice
4   that you didn't get involved in the minutia of
5   matters, and you would not regard the work that
6   you were doing that --
7       MR. BENOWITZ:  She didn't say that.
8   Q.   -- Whiteaker and Dougal on the scopes
9   of work to be --
10      MR. BENOWITZ:  I object.
11      MR. KARLINSKY:  I haven't asked a
12  question, Mr. Benowitz.
13      MR. BENOWITZ:  Yes, you have.  You
14  said she doesn't get into the minutia.
15      MR. KARLINSKY:  I haven't asked a
16  question.
17      MR. BENOWITZ:  She said she didn't get
18  into all the minutia.
19      MR. KARLINSKY:  I haven't asked a
20  question.
21      MR. BENOWITZ:  Go right ahead.  So
22  long as you correctly characterize her
23  testimony.
24  BY MR. KARLINSKY:
25  Q.   In response to my question you said:

Page 190

SANDRA BIENVENU

1         SANDRA BIENVENU
2 "I didn't always get involved in all the minute
3 details." You were involved in all of the
4 details of preparing the scopes of work, did you
5 not?
6       MR. BENOWITZ: Objection.
7    A.  Of preparing the scope of work?
8    Q.  The scopes of work, ma'am, yes.
9    A.  No, I wasn't.
10    Q.  You weren't involved in the minute
11 details of preparing the scopes of work?
12    A.  No, I was involved in the minute
13 details of doing the price quotes and --
14    Q.  In connection with the preparation of
15 the scopes of work, correct?
16    A.  Actually was in preparation for the
17 RFP that I got really involved, yes.
18    Q.  In connection with the RFP which
19 reflected the scopes of work, correct?
20    A.  The eventual project, yes.
21    Q.  You have 117 in front of you?
22    A.  117?
23    Q.  Yes. I'm sorry, 17. The one I asked
24 you to look at just before?
25    A.  Yes, I do.

Page 191

1         SANDRA BIENVENU
2    Q.  Under Exhibit 17, ma'am, when did
3 America's Choice have the right to invoice the
4 State of Arkansas?
5       MR. RHORER: Object to the form.
6    A.  I believe in paragraph five, rendering
7 of compensation, is that what you are talking
8 about?
9    Q.  Yes.
10    A.  The methods of rendering compensation
11 and/or evaluation of satisfactory achievement
12 toward attainment of the agreement -- I'm not an
13 attorney so I don't really know all of this, the
14 method of --
15    Q.  Ma'am, looking at paragraph five, have
16 you read paragraph five to yourself in its
17 entirety?
18    A.  I will right now.
19    Q.  Read it to yourself in its entirety,
20 please. Tell me when you are finished.
21    A.  Okay.
22    Q.  You have read it?
23    A.  I am finished.
24    Q.  Under paragraph five, what's your
25 understanding of when ACI had the right to

Page 192

1         SANDRA BIENVENU
2 invoice Arkansas and Arkansas had the obligation
3 to pay ACI?
4       MR. BENOWITZ: Objection.
5       MR. RHORER: Object to form.
6    A.  The method of rendering compensation
7 will be delivered in accordance with a schedule
8 developed by the contractor and ADE.
9    Q.  Yes. And the answer to my question is
10 what?
11    A.  I just answered it.
12    Q.  Is there something in what you just
13 read that indicates when America's Choice has
14 the right and under what conditions it has the
15 right to invoice ADE?
16       MR. BENOWITZ: Objection.
17    A.  According to this, it had to be agreed
18 upon by the contractor and ADE.
19    Q.  Thank you.
20       MR. BENOWITZ: Could we take a
21 three-minute break?
22       MR. KARLINSKY: Sure.
23       THE VIDEOGRAPHER: The time is 3:33
24 p.m. We are now off the record.
25       (Recess)

Page 193

1         SANDRA BIENVENU
2       THE VIDEOGRAPHER: The time is 3:49
3 p.m. We are now back on the record.
4 BY MR. KARLINSKY:
5    Q.  Ms. Bienvenu, you still have a copy of
6 Exhibit 107 in front of you? That's your
7 amended counterclaims.
8    A.  Yes.
9    Q.  Would you turn to paragraph 13, page
10 5?
11    A.  Yes.
12    Q.  Actually let's talk about paragraph
13 ten for a moment.
14       In paragraph ten you alleged among
15 other things that "commissions were to be paid
16 on sales generated in the sales territory," do
17 you see that?
18    A.  No, sir.
19    Q.  Second sentence of paragraph ten?
20       MR. BENOWITZ: Are you looking at the
21 right exhibit?
22    A.  Exhibit 107?
23    Q.  Yes. You need to be looking at page
24 5.
25    A.  Oh, I'm sorry. There was another

Page 194

SANDRA BIENVENU

1 paragraph ten earlier.
2    Q.   Yes, the numbering repeats itself.
3       You see where it says commissions were
4 to be paid on sales generated in the sales
5 territory?
6    A.   Yes.
7    Q.   Was it your understanding that all
8 sales regardless of who was responsible for them
9 within your territory were to be credited to you
10 for commission purposes?
11       MR. BENOWITZ: Objection to form.
12    A.   What do you mean by regardless of who
13 generated the sales? I had salespeople who
14 worked for me.
15    Q.   Yes, that's what I'm talking about.
16    A.   Yes.
17    Q.   Certainly you were entitled to receive
18 a commission with respect to sales generated by
19 the salespeople that worked for you, correct?
20    A.   Yes.
21    Q.   Were you entitled to be credited and
22 to receive a commission based on sales that were
23 done by people other than the salespeople who
24 worked for you but within your region, your

Page 195

SANDRA BIENVENU

1 territory?
2    A.   In my experience in the industry, that
3 is a good, fair assumption, yes.
4    Q.   I'm not asking about your experience
5 in the industry, though. I'm asking about your
6 understanding of your commission plan at ACI.
7    A.   Since the only commission plan that I
8 had was that one-page spreadsheet with no
9 written explanations, yes, I assumed that was
10 true.
11    Q.   Is your claim in this case based on
12 sales done by people within your sales territory
13 but not people who worked for you?
14       MR. BENOWITZ: Objection.
15    A.   I'm not sure I know how to answer
16 that.
17    Q.   I'm sorry?
18    A.   I'm not sure I know how to answer
19 that.
20    Q.   Why not?
21    A.   There were sales that were helped
22 along by my sales reps that neither they nor I
23 have received any credit for.
24    Q.   My question to you was, ma'am, are you

Page 196

SANDRA BIENVENU

1 seeking any recovery in this litigation based on
2 those sales?
3    A.   I don't really know what I'm seeking
4 recovery for because I still have not been
5 provided with detailed documents from America's
6 Choice.
7    Q.   We are now a year and six months or so
8 into this litigation.
9    A.   Yes.
10    Q.   You know that, right?
11    A.   Yes.
12    Q.   And you don't know as you sit here
13 today what specifically you were seeking in
14 damages from America's Choice?
15    A.   I still do not have documents from
16 America's Choice detailing the sales that were
17 made in my territory.
18    Q.   What documents are you talking about?
19    A.   They had no form of tracking sales
20 that was ever revealed to me.
21    Q.   Well, what demands have you made in
22 connection with this litigation to receive such
23 documents?
24    A.   Well, it is my understanding that we

Page 197

SANDRA BIENVENU

1 asked for documents from America's Choice.
2    Q.   Yes? And you were provided documents
3 from America's Choice. My question is, what
4 documents did you ask for?
5    A.   I wanted the actual contracts,
6 purchase orders, invoices, etc., for all the
7 sales in my territory.
8    Q.   Have you seen America's Choice's
9 production in this case, ma'am?
10    A.   I believe I have.
11    Q.   All four or 5,000 pages of it?
12    A.   Oh, no, maybe not. Maybe not.
13    Q.   Well, ma'am, I represent to you that
14 we have provided pursuant to request all
15 purchase orders, all contracts within the south
16 region at your request. Have you not formulated
17 a final position with respect to the damages you
18 are seeking in this case?
19    A.   I believe it was in excess of a
20 certain amount of money and I don't know
21 exactly -- it was either 900 or a million, yes.
22    Q.   I know what you said in the
23 counterclaims, but the counterclaims were filed
24 on or about July 27 of 2007 which was about a

Page 198

SANDRA BIENVENU

1
2  year ago, a little less than a year ago.  What I
3  don't know is what specific sales you contend
4  you are entitled to recover a commission on.
5       So maybe you would tell me that?
6       A.   If I had the documents in front of me
7  I would tell you.
8       Q.   As you sit here you cannot provide me
9  information on what specific sales you claim you
10  are entitled to a commission on?
11       A.   Every single one of them?
12       Q.   Yes, ma'am.
13       A.   No, I cannot.
14       Q.   Can you tell me any?
15       A.   Yes.
16       Q.   Identify those, please?
17       A.   Arkansas, Carrollton Farmers Branch,
18  Grand Bend Kansas, numerous accounts in
19  Mississippi.  Those are the ones off the top of
20  my head.
21       Q.   Any others that you know of?
22       A.   Not that I can specifically recall.
23       Q.   How would you set about specifically
24  identifying others?
25       A.   Looking at the contract or the

Page 199

SANDRA BIENVENU

1
2  purchase order and seeing who they went to and
3  which salesperson was responsible.
4       MR. KARLINSKY:  Mr. Benowitz, we are
5  at the end of discovery in this case.  We have a
6  26A1 specification of damages from you that says
7  nothing other than that your client is entitled
8  to damages in excess of $900,000.  The witness
9  is telling me she can't identify the particulars
10  of her claim as she sits here.
11       I think either you give me an explicit
12  specification of the claim or I keep the
13  deposition open.
14       MR. BENOWITZ:  I think -- and correct
15  me if I'm wrong because I didn't attend -- but I
16  believe that yesterday one of the associates of
17  my firm took the deposition of Mr. Wozniak, am I
18  correct?  You were there, Mr. Karlinsky.
19       MR. KARLINSKY:  Yes.
20       MR. BENOWITZ:  I believe that Mr.
21  Wozniak was shown several hundred pages worth of
22  unsigned ACI contracts.
23       MR. KARLINSKY:  1700 plus pages of
24  contracts, yes.
25       MR. BENOWITZ:  Which Mr. Wozniak was

Page 200

SANDRA BIENVENU

1
2  unable to identify.
3       MR. KARLINSKY:  No, he wasn't unable
4  to identify them, he identified them as
5  contracts.
6       MR. BENOWITZ:  Did he identify them as
7  signed contracts?
8       MR. KARLINSKY:  They are signed
9  contracts, sir.
10       MR. BENOWITZ:  Okay.  Well, we didn't
11  know that until yesterday, did we not?
12       MR. KARLINSKY:  You have had them well
13  over a year, Mr. Benowitz.
14       MR. BENOWITZ:  I'm not going to argue
15  with you, I am not testifying.
16       MR. KARLINSKY:  Okay.  We are just
17  going to leave this deposition open specifically
18  on this issue, but perhaps on others as well.
19       Q.   Let's talk about your counterclaim.
20       MR. RHORER:  Marty, I am okay with
21  your statement that you are leaving it open on
22  that issue and I am not necessarily opposed to
23  the rest of your statement.
24       MR. KARLINSKY:  It is not your case,
25  actually, it wouldn't be left open in your case.

Page 201

SANDRA BIENVENU

1
2  It only applies to her case.
3       MR. RHORER:  When you said "and
4  perhaps other issues" --
5       MR. KARLINSKY:  Well, you know, we'll
6  see.  I haven't gotten to that, but I am
7  specifically reserving on that point in her
8  case.  It need not stay open in the Harris
9  litigation.
10       MR. RHORER:  Fair enough.
11  BY MR. KARLINSKY:
12       Q.   In paragraph 15 of your counterclaim,
13  ma'am, which is on page 6, you claim, and I
14  quote:  "Defendant is owed commissions for sales
15  generated in the sales territory for the second
16  half of calendar 2006 in an amount that is not
17  known at this time."
18       What commissions are you claiming in
19  that paragraph?
20       A.   I don't know the answer to the
21  question.
22       Q.   Would you look back at paragraph 14,
23  just the preceding paragraph?
24       A.   Yes.
25       Q.   In that paragraph you claim to be

52 (Pages 202 to 205)

Page 202

SANDRA BIENVENU

1                SANDRA BIENVENU
2  entitled to, and I'll quote:  "To be paid
3  additional commissions for other sales generated
4  in the sales territory on behalf of plaintiff
5  for the first and second calendar quarters of
6  2006 including sales in the State of
7  Mississippi, Grand Bend, Kansas, and Carrollton
8  Farmers Branch, Texas"?
9      A.  Right.
10      Q.  There you claim in excess of $300,000
11  in commissions, correct?
12      A.  Yes.
13      Q.  Those are in the contracts that you
14  identified to me before?
15      A.  Yes.
16      Q.  Now, what I want to know is are the
17  commissions you claim in paragraph 15 the same
18  commissions you are talking about in paragraph
19  14 or are they different?
20      A.  Anything that was sold from the
21  beginning of my employment through the time that
22  I received a new commission plan which was in
23  September of 2006 should be paid under that
24  first plan.  And I don't know the exact sales.
25      Q.  Ms. Bienvenu, you received a 2006

Page 203

1                SANDRA BIENVENU
2  compensation plan, correct?
3      A.  In October of 2005, yes.
4      Q.  And through what date was that 2006
5  fiscal year commission plan in effect?
6      A.  It was in effect until a new
7  compensation plan was approved by the board.
8      Q.  How do you know that?
9      A.  How do I know that?
10      Q.  Yes.
11      A.  I believe it says it in my employment
12  agreement, that everything had to be approved by
13  the board.
14      Q.  So your understanding is that the
15  fiscal year 2006 sales commission plan remained
16  in effect despite the fact that the fiscal year
17  2006 had terminated?
18      MR. BENOWITZ:  Objection to form.
19      Q.  Is that right?
20      A.  Yes, because I didn't have a new
21  compensation plan.
22      Q.  And did someone tell you that?
23      A.  I believe in my discussions with Nick
24  when I was first hired that the compensation
25  plan would be in effect until the board changed

Page 204

1                SANDRA BIENVENU
2  for the second one.
3      Q.  Did you ever tell anybody at the
4  company that you believed your 2006 sales
5  compensation plan was in effect after June 30 of
6  2006?
7      A.  Yes.
8      Q.  Who?
9      A.  Tommy Harris, Tim Wozniak, Judy
10  Codding.
11      Q.  When did you tell them that?
12      A.  I can't be specific.  Sometime in the
13  summer of 2006.
14      Q.  Tell me what you said to each of them.
15      A.  I don't know specifically what I said,
16  but we did not have a new comp plan, so I was
17  operating under the old one until a new one was
18  given.
19      Q.  What did they say to you when you told
20  them that?
21      A.  They were working on a comp plan.
22      Q.  Is that all they said?
23      A.  Well, they disagreed with me.
24      Q.  They disagreed with you?
25      A.  Yes.

Page 205

1                SANDRA BIENVENU
2      Q.  Did you ever have discussions about
3  that subject with anyone else at America's
4  Choice?
5      A.  Other than the other salespeople and
6  the other people in my position?
7      Q.  Yes.
8      A.  I'm sure we all had those discussions,
9  yes.
10      Q.  I'm asking if you had those
11  discussions with anyone else?
12      A.  With each other, yes.
13      Q.  You recall those discussions?
14      A.  Not specifically, but Eric Hoagland
15  and I talked regularly, Loretta Pohill and I
16  talked regularly.
17      Q.  Ms. Bienvenu, did you speak to Mr.
18  Cecil Harris about that point?
19      A.  I believe I said earlier that with the
20  salespeople and the people in my position, yes,
21  those discussions were --
22      Q.  Including Cecil Harris, correct?
23      A.  I'm sure I did.
24      Q.  Did Mr. Cecil Harris agree with your
25  position that the 2006 fiscal year plan

Page 206

SANDRA BIENVENU

1     SANDRA BIENVENU
2  continued into fiscal year 2007?
3     A.   I don't know what his thoughts were.
4     Q.   In paragraph 16 of your counterclaim,
5  you say: "Plaintiff has failed to provide
6  defendant with either statements or payments of
7  commissions for the period of her employment
8  although the same has been duly demanded."
9         When did you make such demand?
10    A.   I started asking Tommy Harris shortly
11 after, I believe shortly -- in June, sometime in
12 that time frame.
13    Q.   In June of 2006?
14    A.   Hm-hmm.
15    Q.   Anyone else that you asked?
16    A.   I asked for an accounting of all of
17 the sales that had been done in our territory
18 and I had been asked for that several times just
19 because it was very hard to track.
20    Q.   Of whom did you ask that?
21    A.   I don't remember who I asked first,
22 but it eventually got passed off to Joe Murphy.
23    Q.   You say passed off to Mr. Murphy.
24 What do you mean by that?
25    A.   Joe Murphy was the person who was

Page 208

SANDRA BIENVENU

1     SANDRA BIENVENU
2     A.   I believe he did.
3     Q.   And you knew that Mr. Wozniak was the
4  chief financial officer, correct?
5     A.   Yes.
6     Q.   Did you ask Mr. Wozniak to provide you
7  with the financial information if you wanted?
8     A.   It probably was him, but I don't know
9  for certain.  It may have been Judy Codding.
10    Q.   When you were told to ask Mr. Murphy,
11 why did you think you were being asked to ask
12 him?
13         MR. BENOWITZ:  She never testified
14 that she was told to ask Mr. Murphy anything.
15 She said it was passed on to Mr. Murphy.
16         MR. KARLINSKY:  Well, let's just find
17 out exactly how it happened.
18         MR. BENOWITZ:  Fine.
19 BY MR. KARLINSKY:
20    Q.   How did it come about that you were
21 directed to Mr. Murphy?
22    A.   I don't remember.
23    Q.   You don't remember?
24    A.   No.
25    Q.   How did you make the request of Mr.

Page 207

SANDRA BIENVENU

1     SANDRA BIENVENU
2  supposed to provide it to me.
3     Q.   So when you say passed off, you don't
4  mean --
5     A.   I don't remember who I asked the first
6  time.
7     Q.   It was his responsibility --
8         MR. BENOWITZ:  Could you please, Mr.
9  Karlinsky, you don't let her finish her answer.
10    Q.   Let's just ask another question.
11         Did you understand it was Mr. Murphy's
12 responsibility to provide that information?
13    A.   Not in the beginning.
14    Q.   Mr. Murphy was the controller of the
15 company, correct?
16    A.   I believe he was new to the company.
17    Q.   I didn't ask you that, ma'am.  I asked
18 you if he was the controller?
19    A.   I don't know what his title was.
20    Q.   You really don't know who Mr. Murphy
21 was?  You don't know what title he had at
22 America's Choice?
23    A.   No, I don't.
24    Q.   Did you know that he worked for Mr.
25 Wozniak?

Page 209

SANDRA BIENVENU

1     SANDRA BIENVENU
2  Murphy?
3     A.   I believe it was by e-mail.
4     Q.   Look at Exhibit 63, please.
5     A.   Okay.
6     Q.   Identify Exhibit 63, ma'am?
7     A.   The top part is a message -- the top
8  part appears to be a message from Joe Murphy to
9  me on August 24 that says: "Sandy, per your
10 request, sorry it took so long.  Joe."  But
11 below that I had looked at a document, I guess,
12 so it is e-mails between me and Joe Murphy.
13    Q.   When did you first make a request of
14 Mr. Murphy about financial information?
15    A.   All I remember is it took a couple of
16 months to get it, so it must have been sometime
17 in June, July.
18    Q.   Where is the e-mail by which you
19 requested that?
20    A.   I have no idea.
21    Q.   You don't have a copy of it?
22    A.   I didn't have access to the e-mails
23 for production.  They were on America's Choice's
24 server, not mine.
25    Q.   I asked you if you had a copy of it,

Page 210

SANDRA BIENVENU

1
2 ma'am?
3        MR. BENOWITZ: I think she answered
4 you.
5    Q.    I asked you if you had a copy of it?
6    A.    If I had had a copy I would have
7 submitted it to you.
8    Q.    Turn to Exhibit 68, ma'am. Identify
9 that, please.
10    A.    An e-mail from me to Joe Murphy in
11 October of 2006.
12    Q.    What's the subject of it?
13    A.    I'm still getting -- trying to get an
14 accounting of the sales and my territory for
15 2006.
16    Q.    In this e-mail, Exhibit 68, were you
17 claiming credit for $2,313,145 of sales?
18    A.    That's what he sent me, yes.
19    Q.    And you were claiming credit for that?
20    A.    I assumed that I was since I had asked
21 him for the sales that were credited in my
22 territory.
23    Q.    You don't know what you were claiming
24 at that point?
25    A.    According to this e-mail it says:

Page 211

SANDRA BIENVENU

1
2 "Here is what I know so far."
3    Q.    Yes.
4    A.    These are based on the spreadsheets
5 that he sent me --
6    Q.    My question to you is, were you
7 claiming credit with respect to the $2,313,145
8 of sales that are reflected in this e-mail?
9    A.    Yes.
10    Q.    In this e-mail you also said to Mr.
11 Murphy that the numbers he had given you don't
12 reflect business in the southeast region for
13 which you also had responsibility?
14    A.    Yes.
15    Q.    What specific sales within the
16 southeast region were you referring to?
17    A.    I can't list them off the top of my
18 head, but there were sales in Mississippi, there
19 were some sales in Florida.
20    Q.    Had you completed your answer?
21    A.    Those are all that I can recall right
22 off the top of my head.
23    Q.    With respect to the sales in Great
24 Bend, Kansas, and Carrollton Farmers Branch,
25 Texas?

Page 212

SANDRA BIENVENU

1
2    A.    Yes.
3    Q.    Where did those fall, what region?
4    A.    Texas was mine and Great Bend, Kansas
5 was not really anybody's, so when I started
6 working on that I asked if I would get credit
7 for it if I did it and I was told yes.
8    Q.    Who told you that?
9    A.    Judy.
10        MR. KARLINSKY: Let's go off.
11        THE VIDEOGRAPHER: Here now marks the
12 end of tape four of the deposition of Ms. Sandra
13 Bienvenu. The time is 4:15 p.m. We are off the
14 record.
15        (Recess)
16        THE VIDEOGRAPHER: Here now marks the
17 beginning of tape five of the deposition of Ms.
18 Sandra Bienvenu. Time is now 4:22 p.m. We are
19 back on the record.
20 BY MR. KARLINSKY:
21    Q.    Ma'am, you still have Exhibit 68 in
22 front of you?
23    A.    Yes, sir.
24    Q.    You listed in Exhibit 68 the sales
25 within your region for which you were claiming

Page 213

SANDRA BIENVENU

1
2 credit as you told me before, correct?
3    A.    Those are some of the sales. Those
4 were the sales that he had provided me on a
5 spreadsheet. It did not include all of them.
6    Q.    And you didn't in this particular
7 e-mail include any claim with respect to the
8 Arkansas contract?
9    A.    Because I was trying to uncover the
10 other contracts. I already knew about Arkansas.
11    Q.    Was Arkansas on the spreadsheets that
12 Mr. Murphy had given you?
13    A.    I don't know if they were or not. It
14 doesn't appear that it is.
15    Q.    So let me see if I can understand this
16 a little bit more fully.
17        You wrote to Mr. Murphy on October 30
18 of 2006 and in your e-mail to him you said: I
19 asked you for the total revenue generated for
20 the south region in 2006. And he, Mr. Murphy,
21 sent the attached spreadsheets, you see that?
22    A.    Yes.
23    Q.    And in the attached spreadsheets he
24 did not reflect any revenue under the Arkansas
25 contract?

Page 214

SANDRA BIENVENU
1
2    A.    I don't see it on these spreadsheets.
3    Q.    So the answer to my question is
4    correct, he did not reflect any of that revenue,
5    correct?
6    A.    I did not see Arkansas listed on these
7    spreadsheets.
8    Q.    The answer to my question is yes, he
9    did not list Arkansas revenue on his
10   spreadsheets?
11         MR. BENOWITZ:  Objection.
12   A.    You are putting words in my mouth.  I
13   don't see Arkansas listed on here.
14   Q.    When you say that you don't see
15   Arkansas listed on there, that means that Mr.
16   Murphy did not reflect any revenue from the
17   Arkansas contract on the spreadsheets he sent
18   you, is that correct, ma'am?
19   A.    He did not reflect Arkansas revenue on
20   that spreadsheet.
21   Q.    And in your response to him when you
22   asked him about the figures he had given you for
23   total revenue generated for the south region in
24   2006, in your e-mail you didn't say anything to
25   him about the Arkansas contract, correct?

Page 215

SANDRA BIENVENU
1
2    A.    No, I did not.
3    Q.    And the e-mail that you sent him,
4    Exhibit 68 was sent on October 30, 2006,
5    correct?
6    A.    Yes.
7    Q.    And certainly you know now -- well,
8    strike that.
9          Certainly you knew at that time that
10   monies had come in from Arkansas, true?
11         MR. BENOWITZ:  Objection to form.
12   A.    I believe I did, yes.
13   Q.    Do you know how much money had come
14   in?
15   A.    I believe it was half.
16   Q.    Half of the full invoice -- half of
17   the full contract amount?
18   A.    Yes.
19   Q.    Or a little over $3 million?
20   A.    Yes.
21         MR. KARLINSKY:  Let's mark as Exhibit
22   120 an e-mail dated October 30, 2006.
23         (Exhibit 120, Document Bates Stamped
24   ACI-DC-02559 through 02561, marked for
25   identification)

Page 216

SANDRA BIENVENU
1
2    BY MR. KARLINSKY:
3    Q.    Is Exhibit 120, ma'am, an e-mail that
4    you received back from -- I'm sorry, an e-mail
5    that you wrote to Mr. Murphy on -- I'm not
6    certain I can understand it the way it is so why
7    don't I just ask you to identify it.
8    A.    It appears that it is a reply to me
9    from Joe Murphy on Monday, October 30, at 1:12
10   that says:  "Sandy, there was no billing for
11   Great Bend, Kansas or Carrollton Farmers Branch
12   in 2006, it is being picked up in 2007."
13         And I said:  "Okay, Joe, but what
14   about the southeast cohort and the other
15   contracts?"
16   Q.    Which other contracts were you
17   referring to?
18   A.    Arkansas.
19   Q.    How would he know that?
20   A.    Because I asked for the total
21   contracts that had been done in my territory.
22   Q.    But I thought you knew about Arkansas?
23   A.    I did know about Arkansas.
24   Q.    So why would you be asking about
25   Arkansas by calling Arkansas other contracts?

Page 217

SANDRA BIENVENU
1
2          MR. BENOWITZ:  Objection.
3    A.    Why wouldn't I call it another
4    contract?
5    Q.    Well, Ms. Bienvenu, you just told me
6    that you knew that by October 30 the company had
7    already received in excess of $3 million
8    pursuant to the Arkansas contract?
9    A.    Right.
10   Q.    So you weren't asking Mr. Murphy to
11   tell you what you already knew, were you?
12   A.    Not necessarily, no.
13   Q.    Thank you.
14   A.    But there were other contracts.
15   Q.    Aside from Arkansas, correct?
16   A.    Aside from Arkansas.
17   Q.    Did you dispute what Mr. Murphy told
18   you about the Great Bend, Kansas, or Carrollton
19   Farmers Branch contracts?
20   A.    Not to him.
21   Q.    To anyone?
22   A.    I believe I had discussions with
23   either Tommy Harris or Judy Codding because
24   those -- those contracts were signed in the 2006
25   year.

Page 218

SANDRA BIENVENU

1
2   Q.   Both Great Bend, Kansas, and
3   Carrollton Farmers Branch were signed prior to
4   June 30, 2006?
5   A.   If I am not mistaken, yes.
6   Q.   And it was your position that you were
7   owed commissions with respect to those
8   contracts?
9   A.   And it is my position that when a
10  contract is signed I am owed commissions.
11  Q.   That's my question to you.
12  A.   Yes.
13  Q.   Is it your position that you were owed
14  commissions with respect to those two contracts?
15  A.   Yes.
16  Q.   In addition to the Arkansas contract?
17  A.   In addition to the Arkansas and
18  several others.
19  Q.   With respect to the commissions you
20  were owed under the contracts that I have just
21  identified, it is also your position that you
22  were owed that commission pursuant to the terms
23  of your fiscal year 2006 compensation plan, is
24  that correct?
25  A.   To my compensation plan which was

Page 219

SANDRA BIENVENU

1
2   still in effect until September of 2006.
3   MR. KARLINSKY:  Let's go off for a
4   second.
5   THE VIDEOGRAPHER:  The time is 4:33
6   p.m.  We are now off the record.
7   (Pause)
8   THE VIDEOGRAPHER:  The time is 4:34
9   p.m.  We are now back on the record.
10  BY MR. KARLINSKY:
11  Q.   Would you turn to a copy of Exhibit
12  37, ma'am?
13  A.   Yes.
14  Q.   Exhibit 37 is an e-mail from Tommy
15  Harris, at least at the top of the page, Tommy
16  Harris to John Wozniak dated November 30, 2006
17  with an attachment, and a text that says:  "This
18  is what Sandy send to Judy"?
19  A.   Yes.
20  Q.   And then below it there is an original
21  message printed which is a message on the same
22  day, November 30, 2006, from yourself to Tommy
23  Harris, is that right?
24  A.   Yes.
25  Q.   And that also appears to attach the

Page 220

SANDRA BIENVENU

1
2   document that Mr. Tommy Harris is referring to,
3   is that right?
4   A.   That's true.
5   Q.   And the attachment, the second page of
6   Exhibit 37 is the document that you sent to Judy
7   Codding on November 30 or the day before?
8   A.   Yes.
9   Q.   You drafted this attachment, did you
10  not?
11  A.   I did.
12  Q.   It is not signed in any way but
13  certainly it is your document?
14  A.   Yes, it is.
15  Q.   For what purpose did you draft it?
16  A.   To send to Judy.
17  Q.   Why?
18  A.   Because I was still trying to get paid
19  for the work I had done and I was disputing the
20  new 2007 contract or compensation plan that had
21  been given to me in mid to late September for
22  the first time.
23  Q.   Let's stay with the first of those
24  subjects.  You say you were still trying to get
25  paid for what you had done in 2006?

Page 221

SANDRA BIENVENU

1
2   A.   Yes.
3   Q.   What conversations had you had
4   preceding your sending Exhibit 37 and its
5   attachment to Judy Codding, or rather just the
6   attachment to Ms. Codding?
7   A.   Numerous conversations with Judy and
8   John and Tommy beginning back as early as June
9   of 2006 -- well, probably the first one was
10  December of 2005 when I was concerned because
11  Nick was leaving, and we had a conversation
12  about the state alliance and whether or not they
13  were going to take over Arkansas and how the
14  compensation plan for 2006 was to work.
15  So those were the two issues that I
16  brought up to Nick, and we had a conversation at
17  that point with Judy and John Wozniak and that's
18  when Judy said:  "Don't worry, Sandy, I am going
19  to take care of you."
20  Q.   Let's stop there.
21  A.   Okay.
22  Q.   Because I want to penetrate into that
23  conversation.  What specifically had you said to
24  Nick Solinger that led to your having that
25  conversation?

Page 222

SANDRA BIENVENU

1
2     A.   Nick was leaving and I was very
3  concerned because Judy and the company had hired
4  a team of people -- I think they were called the
5  state alliance team or something to that effect,
6  and it was Pat Harvey and I can't remember the
7  other woman's name who used to work in the U.S.
8  Department of Education, Susan somebody.
9            I was concerned that they were going
10  to try to take Arkansas away from me.  And Cecil
11  and we had done a lot of work up until that
12  point so I didn't want that taken away.
13            Then the other --
14     Q.   Wait, let me stay with you there.
15  When you say up until that point, we are talking
16  about early December of 2005?
17     A.   Yes.  Then I did -- I wanted to make
18  sure that my understanding of the comp plan,
19  what Nick had told me, that we got quite a
20  credit when orders were signed and payment when
21  the company got paid.
22     Q.   I just -- I had asked you the question
23  just before, Ms. Bienvenu.  What specifically
24  had you said to Nick Solinger that led to your
25  having that conversation, that is, led to the

Page 223

SANDRA BIENVENU

1
2  conversation among you, Solinger, Codding,
3  Wozniak?
4     A.   Nick, I am concerned that you are
5  leaving --
6     Q.   Well, that's what I want to ask you.
7  Looking to shortcut it a little bit.
8            You gave me an answer that wasn't
9  really the recitation of a conversation, it was
10  rather your impressions about concerns that were
11  in your mind.
12            Is that the sum and substance of what
13  you expressed to Nick?
14     A.   Yes.
15     Q.   Is there anything you recall
16  specifically saying to him?
17     A.   I discussed those two issues.  I was
18  trying to tell you the gist of the conversation.
19  You cut me off.
20     Q.   So that was the gist of the
21  conversation --
22            MR. BENOWITZ:  Mr. Karlinsky, you are
23  cutting her off again.
24     Q.   Is that right?
25     A.   Yes.

Page 224

SANDRA BIENVENU

1
2     Q.   As you just described, it was the gist
3  of the conversation you had with Solinger?
4     A.   Prior to that December meeting, as I
5  understand --
6     Q.   What did he say in that conversation?
7            MR. BENOWITZ:  Again, you are cutting
8  her off.  Let her fully answer your question so
9  we have a good record.
10     A.   Will you repeat the question, because
11  you were talking over me?
12     Q.   As you just described it was the gist
13  of the conversation you had with Solinger.
14     A.   Yes.
15     Q.   What did he say in that conversation?
16     A.   That he would bring it up to Judy and
17  John.
18     Q.   Is that all he said?
19     A.   He confirmed that Cecil and I had done
20  a lot of work in Arkansas, we deserved to keep
21  Arkansas.  He also confirmed the explanation of
22  the comp plan.
23     Q.   What did you say about the comp plan
24  at that time?
25     A.   I wanted to make sure because he was

Page 225

SANDRA BIENVENU

1
2  the one that had been telling me all along how
3  the comp plan applied and I just wanted to make
4  sure because I had nothing in writing.
5     Q.   Did you ask him to put something in
6  writing, ma'am?
7     A.   No, I trusted Nick.
8     Q.   My question was, did you ask him to
9  put something in writing on the subject of the
10  comp plan and how it would work?
11     A.   And I answered you no, I had trust in
12  him.
13     Q.   Is the answer to the question no?
14     A.   The answer to the question is no.
15     Q.   I didn't ask you why.  Is the answer
16  to the question no?
17     A.   No.  That's three times.
18     Q.   Did you ask anyone at America's Choice
19  to put something in writing that would record
20  what you say now is your understanding of how
21  the comp plan worked?
22     A.   No, I did not.
23     Q.   When you talked to Solinger about the
24  two points that you have now told me about, that
25  is, the state alliance question and the way the

Page 226

SANDRA BIENVENU

1
2   comp plan worked, was it your understanding that
3   he was going to set up a meeting around that
4   question?
5       A.   It was not my understanding, that was
6   not necessarily Nick's meeting that was set up
7   around that.
8       Q.   Well, what was your understanding?
9       A.   That he was going to discuss it with
10  John and Judy and get back to me.
11      Q.   That he would convey what you told to
12  Judy Codding and John Wozniak and get back to
13  you?
14      A.   Yes.
15      Q.   Did he in fact get back to you?
16      A.   We all met in Los Angeles.
17      Q.   How was that meeting arranged?
18      A.   On -- either Judy, John or both called
19  a meeting with all the business development
20  directors and it was to be held in the ACI Los
21  Angeles office.
22      Q.   Can you tell when that meeting
23  occurred?
24      A.   Early December, 2005.
25      Q.   Who attended?

Page 227

SANDRA BIENVENU

1
2       A.   Judy Codding, John Wozniak, Nick, Eric
3   Hoagland, Loretta Pohill, myself. There were
4   other people in the LA office.
5       Q.   My question to you wasn't who was in
6   the office but rather who attended the meeting
7   that you had?
8       A.   I'm trying to answer your question.
9            MR. BENOWITZ:  Are we talking about --
10  I'm confused.  Are we talking about the meeting
11  of the business development directors or the
12  meeting that she had with Ms. Codding and Mr.
13  Wozniak and --
14           MR. KARLINSKY:  I don't know.  Let me
15  see if I can clarify.
16           MR. BENOWITZ:  Great.
17  BY MR. KARLINSKY:
18      Q.   How many meetings did you have on this
19  occasion?
20      A.   Okay.  Let me finish answering my
21  former question.
22      Q.   I think the question was a poor
23  question.  But we'll go back and see if we can
24  clarify.
25           The occasion that you are talking

Page 228

SANDRA BIENVENU

1
2   about occurred in early December of 2005?
3       A.   Yes.
4       Q.   In the LA office of America's Choice?
5       A.   Yes.
6       Q.   Was there only one meeting with
7   everyone present on that occasion or were there
8   different meetings?
9       A.   There was one meeting with everyone
10  present and then individual meetings with Nick,
11  Judy, John and individual business development
12  directors.
13      Q.   Now, with respect to the group
14  meeting, if I can call it that, you'll
15  understand what I am referring to?
16      A.   Yes, I will.
17      Q.   You told me that Codding, Solinger,
18  Wozniak, the business development directors and
19  as well Tommy Harris attended?
20      A.   Tommy was there for part of that group
21  meeting.  I believe he was introduced at that
22  point, and I believe Sam Esparza was there, but
23  I can't be certain.  I think he was still there.
24      Q.   Mr. Esparza was also a business
25  development director?

Page 229

SANDRA BIENVENU

1
2       A.   Yes, he was.
3       Q.   How long did the group meeting last?
4       A.   I'm not sure I can tell you that.  It
5   was a one-day meeting, and then I believe we all
6   went out to dinner that evening, and the
7   individual meetings were maybe thirty to forty
8   minutes each.  So however you could take that
9   number of hours or 45 minutes out, I just don't
10  recall the exact number.
11      Q.   What were the topics of discussion at
12  the group meeting?
13      A.   I believe we were talking about -- and
14  I can't be certain because there were many
15  meetings like this, but I believe Judy was
16  giving us her version of how presentation should
17  be made.  And if I am not mistaken, I took notes
18  on it and gave them back to Judy so she could
19  correct them.
20           But she was actually telling us how
21  she wanted us to present America's Choice to
22  potential customers.  I think eventually we got
23  into territory planning and I believe we began
24  to talk about the fact that the new comp plan,
25  the one that would follow the 2006 comp plan, I

Page 230

SANDRA BIENVENU

1
2  believe we even started talking about -- that
3  the quotas would increase. I'm just not sure of
4  all the details.
5      Q.  ·You have basically given me three
6  subjects. One is the presentation of America's
7  Choice to potential customers, another was
8  territories and territory planning?
9      A.  I believe I said territory planning.
10     Q.  When you say territory planning, are
11  you referring to planning prospective sales
12  within territories?
13     A.  We were planning where our focus
14  should be.
15     Q.  Okay.
16     A.  One other subject that was covered was
17  Navigator which was one of the products and very
18  near and dear to John Wozniak's heart, and I
19  believe that was covered and we -- I think that
20  was also how do we present it, what are the key
21  facts, what are the features and benefits,
22  things of that sort.
23     Q.  You confirmed the first two subjects
24  that I had tried to reiterate to you. You also
25  started talking about as a third subject the new

Page 231

SANDRA BIENVENU

1
2  comp plan that would be adopted and the increase
3  in quotas under that plan, then you gave me a
4  further subject which was Navigator?
5      A.  Yes.
6      Q.  Any other subjects that you recall! in
7  the general group meeting?
8      A.  Tommy Harris was introduced as Nick
9  Solinger's replacement.
10     Q.  Is that it?
11     A.  That's as much as I can recall.
12     Q.  What was said to your recollection
13  about the new plan that would be put in place
14  for '07?
15     A.  Just that they were going to start
16  working on details for that, that the quotas
17  would probably increase. I believe we had lots
18  of discussion about that because all of the
19  business development directors had a feeling
20  that America's Choice was not a known entity in
21  the marketplace. We felt like we were having to
22  do marketing and sales and we wanted to have
23  some input into the comp plan.
24     Q.  Is that something that the business
25  development directors actually spoke to at the

Page 232

SANDRA BIENVENU

1
2  meeting?
3      A.  I believe we had discussions but I
4  can't be certain.
5      Q.  Anything else that you can recall
6  about the new plan?
7      A.  No, because I don't believe it was
8  finalized and -- I know it wasn't finalized at
9  that point.
10     Q.  That's not what I am asking, though, I
11  am asking whether anything else was discussed
12  concerning what would become the new plan at
13  that meeting?
14     A.  Not that I recall.
15     Q.  What was discussed concerning
16  Navigator?
17     A.  How to present it, what the features
18  and benefits were, that John thought it was the
19  greatest thing since sliced bread -- his words,
20  not mine -- that he felt like it was just going
21  to fly off the shelves. Those kinds of things.
22     Q.  Anything more particular than that?
23     A.  I seem to remember that he thought we
24  could sell $10 million in the first year.
25     Q.  Of that product of Navigator?

Page 233

SANDRA BIENVENU

1
2      A.  Of just Navigator.
3      Q.  Anything else you can recall?
4      A.  We all thought he was crazy.
5      Q.  Did someone tell him that?
6      A.  I think pretty much everybody did.
7      Q.  With respect -- let's just stay with
8  the general group meeting for a second.
9          With respect to that general meeting,
10  have you now exhausted your recollection as to
11  what was discussed during the course of it?
12     A.  Not totally.
13     Q.  What else do you recall?
14     A.  When Judy introduced Tommy Harris she
15  did announce that I was the only dissenting vote
16  in his employment.
17     Q.  What does that mean?
18     A.  I didn't want him to be hired.
19     Q.  How did you know he was going to be
20  hired?
21     A.  Well, I knew that they were
22  interviewing him.
23     Q.  How did you learn that?
24     A.  I believe Judy told me. I'm not sure.
25     Q.  Why didn't --

Page 234

SANDRA BIENVENU

1
2      A.   Well, actually, no, I take that back.
3   It wasn't Judy, I believe Nick Solinger may have
4   told me that Tommy was one of the candidates --
5   in fact, all of us knew it, so I think they
6   interviewed several people.  I had even
7   suggested some people for them to look at.
8      Q.   Why did you dissent with respect to
9   Tommy Harris?
10     A.   His reputation as a poor manager of
11  people had preceded him.
12     Q.   Had you had personal knowledge of
13  Tommy Harris?
14     A.   No.
15     Q.   Never worked with him?
16     A.   No.
17     Q.   Never worked for him?
18     A.   No.  Had never seen him before.
19     Q.   Had you spoken to people who had
20  worked either for him or with him?
21     A.   Yes.
22     Q.   Who?
23     A.   I had heard about Tommy Harris for 15
24  years through people that I had worked with
25  before.

Page 235

SANDRA BIENVENU

1
2      Q.   How did you make known your dissenting
3   view about Tommy Harris?
4      A.   In discussions with I believe Judy and
5   John.
6      Q.   When were those discussions?
7      A.   I don't remember.  Whenever they were
8   interviewing.  I don't know.  Had to be prior to
9   December.
10     Q.   Do you recall what you said to them?
11     A.   Yes.
12     Q.   What did you say to them?
13     A.   I don't think he would be good for the
14  company.  He is known for not supporting his
15  salespeople and I don't think he's a good
16  manager of people.
17     Q.   What did they say to you?
18     A.   We'll take that into consideration.
19     Q.   Anything else?
20     A.   Not that I recall.
21     Q.   Let me again ask you the question,
22  have you now exhausted your recollection as to
23  subjects discussed during the general meeting?
24     A.   All that I can remember at this point,
25  yes.

Page 236

SANDRA BIENVENU

1
2      Q.   Are you aware of any documents which
3   would assist you in refreshing your
4   recollection?
5      A.   Not that I know of.
6      Q.   Was compensation of business
7   development directors or business development
8   managers discussed during the general meeting?
9      A.   The only time I recall compensation
10  being discussed was in our individual meetings.
11     Q.   Was the fiscal year 2006 compensation
12  plan discussed during the general meeting?
13     A.   I don't remember.
14     Q.   Were any policies respecting
15  compensation discussed during the general
16  meeting?
17        MR. BENOWITZ:  Objection.
18     A.   I don't recall.
19     Q.   Let's turn to the individual meetings.
20        Are you aware of any of the
21  discussions in the individual meetings other
22  than the one that you were an attendee at?
23     A.   No.
24     Q.   No one ever told you about those
25  meetings?

Page 237

SANDRA BIENVENU

1
2      A.   No.
3      Q.   Let's just focus on the meeting that
4   you had, and so that the record is clear at this
5   point, obviously you attended and I believe you
6   told me before that Ms. Codding attended, Mr.
7   Wozniak attended and Mr. Solinger attended?
8      A.   Yes.
9      Q.   Just the four of you?
10     A.   Yes.
11     Q.   And that lasted between 30 and 45
12  minutes?
13     A.   Not very long.
14     Q.   To the best of your recollection --
15  actually, let's do a little bit differently.
16        What subjects were discussed during
17  the course of that meeting?
18        By the way, I didn't get a clear
19  answer on the record.  My question was, that
20  lasted between 30 and 45 minutes, is that about
21  right?
22     A.   I believe so.
23     Q.   Okay.  Go ahead.  The question is,
24  what subjects were discussed during the course
25  of that meeting?

Page 238

SANDRA BIENVENU

1
2    A.   Well, the subjects that I recall were
3    the two subjects that I referred to earlier,
4    the -- Arkansas as it related to the state
5    initiative and my understanding from my
6    conversations with Nick about how compensation
7    applied.
8    Q.   Let's talk about the first of those
9    subjects first.  Which of the four of you in the
10   course of that meeting addressed the first
11   subject, that is, Arkansas and the state
12   alliance or state initiative?
13   A.   Nick really led the discussion so he
14   brought it up, that it was one of my concerns.
15   Q.   What did he say?
16   A.   Sandy is concerned that the state
17   alliance that you have now hired the people for
18   will take over the state of Arkansas.  She
19   started working on Arkansas in July of 2005 and
20   she and Cecil have been working diligently in
21   Arkansas, they feel like they have a very, very
22   strong possibility of getting a contract in
23   Arkansas and I don't recommend that you take it
24   away from them.
25   Q.   Ms. Bienvenu, are you aware of any

Page 239

SANDRA BIENVENU

1
2    documents that document the fact that you had
3    begun working on Arkansas in July of 2005?
4    A.   There should have been e-mails between
5    me and Estelle Mathis.
6    Q.   One e-mail or more than one e-mail?
7    A.   I don't remember.  I know there were
8    two phone conversations, and I could be wrong,
9    there were one or two e-mails at that point.
10   And then in October there were e-mails and phone
11   calls between me, Bill Mullins who was an
12   Arkansas department -- was an Arkansas
13   Department of Ed employee.  I believe he now
14   works for America's Choice.
15   Q.   Give me his name?
16   A.   Bill Mullins, M-U-L-L-I-N-S.
17   Q.   Those were phone calls?
18   A.   Phone calls and e-mails between me,
19   Cecil and Bill Mullins.  Bill was inquiring
20   about one of our math -- I believe either
21   Navigator or Ramp Up Math.  And I spoke to him
22   first and I turned it over to Cecil since that
23   was his territory.  And so that was happening in
24   October.  And then in early November, we began
25   with Jannine Riggs and the people in the State

Page 240

SANDRA BIENVENU

1
2    Department.  And that's all 2005.
3    Q.   Was it in November of 2005 that you
4    had a meeting with the Arkansas Department of
5    Education along with other personnel from
6    America's Choice?
7    A.   That was about the third meeting in
8    the Arkansas, but, yes, we did invite others.
9    Q.   That was the November '05 meeting?
10   A.   It was one of the November '05
11   meetings.
12   Q.   So there were some meetings that you
13   had that preceded that one?
14   A.   Yes.
15   Q.   The one I am referring to, who
16   attended from America's Choice?
17   A.   The one you are referring to is when
18   we talked about specifics on curriculum, is that
19   the meeting?
20   Q.   I believe so.
21   A.   Dottie Whitlow was our math expert and
22   Linda Lewis was our literacy expert.
23   Q.   Let me go back to the question that I
24   had asked before which was a discussion on the
25   subject at your December '05 meeting.

Page 241

SANDRA BIENVENU

1
2    A.   Okay.
3    Q.   Right?  So how did this lead off, Mr.
4    Solinger expressed the fact that you were
5    concerned about this?
6    A.   I believe he said Sandy has two
7    concerns that we need to address before I leave,
8    and the one was the Arkansas versus state
9    alliance staying with Sandy and Cecil, and the
10   second one was to reconfirm what Nick had told
11   me about the compensation plan.
12   Q.   Did he say anything else other than
13   that when he lead off?
14   A.   I don't remember exactly, I mean, he
15   said a lot of flattering things about me and why
16   I was hired, but other than that I don't
17   remember.
18   Q.   You don't remember the flattering
19   things?
20   A.   You think I should because a young man
21   flattered me?
22   Q.   Did anyone respond to Nick's opening
23   statements?
24   A.   After he gave the two concerns, Judy
25   Codding said:  Sandy, I will take care of you.

Page 242

SANDRA BIENVENU

1    SANDRA BIENVENU
2    Q.   With respect to the --
3    A.   To the two concerns was my assumption,
4  yes. Because she put her hands on my shoulder,
5  you know, looked me straight in the face and
6  said: Sandy, I will take care of you.
7    Q.   Let me stay with what Mr. Solinger
8  then said in connection with these opening
9  remarks he made.
10       You have told me, I think, about the
11  specifics of the state alliance initiative
12  issue. You didn't really say more than given
13  the work you had done to that point in Arkansas,
14  you were concerned about whether it would be
15  taken away from you?
16    A.   Yes.
17    Q.   That's a fair statement of the
18  substance of what he said?
19    A.   Well, that was the gist of it along
20  with he didn't think that they should take it
21  away.
22    Q.   His recommendation was it remain with
23  you?
24    A.   Right.
25    Q.   Let's just turn, then, to the subject

Page 243

SANDRA BIENVENU

1    SANDRA BIENVENU
2  of what Mr. Solinger said how the compensation
3  plan would work, and as you characterized it,
4  your understanding of it based on your
5  discussions with him.
6       What precisely did he say?
7    A.   Quota credit and commissions earned
8  are accrued on signing of the contract. And he
9  says it much more eloquently because he has one
10  sentence that says it all and I can't say it
11  that way. Payments would occur when the company
12  was paid. And that was different from any
13  company I had worked for because usually we
14  didn't have to wait until the company got paid.
15  But I was okay with that.
16    Q.   That's how you recall him framing it
17  during the course of the December '05 meeting?
18    A.   That's what I recall.
19    Q.   Anything else on that subject that you
20  recall him saying?
21    MR. BENOWITZ: At that meeting?
22    MR. KARLINSKY: Right then, yes.
23    Q.   In fact, right then, not at that
24  meeting generally, but right then on that
25  subject?

Page 244

SANDRA BIENVENU

1    SANDRA BIENVENU
2    A.   That's all I can remember.
3    Q.   Did anyone respond to that?
4    A.   Judy put her hands on my shoulders and
5  said: Sandy, I will take care of you.
6    Q.   What did you take that to mean?
7    A.   That she would not take Arkansas away
8  from us and that the compensation plan would be
9  as I thought it was going to be.
10    Q.   Did she say anything about the
11  compensation plan?
12    A.   She said: Sandy, I will take care of
13  you.
14    Q.   Did she say anything else?
15    A.   I value you, you have a great
16  reputation. I mean, things like that, but
17  nothing -- nothing substantial.
18    Q.   Did Mr. Wozniak say anything?
19    A.   Mr. Wozniak I don't recall ever opened
20  his mouth very much in that meeting.
21    Q.   Did Ms. Codding ever mention the
22  phrase compensation plan?
23    A.   I don't remember her exact words or
24  exact conversations, no.
25    Q.   Do you recall her using the term

Page 245

SANDRA BIENVENU

1    SANDRA BIENVENU
2  commissions?
3    A.   I don't remember. All I remember is
4  her saying: I'll take care of you.
5    Q.   Do you recall her using any terms
6  relating to quota credit?
7    A.   No.
8    MR. KARLINSKY: Let's take a
9  two-minute break.
10    THE VIDEOGRAPHER: The time is 5:07
11  p.m. We are now off the record.
12    (Recess)
13    THE VIDEOGRAPHER: The time is 5:16
14  p.m. We are now back on the record.
15  BY MR. KARLINSKY:
16    Q.   Ms. Bienvenu, this line of examination
17  started when I asked you what conversations you
18  had had preceding your sending the attachment to
19  Exhibit 37 to Judy Codding.
20    A.   Yes.
21    Q.   One of the things you told me in
22  answer to that was that you had numerous
23  conversations with Codding and Wozniak and Tommy
24  Harris beginning back as early as December of
25  2005 concerning how the compensation plan for

Page 246

SANDRA BIENVENU

1  2006 was to work.
2      Q.   Have you now told me everything you
3  remember about the first conversation on that
4  subject that occurred early December of 2005 in
5  Los Angeles?
6      A.   All that I can recall, yes, sir.
7      Q.   When was the next conversation that
8  you had on that subject with either Codding,
9  Tommy Harris or Wozniak or for that matter
10 anyone else?
11     A.   Sometime after the Arkansas contract
12 was signed in April, I just recall asking when
13 we would expect payment.
14     Q.   Can you recall -- strike that
15 question.
16     When you say sometime after the
17 Arkansas contract was signed in April, you are
18 referring to the document we looked at earlier
19 today, the April 17 document?
20     A.   I am referring to that.
21     Q.   How long after April 17 did you have
22 that discussion?
23     A.   I don't remember if it was May or
24 June. It was sometime in that vicinity.

Page 247

SANDRA BIENVENU

1      Q.   Of whom did you ask that?
2      A.   I believe I may have started with
3  Tommy Harris but I can't be certain.
4      Q.   Did you ask anyone besides Tommy
5  Harris?
6      A.   Eventually I got to the point that I
7  didn't ask Tommy anything because I wasn't ever
8  sure that my questions went further than Tommy.
9  So I did begin to ask Judy, but I don't remember
10 exactly when.
11     Q.   I move to strike the last answer as
12 nonresponsive.
13     My question to you was, did you ask
14 anyone beside Tommy Harris?
15     A.   Yes, eventually.
16     Q.   Who did you ask other than Tommy
17 Harris?
18     A.   To the best of my knowledge I asked
19 Judy Codding and John Wozniak.
20     Q.   Let me start with Tommy Harris. What
21 precisely did you say to him?
22     A.   I don't remember.
23     Q.   Was it in a face-to-face conversation,
24 in a telephone call or by e-mail?

Page 248

SANDRA BIENVENU

1      A.   I don't recall.
2      Q.   Do you recall whether he responded to
3  you?
4      A.   I believe he did.
5      Q.   Do you recall what he said?
6      A.   I don't recall what he said the first
7  time I talked to him and I believe it was by
8  telephone, but I cannot be certain.
9      Another conversation with Tommy was
10 during CPD week in June at the Xerox training
11 center. And I don't remember the city, though,
12 it was in. I know it was dreadful.
13     Q.   Leesburg, Virginia?
14     A.   It was in Virginia.
15     Q.   So you don't recall the first time --
16 you don't recall what he said during the first
17 time you talked to him about this?
18     A.   I don't remember. I believe --
19     Q.   You did have -- did I cut you off?
20     A.   I'm sorry, I believe I had a
21 conversation with him via telephone.
22     Q.   But you don't recall the substance of
23 it?
24     A.   Well, I remember that I was asking him

Page 249

SANDRA BIENVENU

1  about when Cecil and I could expect to be paid,
2  but I don't recall what he told me.
3      Q.   At the time you had that conversation
4  had America's Choice received any revenue from
5  that contract?
6      MR. BENOWITZ: Objection.
7      A.   I don't think they had.
8      Q.   Why would you be asking them when you
9  would get paid?
10     A.   Because in early May, Diana Julian had
11 said that they would pay as soon as they got an
12 invoice, so I guess I was just asking.
13     Q.   Were you concerned as to how the 2006
14 compensation plan would work at the time that
15 you had this discussion with Tommy Harris?
16     A.   I believe I was concerned because
17 there have been numerous conversations about
18 developing the 2007 compensation plan.
19     Q.   Based on your discussion with Ms.
20 Codding in December of 2005 as you have related
21 it to us, did you continue to have concerns as
22 to how the 2006 compensation plan would work?
23     A.   Not until they decided to bring an
24 outside consultant in to develop the 2007 plan.

Page 250

SANDRA BIENVENU

1
2      Q.    Why did that give you concern about
3  how the 2006 compensation plan would work?
4      A.    I just wanted to make sure they were
5  going to live up to their agreement.
6      Q.    Well, what about their bringing in an
7  outside consultant would cause you to have some
8  question as to whether they would comply with
9  their agreement?
10     A.    I just recall having conversations
11  with that outside consultant and he had no
12  experience in the educational market.  And some
13  of the things that he was talking about that
14  should be included in a 2007 plan were totally
15  foreign to my twenty-something years in this
16  business.
17     Q.    Who are you talking about when you are
18  referring to the outside consultant?
19     A.    It was Mercer Consulting and I believe
20  his name was Bacon Reece -- Reece Bacon, maybe.
21     Q.    When did you have discussions with Mr.
22  Bacon?
23     A.    They asked me to talk to him once on
24  the telephone when it was just the two of us,
25  and I want to say that was pretty early in the

Page 251

SANDRA BIENVENU

1
2  year 2006.
3      Q.    2006 or 2007?
4      A.    Oh.  Well, not 2007, I was gone.
5      Q.    I'm sorry, 2006, right.
6      A.    February, March, April, sometime in
7  that timeframe.  So I had one conversation with
8  him.  They scheduled another one, canceled it,
9  and then he attended one of our leadership team
10  meetings.  And I want to say it was in May but
11  I'm not absolutely positive.
12     Q.    Also in 2006?
13     A.    Yes.
14     Q.    Were those the only discussions you
15  had with him?
16     A.    As far as I know, yes.
17     Q.    Did you not have a telephone
18  conversation with him in November of 2006?
19     A.    I did.  I'm sorry, I did.
20     Q.    Let me just -- I'm not going to be
21  able to exhaust that at this point, but let me
22  just go back and ask you the question as a
23  follow-up.
24            You had just told me that some of the
25  things Mr. Bacon was talking about that would be

Page 252

SANDRA BIENVENU

1
2  or should be included in the 2007 plan, and
3  these were your words, "were totally foreign to
4  my twenty-something years in this business"?
5      A.    Yes.
6      Q.    What do you mean by that?  What things
7  was he talking about that were totally foreign
8  to your twenty-something years in the business?
9      A.    The way he wanted to structure the
10  commission percentages, he talked about that.
11  He did talk about one thing that has been my
12  experience which was giving quotas out six
13  months in advance of the fiscal year beginning.
14  I don't remember all the details.  I mean, there
15  were concerns, I just remember getting off the
16  phone and thinking he wasn't qualified to do
17  this.
18     Q.    The subject of your discussion with
19  Mr. Bacon as you have related it to me was about
20  Mercer Consulting's and Mr. Bacon's work for
21  America's Choice in connection with the
22  development of the 2007 plan, correct?
23     A.    As I understand it, yes.
24     Q.    As you understood it, neither Mr.
25  Bacon nor Mercer was retained in order to deal

Page 253

SANDRA BIENVENU

1
2  with a 2006 plan, correct?
3      A.    I don't believe they were, but I don't
4  know that.
5      Q.    So what about this gave you -- what
6  about your communication with Bacon gave you
7  some concern about how the 2006 plan was going
8  to work?
9      A.    I'm not sure.
10     Q.    Let me stay with your discussions with
11  Tommy Harris.  You told me before that you
12  didn't recall the subject -- I'm sorry, his
13  response during the first telephone call you had
14  with him?
15     A.    Right.
16     Q.    Where you were talking about payment
17  under the 2006 plan.
18     A.    Right.
19     Q.    Do you recall -- and you also
20  mentioned you had a discussion with him during
21  the CPD June 13 through 14, 2006.
22     A.    Yes.
23     Q.    In Virginia?
24     A.    Yes.
25     Q.    What did you say and what did he say

Page 254

SANDRA BIENVENU

1       SANDRA BIENVENU
2    during the course of that discussion at CPD?
3        A.    It was about the Arkansas contract,
4    and I believe he may have said at that time that
5    they weren't going to count Arkansas in the 2006
6    year. I'm not sure. And I argued with him and
7    he got up and left.
8        Q.    You argued with him?
9        A.    Hm-hmm.
10       Q.    What did you say to him?
11       A.    That the contract was signed in 2006
12   and it should --
13       Q.    What did he say to you?
14       A.    That he could see both sides but he
15   didn't think the company was going to recognize
16   it, I believe.
17       Q.    Anything else that you recall about
18   the discussion with him?
19       A.    It wasn't a very long discussion. He
20   left.
21       Q.    Is there anything else that you recall
22   about the discussion?
23       A.    No.
24           MR. KARLINSKY: We are at 5:30 and I'm
25   going to stop for the day. I understand, Mr.

Page 256

1       SANDRA BIENVENU
2        THE VIDEOGRAPHER: Here now marks the
3    end of tape five of the deposition of Ms. Sandra
4    Bienvenu. The time is 5:30 p.m. We are now off
5    the record.
6
7
8    _____
         SANDRA BIENVENU
9
10
11
12   Subscribed and sworn to before me
13   this_____day of_____, 2008.
14   _____
15     Notary Public
16
17
18
19
20
21
22
23
24
25

Page 255

SANDRA BIENVENU

1       SANDRA BIENVENU
2    Benowitz, that you would continue as long as it
3    was necessary to complete the deposition, but I
4    don't think that's reasonable in the
5    circumstances. We have been going since 9:35 or
6    9:40 this morning and I'm not prepared to go
7    further.
8        So we will talk off the record about
9    continuation of the deposition.
10           MR. BENOWITZ: Please note our
11   objection to any continuation of this
12   deposition. We confirm what you said that we
13   are willing to stay until it is over here today.
14           MR. KARLINSKY: Your objection is
15   noted.
16
17
18
19
20
21
22
23
24
25

Page 257

1       SANDRA BIENVENU
2    STATE OF NEW YORK
3    COUNTY OF NEW YORK
4        I wish to make the following changes, for the
5    following reasons:
6    PAGE LINE
7    ___ ____    CHANGE:_____
8              REASON: _____
9    ___ ____    CHANGE:_____
10             REASON: _____
11   ___ ____    CHANGE:_____
12             REASON: _____
13   ___ ____    CHANGE:_____
14             REASON: _____
15   ___ ____    CHANGE:_____
16             REASON: _____
17   ___ ____    CHANGE:_____
18             REASON: _____
19   ___ ____    CHANGE:_____
20             REASON: _____
21   ___ ____    CHANGE:_____
22             REASON: _____
23   ___ ____    CHANGE:_____
24             REASON: _____
25

Page 258

```
 1              SANDRA BIENVENU
 2
 3            C E R T I F I C A T E
 4
   STATE OF NEW YORK
 5 COUNTY OF NEW YORK
 6
 7       I, BRANDON RAINOFF, a Federal
 8  Certified Realtime Reporter and Notary Public
 9  within and for the State of New York, do hereby
10  certify:
11       That SANDRA BIENVENU, the witness
12  whose  deposition is hereinbefore set forth, was
13  duly sworn by me and that such deposition is a
14  true record of the testimony given by the
15  witness.
16       I further certify that I am not
17  related to any of the parties to this action by
18  blood or marriage, and that I am in no way
19  interested in the outcome of this matter.
20       IN WITNESS WHEREOF, I have hereunto
21  set my hand this____day of_____, 2008.
22       _____
           BRANDON RAINOFF, FCRR, CM
23
24
25
```

Page 259

```
 1           SANDRA BIENVENU
 2
 3         INDEX OF EXHIBITS
 4
 5  107  Answer to the Complaint and Amended ...........92
         Counterclaims
 6
    108  Document Bates Stamped SB 001, 2, 5, 6, 8, ...101
 7        9 and 10
 8  109  Document Bates Stamped SB 001 through 0010 ...111
 9  110  Document Bates Stamped ACI-DC-03552 ...........118
         through 03554
10
    111  Document Bates Stamped ACI-DC-02621 ...........132
11
    112  Document Bates Stamped SB 0012 through .......164
12        0019
13  113  Document Bates Stamped ACI-DC-02635 ...........166
         through 02638
14
    114  Document Bates Stamped ACI-DC-02639 ...........170
15        through 02642
16  115  Document Bates Stamped ACI-DC-02651 ...........170
         through 02654
17
    116  Document Bates Stamped SB 0083 through .......174
18        0085
19  117  Document Bates Stamped ACI-DC-02655 ...........175
         through 02657
20
    118  Document Bates Stamped ACI-DC-00234 ...........177
21        through 00237
22  119  Document Bates Stamped ACI-DC-02658 ...........180
         through 02699
23
    120  Document Bates Stamped ACI-DC-02559 ...........216
24        through 02561
25
```

Page 260

```
 1              SANDRA BIENVENU
 2
 3      QUESTION MARKED FOR A RULING
 4
 5  Page 77
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# Exhibit B

## Rosans, John

**From:**    Robert J. Benowitz, Esq. [rbenowitz@ricksteinerlaw.com]
**Sent:**    Monday, July 07, 2008 2:20 PM
**To:**    Rosans, John
**Cc:**    Karlinsky, Martin E.
**Subject:**  RE: Continuation of Bienvenu deposition

John, we have tried various forms of communication to no avail as yet. I'm sure she will contact us shortly. She may have been away over the holiday weekend.

With best regards,
        Bob Benowitz

RICK STEINER FELL & BENOWITZ LLP
90 Broad Street, 25th Floor
New York, NY  10004
Tel:  (212) 422-0488
Fax:  (212) 422-0158
email:  rbenowitz@ricksteinerlaw.com

Visit our website at www.ricksteinerlaw.com

**From:** Rosans, John [mailto:john.rosans@kattenlaw.com]
**Sent:** Monday, July 07, 2008 10:36 AM
**To:** Bob Benowitz
**Cc:** Karlinsky, Martin E.
**Subject:** ACI: Continuation of Bienvenu deposition

Bob, I'm just writing to confirm the telephone discussion with you, Marty, and me from last Thursday (7/3) whereby you agreed you would contact Ms. Bienvenu so that we may schedule the balance (< 2 hours) of her deposition at a location and time most convenient for her.  Please let us know at your earliest convenience today whether you have been able to coordinate with her. Thank you.

John Rosans
Katten Muchin Rosenman LLP
1025 Thomas Jefferson Street, NW
East Lobby, Suite 700
Washington, DC 20007-5201
202.625.3639
202.625.3500 main
800.627.8855 toll free
202.339.8267 fax
john.rosans@kattenlaw.com

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

CIRCULAR 230 DISCLOSURE: Pursuant to Regulations Governing Practice Before the Internal Revenue Service, any tax advice contained herein is not intended or written to be used and cannot be used by a taxpayer for the purpose of avoiding tax penalties that may be imposed on the taxpayer.

CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.

NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997).

# Exhibit C

## Rosans, John

| | |
|---|---|
| **From:** | Karlinsky, Martin E. |
| **Sent:** | Wednesday, July 09, 2008 8:29 PM |
| **To:** | Bob Benowitz; jkdecosta@jkdcpc.com |
| **Cc:** | Rosans, John |
| **Subject:** | ACI -- Motion for Enlargement of Discovery Period (Bienvenu).DOC |
| **Attachments:** | ACI -- Motion for Enlargement of Discovery Period (Bienvenu).DOC |

Bob and Janet,

Please review and advise whether you will consent to this motion.  We intend to file tomorrow afternoon.

# Exhibit D

**RSF&B**  **RICK STEINER FELL & BENOWITZ** LLP

**A T T O R N E Y S   A T   L A W**

NEW JERSEY OFFICE:
111 PATERSON AVENUE, HOBOKEN, NJ 07030
TEL: 201-798-6613 • FAX: 201-798-5070

WESTCHESTER OFFICE:
162 ROUTE 202, SOMERS, NY 10589
TEL: 914-277-7303 • FAX: 914-243-0330

90 BROAD STREET, 25™ FL., NY, NY 10004 • TEL: 212-422-0488 • FAX: 212-422-0158

July 7, 2008

Martin E. Karlinsky, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022-2585

> **Re:** **America's Choice Inc. v. Sandra Bush Bienvenu**
> **RSF&B File No.: 2120.001**

Dear Mr. Karlinsky:

Since our telephone discussion last Thursday concerning your Notice of Continued Deposition of Ms. Bienvenu, I reviewed the transcript of her testimony on June 25, 2008 which clearly indicates that the Deposition commenced at 9:44 A.M. and concluded at 5:30 P.M. The transcript also indicates that Ms. Bienvenu was willing to continue the Deposition in your office on June 25th to afford you the opportunity to conclude your questioning of her at that time but that you made the decision to stop questioning her at 5:30 P.M.

Accordingly, we continue our objection as I stated on the record at the conclusion of Ms. Bienvenu's testimony in response to your stated desire to arrange for the continuation of the Deposition. Under FRCP 30(d)(2) you have exceeded the one day, seven hour limitation for the Deposition.

Unless a reasonable accommodation is offered by ACI, please be advised that our client will not consent and will vigorously contest any efforts to compel the continuation of her Deposition.

Very truly yours,

Robert J. Benowitz

cc:    Janet K. DeCosta, Esq.
       John Rosans, Esq.
       Ugo Colella, Esq.

**IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **AMERICA'S CHOICE, INC.,** | ) | |
| | ) | **Case No. 07-CV-00428** |
| | ) | **Judge Emmet Sullivan** |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **SANDRA BUSH BIENVENU,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |
| | ) | |

**<u>ORDER</u>**

Considering the foregoing Motion To Enlarge Discovery Period And To Compel Continued Deposition,

**IT IS HEREBY ORDERED** that the deadline to complete the deposition of Defendant/Counter-Plaintiff Sandra Bush Bienvenu and of any other required discovery herein is extended until July 31, 2008. The date of the Status Conference, currently set for July 24, 2008, at 12:45 p.m., shall remain the same.

Washington, DC, this ___ day of July, 2008.

_____
United States District Judge