IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICA'S CHOICE, INC., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | Case No.: 07CV00428 |
| v. | ) | |
| | ) | Judge Emmet Sullivan |
| SANDRA BUSH BIENVENU, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | |
| | ) | |

**DEFENDANT/COUNTER-PLAINTIFF'S OPPOSITION TO PLAINTIFF/COUNTER-DEFENDANT'S MOTION TO ENLARGE DISCOVERY PERIOD**

Defendant/Counter-Plaintiff Sandra Bush Bienvenu ("Ms. Bienvenu"), by and through her attorneys, Rick Steiner Fell & Benowitz, LLP, and Janet K. DeCosta, P.C. hereby opposes Plaintiff/Counter-Defendant America's Choice Inc.'s ("ACI") Motion to Enlarge Discovery Period ("Motion"). Ms. Bienvenu opposes the Motion of the grounds that (1) she already incurred substantial financial hardship when she traveled from her home in Destin, Florida to New York City to be deposed at a place convenient for ACI's counsel; (2) she has submitted to a full day of testimony; and (3) ACI has failed to set forth good cause to justify the continuation of Ms. Bienvenu's deposition.

I.     **Relevant Procedural History**

On May 22, 2008, ACI filed a Consent Motion to extend the discovery time period wherein the parties set forth a timetable for the deposition of then remaining

witnesses in this action.[1]  On May 23, 2008, the court issued a Minute Order wherein it directed, *inter alia*, that depositions shall be completed by June 30, 2008.

On June 25, 2008, Ms. Bienvenu appeared for a deposition at the New York offices of ACI's counsel.  Her deposition commenced at 9:44 A.M. and continued for the entire day.  At approximately 5:30 P.M., after deposing Ms. Bienvenu for 6 hours and 47 minutes, excluding a lunch break, ACI's counsel, Martin E. Karlinsky, Esq., abruptly ceased questioning Ms. Bienvenu.   His unexpected termination of the deposition brought about the following exchange between Mr. Karlinsky and Ms. Bienvenu's counsel, Robert J. Benowitz, Esq.,

> MR. KARLINSKY:  We are at 5:30 and I'm going to stop for the day.  I understand, Mr. Benowitz, that you would continue as long as it was necessary to complete the deposition, but I don't think that's reasonable in the circumstances.  We have been going since 9:35 or 9:40 this morning and I'm not prepared to go further.  So we will talk off the record about continuation of the deposition.
>
> MR. BENOWITZ:   Please note our objection to any continuation of this deposition.  We confirm what you said that we are willing to stay until it is over here today.
>
> MR. KARLINSKY:  Your objection is noted.

*See* Exhibit 1, Excerpt from June 25, 2008 Deposition Transcript at 254-255.   Mr. Karlinsky refused to continue with the deposition that day.

Late in the afternoon of July 2, 2008, two days after the deadline to complete depositions had expired (except as to the deposition of ACI's general counsel,

---

[1]     ACI's description of the procedural posture of this case, set forth in its Motion is accurate, only  to the extent that it describes the various court filings.

Jason Dougal, Esq.) and shortly before the start of the July 4th holiday, ACI's counsel served a Notice to Continue Ms. Bienvenu's deposition, setting the deposition in Washington, D.C. for July 8th.  Ms. Bienvenu's local counsel immediately informed ACI's local counsel, who served the Notice, that Ms. Bienvenu was not available and that New York counsel previously addressed the issue.  *See* Exhibit 2, July 2, 2008 E-mail to John Rosans, Esq.

Subsequently, ACI's counsel and Mr. Benowitz discussed whether Ms. Bienvenu would be made available for a continued deposition.   Mr. Benowitz made it clear that he objected to producing Ms. Bienvenu.  He, however, did agree to consult once again with his client.  *See* Exhibit 3, Affidavit of Robert Benowitz, Esq.

By way of letter dated July 7, 2008, Mr. Benowitz reiterated his position with respect to ACI's demand: Ms. Bienvenu would not consent to a continued deposition.  Ms. Bienvenu did not have a "change of heart," as ACI contends.  Counsel simply left the door open that Ms.  Bienvenu may reconsider her position, if ACI was prepared to offer reasonable accommodations.   *See* Exhibit 4, July 7, 2008 Letter.[2]  ACI nonetheless went forward with the instant Motion, although it acknowledges that it received the July 7th letter inviting it to propose an accommodation to Ms. Bienvenu.

---

[2]       Counsel for ACI suggests that local counsel was aware of  the discussions between Mr. Benowitz and  ACI counsel on July 3rd and the July 7th correspondence.  Leaving aside that there is no room for *ad hominem* attacks, ACI's aspersions are without foundation, without merit, and add nothing to the issue before the court.,

## II.     ARGUMENT

### A.  Legal Standard

Rule 30(d)(1), Fed. R. Civ. P. provides, in pertinent part, "[u]nless otherwise authorized by the court or stipulated by the parties, a deposition is limited to *one day of seven hours*." (Emphasis added) The time limitation in Rule 30(d)(1) was intended to address "overlong depositions [which] can result in undue costs and delays in some circumstances."  *See*, Advisory Committee Notes, 2000 Amendments, Fed. R. Civ. P. 30(d)(2).  The Notes further state that "the party seeking a court order to extend the examination, or otherwise alter the limitations, is expected to show *good cause* to justify such an order." (emphasis added)  *Id.*

Rule 30(d)(1) permits the court to grant additional time to depose a witness ". . . consistent with Rule 26(b)(2) if needed to fairly examine the deponent or if the deponent, another person, or any other circumstance impedes or delays the examination. "  Rule 26(b)(2)(C), in turn, requires the court to limit the use of any discovery method if "(i) the discovery sought is unreasonably cumulative or duplicative or can be obtained from some other source that is more convenient, less burdensome or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

In a recent District of Columbia decision, the court set forth several considerations in evaluating whether a court should waive the seven hour limitation of Rule 30(d)(1):

> In weighing these factors, and applying them to whether a deposition should be longer than seven hours, the court should begin with the presumption that the seven-hour limit was carefully chosen and that extensions of that limit should be the exception, not the rule. Automatic extensions eviscerate the rule. Moreover, the seven-hour limit encourages efficiency; it has been said that a writer's best friends are a deadline and a page limitation. The same may be said of lawyers conducting depositions.

*Roberson v. Bair*, 242 F.R.D. 130, 138 (D.D.C. 2007).

Contrary to ACI's contention that this court "must allow additional time consistent with Rule 26(b)(2). . ." (Motion at 6), an extension of the seven hour limit is not automatic. A movant must present specific facts in support of a motion seeking leave to go beyond the one day-seven hour limitation. *See Carmody v. Village of Rockville Centre*, 2007 WL 2177064 (E.D.N.Y. July 27, 2007). In fact, courts are not hesitant to deny an application for the continuation of a party's deposition where the movant failed to set forth good cause for the granting of such relief. For example, in *Margel v. E.G.L. Gem Lab Ltd.*, 2008 WL 2224288 (S.D.N.Y. May 29, 2008), the court criticized movant's use of the time allotted for the deposition under Rule 30(d)(1) as it ceased questioning the respondent and, as here, refused to accept the offer to continue the deposition. In addition, the court found telling that the movant failed to specify the additional areas of inquiry or describe the how the time was utilized in the first deposition.

**ACI Has Failed to Demonstrate Good Cause to Justify an Order for the Continuation of Bienvenu's Deposition**

ACI has failed to demonstrate "good cause;" rather, the facts demonstrate that Ms. Bienvenu has met the standards set forth in Rule 26(b)(2) to warrant the denial of the Motion. For example, Rule 26(b)(2)(C)(ii) allows the court to limit discovery when the party has had ample time to obtain the information sought.

ACI contends that it did not have sufficient time, and asserts --- erroneously -- that it was allotted 5 hours and 19 minutes to depose Ms. Bienvenu. Nothing could be further from the truth. The deposition began at 9:44 A.M. and concluded at 5:30 P.M., with a 59 minute lunch break. ACI thus deposed Ms. Bienvenu for a full day, thirteen (13) minutes shy of the seven hour limitation as contemplated by the Federal Rules. Moreover, Ms. Bienvenu offered to continue the deposition beyond the 5:30 P.M. deadline unilaterally set by Mr. Karlinsky. ACI, not Ms. Bienvenu, should suffer the consequences of Mr. Karlinsky's refusal to avail himself of her offer.

Similarly, ACI has failed to make the requisite showing of good cause in light of Rule 26(b)(2)(C)(iii), which addresses the balancing of burden and expense on one party relative to that party's resources, the needs of the case, and the amount in controversy. As noted at the outset, Ms. Bienvenu endured considerable hardship in accommodating ACI's counsel by appearing for her deposition in New York. In addition to the time and expense of her travel from Destin, Florida to one of the most, if not the most, expensive city in the country, she also was required to take time away from her busy work schedule. Thus, in order to avoid the financial and professional

burdens and time consuming process associated with returning to New York City (or Washington, D.C.), Ms. Bienvenu agreed to stay as long as it was necessary on the date of her deposition for Mr. Karlinsky to complete his questioning of her. She agreed to do so, notwithstanding the one-day, seven hour limit of Rule 30(d)(1). Now, ACI urges that Ms. Bienvenu be forced to return to New York City or Washington, DC, at her own expense, incur additional legal fees, and lose yet more time from work, all as a result of Mr. Karlinsky's refusal to continue his questioning on June 25th . As above, ACI should suffer the consequences. Ms. Bienvenu should be afforded the protection of Rule 26(b)(2).

To avoid the obvious consequences of ACI's unwillingness to continue the deposition on June 25th and its concomitant inability to demonstrate good cause, ACI attempts to shift blame to Ms. Bienvenu's counsel. It alleges that the "deposition was not concluded that day in major part because of the deponent's repeated resistance to examination and repeated obstreperous speaking objections made by the deponent's counsel." (Motion at 3.) ACI's failure to describe the nature and extent of the allegedly improper objections is transparent. As the deposition record would show, the objections were well-taken, certainly not abusive, and clearly did not consume a sufficient number of minutes to warrant a continued deposition. Moreover, surely the drafters of the Rules contemplated objections by counsel as part of the one-day, seven hour limitation.

Similarly, ACI  failed to specify the circumstances under which Ms. Bienvenu "refused" to answer questions.   ACI's complaint regarding her testimony simply reflects that it did not like what she had to say about ACI's actions.

ACI omitted to mention the fact that it finds itself before the court solely as a result of its own conduct.  Mr. Karlinsky's calculated risk in refusing to continue Ms. Bienvenu's deposition on June 25th does not rise to the level of "good cause" as contemplated by the Rules.

In sum, ACI has failed to demonstrate good cause as to why it is entitled to any relief.  It has failed to submit any reasonable explanation as to why the time already afforded for Ms. Bienvenu's deposition was not sufficient.  It similarly has failed to enlighten the court with respect to additional relevant areas of inquiry for which ACI has not previously had ample opportunity to discover, because there are no such areas. ACI has failed  to contend that the information which it seeks from Ms. Bienvenu, beyond that which it obtained from her on June 25th, through the depositions of numerous other deponents, and through written discovery is insufficient or inadequate. ACI cannot speak to any financial burden, as the financial burden, expense, and inconvenience would be borne solely by Ms. Bienvenu if the Motion is granted.

Ms. Bienvenu is the only party who fairly can argue "good cause."  She gave ACI an opportunity, which they rejected.  To grant the relief sought in ACI's motion would be contrary to the intended purpose of Fed. R. Civ. P. 30(d)(1) and 26(b)(2).

## CONCLUSION

For the reasons set forth above, Defendant/Counter-Plaintiff Sandra Bush Ms. Bienvenu respectfully requests that the court the deny the motion of Plaintiff/Counter-Defendant in its entirety.    In the alternative, Ms. Bienvenu requests that any Order granting the Motion specify that the deposition be held at a place and time convenient to Ms. Bienvenu,  for no longer than two (2) hours, and with all expenses attendant to the deposition, including attorneys' fees and travel expenses to be borne by ACI.

Respectfully submitted,

RICK STEINER FELL & BENOWITZ LLP

By:____/s/ Raymond W. Lew_____
Robert J. Benowitz, Esq. (Admitted Pro Hac Vice)
Raymond W. Lew, Esq. (Admitted Pro Hac Vice)
90 Broad Street, 25th Floor
New York, NY 10004
(212) 422-0488 (voice)
(212) 422-0158 (facsimile)

Janet K. DeCosta, Esq. (Bar No. 439674)
JANET K. DeCOSTA P.C.
1825 Eye Street, N.W., Suite 400
Washington, D.C. 20006
(202) 638-3344 (voice)
(202) 824-8126 (facsimile)

*Attorneys for Defendant/Counter-Plaintiff*
*SANDRA BUSH BIENVENU*

# In The Matter Of:

*CECIL HARRIS v.*
*AMERICA'S CHOICE, INC., et al.*

## *SANDRA BIENVENU*
*June 25, 2008*

# *MERRILL LEGAL SOLUTIONS*

*25 West 45th Street - Suite 900*
*New York, NY 10036*
*PH: 212-557-7400 / FAX: 212-692-9171*

**BIENVENU, SANDRA - Vol. 1**

Page 1

SANDRA BIENVENU

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

------------------------------x
CECIL HARRIS,

        Plaintiff,

      v.               No. 07-195-JVP-SCR

AMERICA'S CHOICE, INC.,

        Defendant.
------------------------------x

UNITED STATES DISTRICT COURT

    DISTRICT OF COLUMBIA
------------------------------x
AMERICA'S CHOICE, INC.,

        Plaintiff/Counterdefendant,

      v.               No. 07-CV-00428

SANDRA BUSH-BIENVENU,

        Defendant/Counterplaintiff.
------------------------------x

               June 25, 2008
               9:44 a.m.


          Deposition of SANDRA BUSH-BIENVENU,

taken by Plaintiff/Counterdefendant America's Choice,

Inc., at the offices of Katten Muchin Rosenman LLP,

575 Madison Avenue, New York, New York, before Brandon

Rainoff, a Federal Certified Realtime Reporter and

Notary Public of the State of New York.

Page 2

```
    1              SANDRA BIENVENU
    2    APPEARANCES:
    3
    4    KATTEN MUCHIN ROSENMAN LLP
    5    Attorneys for America's Choice, Inc.
    6         575 Madison Avenue
    7         New York, NY 10022-2585
    8    BY:    MARTIN E. KARLINSKY, ESQ.
    9
   10    RICK STEINER FELL & BENOWITZ, LLP
   11    Attorneys for Sandra Bienvenu
   12         90 Broad Street, 25th Floor
   13         New York, NY 10004
   14    BY:    ROBERT J. BENOWITZ, ESQ.
   15
   16    RHORER LAW FIRM
   17    Attorneys for Cecil Harris
   18         10566 Airline Highway
   19         Baton Rouge, Louisiana 70816
   20    BY:    S. BRADLEY RHORER, ESQ.
   21
   22
   23    ALSO PRESENT:
   24    JASON S. DOUGAL, ESQ., America's Choice, Inc.
   25    ROBERT GIBBS, Videographer
```

Page 3

```
            1              SANDRA BIENVENU
09:36:13 2        (Time noted: 9:44 a.m.)
09:44:32 3        THE VIDEOGRAPHER: Good morning. This
09:44:33 4    is the video operator speaking, Robert Gibbs of
09:44:36 5    Merrill Legal Solutions, 25 West 45th Street,
09:44:39 6    New York, New York 10036. Today is June 25 of
09:44:44 7    2008 and the time is 9:44 a.m.
09:44:48 8        We are at the offices of Katten Muchin
09:44:50 9    Rosenman, LLP, 575 Madison Avenue, New York
09:44:55 10   City, New York. To take the videotape
09:44:59 11   deposition of Ms. Sandra Bienvenu in the matter
09:45:02 12   of Cecil Harris versus America's Choice, Inc.,
09:45:08 13   in the United States District Court, Middle
09:45:11 14   District of Louisiana, Civil Action
09:45:14 15   07-195-JVP-SCR, caption two, America's Choice
09:45:27 16   incorporated versus Sandra Bush-Bienvenu in the
09:45:30 17   United States District Court for the District of
09:45:33 18   Columbia, Case No. 07-CV-00428.
09:45:42 19       Will counsel please introduce
09:45:43 20   themselves for the record.
09:45:45 21       MR. KARLINSKY: Martin Karlinsky of
09:45:46 22   Katten Muchin Rosenman LLP on behalf of
09:45:48 23   America's Choice, Inc., in both cases. To my
09:45:51 24   right is Jason S. Dougal, general counsel of
09:45:54 25   America's Choice, Inc.
```

Page 4

```
            1              SANDRA BIENVENU
09:45:56 2        MR. BENOWITZ: Robert Benowitz, Rick
09:45:58 3    Steiner Fell & Benowitz on behalf of the witness
09:46:03 4    and defendant in this action.
09:46:04 5        MR. RHORER: Brad Rhorer, counsel for
09:46:06 6    Cecil Harris in the Louisiana case.
09:46:09 7        THE VIDEOGRAPHER: Will the court
09:46:10 8    reporter, Brad Rainoff of Merrill Legal
09:46:11 9    Solutions, please swear the witness.
09:46:24 10   SANDRA BUSH-BIENVENU,
09:46:25 11       having been duly sworn, was examined
09:46:25 12       and testified as follows:
09:46:25 13   EXAMINATION
09:46:25 14   BY MR. KARLINSKY:
09:46:28 15       Q.  Ms. Bienvenu, would you just state
09:46:30 16   your address for the record, please?
09:46:33 17       A.  4721 Seastar Vista, Destin, Florida
09:46:39 18   32541.
09:46:41 19       Q.  Now, Ms. Bienvenu, you and I have been
09:46:45 20   introduced before?
09:46:46 21       A.  Yes, sir.
09:46:46 22       Q.  And you know that I am counsel to
09:46:48 23   America's Choice in the Bienvenu action, the
09:46:51 24   case brought against you and as well the Harris
09:46:56 25   case, do you know it?
```

Page 5

```
            1              SANDRA BIENVENU
09:46:56 2        A.  Yes.
09:46:57 3        Q.  You do have an understanding of what
09:46:59 4    that process is today, this deposition process?
09:47:01 5        A.  Yes, sir.
09:47:02 6        Q.  You have attended several depositions
09:47:04 7    in this case or the related Harris case?
09:47:07 8        A.  Yes, sir.
09:47:09 9        Q.  You attend the depositions taken in
09:47:10 10   Little Rock, Arkansas, at the end of May?
09:47:14 11       A.  I did.
09:47:14 12       Q.  And you also attended the deposition
09:47:16 13   of Cecil Harris in New Orleans last week?
09:47:20 14       A.  I did.
09:47:21 15       Q.  And you were also present in my office
09:47:23 16   yesterday during the course of the deposition of
09:47:27 17   Judy Codding, were you not?
09:47:29 18       A.  I was.
09:47:32 19       Q.  You have had a chance to prepare for
09:47:34 20   this deposition?
09:47:36 21       A.  Yes.
09:47:40 22       Q.  I take it you met with counsel in
09:47:41 23   connection with that preparation?
09:47:43 24       A.  Yes.
09:47:46 25       Q.  I take it you also reviewed some
```

2  (Pages 2 to 5)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 6

SANDRA BIENVENU

09:47:49 2  documents in order to prepare?
09:47:49 3      A.  Yes.
09:47:50 4      Q.  Were any of those documents documents
09:47:53 5  other than ones that had been marked as
09:47:56 6  deposition exhibits in these matters?
09:48:03 7      A.  I don't believe so.  I did find some
09:48:06 8  extra documents that were in file folders as I
09:48:10 9  was cleaning out my office and I believe I
09:48:1210  provided those for my attorney day before
09:48:1711  yesterday.
09:48:1812      Q.  Those were the ones that were
09:48:1913  delivered to me yesterday?
09:48:2014      A.  Yes, sir.
09:48:2115          MR. KARLINSKY:  Let me just stop for a
09:48:2216  second and just talk about some housekeeping.
09:48:2517          We should probably have the same
09:48:2718  stipulations we discussed yesterday on the
09:48:2919  record here as well and those relate to the use
09:48:3320  of this deposition as well as the protocol of
09:48:3721  marking exhibits and the use of exhibits marked
09:48:4222  in the Harris action.
09:48:4023          We've agreed, and I would ask counsel
09:48:4624  to so stipulate, that all of the exhibits
09:48:4925  previously marked in the Harris case may be

Page 7

SANDRA BIENVENU

09:48:53 2  deemed marked in the Bienvenu action?
09:48:55 3          MR. BENOWITZ:  So stipulated.
09:48:58 4          MR. KARLINSKY:  Brad, is that good?
09:49:00 5          MR. RHORER:  Sure.
09:49:00 6          MR. KARLINSKY:  We have also agreed
09:49:01 7  that we'll continue to use the same marking
09:49:03 8  protocol that was used in the Harris action with
09:49:05 9  respect to the exhibit so that exhibits will be
09:49:0910  sequentially marked today beginning with 107.
09:49:1211          MR. BENOWITZ:  That's correct.
09:49:1312          MR. KARLINSKY:  Good?
09:49:1513          MR. RHORER:  Good, yes.
09:49:1614          MR. KARLINSKY:  This deposition is
09:49:1715  actually being taken in both actions and was
09:49:1916  noticed in both actions, so perhaps we don't
09:49:2117  even need to stipulate about use, but we can
09:49:2418  deal with that off the record later.
09:49:3119      Q.  Ma'am, have you also reviewed
09:49:3320  deposition testimony given by other witnesses in
09:49:3521  this case?
09:49:3522      A.  Yes, sir.
09:49:3623      Q.  Whose testimony have you reviewed?
09:49:4024      A.  Nick Solinger, Judy Codding, John
09:49:4425  Wozniak, Jason Dougal, Cecil Harris.

Page 8

SANDRA BIENVENU

09:50:01 2      Q.  How about Tommy Harris?
09:50:03 3      A.  I think I did see it, I'm not sure I
09:50:09 4  read --
09:50:11 5      Q.  You are not certain you read it?
09:50:12 6      A.  I'm not sure I read the whole --
09:50:14 7      Q.  With respect to the ones you
09:50:16 8  mentioned, Solinger, Codding, Wozniak, Dougal,
09:50:20 9  Cecil Harris when did you review the transcripts
09:50:2310  of those depositions?
09:50:2911      A.  Yesterday afternoon for some of them.
09:50:3712  I think the John Wozniak, Jason Dougal, I was
09:50:4213  sent those and I read those at home.
09:50:4914      Q.  Those depositions were taken in early
09:50:5115  February if memory serves me right and you
09:50:5416  provided them at or about that time?
09:50:5717      A.  I think it was about a month, maybe a
09:51:0018  month and a half, two months afterwards.
09:51:0419      Q.  After they were taken?
09:51:0420      A.  Yes.
09:51:0421      Q.  So sometime perhaps between the middle
09:51:0622  of March and the middle of April?
09:51:0823      A.  In that springtime.
09:51:1124      Q.  Are you on any medications --
09:51:1325          MR. BENOWITZ:  Excuse me, can I -- I

Page 9

SANDRA BIENVENU

09:51:14 2  would just like to ask her --
09:51:16 3          MR. KARLINSKY:  Sure.
09:51:17 4          (Pause)
09:51:30 5      A.  I probably need to correct myself.  I
09:51:32 6  did review some of the Arkansas depositions,
09:51:33 7  too.
09:51:37 8      Q.  I take it that was yesterday?
09:51:44 9      A.  They may have been sent to me earlier,
09:51:4810  after, but I was present --
09:51:5011      Q.  You were present at the depositions
09:51:5112  and read them as well or reviewed them?
09:51:5413      A.  Yes, I did.
09:51:5514      Q.  Ma'am, are you on any medications that
09:51:5715  affect your memory or your ability to testify?
09:51:5916      A.  No medications, I'm just getting
09:52:0117  older.
09:52:0218      Q.  As we all are.
09:52:0419          Is there any reason that you can't
09:52:0720  testify today fully and forthrightly in this
09:52:1021  matter?
09:52:1122      A.  I see no reason.
09:52:1523      Q.  You were sitting through the Harris
09:52:1824  deposition, Cecil Harris deposition so you heard
09:52:1925  my rules, but I'm going to give them to you

3 (Pages 6 to 9)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 10

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 09:52:22 2 | anyway. |
| 09:52:23 3 | A. Please do. |
| 09:52:26 4 | Q. First rule. I only have two rules |
| 09:52:27 5 | which are easy to remember. First rule, if you |
| 09:52:30 6 | answer a question, you will assume that you have |
| 09:52:33 7 | understood it, good? |
| 09:52:34 8 | A. Good. |
| 09:52:35 9 | Q. And you agree to that? |
| 09:52:3810 | A. I agree to that. |
| 03:52:4011 | Q. Secondly, you must answer questions |
| 09:52:4112 | orally, not by gesturing or saying hm-hmm, got |
| 09:52:4513 | it? |
| 09:52:4514 | A. I have it. |
| 09:52:4915 | Q. Is there any document in particular |
| 09:52:5116 | that you reviewed that stands out in your |
| 09:52:5417 | memory? |
| 09:53:0118 | A. Not any one particular one that would |
| 09:53:0319 | stand out. |
| 09:53:0520 | Q. Did you meet with anyone other than |
| 09:53:0621 | counsel in anticipation of this deposition? |
| 09:53:1722 | A. I'm not sure I really know what you |
| 09:53:1923 | are asking. |
| 09:53:2024 | Q. Well, you met with, I take it, Mr. |
| 09:53:2325 | Benowitz in connection with your preparation for |

Page 11

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 09:53:24 2 | this deposition? |
| 09:53:25 3 | A. I did. |
| 09:53:55 4 | (Pause) |
| 09:54:16 5 | Q. My question, then, was in addition to |
| 09:54:19 6 | Mr. Benowitz to prepare for the deposition, did |
| 09:54:22 7 | you meet with anyone else? |
| 09:54:31 8 | A. Raymond Lew was present yesterday. |
| 09:54:34 9 | Jay -- Jay Rick was present yesterday. Janet |
| 09:54:4710 | DeCosta was not present yesterday but she was |
| 09:54:4911 | with me in New Orleans. |
| 09:54:5412 | Q. And you did some preparation work with |
| 09:54:5613 | her as well? |
| 09:54:5814 | A. Just talking about the -- |
| 09:55:0115 | MR. BENOWITZ: Just say yes or no. |
| 09:55:0316 | A. Yes. |
| 09:55:0517 | Q. And I take it that was talking about |
| 09:55:0618 | the facts of the case? |
| 09:55:0819 | A. Yes. |
| 09:55:1020 | Q. Did you have any discussions with |
| 09:55:1521 | Cecil Harris in connection with your preparation |
| 09:55:1822 | for this deposition? |
| 09:55:2223 | A. Not in preparation for my deposition, |
| 09:55:2524 | no. |
| 09:55:2925 | Q. You've discussed the case generally |

Page 12

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 09:55:31 2 | with Cecil Harris? |
| 09:55:33 3 | A. Yes. |
| 09:55:34 4 | Q. On how many occasions, ma'am? |
| 09:55:38 5 | A. Cecil and I are friends. We probably |
| 09:55:41 6 | talk once or twice a week every week. |
| 09:55:47 7 | Q. So would it be fair to say that over |
| 09:55:49 8 | the course of the last year and a half since on |
| 09:55:53 9 | or about the first week of January of 2007, you |
| 09:55:5710 | and Mr. Harris have spoken maybe a hundred fifty |
| 09:56:0411 | times? |
| 09:56:0812 | A. I didn't do the math but we have |
| 09:56:1013 | spoken regularly. |
| 09:56:1314 | Q. Have you spoken about your case and |
| 09:56:1515 | his case regularly? |
| 09:56:1716 | A. Not specifically. Generally about the |
| 09:56:2117 | unfairness of what is happening. |
| 09:56:2818 | (Pause) |
| 09:56:4619 | A. So would you reread the question for |
| 09:56:4820 | me? |
| 09:56:5021 | Q. The question was, have you spoken |
| 09:56:5122 | about your case and his case regularly? |
| 09:56:5523 | A. We speak regularly. We don't always |
| 09:56:5524 | discuss this case. |
| 09:57:0425 | Q. When was the last time you spoke to |

Page 13

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 09:57:06 2 | Nick Solinger? |
| 09:57:16 3 | A. Within the past couple of months I |
| 09:57:18 4 | called to inquire about his wife's pregnancy. |
| 09:57:23 5 | Q. Aside from that subject, did you and |
| 09:57:25 6 | he discuss anything related to this case? |
| 09:57:31 7 | A. It might have been mentioned but it |
| 09:57:33 8 | wasn't a large part of the conversation. |
| 09:57:37 9 | Q. Since the time you terminated your |
| 09:57:3910 | employment with America's Choice, have you had |
| 09:57:4311 | other discussions with Nick Solinger? |
| 09:57:4612 | A. Yes. |
| 09:57:4613 | Q. How many? |
| 09:57:5214 | A. Maybe three, four. |
| 09:57:5415 | Q. Were those related to this case? |
| 09:58:0116 | A. The first couple definitely were. |
| 09:58:0517 | Q. When were they? |
| 09:58:1118 | A. I can't be specific, but shortly after |
| 09:58:1619 | I left America's Choice I called Nick and told |
| 09:58:2220 | him that I had left and told him that I was |
| 09:58:2921 | thinking about bringing charges because I felt |
| 09:58:3222 | what they had done was very unfair. |
| 09:58:3723 | Q. Is that the extent of the conversation |
| 09:58:3924 | you had with him on that occasion? |
| 09:58:4225 | A. I asked him if he had any remembrance |

4 (Pages 10 to 13)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 14

SANDRA BIENVENU

09:58:47 2  of the things that he had said to me and if he
09:58:50 3  had any documents that related to that.
09:58:56 4      Q.  Is that all you said to him during the
09:58:58 5  course of that call?
09:59:01 6      A.  I can't be sure that that was
09:59:04 7  everything that I said.
09:59:05 8      Q.  That is the most you remember right
09:59:06 9  now?
09:59:07 10     A.  That's the most that I can recall
09:59:08 11  right now.
09:59:09 12     Q.  Did he tell you -- did he say anything
09:59:10 13  in response to what you asked him?
09:59:14 14     A.  Yes.
09:59:15 15     Q.  With respect specifically to any
09:59:19 16  recollection that he had of matters that he had
09:59:24 17  discussed with you, what did he say?
09:59:32 18     A.  He reiterated what he had told me when
09:59:37 19  we were discussing my employment to begin with
09:59:40 20  before I was ever employed.  He talked about you
09:59:51 21  achieve quota credit when contracts are signed
09:59:56 22  and you get paid when the company gets paid, and
10:00:01 23  that's what I remembered, that's what I had been
10:00:07 24  operating under and that's what Nick confirmed.
10:00:14 25  And he says it more eloquently than I do.

Page 15

10:00:25 2      Q.  Do you recall the specific words he
10:00:27 3  used when he told you about the achievement of
10:00:33 4  quota credit?
10:00:35 5      A.  You accrue quota credit and
10:00:40 6  commissions earned on signing of contracts.  You
10:00:45 7  are not paid until the company is paid.
10:00:52 8      Q.  What particular contracts--
10:00:53 9      A.  That's the gist of it.
10:00:55 10     Q.  I'm sorry, I didn't hear the end of
10:00:57 11  that.
10:00:58 12     A.  That is the gist of it.
10:01:00 13     Q.  Okay.  What specific contracts did he
10:01:01 14  mention to you on the occasion that you talked
10:01:05 15  about this with him in early 2007?
10:01:12 16     A.  Well, I was specifically talking about
10:01:15 17  the Arkansas contract.
10:01:17 18     Q.  Did you ask him about the Arkansas
10:01:19 19  contract?
10:01:20 20     A.  No, because he was gone by then.
10:01:23 21     Q.  So you had a conversation in early
10:01:26 22  2007, January of 2007?
10:01:28 23     A.  Yes, sir.
10:01:30 24     Q.  You didn't ask him specifically about
10:01:31 25  the Arkansas contract because the Arkansas

Page 16

SANDRA BIENVENU

10:01:34 2  contract came after the time Mr. Solinger had
10:01:37 3  left the company?
10:01:39 4      A.  Yes.
10:01:42 5      Q.  Was it your understanding that when he
10:01:44 6  said to you that you achieved quota credit based
10:01:48 7  on the signing of a contract, that he was referring
10:01:51 8  to contracts other than the Arkansas contract?
10:01:54 9          MR. BENOWITZ:  Objection, I don't
10:01:54 10  think she said that.
10:01:57 11     A.  Any contract.
10:02:00 12     Q.  In other words, he didn't make it
10:02:02 13  specific to Arkansas?
10:02:04 14         MR. BENOWITZ:  Excuse me, do you
10:02:06 15  understand what conversation he is referring to?
10:02:08 16  I'm not sure.
10:02:09 17         MR. KARLINSKY:  Mr. Benowitz, if you
10:02:10 18  have an objection please place it on the record.
10:02:14 19  Place your objection on the record, please.  To
10:02:16 20  start giving a speech about what she understands
10:02:19 21  or what you understand is not an objection.  If
10:02:21 22  you have an objection, state it, please.
10:02:23 23         MR. BENOWITZ:  I object.  Why don't
10:02:24 24  you rephrase the question so she knows what time
10:02:26 25  period you are referring to so you are not

Page 17

SANDRA BIENVENU

10:02:28 2  trying to trick the witness.
10:02:30 3          MR. KARLINSKY:  I'm not trying to
10:02:31 4  trick the witness.
10:02:32 5      Q.  We are talking about the conversation
10:02:34 6  that you and Mr. Solinger had in January of
10:02:36 7  2007.  You are clear on that, aren't you?
10:02:38 8      A.  After I quit --
10:02:39 9      Q.  After you quit America's Choice.
10:02:41 10     A.  Yes.
10:02:41 11     Q.  That's what we are talking about.
10:02:43 12     A.  Yes, I am clear.
10:02:44 13     Q.  And my question to you was, was it
10:02:51 14  your understanding that Mr. Solinger was talking
10:02:53 15  about the Arkansas contract when he explained to
10:02:58 16  you what his view of quota credit was?
10:03:04 17         MR. RHORER:  Object to the form.
10:03:06 18     A.  I asked Nick what he had told me when
10:03:12 19  I was being hired for America's Choice, and he
10:03:20 20  gave me the statement.  Later in the
10:03:23 21  conversation I told him why I was upset and that
10:03:28 22  it was over mainly the Arkansas contract, but
10:03:33 23  there were others.
10:04:16 24     Q.  Ms. Bienvenu, just to be clear about
10:04:19 25  this, when you called Mr. Solinger in January of

5 (Pages 14 to 17)

Page 18

SANDRA BIENVENU

10:04:24 2   2007, you were no longer employed by the
10:04:28 3   company, correct? By America's Choice?
10:04:30 4   A.   Correct.
10:04:30 5   Q.   And he was no longer employed by
10:04:32 6   America's Choice?
10:04:33 7   A.   Correct.
10:04:33 8   Q.   In fact, Mr. Solinger had left the
10:04:35 9   employ of America's Choice over a year before
10:04:39 10  that time?
10:04:44 11        MR. BENOWITZ: Is that a question or a
10:04:46 12  statement?
10:04:47 13  A.   I think Mr. Solinger left in December
10:04:51 14  of 2005.
10:04:54 15  Q.   So it would have been over a year
10:04:56 16  before the time of --
10:04:58 17  A.   Yes, sir.
10:04:58 18  Q.   -- the call that you are describing?
10:05:16 19       Now, is there anything else that you
10:05:18 20  recall of that particular conversation with
10:05:22 21  Solinger in January of 2007?
10:05:30 22  A.   We talked about a lot of things, what
10:05:32 23  he was doing, talked about his son, talked about
10:05:36 24  my grandchild.
10:05:39 25  Q.   Anything else on the subject of

Page 19

SANDRA BIENVENU

10:05:41 2   America's Choice?
10:05:49 3   A.   The conversation of the unfairness,
10:05:54 4   why I quit, and what he had told me when he
10:06:01 5   hired me and what he told me up until the day he
10:06:05 6   left.
10:06:07 7   Q.   You stated the conversation of the
10:06:09 8   unfairness. What do you mean by that?
10:06:12 9   A.   That I worked very hard for America's
10:06:14 10  Choice, I did what my employment required.
10:06:20 11  Q.   Let me stop for a second and interrupt
10:06:22 12  you. What I really meant to ask you was you
10:06:26 13  said the conversation of the unfairness.
10:06:29 14  What did you say to him and what did
10:06:31 15  he say to you in that regard?
10:06:36 16  A.   I don't recall exact words.
10:06:38 17  Q.   Substance?
10:06:39 18  A.   I can tell you the substance of the
10:06:40 19  conversation.
10:06:41 20  Q.   Please do.
10:06:43 21  A.   I was very upset that America's Choice
10:06:47 22  had not paid me commissions on contracts that
10:06:52 23  were executed during my employment, and I
10:06:57 24  thought it was extremely unfair that I did a
10:07:01 25  great job for them and they did not respect that

Page 20

SANDRA BIENVENU

10:07:06 2   or honor that by paying what they should have
10:07:10 3   paid.
10:07:11 4   Q.   Do you recall when this conversation
10:07:12 5   was with any specificity other than the fact
10:07:15 6   that it was in January of 2007?
10:07:18 7   A.   I know it was after I left.
10:07:20 8   Q.   How soon after you left, ma'am?
10:07:24 9        Actually, let me ask you a more
10:07:26 10  specific question, perhaps it will assist you.
10:07:30 11       Your resignation was effective January
10:07:32 12  20 of 2007, would you agree with that?
10:07:36 13  A.   It was in the mid-January time. I
10:07:39 14  think I wrote it on the 15th, 16th, 17th,
10:07:45 15  somewhere around there.
10:07:46 16  Q.   Whenever you wrote it, I believe you
10:07:48 17  made your resignation effective on January 20?
10:07:51 18  A.   I don't remember the exact date but it
10:07:53 19  was definitely in the middle of January.
10:07:56 20  Q.   With respect to the date of the
10:07:57 21  effectiveness of your resignation, about how
10:08:00 22  long after that was your call with Mr. Solinger
10:08:03 23  that you are talking about?
10:08:07 24  A.   I don't recall the exact time.
10:08:07 25  Q.   Do you know if it was within a week?

Page 21

SANDRA BIENVENU

10:08:09 2   A.   I don't recall the exact time.
10:08:10 3   Q.   Two weeks?
10:08:12 4   A.   I do not recall.
10:08:13 5        MR. BENOWITZ: I think she has
10:08:14 6   answered your question.
10:08:15 7   Q.   Three weeks?
10:08:15 8        MR. BENOWITZ: Objection. She has
10:08:16 9   answered your question. How many more times can
10:08:19 10  you ask her?
10:08:20 11  A.   I don't recall.
10:08:21 12  Q.   Do you know if it was within a
10:08:22 13  month of the time you quit?
10:08:23 14  A.   I do not recall.
10:08:24 15  Q.   You told me before that the
10:08:26 16  conversation was in January of 2007. I'm trying
10:08:28 17  to ask you when.
10:08:30 18  A.   I believe it was --
10:08:31 19       MR. BENOWITZ: Excuse me, objection.
10:08:33 20  You have asked this question five times. Excuse
10:08:35 21  me, I am allowed to make my objection, am I not,
10:08:38 22  Mr. Karlinsky?
10:08:39 23       MR. KARLINSKY: Mr. Benowitz, that's
10:08:40 24  not an objection, that's a speech. If you have
10:08:41 25  an objection, make it.

6 (Pages 18 to 21)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 22

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 10:08:42 2 | MR. BENOWITZ: You are asking the same |
| 10:08:42 3 | question five times. She has answered your |
| 10:08:45 4 | question five times. You want to continue |
| 10:08:46 5 | asking the same question, go ahead. You are |
| 10:08:50 6 | going to get the same answer. |
| 10:08:51 7 | BY MR. KARLINSKY: |
| 10:08:53 8 | Q. Do you know about how long after the |
| 10:08:55 9 | effective date of your resignation your call |
| 10:09:0510 | was with Mr. Solinger? |
| 10:09:0011 | A. It was sometime after I quit the |
| 10:09:0312 | company in January. I do not recall the exact |
| 10:09:0713 | date. |
| 10:09:0714 | Q. Do you believe it was within a month |
| 10:09:0915 | of the time you quit? |
| 10:09:1016 | A. I do not know when I made the call. |
| 10:09:1417 | Q. You have phone records? |
| 10:09:2118 | A. Probably. |
| 10:09:2419 | Q. From where did you make this telephone |
| 10:09:2620 | call to Mr. Solinger? |
| 10:09:3921 | A. I was at my home, but I don't remember |
| 10:09:4122 | if I used my home phone or my cellphone. |
| 10:09:4923 | Q. Could you give me your home phone |
| 10:09:5124 | number and your cellphone number, please, at |
| 10:09:5325 | that time? |

Page 23

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 10:09:55 2 | A. 850-269-0200. |
| 10:10:01 3 | Q. That's the home phone? |
| 10:10:02 4 | And the cellphone? |
| 10:10:03 5 | A. 890-217-2887. |
| 10:10:06 6 | Q. What are your respective service |
| 10:10:08 7 | providers? |
| 10:10:14 8 | A. At that time I think my home phone was |
| 10:10:19 9 | with Embarq or Sprint, E-M-B-A-R-Q, or Sprint. |
| 10:10:3210 | I'm really not positive. |
| 10:10:3411 | Q. How about your cellphone? |
| 10:10:3512 | A. Cellphone has always been with |
| 10:10:3713 | Cingular, which is now AT&T. |
| 10:11:1314 | Q. You also told me before in answer to |
| 10:11:1515 | my question about the substance of the |
| 10:11:1816 | conversation relating to America's Choice that |
| 10:11:2317 | you discussed with Mr. Solinger why you had |
| 10:11:2618 | quit. |
| 10:11:2819 | Could you explain to me what was |
| 10:11:3020 | discussed in that regard? |
| 10:11:3321 | A. I told him that I quit America's |
| 10:11:3522 | Choice because they didn't pay me the |
| 10:11:3923 | commissions that I had earned. It was very |
| 10:11:4524 | unfair and I no longer could work for a company |
| 10:11:4925 | that I did not trust. |

Page 24

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 10:11:53 2 | Q. Did he respond to you in any way? |
| 10:12:00 3 | A. I'm sure he did. |
| 10:12:02 4 | Q. Tell me about that. |
| 10:12:06 5 | A. I don't remember his exact response. |
| 10:12:08 6 | Q. What was the substance of his |
| 10:12:10 7 | response? |
| 10:12:12 8 | A. I understand, I don't blame you. |
| 10:12:20 9 | Q. Anything else you can recall? |
| 10:12:2110 | A. I couldn't work for a company that I |
| 10:12:2311 | didn't trust. |
| 10:12:2812 | Q. Did you ask Mr. Solinger to provide |
| 10:12:3913 | any documents to you, Ms. Bienvenu? |
| 10:12:4214 | A. I believe in subsequent conversations |
| 10:12:4515 | I did. I don't recall that it was that first |
| 10:12:5216 | conversation. |
| 10:12:5917 | Q. How many conversations have you had |
| 10:13:0018 | from the conversation you have just related in |
| 10:13:0319 | January of 2007 to the present time with Mr. |
| 10:13:0720 | Solinger in which you and he or either of you |
| 10:13:1421 | discussed the question of America's Choice or |
| 10:13:1622 | any matter related to this case? |
| 10:13:2223 | A. I probably have not had more than |
| 10:13:2424 | three to five conversations with Nick since he |
| 10:13:2725 | left. |

Page 25

SANDRA BIENVENU

| | |
|---|---|
| 1 | |
| 10:13:29 2 | Q. My question to you was conversations |
| 10:13:32 3 | with Mr. Solinger that relate to the issues in |
| 10:13:37 4 | this litigation, do you understand that? |
| 10:13:40 5 | A. I do. |
| 10:13:41 6 | Q. Is that your answer, that you had |
| 10:13:43 7 | something like three to five conversations with |
| 10:13:46 8 | Mr. Solinger since he left the company in |
| 10:13:49 9 | connection with this litigation? |
| 10:13:5110 | A. I had three to five conversations with |
| 10:13:5311 | Mr. Solinger, and I had not finished my |
| 10:13:5812 | response. |
| 10:13:5813 | Q. I'm sorry, go ahead. |
| 10:14:0214 | A. I probably mentioned America's Choice |
| 10:14:0915 | in at least three of those five. |
| 10:14:1416 | Q. Can you tell me when those were? |
| 10:14:1717 | A. Absolutely not. I have no idea. |
| 10:14:2118 | Q. They were sometime between January of |
| 10:14:2319 | 2007 and the present date? |
| 10:14:2520 | A. Yes. |
| 10:14:2521 | Q. When was the last conversation you had |
| 10:14:2722 | with Mr. Solinger? |
| 10:14:3123 | A. Within the past two to three months. |
| 10:14:3524 | That was to inquire about his wife's pregnancy |
| 10:14:4025 | which was a very difficult one. |

7 (Pages 22 to 25)

MERRILL LEGAL SOLUTIONS
(800) 325-3376      www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 26

SANDRA BIENVENU

10:14:43 2   Q.   Let's leave that on the side. I want
10:14:45 3   to just stay with the conversations about
10:14:48 4   America's Choice and the issues related to this
10:14:50 5   litigation.
10:14:52 6         Can you tell me when the last
10:14:53 7   conversation you had with him on those subjects
10:14:55 8   was?
10:15:04 9   A.   Not specifically. It's been months.
10:15:08 10   Q.   To the extent -- it's been months
10:15:10 11   since now, since the present time?
10:15:12 12   A.   Yes, sir.
10:15:13 13   Q.   In the three conversations --
10:15:20 14   actually, let me just see if we can get a little
10:15:23 15   bit more clarity on the first of the
10:15:25 16   conversations. Then we'll go on to what else
10:15:31 17   you can recall.
10:15:37 18         Yes. So you had told me in your
10:15:39 19   answer before, I had asked you anything else on
10:15:44 20   the subject of America's Choice, and what you
10:15:46 21   answered was the conversation of the unfairness,
10:15:50 22   why I quit, and what he had told me when he
10:15:53 23   hired me and what he told me up until the day he
10:15:56 24   left.
10:15:56 25         Is there anything else specifically

Page 27

SANDRA BIENVENU

10:15:58 2   that you recall him saying in that conversation
10:16:01 3   related to any of those matters?
10:16:01 4   A.   Not specifically, but we were
10:16:24 5   discussing all of the conversations that we had
10:16:26 6   had during the recruiting process when I was
10:16:32 7   being recruited by America's Choice.
10:16:34 8   Q.   Is there anything about that subject
10:16:40 9   that you now recall?
10:16:47 10   A.   Not specifically.
10:16:49 11   Q.   How about generally?
10:16:52 12   A.   Well, generally we talked about the
10:16:57 13   benefit package, we talked about --
10:16:57 14   Q.   No, you and I are not on the same
10:16:59 15   page. I don't want to go back to the
10:17:02 16   conversations at the time of your recruitment
10:17:04 17   because we will talk about that separately. I
10:17:06 18   just want to talk about what you can now recall
10:17:10 19   of the discussion that you had with Solinger at
10:17:13 20   or about the time that you resigned your
10:17:16 21   employment with America's Choice.
10:17:19 22         So my question to you is, is there
10:17:21 23   anything else that you recall about that
10:17:23 24   discussion that you have not yet told me?
10:17:28 25   A.   That's what I was trying to tell you.

Page 28

SANDRA BIENVENU

10:17:30 2   We discussed the benefit package because one of
10:17:34 3   my questions to Mr. Solinger was if he recalled
10:17:41 4   telling me that there were cost of living raises
10:17:49 5   that were included in the benefit package.
10:17:56 6         So I was asking him to reconfirm the
10:18:01 7   things that he had told me when he hired me, and
10:18:10 8   it was mostly about why I quit. And I asked him
10:18:16 9   why he quit.
10:18:22 10   Q.   Let's stay with the first subject
10:18:24 11   matter you just mentioned. On the subject of
10:18:26 12   the benefits packages and cost of living raise,
10:18:33 13   what did you say and what did he say?
10:18:38 14   A.   I asked about the cost of living
10:18:42 15   raise, if it was supposed to be included because
10:18:44 16   it was part of the benefit package that I
10:18:48 17   signed, and then later Judy Codding announced to
10:18:53 18   the whole company that everyone would get cost
10:18:57 19   of living raises but not the salespeople because
10:19:01 20   the salespeople were getting other compensation.
10:19:08 21         So my question to Mr. Solinger was,
10:19:10 22   did he remember that that was supposed to be
10:19:15 23   part of the package.
10:19:17 24   Q.   And what did he respond if anything?
10:19:18 25   A.   He didn't remember the full benefit

Page 29

SANDRA BIENVENU

10:19:21 2   package.
10:19:23 3   Q.   Are you seeking recovery of any
10:19:27 4   additional salary which would have been derived
10:19:30 5   as a result of a cost of living increase in this
10:19:33 6   litigation?
10:19:34 7   A.   No, I was curious.
10:19:39 8   Q.   What did Mr. Solinger say about why he
10:19:43 9   quit America's Choice?
10:19:46 10   A.   I believe he told me that the travel
10:19:49 11   had become too much away from his family, that
10:19:54 12   when he started he understood there was going to
10:19:58 13   be an office in LA and he just could not commute
10:20:03 14   back and forth to DC any more.
10:20:11 15   Q.   Anything else on that subject?
10:20:14 16   A.   On which subject?
10:20:15 17   Q.   On the subject of Mr. Solinger's
10:20:18 18   resignation from America's Choice?
10:20:21 19   A.   Not that I recall.
10:20:26 20   Q.   Anything else that you can recall
10:20:27 21   about that discussion with him now?
10:20:29 22   A.   I told you to the best of my knowledge
10:20:31 23   all that I can recall.
10:20:34 24   Q.   With respect to the two other
10:20:36 25   conversations that you mentioned having with Mr.

8  (Pages 26 to 29)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

---

---

**Page 30**

SANDRA BIENVENU

Solinger in which America's Choice was discussed or any subject related to this litigation was discussed, what can you tell me about those discussions?

A. I called him and asked him if – I asked him if he would provide me with any documentation that he had and I believe I asked him if he would talk to my attorney.

Q. Did he respond?

A. He did.

Q. What did he say?

A. He would be happy to look for documents and he would talk to my attorney.

Q. Did you do something as a result of that discussion with him?

A. I'm not sure I understand what you are asking.

Q. For example, did you put your counsel in touch with him?

A. I did call my counsel and give him Nick's phone number, yes.

Q. Do you know if your counsel contacted Mr. Solinger?

A. I know that he tried and I think they

**Page 31**

SANDRA BIENVENU

did eventually connect. I'm not sure.

Q. Is it your understanding that your counsel discussed – had a discussion with Mr. Solinger?

A. I believe they did talk, I'm not sure.

Q. Which counsel did you put in touch with Mr. Solinger?

A. Mr. Benowitz.

Q. Did Mr. Solinger also provide documents following that discussion you had with him?

A. Yes, he did.

Q. And he provided those directly to you?

A. I don't remember if he sent them to me or to my counsel.

Q. Have you produced them in connection with this litigation?

A. Yes, sir.

Q. Is there anything else you recall about this particular telephone discussion with Mr. Solinger?

A. No, sir.

Q. So aside from what you told me, there was no substantive discussion?

**Page 32**

SANDRA BIENVENU

A. I don't believe so. To the best of my knowledge Mr. Solinger was in a meeting and I called and it had to be short and sweet.

Q. That's two conversations you have now told us about. There was a third?

A. I believe.

Q. What can you tell me about that one?

A. I can't tell you anything because I don't remember it.

Q. Don't have a recollection of it?

A. No.

Q. Aside from speaking to Mr. Solinger, have you had any communications with other employees of America's Choice whether current or former since the time you left?

A. Yes.

Q. Who?

A. Lewie Hartley, Gerry Miller, Washington Cole, James Williams, Shou-Shou Pohill – her name is Loretta Pohill – Lynn Barbour, Jason Dougal, Marc Tucker -- not Marc, Josh Tucker, Judy Codding, Cindy Fielder, John Fryer.

What is Larry's last name?

**Page 33**

SANDRA BIENVENU

MR. DOUGAL: Molinaro?

A. Larry Molinaro. Oh, my goodness, I just lost her name. Down in Texas.

MR. DOUGAL: Lewis?

A. No.

MR. DOUGAL: Oh, Sally Hampton?

A. Sally Hampton. Sorry.

To the best of my knowledge, those are the only people.

Q. With respect to the 13 names you have mentioned, did you have a discussion with any of them that was in any way related to this litigation?

A. Oh, did I mention Eric Hoagland?

Q. No.

A. Sorry.

Q. That's 14. You have my question in mind?

A. Pardon?

Q. Do you have my question in mind?

A. I do.

Q. Okay.

A. Eric and I have talked extensively about our experience with America's Choice. I

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

Page 34

SANDRA BIENVENU

10:25:58 2 didn't put Cecil Harris on this list although I
10:26:00 3 did tell you formerly that Cecil and I have
10:26:08 4 talked often. Most of those people I ran into
10:26:16 5 at conferences or meetings of some sort and the
10:26:22 6 conversation was more we miss you, we wish you
10:26:27 7 were back, I miss you all, that sort of thing.
10:26:33 8     My conversations with Eric Hoagland,
10:26:36 9 we discussed America's Choice. I don't recall
10:26:49 10 specific information that was shared between me
10:26:53 11 and any of the rest of them.
10:26:57 12   Q.   Related to this litigation?
10:26:59 13   A.   Related to this, no.
10:27:00 14   Q.   So Hoagland you did have discussions
10:27:03 15 with related to matters -- strike that --
10:27:08 16 relating to matters -- you had specific
10:27:13 17 discussions with Mr. Hoagland relating to the
10:27:16 18 subject matter of this litigation?
10:27:19 19   A.   Related to the subject matter, yes.
10:27:20 20 sir.
10:27:21 21   Q.   And also with Mr. Harris, Cecil
10:27:22 22 Harris?
10:27:23 23   A.   Yes, sir.
10:27:25 24   Q.   Aside from them, with none of the rest
10:27:30 25 of the people you have identified?

Page 35

SANDRA BIENVENU

10:27:35 2   A.   I don't recall any discussions about
10:27:37 3 the litigation. Excuse me, did I put Jason's
10:27:50 4 name on there?
10:27:51 5   Q.   Yes.
10:27:52 6   A.   Okay.
10:27:53 7   Q.   Ms. Bienvenu, I'm just going to read a
10:27:55 8 list of names to you. You have already talked
10:27:57 9 about a lot of these people but I just want to
10:28:00 10 make sure we are all on the same page here. If
10:28:02 11 you don't know who any of these people are,
10:28:06 12 please tell me so.
10:28:07 13   A.   Okay.
10:28:09 14   Q.   Because we'll be mentioning these
10:28:12 15 names probably in the course of the deposition
10:28:14 16 today.
10:28:15 17   A.   Nick Solinger, Cecil Harris, Tommy
10:28:18 18 Harris, John Wozniak, Marietta Palmer, Judy
10:28:20 19 Codding, Judy Aronson, Jason Dougal, Wade Davis,
10:28:24 20 Eric Hoagland, Sam Esparza, Loretta Polhill,
10:28:29 21 Patricia Harvey, Marty Monroe, people related to
10:28:34 22 or employed by the Arkansas Department of
10:28:36 23 Education, Becky Dalton, Estelle Mathis, Dr.
10:28:39 24 Diana Julian, Dr. Bobby Davis, Jannine Riggs,
10:28:44 25 Kenneth James.

Page 36

SANDRA BIENVENU

10:28:45 2   Q.   You know all those people?
10:28:47 3   A.   I know who they are, yes, sir.
10:28:49 4   Q.   And common abbreviations that we may
10:28:51 5 be using in the course of this deposition so
10:28:53 6 that, again, we are on the same page, ACI is
10:28:58 7 America's Choice, of course?
10:29:00 8   A.   Yes.
10:29:00 9   Q.   And ACI School Design, ACI SD, you
10:29:04 10 understand what that means and what that refers
10:29:06 11 to?
10:29:08 12   A.   ACI School Design?
10:29:11 13   Q.   Yes.
10:29:12 14   A.   Yes.
10:29:14 15   Q.   And NCEE you are familiar with that
10:29:16 16 abbreviation?
10:29:17 17   A.   Yes, sir.
10:29:18 18   Q.   Also --
10:29:19 19     MR. DOUGAL:   We usually say ACSD?
10:29:25 20   A.   Sorry.
10:29:28 21   Q.   ACSD is what I meant to say.
10:29:30 22   A.   Yes, sir.
10:29:31 23   Q.   And NISL, you are familiar with that?
10:29:34 24   A.   I'm not sure what it stands for but I
10:29:37 25 do know what NISL -- the organization, yes.

Page 37

SANDRA BIENVENU

10:29:42 2   Q.   And frequently we have talked about
10:29:44 3 business development directors, that was your
10:29:47 4 actual title at America's Choice, was it not?
10:29:51 5   A.   Yes, it was.
10:29:52 6   Q.   And if I say a BDD, you'll understand
10:29:54 7 that?
10:29:55 8   A.   I will.
10:29:56 9   Q.   And the people that reported to you
10:29:58 10 were business development managers, true?
10:30:00 11   A.   Yes.
10:30:01 12   Q.   And we sometimes call them BDMs?
10:30:04 13   A.   Yes.
10:30:04 14   Q.   Arkansas Department of Education we
10:30:06 15 frequently refer to as ADE?
10:30:08 16   A.   Yes.
10:30:10 17   Q.   And finally CPD, you understand what
10:30:12 18 that is?
10:30:13 19   A.   Continuing professional development,
10:30:15 20 yes, sir.
10:30:16 21   Q.   You understand what a fiscal year is,
10:30:18 22 do you not?
10:30:19 23   A.   I do.
10:30:20 24   Q.   What was or what is for that matter
10:30:25 25 America's Choice's fiscal year?

10 (Pages 34 to 37)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 38

1                    SANDRA BIENVENU
10:30:27 2          MR. BENOWITZ: Objection.
10:30:29 3          A.   I believe that America's Choice's
10:30:31 4   fiscal year was from June 1st through -- July
10:30:36 5   1st through June 30.
10:30:43 6          Q.   Have you been involved, Ms. Bienvenu,
10:30:48 7   in any prior litigation involving employment?
10:30:59 8          A.   Are you asking me if I have brought
10:31:01 9   charges or someone has brought charges against
10:31:0310   me about employment?
10:31:0511          Q.   Both questions. Have any involvement
10:31:0812   whatsoever in prior litigation involving
10:31:1013   employment?
10:31:1114          A.   No, sir.
10:31:1215          Q.   So you haven't sued an employer at any
10:31:1416   time in the past?
10:31:1517          A.   Never.
10:31:1618          Q.   And you have never had any involvement
10:31:1819   as a witness or a subject in any litigation?
10:31:2220          A.   Not as it related to my employment,
10:31:2521   no, sir.
10:31:2522          Q.   Have you been involved in litigation
10:31:2723   generally?
10:31:2824          A.   Yes.
10:31:2825          Q.   What was that?

Page 39

1                    SANDRA BIENVENU.
10:31:31 2          A.   It was SEC versus Kenney.
10:31:38 3          Q.   Kenney, K-E-N-N-E-Y?
10:31:41 4          A.   I think that's how it is spelled.
10:31:43 5          Q.   What was your involvement in
10:31:44 6   connection with that matter?
10:31:45 7          A.   I was a witness.
10:31:51 8          Q.   Did you testify in a deposition or
10:31:52 9   trial?
10:31:5310          A.   In a deposition.
10:32:0011          Q.   Kenney was the name of an individual?
10:32:0412          A.   Martin Kenney.
10:32:0613          Q.   K-E-N-N-E-Y?
10:32:0814          A.   It is either K-E-N-N-Y or K-E-N-N-E-Y
10:32:1215   and I don't know which way.
10:32:1316          Q.   Was Mr. Kenney affiliated with some
10:32:1617   company?
10:32:1718          A.   Mr. Kenney was the CEO of Compass
10:32:2319   Learning.
10:32:3220          Q.   Were you an employ of Compass
10:32:3221   Learning?
10:32:3222          A.   Yes, I was.
10:32:3323          Q.   What was your position there?
10:32:3424          MR. BENOWITZ: I would just like, I
10:32:3525   think, to make a correction for the record. I

Page 40

1                    SANDRA BIENVENU
10:32:37 2   think Mr. Kenney was a CEO of a company called
10:32:40 3   WRC Media, Inc.
10:32:42 4          MR. KARLINSKY: WRC Media, Inc.?
10:32:44 5          MR. BENOWITZ: Right, of which Compass
10:32:45 6   Learning was a subsidiary.
10:32:48 7   BY MR. KARLINSKY:
10:32:53 8          Q.   What was your position with Compass
10:32:54 9   Learning?
10:32:5610          A.   Area vice-president for sales.
10:32:5911          Q.   Were you represented by counsel in
10:33:0212   connection with the testimony you gave in that
10:33:0413   case?
10:33:0414          A.   Yes.
10:33:0515          Q.   Who was your counsel?
10:33:0716          A.   Mr. Benowitz.
10:33:1117          Q.   Same individual that represents you in
10:33:1218   this matter?
10:33:1419          A.   Yes, sir.
10:33:2220          Q.   How many occasions did you testify in
10:33:2321   that case?
10:33:3022          A.   I had one videotaped deposition and
10:33:3623   two other meetings with the SEC.
10:33:4024          Q.   Was testimony taken at the other
10:33:4325   meetings?

Page 41

1                    SANDRA BIENVENU
10:33:44 2          A.   I believe so.
10:33:49 3          Q.   Can you tell me when the testimony
10:33:51 4   was?
10:33:59 5          A.   I can tell you generally it was
10:34:03 6   2005-2006, somewhere in that range.
10:34:13 7          Q.   What was the nature of your
10:34:15 8   involvement in that matter?
10:34:19 9          A.   I was the area vice-president for
10:34:2210   sales for a certain region. There was a sale
10:34:2911   that was made in my region that Mr. Kenney was
10:34:3612   involved in so I was asked questions about it.
10:34:4513          Q.   What was the sale in your region, how
10:34:4614   would you identify it?
10:34:5215          A.   In December, I think it was 2002, it
10:34:5616   was the end of the year. Pushed to get business
10:35:0617   in, superintendent signed an order agreement
10:35:1718   that was pending school board approval and so it
10:35:2119   should not have been counted in that year's
10:35:2420   business but I believe it was, and through
10:35:3321   financial reporting or whatever it is that it
10:35:3922   was not supposed to be reported as income and it
10:35:4423   was and it was never taken off the books even
10:35:4824   though the board had never approved it. And so
10:35:5325   that was the issue.

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 42

SANDRA BIENVENU

10:35:58 2  Q.  What was the order for?
10:35:59 3  A.  For Compass Learning's integrated
10:36:03 4  learning system.
10:36:07 5  Q.  What was that composed of?
10:36:10 6  A.  Professional development, software,
10:36:24 7  installation. I believe it was training of
10:36:30 8  teachers, professional development of district
10:36:33 9  staff, technology installation and software. I
10:36:44 10  believe that was all.
10:36:49 11  Q.  At Compass Learning did you receive
10:36:52 12  credit for that particular sale?
10:36:54 13  A.  I did.
10:36:55 14  Q.  Was that later paid or reversed or
10:36:58 15  what happened with it?
10:37:00 16  A.  I received credit for it. I was paid
10:37:03 17  a commission, and once we realized that it
10:37:12 18  wasn't supposed to be, I paid the commission
10:37:14 19  back.
10:37:33 20  Q.  Ms. Bienvenu, would you give me your
10:37:35 21  educational background, please?
10:37:37 22  A.  I have a Bachelor of Science from the
10:37:44 23  University of Tennessee in elementary education
10:37:47 24  with a minor in mathematics. I have a master's
10:37:56 25  from Georgia State University.

Page 43

SANDRA BIENVENU

10:37:59 2  Q.  An MS degree or an MA degree?
10:38:02 3  A.  Hadn't thought about it. I believe it
10:38:07 4  was an MS.
10:38:08 5  Q.  What was that in?
10:38:09 6  A.  Reading diagnosis and correction with
10:38:14 7  a minor in something and I swear I don't
10:38:18 8  remember.
10:38:19 9  Q.  When did you receive your two degrees?
10:38:25 10  A.  You really do want to know my age.
10:38:27 11  don't you.
10:38:29 12  Q.  Give me the decade.
10:38:31 13  A.  I graduated from University of
10:38:34 14  Tennessee in June of 1970, I believe, and I
10:38:42 15  graduated from Georgia State University for the
10:38:44 16  Master's in 1972.
10:38:47 17  Q.  If it makes you feel any better, we
10:38:49 18  are in the same decade.
10:38:51 19  A.  It doesn't.
10:38:53 20  Q.  Nor me.
10:38:55 21  A.  I wanted to be in Jason Dougal's
10:38:57 22  decade.
10:38:59 23  Q.  I'm with you.
10:39:05 24  What did you do after completing your
10:39:08 25  education?

Page 44

SANDRA BIENVENU

10:39:09 2  A.  After which education?
10:39:11 3  Q.  Well, did you have a job, a regular --
10:39:13 4  did you have any regular employment after you
10:39:15 5  received your undergraduate degree?
10:39:18 6  A.  Yes.
10:39:18 7  Q.  Where was that?
10:39:21 8  A.  The summer after I graduated I worked
10:39:23 9  at a savings and loan in Atlanta, Georgia, and
10:39:28 10  then began my teaching career in Atlanta public
10:39:35 11  schools in August 1970.
10:39:37 12  Q.  And you taught in the Atlanta,
10:39:39 13  Georgia, public education system?
10:39:41 14  A.  I did.
10:39:41 15  Q.  For how long a period of time?
10:39:49 16  A.  I don't remember the exact number of
10:39:51 17  years.
10:39:52 18  Q.  Generally?
10:39:53 19  A.  Somewhere in five, six, in that range.
10:39:56 20  Q.  Did you return to school to obtain
10:39:58 21  your Master's after that period?
10:39:59 22  A.  No, I actually returned to school to
10:40:01 23  get my Master's while I was working.
10:40:04 24  Q.  After you -- I take it that at some
10:40:07 25  point you left the Georgia -- the Atlanta,

Page 45

SANDRA BIENVENU

10:40:10 2  Georgia, public school system?
10:40:12 3  A.  I did.
10:40:12 4  Q.  What did you do next?
10:40:13 5  A.  So where did I go from there? I left
10:40:19 6  Georgia and moved to Baton Rouge, Louisiana, and
10:40:26 7  taught in Baton Rouge, but I believe I was at a
10:40:31 8  private school then. I would have to go back
10:40:33 9  and look, but I think I was at a private school
10:40:36 10  then.
10:40:36 11  Q.  When was that, sometime in the late
10:40:38 12  seventies?
10:40:44 13  A.  Sometime in the late seventies. And I
10:40:49 14  had one child who was a couple months old when I
10:40:52 15  went back to teaching in Baton Rouge. Then we
10:41:01 16  moved to Waco, Texas, and I did not work. We
10:41:04 17  moved from Waco, Texas, to Bloomington,
10:41:08 18  Illinois, and I did not work. Moved from
10:41:13 19  Bloomington to Cincinnati, I did not work. I
10:41:13 20  had two kids by this time.
10:41:16 21  Q.  So you were working if you had two
10:41:18 22  kids.
10:41:19 23  A.  I was working but I was not getting
10:41:21 24  paid, let me put it this way.
10:41:23 25  Q.  Right.

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 46

| | SANDRA BIENVENU |
|---|---|
| 1 | |
| 10:41:24 2 | A.   Then moved from Cincinnati back to |
| 10:41:31 3 | Slidell, Louisiana, and I went to work in sales, |
| 10:41:37 4 | in educational sales at that time, and that was |
| 10:41:42 5 | about 1979, '80, in that range. |
| 10:41:47 6 | Q.   For whom did you go to work at that |
| 10:41:51 7 | time? |
| 10:41:51 8 | A.   A company called Interstate School |
| 10:41:52 9 | Supply. |
| 10:41:53 10 | Q.   What did you do for that company? |
| 10:41:55 11 | A.   I was a sales rep. |
| 10:41:57 12 | Q.   What were you selling? |
| 10:42:00 13 | A.   Classroom furniture, bleachers, |
| 10:42:04 14 | lockers, and educational materials like books, |
| 10:42:14 15 | supplementary books, reading programs, math |
| 10:42:18 16 | programs, and then when computers came out the |
| 10:42:20 17 | next year, selling computerized assisted |
| 10:42:25 18 | learning systems. |
| 10:42:31 19 | Q.   How long have you worked for |
| 10:42:32 20 | Interstate? |
| 10:42:38 21 | A.   I believe it was two to three years. |
| 10:42:41 22 | Q.   What did you do after that time? |
| 10:42:43 23 | A.   One of my prior customers decided to |
| 10:42:48 24 | open a computer-assisted instruction company and |
| 10:42:54 25 | recruited me to work with him and his partner. |

Page 47

| | SANDRA BIENVENU |
|---|---|
| 1 | |
| 10:43:00 2 | Q.   In what capacity? |
| 10:43:01 3 | A.   As a salesperson and a trainer. |
| 10:43:10 4 | Q.   How long did you remain in the employ |
| 10:43:12 5 | of that company? |
| 10:43:13 6 | A.   Ten years. |
| 10:43:14 7 | Q.   What was the name of it? |
| 10:43:16 8 | A.   Micro Instructional Systems. |
| 10:43:18 9 | Q.   Where was it located? |
| 10:43:20 10 | A.   Chalmette, Louisiana. |
| 10:43:24 11 | Q.   Can you tell me what time -- strike |
| 10:43:27 12 | the question. |
| 10:43:28 13 | Can you tell me what year it was you |
| 10:43:30 14 | left the employ of that company? |
| 10:43:40 15 | A.   I believe it was '92, '93. '92, I |
| 10:43:44 16 | think. |
| 10:43:46 17 | Q.   Why did you leave? |
| 10:43:48 18 | A.   Because I had a better job offer and |
| 10:43:51 19 | the gentleman who owned the company had run for |
| 10:43:55 20 | public office. He was now a state |
| 10:43:58 21 | representative and I didn't want to run the |
| 10:44:03 22 | company alone. |
| 10:44:07 23 | Q.   Where did you go in 1992? |
| 10:44:09 24 | A.   Jostens Learning Corporation. |
| 10:44:12 25 | Q.   What was the business of that company? |

Page 48

| | SANDRA BIENVENU |
|---|---|
| 1 | |
| 10:44:15 2 | A.   Educational software. |
| 10:44:21 3 | Q.   Did it sell any services? |
| 10:44:23 4 | A.   Yes. |
| 10:44:25 5 | Q.   What were they? |
| 10:44:28 6 | A.   Both professional development for |
| 10:44:31 7 | teachers and administrators as well as technical |
| 10:44:36 8 | services. |
| 10:44:38 9 | Q.   Were you a commissioned salesperson |
| 10:44:39 10 | for Jostens? |
| 10:44:41 11 | A.   Yes, I was. |
| 10:44:42 12 | Q.   At that company how did you receive -- |
| 10:44:45 13 | did you work against a quota there? |
| 10:44:47 14 | A.   Yes. |
| 10:44:47 15 | Q.   At that company, how did you receive |
| 10:44:51 16 | quota credit? |
| 10:44:52 17 | MR. BENOWITZ:  Objection. You can |
| 10:44:57 18 | answer. |
| 10:44:58 19 | A.   I received quota credit when either |
| 10:45:02 20 | contracts were signed or purchase orders were |
| 10:45:05 21 | signed, and I was paid at that time within a |
| 10:45:16 22 | couple months or a month. I believe way back |
| 10:45:23 23 | then we were paid monthly commissions, I'm not |
| 10:45:27 24 | absolutely certain. |
| 10:45:28 25 | Q.   How long did you stay in the employ of |

Page 49

| | SANDRA BIENVENU |
|---|---|
| 1 | |
| 10:45:31 2 | Jostens? |
| 10:45:32 3 | A.   Jostens became Compass Learning. I |
| 10:45:38 4 | was there for 12, 13 plus years. |
| 10:45:50 5 | Q.   Until sometime in or about 2004 or |
| 10:45:52 6 | 2005? |
| 10:45:53 7 | A.   No.  I left them to go to work for |
| 10:46:00 8 | America's Choice. |
| 10:46:00 9 | Q.   So you would have been there right up |
| 10:46:02 10 | through the spring of 2005? |
| 10:46:04 11 | A.   2005. |
| 10:46:07 12 | Q.   Did your position ever change at |
| 10:46:10 13 | Jostens or Compass? |
| 10:46:12 14 | A.   Yes. |
| 10:46:12 15 | Q.   What positions did you hold there? |
| 10:46:15 16 | A.   I was a sales rep until -- to the best |
| 10:46:26 17 | of my knowledge, it was 2000 or 2002, and I'm |
| 10:46:34 18 | really not sure of the exact date.  I was named |
| 10:46:40 19 | area vice-president when my boss became the |
| 10:46:43 20 | national VP of sales. |
| 10:46:45 21 | Q.   Who did you answer to? |
| 10:46:49 22 | A.   I answered to a great number of them. |
| 10:46:52 23 | The last person was Glenn Chapin. |
| 10:46:55 24 | Q.   Was that your direct report? |
| 10:46:59 25 | A.   Yes. |

13  (Pages 46 to 49)

Page 50

SANDRA BIENVENU

10:46:59 2  Q. Glenn Chapin?
19:47:01 3  A. Glenn Chapin.
10:47:02 4  Q. Where was Compass Learning and Jostens
10:47:06 5  before it located?
10:47:09 6  A. It was in -- right outside of San
10:47:17 7  Diego, and I don't remember the town.
10:47:22 8  Q. Where did you work from?
10:47:23 9  A. Louisiana.
10:47:2510 Q. But its headquarters were somewhere
10:47:2811 right outside of San Diego?
10:47:3112 A. Yes, sir.
10:47:3113 Q. And you left Compass Learning I think
10:47:3314 you just said to enter the employ of America's
10:47:3615 Choice?
10:47:3716 A. Yes, I did.
10:47:3817 Q. For what reason did you leave Compass
10:47:3918 Learning?
10:47:4119 A. I was recruited to go to work for
10:47:4520 America's Choice by Nick Solinger.
10:47:5221 MR. KARLINSKY: This is a convenient
10:47:5322 stopping point as to why don't we take a break.
10:48:0023 THE VIDEOGRAPHER: Here now marks the
10:48:0024 end of tape one of the deposition of Ms. Sandra
10:48:0625 Bienvenu. The time is 10:48 a.m. We are now

Page 51

SANDRA BIENVENU

10:48:09 2  off the record.
10:48:10 3  (Recess)
11:01:36 4  THE VIDEOGRAPHER: Here now marks the
11:01:37 5  beginning of tape two of the deposition of
11:01:39 6  Sandra Bienvenu. The time is 11:01 a.m. We are
11:01:43 7  now back on the record.
11:01:44 8  BY MR. KARLINSKY:
11:01:46 9  Q. Ms. Bienvenu, the last thing you told
11:01:5210 me was that you had been recruited to go to work
11:01:5511 for America's Choice by Nick Solinger, so I
11:01:5712 think that would be a good place to pick up
11:01:5913 again.
11:02:0014 I take it that you knew something
11:02:0215 about America's Choice before you ever had any
11:02:0416 contact with Mr. Solinger?
11:02:0817 A. I had heard of America's Choice
11:02:1418 through my travels in Mississippi, but I didn't
11:02:1819 know a whole lot about it.
11:02:2120 Q. How is it that Mr. Sofinger contacted
11:02:2321 you?
11:02:2422 A. Actually Mr. Solinger did not contact
11:02:2823 me. In the beginning a headhunter -- I want to
11:02:3624 say DHR, it was initials, they contacted me
11:02:3925 first and told me that I had great

Page 52

SANDRA BIENVENU

11:02:46 2  qualifications and they had a job that they
11:02:48 3  thought matched my qualifications.
11:02:54 4  Q. Can you tell me when that was?
11:03:03 5  A. February of 2005, I believe, January
11:03:12 6  or February, in that early part of 2005.
11:03:15 7  Q. With whom at America's Choice did you
11:03:17 8  have contact before the commencement of your
11:03:22 9  employment?
11:03:2310 MR. BENOWITZ: Objection.
11:03:2411 A. I'm not sure I understand what you are
11:03:2612 asking.
11:03:2713 Q. Who did you have any communications
11:03:2814 with at America's Choice before you actually
11:03:3015 became an employee?
11:03:3216 MR. BENOWITZ: Objection to form.
11:03:3617 A. I interviewed with Nick Solinger, Bob
11:03:4418 Petit, Steve Niederman, Loretta Polhill.
11:03:5219 Q. Steve Niederman?
11:03:5520 A. Niederman. Don't ask me to spell it.
11:03:5921 There were two or three more. I was flown to DC
11:04:1622 and I had eight hours of straight interviews
11:04:1923 with no lunch, and I don't remember every person
11:04:2524 that I spoke with. But that was the first time
11:04:2825 I spoke with —

Page 53

SANDRA BIENVENU

11:04:30 2  Q. Did you speak with Nick Solinger on
11:04:34 3  that occasion, too?
11:04:34 4  A. Yes.
11:04:38 5  Q. How about Judy Codding?
11:04:38 6  A. No.
11:04:38 7  Q. That was one occasion, that is one day
11:04:40 8  of eight hours? That's a lot of interviews.
11:04:44 9  A. Yes, it was.
11:04:4510 Q. Right. What do you recall of it?
11:04:5111 A. They put me a small conference room
11:04:5312 much smaller than this, and every hour or hour
11:04:5613 and a half a different person came in to talk
11:05:0114 with me.
11:05:0215 Q. On that first occasion, was there any
11:05:0516 discussion about terms and conditions of your
11:05:0817 employment?
11:05:1718 A. As I recall those discussions, it was
11:05:2319 more like they were trying to sell me on the
11:05:2720 company, telling me what the company was about,
11:05:3121 what they did, what I would be responsible for,
11:05:3822 talking about the position of business
11:05:4123 development director and what those
11:05:4324 responsibilities were. That's generally the
11:05:4725 conversations.

14 (Pages 50 to 53)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 54

SANDRA BIENVENU

```
11:05:52 2    Q.  Anything mentioned during the course
11:05:53 3   of that day about compensation?
11:05:57 4    A.  No, sir.
11:05:58 5    Q.  When was the first discussion that you
11:06:00 6   can recall on the subject of compensation?
11:06:09 7    A.  I still had several phone interviews
11:06:11 8   after that where compensation was never
11:06:15 9   mentioned. I believe once I passed all the
11:06:20 10  interviews, I want to say sometime in the April,
11:06:33 11  March-April timeframe, the discussions began to
11:06:36 12  get serious about actual territories'
11:06:44 13  compensation.
11:06:47 14   Q.  With whom were the discussions in the
11:06:48 15  March-April timeframe?
11:06:56 16   A.  Mainly between me and the headhunter
11:06:59 17  because they were the intermediaries, I guess.
11:07:05 18   Q.  I would like to know about your
11:07:06 19  discussions with people at the company on the
11:07:08 20  subject of compensation, so let's leave the
11:07:10 21  headhunters off to one side for a moment and
11:07:12 22  move to the point at which you had discussions
11:07:15 23  with people at the company on the subject of
11:07:19 24  compensation.
11:07:29 25   A.  I believe in the March-April timeframe
```

Page 55

SANDRA BIENVENU

```
11:07:35 2   Nick and I did have a couple of phone
11:07:37 3   conversations and some e-mails back and forth
11:07:42 4   about what they were offering and what I was
11:07:45 5   willing to take.
11:07:47 6    Q.  Tell me about those.
11:07:59 7    A.  I don't remember the first salary that
11:08:00 8   they offered me. I remember countering and
11:08:06 9   telling them that I wouldn't leave the company
11:08:09 10  that I was with for less than 150 a year.
11:08:21 11   There was discussion about where I
11:08:22 12  would be based and I believe that Nick told me I
11:08:33 13  needed to be based in Atlanta after the position
11:08:39 14  said that I could live in Florida. When I first
11:08:43 15  started interviewing he told me I needed to be
11:08:45 16  based in Atlanta and if I wasn't that I would
11:08:48 17  have to pay my own travel back and forth to
11:08:52 18  Atlanta, but I had to be in Atlanta so many days
11:08:57 19  a week.
11:08:59 20   And I refused and said that I wasn't
11:09:02 21  interested in working that way. And I believe
11:09:05 22  at one point in one of those e-mails I said:
11:09:08 23  This is ridiculous. I don't travel just because
11:09:14 24  I love to work in hotels, and that I really
11:09:19 25  didn't want to work for a company that I
```

Page 56

SANDRA BIENVENU

```
11:09:20 2   couldn't trust or that couldn't — didn't feel
11:09:23 3   like they could trust me. Something to that
11:09:28 4   effect. So those were my first conversations.
11:09:30 5    Q.  When was the first conversation you
11:09:32 6   had with Mr. Solinger on the subject of
11:09:34 7   commissions?
11:09:48 8    A.  Sometime during those initial --
11:09:51 9   sometime during those initial negotiations. I
11:09:57 10  don't recall the exact moment in time.
11:10:05 11   Q.  Without regard to when it was, can you
11:10:08 12  tell me what Mr. Solinger said in connection
11:10:10 13  with that communication and what you said to
11:10:13 14  him?
11:10:17 15   A.  That I would be paid commissions on
11:10:21 16  sales that were made and the territory that I
11:10:24 17  was responsible for. My quota would be, I
11:10:36 18  believe -- I believe in the beginning he was
11:10:38 19  talking about a higher quota. I don't recall
11:10:42 20  the exact numbers. I believe we settled on 2.5.
11:10:50 21   Q.  2.5 percent?
11:10:52 22   A.  No, 2.5 million as quota. I know that
11:11:04 23  I asked if commissions were paid quarterly and
11:11:10 24  he didn't know that information at that
11:11:12 25  particular time. He gave me a sample of what
```

Page 57

SANDRA BIENVENU

```
11:11:19 2   the quota commission percentages would be and --
11:11:33 3   and I think at that time I said, so it's going
11:11:38 4   to be like most other companies in this
11:11:41 5   industry, quota credit is given when the PO or
11:11:50 6   contract or whatever way they do business is
11:11:54 7   signed, and then you get paid sometime after
11:11:59 8   that. That's why I was asking if they paid
11:12:02 9   quarterly.
11:12:05 10   Q.  What did Mr. Solinger say in response
11:12:07 11  to that?
11:12:11 12   A.  He had a very succinct way of saying
11:12:13 13  this sentence and I don't think I'm going to say
11:12:17 14  it exactly right, but you accrue quota credit
11:12:21 15  and commissions on the signing of contracts and
11:12:25 16  then he said this company pays after they are
11:12:31 17  paid.
11:12:32 18   Q.  Anything else you can recall about
11:12:33 19  that?
11:12:39 20   A.  Not specifically.
11:12:40 21   Q.  Can you recall when he told you that?
11:12:44 22   A.  It was in the beginning as we were
11:12:44 23  still negotiating.
11:12:49 24   Q.  Did you have any discussions other
11:12:50 25  than what you have already related to me with
```

15  (Pages 54 to 57)

Page 58

SANDRA BIENVENU

11:12:52 2  Mr. Solinger concerning commissions, quotas,
11:12:56 3  quota credit, anything related to that prior to
11:13:00 4  the time you signed your offer letter?
11:13:05 5      A.  Not that I recall.
12:13:36 6      (Pause)
11:13:47 7      Q.  Ms. Bienvenu, I show you what's been
11:13:50 8  marked previously in the course of this
11:13:52 9  litigation as Exhibit 58.
11:14:07 10      Could you identify Exhibit 58 for us,
11:14:11 11  Ms. Bienvenu?
11:14:38 12      A.  It appears to be my offer letter along
11:14:48 13  with a letter that welcomes me to America's
11:14:56 14  Choice and tells me about my benefits.
11:15:04 15      Q.  Let me see if I can be more specific
11:15:09 16  here.  The first two pages of Exhibit 58 are a
11:15:14 17  letter directed to you dated April 25, 2005?
11:15:19 18      A.  Yes, sir.
11:15:21 19      Q.  If you look with me to the Bates stamp
11:15:23 20  numbers at the bottom right of the page?
11:15:28 21      A.  Yes, sir.
11:15:26 22      Q.  You'll see that this is a document
11:15:27 23  produced by America's Choice where it says ACI
11:15:31 24  DC 03260, do you see that?
11:15:34 25      A.  Yes, sir.

Page 59

SANDRA BIENVENU

11:15:36 2      Q.  If we turn to the second page, this
11:15:38 3  copy of this document is signed, is it not?
11:15:41 4      A.  Yes, it is.
11:15:42 5      Q.  It bears your signature?
11:15:44 6      A.  Yes, it is.
11:15:45 7      Q.  Doesn't seem to bear any signature on
11:15:47 8  the part of the company?
11:15:50 9      A.  No, sir.
11:15:51 10      Q.  Do you know why that is?
11:15:55 11      A.  No, sir.
11:15:56 12      Q.  Is this the form in which you received
11:15:58 13  Exhibit 58?
11:16:01 14      A.  To the best of my knowledge, yes.
11:16:02 15      Q.  You did sign it, that's your
11:16:04 16  signature, correct?
11:16:05 17      A.  Yes, I did.
11:16:07 18      Q.  It is dated to the right of your
11:16:09 19  signature.  Is that your handwriting?
11:16:11 20      A.  Yes, it is.
11:16:12 21      Q.  And it says April 29, 2005, is that
11:16:14 22  correct?
11:16:15 23      A.  That is true.
11:16:15 24      Q.  If we look to the continuing two
11:16:17 25  pages, these are pages that were produced by you

Page 60

SANDRA BIENVENU

11:16:21 2  in connection with this litigation which you can
11:16:24 3  tell by the Bates number in the lower right, it
11:16:26 4  says SB00270028, see that?
11:16:31 5      A.  Yes, sir.
11:16:31 6      Q.  Now, this would appear, that is, 27
11:16:34 7  and 28, the third and fourth pages of Exhibit 58
11:16:38 8  would appear to be the same document as the
11:16:42 9  first two pages, am I correct?
11:16:52 10      A.  It seems to be.
11:16:53 11      Q.  With one exception, I believe, and
11:16:56 12  that is that there is a handwritten alteration
11:16:59 13  on the page Bates stamped 03260 which is the
11:17:03 14  first page of the exhibit?
11:17:05 15      A.  Yes, sir.
11:17:05 16      Q.  Where it says:  "Your start date is,"
11:17:11 17  in printing, "9 May, 2005."  There appears to be
11:17:16 18  a strike out and what looks to be the numeral 2
11:17:20 19  is written in, do you see that?
11:17:25 20      A.  It's not very clear but there is
11:17:28 21  something written there.
11:17:29 22      Q.  And to the right of it there are what
11:17:31 23  might be initials, do you see that?
11:17:33 24      A.  I do.
11:17:34 25      Q.  Do you know whose initials those are?

Page 61

SANDRA BIENVENU

11:17:43 2      A.  I do but I have just forgotten her
11:17:45 3  name.
11:17:46 4      Q.  Cindy Williams?
11:17:46 5      A.  Oh.  No.  She works in human
11:17:54 6  resources.  I don't remember.
11:18:07 7      Q.  Cordelia Williams?
11:18:09 8      A.  Yes.
11:18:10 9      Q.  When you placed your signature on the
11:18:12 10  first document?
11:18:15 11      A.  Yes, sir.
11:18:16 12      Q.  Second page of the first document
11:18:17 13  which is part of Exhibit 58, was that alteration
11:18:20 14  in the document, that is, the date alteration
11:18:23 15  with those initials?
11:18:33 16      A.  I don't believe so but I'm not sure.
11:18:34 17      Q.  If we look at the second document
11:18:36 18  which is part of Exhibit 58, again, this is the
11:18:40 19  document that was produced by your files in
11:18:42 20  connection with this litigation, and turn to the
11:18:44 21  second page of it, you'll see that your
11:18:48 22  signature appears on that page?
11:18:49 23      A.  Yes, sir.
11:18:50 24      Q.  It is your signature?
11:18:50 25      A.  Yes, it is.

16 (Pages 58 to 61)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 62

SANDRA BIENVENU

| | |
|---|---|
| 11:18:51 2 | Q. And to the right a date is written and |
| 11:18:53 3 | that would appear to be your handwriting? |
| 11:18:55 4 | A. Yes, it is. |
| 11:18:56 5 | Q. That date is May 9, 2005? |
| 11:18:58 6 | A. Yes, it is. |
| 11:18:59 7 | Q. Which, of course, is different than |
| 11:19:06 8 | the date on the first document? |
| 11:19:02 9 | A. Yes, it is. |
| 11:19:0310 | Q. Can you explain that to me? |
| 11:19:1011 | A. As I recall, I had agreed to begin on |
| 11:19:1612 | May 9 and I believe Nick called and asked me if |
| 11:19:2813 | I would start on May 3rd because he wanted me to |
| 11:19:3514 | fly to San Francisco and have either a two or a |
| 11:19:4215 | three-day meeting with him and I believe that's |
| 11:19:5016 | why the dates changed. |
| 11:19:5117 | Q. So in fact was your start date May 2 |
| 11:19:5418 | of 2005? |
| 11:19:5819 | A. I always thought it was May 3rd. So I |
| 11:20:0320 | don't know. |
| 11:20:0621 | Q. Did you in fact sign the two letters |
| 11:20:0922 | that are part of Exhibit 58 on two separate |
| 11:20:1223 | days? |
| 11:20:1324 | A. I did. |
| 11:20:1425 | Q. Did you sign two copies of the |

Page 63

SANDRA BIENVENU

| | |
|---|---|
| 11:20:17 2 | document, that is, the letter of April 25? |
| 11:20:24 3 | A. I don't remember. |
| 11:20:26 4 | Q. Who gave you Exhibit 58? |
| 11:20:42 5 | A. Which part of Exhibit 58? |
| 11:20:46 6 | Q. Either of the two documents that |
| 11:20:48 7 | constitute the exhibit. |
| 11:20:50 8 | A. America's Choice sent them to me. |
| 11:20:53 9 | Q. Let's not pay any regard right now to |
| 11:20:5510 | the alteration by hand. I'm just talking about |
| 11:20:5811 | the printed letter itself. |
| 11:21:0012 | A. America's Choice sent it to me. |
| 11:21:0113 | Q. And you — I take it from Mr. |
| 11:21:0414 | Solinger? |
| 11:21:0515 | A. No, sir. |
| 11:21:0616 | Q. From whom? |
| 11:21:0817 | A. Marietta Palmer. |
| 11:21:0918 | Q. Did you have any discussions with |
| 11:21:1119 | Palmer about Exhibit 58? |
| 11:21:1720 | A. If I am not mistaken, I did have a |
| 11:21:2221 | conversation with her before this document |
| 11:21:2722 | reached my house, I think. |
| 11:21:3223 | Q. Tell me about that conversation, |
| 11:21:3324 | please. |
| 11:21:3425 | A. I believe that she called to give me |

Page 64

SANDRA BIENVENU

| | |
|---|---|
| 11:21:40 2 | basically what would be contained in my offer |
| 11:21:46 3 | and wanted to know if I did in fact agree that I |
| 11:21:50 4 | wanted to receive an offer, I think. |
| 11:21:54 5 | Q. Do you recall any details of that |
| 11:21:58 6 | telephone call? |
| 11:22:07 7 | A. No more than what I have just told |
| 11:22:10 8 | you. I do recall one detail. |
| 11:22:13 9 | Q. Yes, go ahead, please. |
| 11:22:2210 | A. Marietta went to talk to me because at |
| 11:22:2511 | that time she knew that I had lived in Louisiana |
| 11:22:3212 | and had sold in Louisiana and she wanted to know |
| 11:22:3613 | if I knew her brother or brother-in-law. That's |
| 11:22:4114 | as much as I remember. |
| 11:22:4215 | Q. Nothing besides that? |
| 11:22:4416 | A. I don't believe. |
| 11:22:4517 | Q. I take it you told Ms. Palmer that you |
| 11:22:4818 | wanted to receive an offer? |
| 11:22:5019 | A. Yes, I did. |
| 11:22:5120 | Q. You then received Exhibit 58 from her? |
| 11:22:5521 | A. Yes. |
| 11:23:0022 | Q. Did you discuss Exhibit 58 with anyone |
| 11:23:0623 | after you received it? |
| 11:23:1224 | A. I'm not sure what you are asking me. |
| 11:23:1425 | Q. Did you have any discussions with |

Page 65

SANDRA BIENVENU

| | |
|---|---|
| 11:23:15 2 | anyone about it? |
| 11:23:26 3 | A. I don't -- I don't believe. I don't |
| 11:23:28 4 | know. |
| 11:23:28 5 | Q. I take it Exhibit 58 was acceptable to |
| 11:23:32 6 | you? |
| 11:23:35 7 | A. It must have been, I signed it. |
| 11:23:38 8 | Q. In your view did it reflect the |
| 11:23:41 9 | discussions that you had had with Mr. Solinger |
| 11:23:4410 | up to that point? |
| 11:23:4611 | A. Up to that point, yes. |
| 11:23:4812 | Q. It did? Yes? |
| 11:23:5013 | A. Yes. |
| 11:23:5114 | Q. I see that in the first -- I'm sorry, |
| 11:23:5715 | the second paragraph it is indicated that you |
| 11:24:0016 | would have an annual salary of $150,000 plus a |
| 11:24:0417 | sales compensation plan currently set at 75,000 |
| 11:24:0818 | for reaching your full quota. |
| 11:24:1119 | I read that correctly? |
| 11:24:1220 | A. Yes, you did. |
| 11:24:1321 | Q. It goes on to say: As explained, the |
| 11:24:1622 | final parameters of the plan are in proposal |
| 11:24:1923 | form and must receive board of directors |
| 11:24:2224 | approval. Then it continues again: Upon |
| 11:24:2425 | approval of the structure, your final quota will |

17 (Pages 62 to 65)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 66

SANDRA BIENVENU

1
11:24:27 2  be set based on territory planning.
11:24:30 3      I read that correctly as well, did I
11:24:32 4  not?
11:24:33 5      A.  You did.
11:24:34 6      Q.  At the time that you signed Exhibit
11:26:37 7  58, what was your understanding about your
11:24:40 8  quota, that is, the level of your quota?
11:24:48 9      A.  At the time that I signed?  I'm not
11:24:5410  sure we had determined the exact level, but it
11:24:5811  was supposed to be in the -- somewhere between 2
11:25:0212  and 4 million.  I don't remember the exact
11:25:0513  number.
11:25:0614      Q.  That's what your recollection is, that
11:25:0815  it was between 2 and 4 million?
11:25:1016      A.  That was my recollection.
11:25:1217      Q.  Mr. Solinger has testified in this
11:25:1418  case that he believed your discussions reflected
11:25:2019  a quota in the range of as much as 7 or 9
11:25:2420  million at the outset.  Do you not recall that?
11:25:2721      A.  I recall that that -- we did talk
11:25:3022  about some higher quotas, but it depended on the
11:25:3523  number of states that I was going to be
11:25:3824  responsible for.  I believe in the beginning I
11:25:4225  was only supposed to do a couple or three states

Page 67

SANDRA BIENVENU

1
11:25:51 2  and then it was increased to 10 or 14.  It
11:25:59 3  changed.
11:26:13 4      Q.  When was the first time you recall
11:26:16 5  receiving a definite quota?
11:26:30 6      A.  Sometime in August, September, October
11:26:35 7  timeframe of 2005.
11:26:46 8      Q.  What was that definite quota that you
11:26:48 9  were advised of at that time?
11:26:5210      A.  I believe it was 2.5.
11:27:0011      Q.  Now, was that after the Hurricane
11:27:0212  Katrina catastrophe?
11:27:0613      A.  Yes.
11:27:0714      Q.  Was it after the Hurricane Rita storm
11:27:1215  as well?
11:27:2116      A.  I believe so.
11:27:2217      Q.  Your claim in this case is based upon
11:27:2418  a quota of $2.5 million, is that correct?
11:27:2819      A.  I believe so.
11:27:2920      Q.  Do you have any doubt of that?
11:27:3221      A.  I haven't looked at that document in a
11:27:3422  long time but I believe it was 2.5.
11:27:3723      Q.  We'll look at it together.
11:27:3924      A.  I think at one point I thought that
11:27:4125  Nick had lowered it lower than that but I was

Page 68

SANDRA BIENVENU

1
11:27:43 2  mistaken.
11:27:51 3      Q.  I take it the question of commissions
11:27:54 4  was important to you in connection with agreeing
11:27:57 5  to employment with America's Choice?
11:28:00 6      A.  Absolutely, every salesperson depends
11:28:03 7  on commissions.
11:28:12 8      Q.  Did you read Exhibit 58 before you
11:28:14 9  signed it?
11:28:1610      A.  I believe I did.
11:28:2011      Q.  Did you have any questions about it?
11:28:2712      A.  I did question the commissions, the
11:28:3213  territory, the compensation plan overall.  Nick
11:28:3914  assured me that it would be up to my standards
11:28:4415  and I trusted Nick.
11:28:5116      Q.  You said you questioned -- let me
11:28:5317  clarify this with you, I'm sorry.
11:28:5518      You had a discussion with Mr. Solinger
11:28:5919  concerning Exhibit 58?
11:29:0320      A.  Not necessarily Exhibit 58.
11:29:0521      Q.  That was my question to you.
11:29:0622      A.  Okay, I'm sorry.
11:29:0723      Q.  I asked whether you had any questions
11:29:1024  about Exhibit 58, about the offer letter itself.
11:29:1625      A.  No, because Mr. Solinger and I had

Page 69

SANDRA BIENVENU

1
11:29:19 2  discussed that this second paragraph was not
11:29:22 3  finalized.
11:29:24 4      Q.  Right.  Did Exhibit 58 to the extent
11:29:29 5  that -- strike the question.
11:29:33 6      Was Exhibit 58 at that time you signed
11:29:35 7  it consistent with what Mr. Solinger had
11:29:39 8  discussed with you?
11:29:48 9      A.  At that time yes.
11:30:2710      Q.  Ms. Bienvenu, you understood your
11:30:3011  employment with America's Choice to be what is
11:30:3212  known as at will employment?
11:30:3413      A.  Yes, I did.
11:30:3514      Q.  You understood that that meant that
11:30:3715  you could terminate your employment at any time?
11:30:4016      A.  Yes, I did.
11:30:4117      Q.  For any or for no reason?
11:30:4318      A.  Yes, I did.
11:30:4419      Q.  And likewise that the company could
11:30:4620  terminate your employment at any time?
11:30:5621      A.  Yes.
11:30:5922      Q.  For any or no reason?
11:31:0223      A.  Yes.
11:31:0624      Q.  You also understood that your
11:31:0825  employment at will status could only be modified

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 70

SANDRA BIENVENU

11:31:11 2  by a written agreement that was signed by you
11:31:15 3  and an officer of America's Choice?
11:31:21 4  A.  I need you to restate that.
11:31:27 5  Q.  Sure. My question was, you also
11:31:27 6  understood that your employment at will status
11:31:28 7  could only be modified by a written agreement
11:31:31 8  that was signed by you and an officer of
11:31:34 9  America's Choice?
11:31:4110  A.  Okay. I'm not sure that I understand
11:31:4311  exactly what you are asking. I understood that
11:31:4712  America's Choice could terminate me at any time
11:31:5213  with reason or without reason and they could
11:31:5714  notify me and I didn't necessarily have to sign
11:32:0115  anything.
11:32:3116  Q.  Ms. Bienvenu, you noted to me before
11:32:3417  that you had located some additional documents?
11:32:4318  A.  Yes, sir.
11:32:4319  Q.  Recently?
11:32:4420  A.  Yes, sir.
11:32:4521  Q.  And that those had been, as I
11:32:4622  indicated, those had been produced to me
11:32:4823  yesterday?
11:32:4924  A.  Yes, sir.
11:32:4925  Q.  Where were those documents that you

Page 71

SANDRA BIENVENU

11:32:51 2  located?
11:32:53 3  A.  Misfiled in a different file folder
11:32:56 4  from America's Choice. And I'll have to digress
11:33:04 5  for a moment. I keep my files in alphabetical
11:33:07 6  order. If I am not mistaken, that was in the
11:33:12 7  file that said Alabama, not in the America's
11:33:16 8  Choice file.
11:33:18 9  Q.  How is it that you found those
11:33:1910  documents?
11:33:2011  A.  I was trying to clean out my office
11:33:2212  and throw things away that weren't pertinent to
11:33:2613  my present employment and I came across those.
11:33:3214  MR. KARLINSKY: I need to take a
11:33:3315  three-minute break.
11:33:3816  THE VIDEOGRAPHER: The time is 11:33
11:33:3917  a.m. We are now off the record.
11:33:4218  (Recess)
11:38:0519  THE VIDEOGRAPHER: The time is 11:38
11:38:1420  a.m. We are now back on the record.
11:38:1721  BY MR. KARLINSKY:
11:38:1822  Q.  Ma'am, you still have Exhibit 58 in
11:38:2023  front of you, do you not?
11:38:2124  A.  I do.
11:38:2325  Q.  Are there any terms and conditions of

Page 72

SANDRA BIENVENU

11:38:26 2  your employment with ACI as you understood it
11:38:29 3  that are not reflected or contained in Exhibit
11:38:33 4  58?
11:38:40 5  A.  I'm not sure I understand what you are
11:38:42 6  asking.
11:38:45 7  Q.  My question was, you know what a term
11:38:47 8  and condition of employment is or a term --
11:38:50 9  strike that.
11:38:5010  Do you know what a term or condition
11:38:5211  of employment is?
11:38:5912  A.  I'm not sure.
11:39:0013  Q.  Well, Ms. Bienvenu, let's say that we
11:39:0314  define it together as the contractual
11:39:0715  obligations that America's Choice owed to you
11:39:1116  and that you owed to America's Choice.
11:39:1317  Those are the terms and conditions of
11:39:1518  your employment, is that fair?
11:39:1819  A.  Yes, sir.
11:39:1920  Q.  Are there any terms or conditions of
11:39:2221  your employment that are not contained or
11:39:2622  reflected in Exhibit 58?
11:39:4023  A.  Probably.
11:39:4024  Q.  And what would those be?
11:39:5325  A.  At this point --

Page 73

SANDRA BIENVENU

11:39:55 2  MR. BENOWITZ: Well, I would object.
11:39:56 3  You are asking her to make a legal conclusion.
11:39:59 4  She's not an attorney.
11:40:01 5  Q.  Proceed, please.
11:40:03 6  A.  At this point there is not really a
11:40:12 7  final quota, there is -- the compensation plan
11:40:16 8  had not been approved by the board of directors.
11:40:28 9  In my limited experience that's --
11:40:3710  Q.  So Ms. Bienvenu, your understanding
11:40:4011  was -- actually, let me do this a little bit
11:40:4312  differently, okay?
11:40:4513  I understand that Exhibit 58 says as
11:40:5214  we have discussed before that the final
11:40:5515  parameters of the compensation plan are in
11:41:0016  proposal form and must receive board of
11:41:0417  directors approval. That's what the document
11:41:0618  states, does it not?
11:41:0719  A.  Yes, it does.
11:41:0920  Q.  My question to you wasn't whether
11:41:1221  there are terms or conditions of your employment
11:41:1922  that later came to be applicable to you, my
11:41:2323  question was at the time you signed Exhibit 58,
11:41:2924  was there any term or condition of your
11:41:3225  employment as you understood those terms or

MERRILL LEGAL SOLUTIONS
(800) 325-3376     www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 74

SANDRA BIENVENU

1
11:41:33 2 conditions that was not then reflected in the
11:41:39 3 contract that you signed?
11:41:40 4     MR. BENOWITZ: Objection.
11:41:41 5     A. I'm not sure I even know how to answer
11:41:43 6 the question.
11:41:44 7     Q. Why not?
11:41:45 8     A. I am so confused.
11:41:46 9     Q. What's confusing to you?
11:41:4810     A. Terms and conditions is just not
11:41:5011 something that I use every day, so --
11:41:5212     Q. Well, you do understand contractual
11:41:5413 obligations, do you not?
11:41:5514     MR. BENOWITZ: Objection.
11:41:5615     A. Yes.
11:41:5616     Q. That's an obligation in this
11:41:5817 particular case that was owed by you to the
11:42:0018 company or that the company would owe to you.
11:42:0319 We are on the same page?
11:42:0520     A. Okay.
11:42:0521     Q. And what I said to you before was that
11:42:0822 terms or conditions of employment are the same
11:42:1123 things, we are talking about the contractual
11:42:1324 obligations that are owed by either side in a
11:42:1725 contract of employment. You'll accept that

Page 75

SANDRA BIENVENU

1
11:42:20 2 definition?
11:42:21 3     MR. BENOWITZ: Objection.
11:42:22 4     A. Okay.
11:42:23 5     Q. So that I asked you -- I will ask you
11:42:26 6 the question again.
11:42:29 7     At the time that you signed Exhibit
11:42:33 8 58, was there any contractual obligation on the
11:42:36 9 part of America's Choice to you or on your part
11:42:4010 to America's Choice as you understood the
11:42:4311 relationship that you were about to enter into
11:42:4512 that is not reflected in Exhibit 58?
11:42:4913     MR. BENOWITZ: Objection.
11:42:5114     A. Sure.
11:42:5215     Q. Tell me what that is, please?
11:42:5416     A. A definition of the compensation plan
11:42:5817 as it was to be approved by the board of
11:43:0018 directors.
11:43:0119     Q. Yes. And as you told me before, Mr.
11:43:0420 Solinger had explained the commission plan to
11:43:0721 you, correct?
11:43:0722     A. Yes, he did.
11:43:0823     Q. Is it your contention in this case,
11:43:1124 Ms. Bienvenu, that what Mr. Solinger and you
11:43:1825 discussed are additional terms and conditions of

Page 76

SANDRA BIENVENU

1
11:43:19 2 your employment?
11:43:20 3     MR. BENOWITZ: Objection.
11:43:28 4     A. Additional?
11:43:29 5     Q. Yes. In addition to the matters that
11:43:30 6 are contained in Exhibit 58.
11:43:35 7     MR. BENOWITZ: Mr. Karlinsky, I object
11:43:37 8 to this line of questioning.
11:43:38 9     A. I don't even -- I am very confused.
11:43:4220     MR. BENOWITZ: Let me state my
11:43:4311 objection.
11:43:4412     THE WITNESS: Okay.
11:43:4413     MR. BENOWITZ: The witness is not an
11:43:4614 attorney. You keep asking her the same question
11:43:4815 over and over which she has answered to the best
11:43:5016 of her ability as a nonattorney. I think should
11:43:5317 you switch to a different line of questioning.
11:43:5518 She is not an attorney and is not qualified to
11:43:5919 answer this question. You can give her all the
11:44:0120 definitions you want.
11:44:0221 BY MR. KARLINSKY:
11:44:0322     Q. Ms. Bienvenu, at the time that you
11:44:0523 entered into Exhibit 58, as you understood it,
11:44:0824 were there obligations of ACI that were owed to
11:44:1325 you and that were not reflected in Exhibit 58?

Page 77

SANDRA BIENVENU

1
11:44:18 2     MR. BENOWITZ: Objection. I'm going
11:44:33 3 to direct you not to answer the question.
11:44:36 4     A. I don't know how to answer the
11:44:37 5 question.
11:44:37 6     MR. BENOWITZ: You have her answer on
11:44:38 7 the record. I am directing her not to answer
11:44:40 8 the question.
11:44:41 9     MR. KARLINSKY: On what grounds?
11:44:4210     MR. BENOWITZ: Or ask her a different
11:44:4311 question. It's been asked and answered.
11:44:4712     MR. KARLINSKY: That's not the grounds
11:44:4913 for a direction to a witness --
11:44:5014     MR. BENOWITZ: Fine, that's my
11:44:5115 direction to my witness. Ask her a different
11:44:5316 question.
11:44:5317     MR. KARLINSKY: All right. We'll mark
11:44:5418 that and we'll go to the court for a ruling.
11:45:0719     Q. Ms. Bienvenu, is it your understanding
11:45:0920 that the company's obligation to pay you a
11:45:1821 commission on the signing of a contract was a
11:45:2422 term of your employment?
11:45:2523     MR. BENOWITZ: Objection.
11:45:3224     A. I don't know what you mean a term of
11:45:3425 my employment.

20 (Pages 74 to 77)

MERRILL LEGAL SOLUTIONS
(800) 325-3376                www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 78

SANDRA BIENVENU

```
1
11:45:35 2    Q.   Was it a contractual obligation that
11:45:39 3    America's Choice owed to you?
11:45:42 4         MR. BENOWITZ: Objection.
11:45:47 5    A.   I don't know. I'm not an attorney. I
11:45:48 6    don't know what --
11:45:49 7    Q.   I am asking for your understanding,
11:45:51 8    ma'am.
11:45:52 9         Did you believe at the time you signed
11:45:54 10   Exhibit 58 that if you or people who were
11:45:58 11   answerable to you in connection with your
11:46:00 12   employment at America's Choice were responsible
11:46:03 13   for securing a contract, that on that contract
11:46:08 14   America's Choice would owe you a commission?
11:46:11 15   A.   Yes.
11:46:11 16        MR. BENOWITZ: Objection.
11:46:16 17   Q.   Would you point me to where in Exhibit
11:46:19 18   58 I might find that particular provision?
11:46:26 19        MR. BENOWITZ: Objection.
11:46:28 20   A.   It's not finalized by Exhibit 58.
11:46:35 21   Q.   It is not in Exhibit 58, correct?
11:46:37 22   A.   It was not finalized.
11:46:36 23   Q.   Ma'am, I asked you a question. I
11:46:39 24   asked you whether --
11:46:39 25   A.   And I'm answering your question.
```

Page 79

SANDRA BIENVENU

```
1
11:46:40 2    Q.   -- what you just told me was in
11:46:42 3    Exhibit 58.
11:46:45 4         MR. BENOWITZ: Objection.
11:46:45 5    Q.   That's all I asked you, is it in
11:46:47 6    Exhibit 58?
11:46:48 7         MR. BENOWITZ: Could you repeat what
11:46:48 8    you are asking her?
11:46:50 9         MR. KARLINSKY: Certainly.
11:46:50 10        MR. BENOWITZ: Thank you.
11:46:50 11   Q.   Do you need me to repeat it?
11:46:53 12   A.   Yes, I do.
11:46:53 13   Q.   The question was, did you believe at
11:46:59 14   the time you signed Exhibit 58 that if you or
11:47:03 15   people who were answerable to you in connection
11:47:05 16   with your employment at America's Choice were
11:47:08 17   responsible for securing a contract, that on
11:47:11 18   that contract America's Choice would owe you a
11:47:15 19   commission?
11:47:15 20        MR. BENOWITZ: Objection.
11:47:18 21   Q.   Your answer to the question was yes?
11:47:17 22   A.   Yes.
11:47:23 23   Q.   Then I asked you would you point me to
11:47:23 24   where in Exhibit 58 I might find that particular
11:47:26 25   provision.
```

Page 80

SANDRA BIENVENU

```
1
11:47:29 2         Is that provision in Exhibit 58?
11:47:31 3    A.   I will point you to the sentence that
11:47:36 4    says: As explained, the final parameters of the
11:47:42 5    plan are in proposal form and must receive board
11:47:47 6    of directors approval.
11:47:48 7    Q.   So the answer to my question is that
11:47:53 8    contractual undertaking on the part of America's
11:47:56 9    Choice is not reflected in Exhibit 58, is that
11:47:59 10   correct?
11:48:00 11        MR. BENOWITZ: Objection.
11:48:02 12   A.   Do you want me to read the sentence
11:48:03 13   again?
11:48:04 14   Q.   No, ma'am, I want you to either say
11:48:06 15   yes or no in response to my question.
11:48:06 16        MR. BENOWITZ: Objection.
11:48:08 17   Q.   Which calls for a yes or no answer.
11:48:12 18        MR. BENOWITZ: What's the question
11:48:13 19   again?
11:48:14 20   Q.   Is that provision in Exhibit 58?
11:48:18 21        MR. BENOWITZ: Which provision?
11:48:22 22   Q.   Do you know what I'm asking?
11:48:25 23   A.   I'm not positive, no.
11:48:26 24   Q.   Well, let me ask it again, then.
11:48:29 25        You've told me that you believe that
```

Page 81

SANDRA BIENVENU

```
1
11:48:30 2    the company had an obligation to pay you
11:48:35 3    commission based on contracts that you secured
11:48:38 4    that were signed either by you or by people who
11:48:43 5    reported to you, your salespeople, correct?
11:48:46 6    A.   Yes.
11:48:47 7    Q.   Where is that obligation reflected in
11:48:50 8    Exhibit 58?
11:48:58 9         MR. BENOWITZ: Objection.
11:48:58 10   A.   That obligation was discussed --
11:49:06 11   Q.   That wasn't what I asked you, ma'am.
11:49:08 12   I'm asking you where --
11:49:09 13        MR. BENOWITZ: You may not like her
11:49:11 14   answer but let her give you an answer.
11:49:13 15   A.   I am not --
11:49:15 16   Q.   You are not going to answer?
11:49:16 17   A.   I don't know how to answer you.
11:49:18 18   Q.   Where in the document is it reflected,
11:49:20 19   ma'am?
11:49:31 20   A.   As explained, the final parameters of
11:49:34 21   the plan are in proposal form and must receive
11:49:37 22   board of directors approval.
11:49:39 23   Q.   So your understanding, ma'am, was that
11:49:42 24   that particular undertaking to you by the
11:49:46 25   company to pay that commission was not contained
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 82

SANDRA BIENVENU

| | |
|---|---|
| 11:49:48 2 | in Exhibit 58 but would be contained in some |
| 11:49:51 3 | later document? |
| 11:49:52 4 | MR. BENOWITZ: Objection. |
| 11:49:57 5 | A. According to my discussions with the |
| 11:50:00 6 | man who hired me, yes, that was – |
| 11:50:06 7 | Q. Your understanding was that you would |
| 11:50:07 8 | receive some later document, is that right? |
| 11:50:09 9 | A. My understanding was that I would be |
| 11:50:1310 | paid a commission based on the contracts that |
| 11:50:1811 | were signed within my territory with my sales |
| 11:50:2312 | reps, yes. |
| 11:50:2613 | Q. And my question to you again was where |
| 11:50:2914 | is that set forth in Exhibit 58? |
| 11:50:3615 | A. This was an offer letter. |
| 11:50:3816 | Q. Yes. |
| 11:50:3917 | A. Offer letters don't usually spell out |
| 11:50:4118 | all of the details. |
| 11:50:4419 | Q. You don't regard Exhibit 58 as a |
| 11:50:4620 | contract between you and the company? |
| 11:50:4821 | MR. BENOWITZ: Objection. |
| 11:50:5522 | A. I regard it as an offer letter for my |
| 11:50:5823 | employment. |
| 11:50:5824 | Q. My question was do you regard it as a |
| 11:51:0025 | contract between you and the company? |

Page 83

SANDRA BIENVENU

| | |
|---|---|
| 11:51:02 2 | MR. BENOWITZ: Objection. |
| 11:51:04 3 | A. I am not an attorney. |
| 11:51:06 4 | Q. I'm asking for your understanding, |
| 11:51:08 5 | ma'am. |
| 11:51:09 6 | A. My understanding – |
| 11:51:10 7 | Q. Not a legal opinion. I'm asking for |
| 11:51:12 8 | your understanding. Do you understand that |
| 11:51:15 9 | Exhibit 58 was a contract between you and |
| 11:51:1710 | America's Choice? |
| 11:51:1811 | MR. BENOWITZ: Objection. |
| 11:51:1912 | A. I understand that it was an employment |
| 11:51:2113 | offer that I accepted. |
| 11:51:2614 | Q. In your understanding, is the offer of |
| 11:51:3115 | employment and the acceptance of employment by |
| 11:51:3216 | an employee a contract? |
| 11:51:3417 | MR. BENOWITZ: Objection. |
| 11:51:4018 | A. I've never heard it called a contract, |
| 11:51:4219 | but it's an employment agreement. |
| 11:51:4520 | Q. If's an employment agreement. Is that |
| 11:51:4821 | somehow different than a contract? |
| 11:51:5222 | MR. BENOWITZ: Objection. |
| 11:51:5323 | A. I'm not an attorney. |
| 11:51:5424 | Q. I'm not asking you for a legal |
| 11:51:5625 | opinion, ma'am, I'm asking you for your |

Page 84

SANDRA BIENVENU

| | |
|---|---|
| 11:51:58 2 | understanding. |
| 11:51:59 3 | When you tell me that you regarded |
| 11:52:01 4 | Exhibit 58 as an employment agreement, is that |
| 11:52:05 5 | somehow different than a contract? |
| 11:52:07 6 | MR. BENOWITZ: Mr. Karlinsky, I must |
| 11:52:08 7 | object to the continuing questioning of a |
| 11:52:12 8 | nonattorney as to the distinction between an |
| 11:52:15 9 | employment agreement and a contract which are |
| 11:52:1710 | obviously terms that a layman may not be able to |
| 11:52:2011 | distinguish. |
| 11:52:2012 | I think this witness has clarified for |
| 11:52:2313 | you that she is not capable of making that |
| 11:52:2514 | distinction. But if you want to continue asking |
| 11:52:2815 | these questions, go right ahead, but we continue |
| 11:52:3216 | our objections to this line of questioning. |
| 11:52:3317 | Q. My question, Ms. Bienvenu, was you |
| 11:52:3718 | have told me that you regarded Exhibit 58 as an |
| 11:52:4119 | employment agreement, is that right? |
| 11:52:4220 | A. Yes. |
| 11:52:4321 | Q. Is an employment agreement somehow |
| 11:52:4522 | different than a contract? |
| 11:52:4723 | MR. BENOWITZ: Objection. |
| 11:52:5224 | A. I don't know. |
| 11:52:5225 | Q. You don't know? Do you intend it -- |

Page 85

SANDRA BIENVENU

| | |
|---|---|
| 11:52:54 2 | when you say employment agreement, do you intend |
| 11:52:57 3 | that to carry some meaning? |
| 11:52:59 4 | MR. BENOWITZ: Objection. |
| 11:52:59 5 | Q. Different than employment contract? |
| 11:53:01 6 | MR. BENOWITZ: I object. I am |
| 11:53:02 7 | directing her not to answer the question. First |
| 11:53:04 8 | of all, you are not accurate in your question. |
| 11:53:06 9 | She has said that it is an offer letter is what |
| 11:53:1010 | she said. Then you have coerced her into |
| 11:53:1211 | somehow saying she thinks it might be an |
| 11:53:1612 | employment agreement. Now you are trying to |
| 11:53:1713 | make her distinguish between an offer letter, an |
| 11:53:2014 | employment agreement, a contract. She is not an |
| 11:53:2215 | attorney. She doesn't have to answer any more |
| 11:53:2416 | of these questions. Go on to something |
| 11:53:2617 | different. If you want to get a court order get |
| 11:53:2818 | a court order. |
| 11:53:2919 | MR. KARLINSKY: Mr. Benowitz, coaching |
| 11:53:3120 | a witness and making speeches like that on the |
| 11:53:3421 | record is extremely inappropriate and I urge you |
| 11:53:3822 | to contain yourself to objections. That's not |
| 11:53:4323 | an objection. |
| 11:53:4724 | Q. Ms. Bienvenu, I asked you several |
| 11:53:4825 | questions before and I want a clear answer on |

22 (Pages 82 to 85)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 86

SANDRA BIENVENU

1
11:53:51 2   the record. Did you understand that Exhibit 58
11:53:57 3   is an employment agreement between you and
11:54:01 4   America's Choice?
11:54:02 5         MR. BENOWITZ: Objection.
11:54:07 6   A. I understand, if you will look on page
11:54:09 7   2, the paragraph that starts: "This letter,
11:54:14 8   together with your assignment agreement, forms
11:54:17 9   the complete and exclusive statement of your
11:54:19 10  employment agreement with America's Choice,
11:54:22 11  Inc., ACI."
11:54:24 12  Q. So you understood that Exhibit 58 is
11:54:27 13  an employment agreement, did you not?
11:54:30 14        MR. BENOWITZ: Objection.
11:54:30 15  A. It is an employment agreement.
11:54:31 16  Q. Thank you. Is that somehow different
11:54:33 17  than a contract?
11:54:34 18        MR. BENOWITZ: Objection.
11:54:34 19  A. I don't know.
11:54:35 20  Q. You don't know? Do you intend it,
11:54:37 21  when you say employment agreement, do you intend
11:54:41 22  that to carry a meaning other than an employment
11:54:44 23  contract?
11:54:45 24        MR. BENOWITZ: Objection.
11:54:48 25  Q. Just asking you if you see a

Page 87

SANDRA BIENVENU

1
11:54:48 2   distinction between the two?
11:54:49 3   A. I don't know the difference between an
11:54:50 4   employment agreement, an employment contract.
11:54:54 5   It is semantics as far as I am concerned.
11:54:57 6   Q. You understand, ma'am, that you were
11:54:58 7   bound by the terms of Exhibit 58, do you not?
11:55:01 8         MR. BENOWITZ: Objection.
11:55:07 9   A. Until they changed.
11:55:10 10  Q. Is your answer yes, you understand
11:55:13 11  that you were bound by those terms?
11:55:13 12        MR. BENOWITZ: Objection.
11:55:15 13  A. I was bound by those terms until they
11:55:18 14  changed.
11:55:18 15  Q. If they did not change you were bound
11:55:20 16  by the terms of Exhibit 58, were you not?
11:55:24 17  A. Yes.
11:55:24 18        MR. BENOWITZ: Objection.
11:55:25 19  A. But it plainly states that the final
11:55:28 20  parameters were going to change.
11:55:31 21  Q. Ms. Bienvenu, I asked you the question
11:55:33 22  if they did not change you were bound by the
11:55:35 23  terms of Exhibit 58, were you not? Is your
11:55:38 24  answer –
11:55:39 25        MR. BENOWITZ: Objection.

Page 88

SANDRA BIENVENU

1
11:55:39 2   Q. – yes or no?
11:55:40 3         MR. BENOWITZ: She doesn't have to
11:55:41 4   give you a yes or no answer, she has answered
11:55:43 5   your question.
11:55:43 6   A. I am trying to answer you to the best
11:55:45 7   of my knowledge.
11:55:46 8   Q. You are not trying to answer me –
11:55:47 9         MR. BENOWITZ: Mr. Karlinsky –
11:55:49 10  Q. – you are trying to evade the
11:55:51 11  question.
11:55:51 12        MR. BENOWITZ: – she is trying to
11:55:51 13  provide an answer.
11:55:52 14  A. No, I am not.
11:55:52 15  Q. I asked you the following question:
11:55:54 16  If your terms and if the terms and conditions of
11:55:56 17  your employment were not changed, were you bound
11:55:59 18  by Exhibit 58, the employment agreement that you
11:56:02 19  signed?
11:56:02 20        MR. BENOWITZ: Objection. You know,
11:56:29 21  we object to this line of questioning. You are
11:56:32 22  asking her for a legal conclusion. She's not an
11:56:34 23  attorney. I don't know how many more times I
11:56:38 24  have to state the same objection.
11:56:46 25  A. What it looks like in here is ACI is

Page 89

SANDRA BIENVENU

1
11:56:52 2   offering me benefits, an annual salary, a quota
11:56:59 3   and comp plan to be determined, that I should
11:57:06 4   not use any of their proprietary information,
11:57:17 5   disclose it, that I may terminate any time, they
11:57:20 6   can terminate me.
11:57:21 7         Are these terms? I am asking you.
11:57:23 8   Q. Is there something about my question
11:57:25 9   that you don't understand?
11:57:25 10  A. Yes, absolutely.
11:57:26 11  Q. My question to you is, do you
11:57:30 12  understand that upon signing Exhibit 58 you were
11:57:34 13  bound by it?
11:57:35 14        MR. BENOWITZ: Objection.
11:57:37 15  A. I understand that I accepted their
11:57:40 16  offer of employment by signing Exhibit 58.
11:57:46 17  Q. Do you understand that you were bound
11:57:48 18  by the terms that are contained in Exhibit 58?
11:57:51 19        MR. BENOWITZ: Objection.
11:57:54 20  A. Would you explain to me what are terms
11:57:56 21  in here?
11:57:57 22  Q. I have explained that to you at least
11:57:37 23  five times.
11:58:02 24  A. Using this document, would you point
11:58:04 25  out what is a term?

23 (Pages 86 to 89)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 90

SANDRA BIENVENU

1
11:58:05 2  Q.  Everything that is in Exhibit 58 is a
11:58:09 3  term, ma'am. Everything that is contained in
11:58:10 4  that document is a term of the employment
11:58:13 5  agreement.
11:58:15 6      My question to you is --
11:58:16 7      MR. BENOWITZ: Objection, it is not an
11:58:18 8  employment agreement.
11:58:19 9  Q.  -- are you bound by those terms?
11:58:21 10     MR. BENOWITZ: You are characterizing
11:58:22 11 the document, Mr. Karlinsky, for the witness.
11:58:24 12 Let the witness tell you what her response is
11:58:26 13 without putting words in her mouth.
11:59:00 14     (Pause)
11:59:00 15     MR. BENOWITZ: Is there an outstanding
11:59:01 16 question?
11:59:02 17     MR. KARLINSKY: Yes.
11:59:02 18     MR. BENOWITZ: Could you repeat the
11:59:03 19 question?
11:59:04 20 BY MR. KARLINSKY:
11:59:04 21 Q.  You know what the question is, ma'am?
11:59:06 22 A.  You are asking me about terms and
11:59:08 23 conditions and if I knew that I had agreed to
11:59:12 24 them?
11:59:14 25 Q.  Ms. Bienvenu, my question was, are you

Page 91

SANDRA BIENVENU

1
11:59:20 2  bound by the terms contained in Exhibit 58 which
11:59:25 3  you have testified was your employment
11:59:28 4  agreement?
11:59:29 5      MR. BENOWITZ: Objection. I don't
11:59:29 6  think she testified it was her employment
11:59:31 7  agreement.
11:59:33 8  A.  It is an employment offer letter that
11:59:37 9  gives me benefits. Am I bound by those? I
11:59:46 10 don't understand what I would -- I don't
11:59:47 11 understand what you mean by bound by those.
11:59:50 12 What are you asking me? I have no idea.
11:59:53 13 Q.  Whether the company, America's Choice,
11:59:56 14 may enforce the terms of Exhibit 58 against you,
12:00:01 15 ma'am?
12:00:01 16     MR. BENOWITZ: Objection.
12:00:02 17 Q.  Do you understand that?
12:00:02 18     MR. BENOWITZ: Objection.
12:00:09 19 A.  I don't see terms that -- I don't
12:00:12 20 understand what you are talking about, that they
12:00:15 21 may enforce the terms, that they may terminate
12:00:18 22 at any time? I answered to you yes and I could,
12:00:21 23 too. Would they offer these benefits? Yes.
12:00:28 24 Would I accept them? Yes.
12:00:32 25     I'm not sure I understand what you are

Page 92

SANDRA BIENVENU

1
12:00:34 2  asking me I'm going to be bound on.
12:00:37 3  Q.  I am going to ask it once more in a
12:00:39 4  different way.
12:00:40 5  A.  Okay.
12:00:40 6  Q.  Is Exhibit 58 as it stood on the date
12:00:45 7  you signed it an agreement of employment between
12:00:51 8  you and America's Choice?
12:00:53 9      MR. BENOWITZ: Objection. You are
12:00:54 10 asking for a legal conclusion.
12:00:57 11 A.  At the date that I signed it it was an
12:01:02 12 offer letter. It was an offer letter that I
12:01:06 13 agreed I'm going to go to work for them.
12:01:28 14     MR. KARLINSKY: I would ask the court
12:01:29 15 reporter to mark for identification as Exhibit
12:01:31 16 107 a pleading in the America's Choice versus
12:01:37 17 Bienvenu case titled Answer to the Complaint and
12:01:40 18 Amended Counterclaims. Let the record reflect I
12:01:46 19 am handing counsel a copy.
12:01:48 20     (Exhibit 107, Answer to the Complaint
12:01:48 21 and Amended Counterclaims, marked for
12:01:48 22 identification)
12:02:02 23 BY MR. KARLINSKY:
12:02:02 24 Q.  Do you have a copy of what's been
12:02:03 25 marked as Exhibit 107 in front of you?

Page 93

SANDRA BIENVENU

1
12:02:05 2  A.  Yes, I do.
12:02:10 3  Q.  Can you identify that document, ma'am?
12:02:20 4  A.  The title, Answer to the Complaint and
12:02:23 5  Amended Counterclaims.
12:02:25 6  Q.  Yes. Have you ever seen Exhibit 107
12:02:28 7  before?
12:02:28 8  A.  Yes.
12:02:28 9  Q.  When did you see it?
12:02:33 10 A.  The first time?
12:02:35 11 Q.  Sure.
12:02:41 12 A.  Before it was filed, I guess.
12:02:44 13 Q.  You understand this to be an answer on
12:02:47 14 your part to America's Choice's complaint in the
12:02:53 15 action against you as well as your amended
12:02:57 16 counterclaims against America's Choice in that
12:03:00 17 same action?
12:03:02 18 A.  I believe so.
12:03:03 19 Q.  Is Exhibit 107 to the best of your
12:03:10 20 knowledge true and correct?
12:03:13 21 A.  To the best of my knowledge, I relied
12:03:16 22 on my counsel to word it.
12:03:22 23 Q.  My question to you was, to the best of
12:03:24 24 your knowledge, ma'am, is Exhibit 107 factually
12:03:29 25 true and correct?

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 94

1                    SANDRA BIENVENU
12:03:30 2    A.  To the best of my knowledge.
12:03:32 3    Q.  And you authorized your counsel to
12:03:35 4    file Exhibit 107 with the U.S. District Court
12:03:37 5    for the District of Columbia, correct?
12:03:40 6    A.  Yes.
12:03:43 7    Q.  Turn to page 4 of Exhibit 107, please.
12:03:48 8    Actually turn to page 3 first.  You see page 3?
12:03:51 9    A.  Yes.
12:03:51 10   Q.  That's where your counterclaim starts.
12:03:53 11   You do see that, correct?
12:03:54 12   A.  Yes.
12:03:55 13   Q.  And you understand, ma'am, that your
12:03:56 14   counterclaim is a statement of your legal claim
12:04:00 15   against America's Choice?
12:04:03 16   A.  Yes.
12:04:04 17   Q.  Turn to paragraph seven of the
12:04:07 18   counterclaim which appears on the next page.  It
12:04:12 19   states: "Pursuant to the terms of an employment
12:04:16 20   agreement dated April 25, 2005 which was signed
12:04:21 21   and accepted by plaintiff" -- that refers to
12:04:24 22   America's Choice -- "on May 9, 2005,
12:04:28 23   defendant" -- that refers to you -- "commenced
12:04:29 24   her employment with America's Choice on or about
12:04:33 25   May 9, 2005, and was employed continuously by

Page 95

1                    SANDRA BIENVENU
12:04:37 2    plaintiff until January 20, 2007 when defendant
12:04:42 3    voluntarily resigned."
12:04:43 4      I read that correctly, did I not?
12:04:45 5    A.  Yes, sir.
12:04:46 6    Q.  And you understood that your counsel
12:04:48 7    was making a claim on your part that the
12:04:53 8    document which we have been talking about
12:04:56 9    identified as Exhibit 58 was an employment
12:04:59 10   agreement?
12:05:00 11   A.  Yes.
12:05:02 12   Q.  That you entered into?
12:05:02 13   A.  Yes.
12:05:29 14   MR. KARLINSKY:  I want to take a quick
12:05:31 15   break at this point.  We'll be back on fairly
12:05:34 16   quickly.
12:05:38 17   THE VIDEOGRAPHER:  Here now marks the
12:05:39 18   end of tape two of the deposition of Ms. Sandra
12:05:43 19   Bienvenu.  The time is 12:05 p.m.
12:05:47 20   (Recess)
12:11:23 21   THE VIDEOGRAPHER:  The time is 12:11
12:11:55 22   p.m.  We are now back on the record.
12:11:58 23   BY MR. KARLINSKY:
12:11:59 24   Q.  Ms. Bienvenu, you have Exhibit 58 in
12:12:01 25   front of you still and I wanted to go through a

Page 96

1                    SANDRA BIENVENU
12:12:03 2    couple of specifics in it.  If you look with me
12:12:05 3    to the second paragraph, that indicates that you
12:12:07 4    have an annual salary of $150,000, correct?
12:12:11 5    A.  Yes.
12:12:12 6    Q.  Did you understand that the company
12:12:13 7    was obligated thereby to pay you that salary?
12:12:16 8    A.  Yes.
12:12:17 9    MR. BENOWITZ:  Objection.
12:12:21 10   Q.  If we go down below to the third
12:12:25 11   paragraph, there is a description of provisions
12:12:28 12   of the benefits package that ACI was offering,
12:12:31 13   correct?
12:12:32 14   A.  Yes.
12:12:33 15   Q.  Was it your understanding that ACI was
12:12:36 16   obligated by Exhibit 58 to provide those
12:12:39 17   benefits set forth in the letter to you?
12:12:42 18   MR. BENOWITZ:  Objection.
12:12:44 19   A.  I guess.
12:12:47 20   Q.  Do you have any doubt about that?
12:12:50 21   MR. BENOWITZ:  Objection.
12:12:51 22   A.  I trusted that they would do that.
12:12:53 23   Q.  I'm sorry?
12:12:54 24   A.  I trusted that they would give me
12:12:57 25   those things.

Page 97

1                    SANDRA BIENVENU
12:12:58 2    Q.  Ma'am, I asked you if you understood
12:13:02 3    that ACI was obligated to give you those things?
12:13:05 4    MR. BENOWITZ:  Objection.
12:13:10 5    Q.  Did you understand that?
12:13:11 6    A.  I don't know that I understood
12:13:12 7    obligated, but I understood they were offering
12:13:15 8    it.
12:13:15 9    Q.  Well, you have worked for other
12:13:17 10   companies besides America's Choice, have you
12:13:19 11   not?
12:13:19 12   A.  Yes.
12:13:20 13   Q.  And you understand that those
12:13:22 14   companies also had some kind of benefits package
12:13:26 15   that they had offered to you?
12:13:28 16   A.  Yes.
12:13:29 17   Q.  Do you understand, ma'am, that you
12:13:30 18   were able to enforce that package that was
12:13:34 19   offered to you?
12:13:36 20   MR. BENOWITZ:  Objection.  Which
12:13:39 21   package are you talking about?
12:13:40 22   MR. KARLINSKY:  Any package
12:13:40 23   whatsoever.
12:13:42 24   A.  By enforce you mean --
12:13:44 25   Q.  Sue for enforcement, ma'am.

25  (Pages 94 to 97)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 98

SANDRA BIENVENU

1
12:13:46 2    MR. BENOWITZ: Objection.
12:13:48 3    A.  I never really thought of it. I never
12:13:51 4    sued a company before --
12:13:53 5    Q.  Ms. Bienvenu, are you suing under
12:13:55 6    Exhibit 58?
12:13:58 7    MR. BENOWITZ: Objection.
12:14:02 8    A.  Yes.
12:14:22 9    Q.  Ms. Bienvenu, when was Exhibit 58 ever
12:14:31 10   changed?
12:14:57 11   A.  I don't know that the whole thing was
12:15:01 12   ever changed.
12:15:04 13   Q.  Were the terms and conditions of your
12:15:07 14   employment with America's Choice ever changed
12:15:10 15   after the time you signed Exhibit 58?
12:15:21 16   A.  I don't understand terms and
12:15:23 17   conditions. There was a new -- there were
12:15:29 18   final -- there was a final compensation plan
12:15:33 19   that was given to me August, September, October
12:15:40 20   timeframe of 2005 which according to this
12:15:45 21   document had to be approved by the board of
12:15:53 22   directors, so that part did change.
12:15:56 23   Q.  Did any other parts of Exhibit 58
12:16:00 24   change?
12:16:03 25   A.  Not to my knowledge.

Page 99

SANDRA BIENVENU

1
12:16:12 2    Q.  What was given to you, physically what
12:16:15 3    was given to you in the timeframe of August
12:16:18 4    through October of 2005 that constituted a
12:16:22 5    change to the employment agreement, Exhibit 58?
12:16:30 6    A.  A spreadsheet that said annualized
12:16:34 7    comp plan and had my base salary with an 80,000
12:16:47 8    bonus at commission -- sorry, strike that -- at
12:16:54 9    quota with a 20 percent bonus for reaching quota
12:17:08 10   and a sliding scale of percentages that would be
12:17:12 11   paid at X number of dollars and you had to --
12:17:27 12   you had to put the amounts of the sales in.
12:17:43 13   Q.  You have the books in front of you, I
12:17:44 14   believe. Would you turn to Exhibit 35, please?
12:18:13 15   Can you identify Exhibit 35, Ms.
12:18:16 16   Bienvenu?
12:18:21 17   A.  That was the first comp plan that I
12:18:28 18   received, and I believe somewhere close to this
12:18:31 19   timeframe, I don't remember exactly. This was
12:18:35 20   the first one.
12:18:36 21   Q.  When you say this was the first one,
12:18:38 22   what does that mean? Were there others?
12:18:40 23   A.  Yes.
12:18:41 24   Q.  So in other words this was not the
12:18:43 25   final version of the plan?

Page 100

SANDRA BIENVENU

1
12:18:45 2    A.  No.
12:18:45 3    Q.  That you received?
12:18:46 4    A.  No, sir.
12:18:47 5    Q.  Would you look with me -- actually
12:18:49 6    I'll have to give you an additional exhibit so
12:18:53 7    bear with me for a second.
12:18:56 8    By the way, what about Exhibit 35
12:18:58 9    changed between its terms and your so-called
12:19:03 10   final compensation plan?
12:19:10 11   A.  The target commissions.
12:19:14 12   MR. BENOWITZ: Are we talking about --
12:19:17 13   what year are we talking about?
12:19:19 14   MR. KARLINSKY: Only 2006.
12:19:25 15   MR. BENOWITZ: Okay.
12:19:26 16   A.  The target commissions, on the new
12:19:27 17   plan there was a $20,000 bonus for reaching
12:19:33 18   quota. And I believe, and I'm not exactly sure
12:19:40 19   because I would have to compare them, but I
12:19:42 20   believe these percentages on this sliding scale
12:19:46 21   for the commission rates changed.
12:20:00 22   Q.  I hand you a document that is Bates
12:20:06 23   labeled beginning with SB0001 and continuing,
12:20:13 24   although it is not sequential, this document is
12:20:16 25   SB0001, 2, 5, 6, 8, 9 and 10, and I hand that

Page 101

SANDRA BIENVENU

1
12:20:27 2    to -- actually let me have the court reporter
12:20:30 3    mark that as Exhibit 108.
12:21:13 4    (Exhibit 108, Document Bates Stamped
12:21:13 5    SB-001, 2, 5, 6, 8, 9 and 10, marked for
12:21:13 6    identification.)
12:21:13 7    BY MR. KARLINSKY:
12:21:13 8    Q.  You have Exhibit 108 in front of you?
12:21:16 9    A.  I do.
12:21:17 10   Q.  Would you identify it?
12:21:18 11   A.  An e-mail from Nick to me.
12:21:21 12   Q.  That's the first page, SB 0001?
12:21:24 13   A.  Yes.
12:21:25 14   Q.  And Mr. Solinger in that e-mail which
12:21:27 15   is dated February 10, 2007, says to you:
12:21:32 16   "Sandra attached is the final compensation plan
12:21:34 17   spreadsheet that I had provided you on October
12:21:36 18   7, 2005," is that right?
12:21:39 19   A.  That's true.
12:21:40 20   Q.  And the next page of Exhibit 108 is
12:21:44 21   what?
12:21:50 22   A.  Saturday, February 10.
12:21:52 23   Q.  That's another e-mail from Mr.
12:21:54 24   Solinger to you?
12:21:56 25   A.  It is.

MERRILL LEGAL SOLUTIONS
(800) 325-3376           www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131a3

Page 102

SANDRA BIENVENU

12:21:56 2    Q.   Let's just skip that, we are going to
12:21:59 3    come back to it later.  What I really want to
12:22:01 4    direct your attention to is the third page which
12:22:06 5    is Bates labeled 0005.
12:22:06 6    A.   Yes.
12:22:06 7    Q.   And ma'am, would you identify that
12:22:08 8    page for us?
12:22:10 9    A.   That is the -- a copy of the final
12:22:16 10   comp plan that Nick had given me obviously in
12:22:18 11   October.
12:22:19 12   Q.   And you agree that SB 05 is in fact
12:22:23 13   the final compensation plan for fiscal year 2006
12:22:27 14   that was provided to you?
12:22:30 15   A.   I believe it was, yes.
12:22:58 16   (Pause)
12:23:20 17   Q.   Ms. Bienvenu, in addition to that page
12:23:23 18   of Exhibit 108 that we have just identified
12:23:27 19   that's SB 5?
12:23:30 20   A.   Yes, sir.
12:23:31 21   Q.   Was anything else given to you in
12:23:33 22   October of 2005 that constituted your
12:23:36 23   compensation plan?
12:23:38 24   A.   No, sir.
12:23:38 25   Q.   It was just this one sheet?

Page 103

SANDRA BIENVENU

12:23:40 2    A.   Just this one sheet.
12:23:41 3    Q.   Would it be fair to say, then, that
12:23:43 4    Exhibit 58, that's the employment letter,
12:23:47 5    together with this compensation plan,
12:23:51 6    constituted the full statement of your
12:23:54 7    employment with America's Choice?
12:23:55 8    MR. BENOWITZ:  Objection.
12:23:59 9    A.   As far as I know.
12:24:03 10   Q.   Let's stay with SB 005 or SB 5, part
12:24:09 11   of Exhibit 108 for a moment and let's just make
12:24:13 12   sure we are all understand it together.
12:24:16 13   It is titled:  Director south
12:24:19 14   annualized comp plan, correct?
12:24:21 15   A.   Yes.
12:24:22 16   Q.   And it shows target commissions of
12:24:23 17   $80,000 with a bonus at 100 percent of $20,000?
12:24:36 18   A.   I'm sorry, I didn't understand what
12:24:38 19   you said at the very end.
12:24:39 20   Q.   I said with a bonus of 100 percent of
12:24:43 21   $20,000?
12:24:43 22   A.   The bonus at 100 percent of quota
12:24:46 23   would be $20,000.
12:24:48 24   Q.   That was my next question to you.
12:24:49 25   Your understanding is that referred to a bonus

Page 104

SANDRA BIENVENU

12:24:51 2    to be paid at reaching 100 percent of quota?
12:24:55 3    A.   Yes.
12:24:55 4    Q.   So if you reached quota for fiscal
12:24:58 5    year 2006, you would receive commissions plus
12:25:02 6    bonus of $100,000?
12:25:08 7    A.   Yes.
12:25:08 8    Q.   On top of your salary for that year of
12:25:11 9    $150,000, correct?
12:25:13 10   A.   Yes.
12:25:15 11   Q.   In Exhibit 158, page SB 5, there is
12:25:19 12   also a line which is headed quota, do you see
12:25:23 13   that row?  It is not a line, it is a row of the
12:25:27 14   spreadsheet.
12:25:27 15   A.   Yes.
12:25:27 16   Q.   And that says that your quota is
12:25:30 17   $2,500,000, correct?
12:25:32 18   A.   Yes, it does.
12:25:38 19   Q.   And if I understand this correctly, at
12:25:42 20   specified percentages of quota, you would
12:25:46 21   receive the commission payments that are
12:25:48 22   indicated below in the box that is labeled
12:25:52 23   commission rates based on percentage of annual
12:25:55 24   quota achievement?
12:25:57 25   A.   That was my understanding, yes.

Page 105

SANDRA BIENVENU

12:26:01 2    Q.   Then for illustration purposes, as I
12:26:03 3    understand it, the total annualized
12:26:05 4    compensation, depending on various scenarios, is
12:26:09 5    set forth in the last row of the spreadsheet?
12:26:15 6    A.   I need you to --
12:26:16 7    Q.   Did I make myself clear?
12:26:18 8    A.   You lost me.
12:26:20 9    Q.   All right.  I'll try it again.
12:26:22 10   If we look at the last row of the
12:26:25 11   spreadsheet?
12:26:25 12   A.   The last row or the last column?
12:26:27 13   Q.   Last row.
12:26:28 14   A.   Okay.
12:26:29 15   MR. BENOWITZ:  Reading from left to
12:26:31 16   right?
12:26:31 17   MR. KARLINSKY:  Well, you wouldn't be
12:26:32 18   reading a row from left to right.
12:26:34 19   MR. BENOWITZ:  Well, I would --
12:26:36 20   MR. KARLINSKY:  We would be going
12:26:37 21   across the columns from left to right.
12:26:39 22   MR. BENOWITZ:  Going down case eight,
12:26:41 23   case seven --
12:26:41 24   BY MR. KARLINSKY:
12:26:42 25   Q.   At the moment we are looking in the

27 (Pages 102 to 105)

Page 106

SANDRA BIENVENU

12:26:43 2  first column and the last row of what is a
12:26:46 3  spreadsheet.
12:26:47 4      A.  Okay.
12:26:48 5      Q.  It says total annualized compensation.
12:26:51 6      A.  I see that.
12:26:52 7      Q.  We all agree that's the first column?
12:26:54 8      A.  That's the first column.
12:26:55 9      Q.  If we look across that particular row
12:26:58 10  from left to right, there are a number of cases
12:27:02 11  or scenarios or hypotheticals set forth, agreed?
12:27:06 12      A.  Yes.
12:27:06 13      Q.  For example, the first one indicates
12:27:09 14  minimum sales and is based on sales of
12:27:14 15  1,750,000, agreed?
12:27:18 16      A.  Yes.
12:27:18 17      Q.  That would be 70 percent of the quota?
12:27:20 18      A.  Yes.
12:27:21 19      Q.  And that would yield a commission
12:27:26 20  payment of $43,077?
12:27:32 21      A.  Yes.
12:27:32 22      Q.  Which together with salary would
12:27:36 23  aggregate $193,077 for the year?
12:27:41 24      A.  Yes.
12:27:42 25      Q.  And if we look at the column that is

Page 107

SANDRA BIENVENU

12:27:44 2  headed fulfill quota?
12:27:46 3      A.  Yes.
12:27:47 4      Q.  We can see that at 100 percent of
12:27:50 5  quota the commission would be $80,000?
12:27:53 6      A.  Yes.
12:27:55 7      Q.  Which represents the target
12:27:57 8  commissions under this plan?
12:27:59 9      A.  Yes.
12:27:59 10      Q.  And then if that was achieved, the
12:28:02 11  salary plus that target commission would yield
12:28:07 12  $250,000 of commission plus salary?
12:28:13 13      A.  No, sir.
12:28:13 14      Q.  That's inclusive of a bonus?
12:28:16 15      A.  Inclusive of the $20,000 bonus.
12:28:18 16      Q.  Yes, inclusive of the bonus that
12:28:20 17  applies at reaching the 80,000 figure?
12:28:22 18      A.  Yes.
12:28:23 19      Q.  It aggregates $250,000?
12:28:26 20      A.  Yes, sir.
12:28:27 21      Q.  And if you had a terrific year and you
12:28:32 22  had -- if we look down to the case eight, the
12:28:35 23  last column?
12:28:36 24      A.  Yes.
12:28:39 25      Q.  If there were $9,600,000 of sales, you

Page 108

SANDRA BIENVENU

12:28:44 2  see that?
12:28:44 3      A.  Yes, I do.
12:28:45 4      Q.  That would be the equivalent of 384
12:28:48 5  percent of quota?
12:28:50 6      A.  Yes.
12:28:51 7      Q.  Or almost four times quota?
12:28:53 8      A.  Almost, yes.
12:28:54 9      Q.  And that would yield a commission of
12:28:56 10  $600,000 which together with bonus and salary
12:29:02 11  would aggregate 770,000?
12:29:05 12      A.  That's correct.
12:29:08 13      Q.  Ms. Bienvenu, just to be clear about
12:30:22 14  this, Exhibit 58, the employment agreement, plus
12:30:29 15  SB 5 which is part of Exhibit 108, to your
12:30:33 16  knowledge constituted the entire statement of
12:30:36 17  your employment with America's Choice as of the
12:30:39 18  time you received SB 5?
12:30:41 19          MR. BENOWITZ:  Objection.
12:30:45 20      A.  It was the entire written statement,
12:30:48 21  yes.
12:30:48 22      Q.  Was there anything besides the written
12:30:50 23  statement that you understood to constitute part
12:30:52 24  of your employment?
12:30:57 25      A.  When Nick gave me this compensation

Page 109

SANDRA BIENVENU

12:31:00 2  plan, he explained the compensation plan.
12:31:09 3      Q.  What is it that Mr. Solinger said to
12:31:11 4  you at that time that you believe constituted a
12:31:18 5  part of your employment arrangement with the
12:31:20 6  company?
12:31:21 7      A.  First of all, we went through an
12:31:22 8  explanation much like what you just did, and he
12:31:28 9  also said the sales that you will be given
12:31:34 10  credit for are those for which you get a
12:31:38 11  contract signed, that is when we count your
12:31:41 12  quota credit, you will get paid when the company
12:31:45 13  gets paid.
12:31:46 14          So you accrue quota credit and accrue
12:31:52 15  the commissions at the time of the signing, and
12:31:55 16  then we pay you when the company gets paid.
12:31:58 17      Q.  When did you and Mr. Solinger have a
12:32:01 18  discussion about SB 5, part of Exhibit 108?
12:32:07 19      A.  When he gave it to me the first time.
12:32:09 20      Q.  When was that specifically?
12:32:18 21      A.  According to Exhibit 108, SB 0001, he
12:32:26 22  provided to it me on October 7 in 2005.
12:32:30 23      Q.  Does that accord with your
12:32:32 24  recollection, ma'am?
12:32:33 25      A.  As I told you before, it was sometime

28  (Pages 106 to 109)

MERRILL LEGAL SOLUTIONS
(800) 325-3376         www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 110

SANDRA BIENVENU

12:32:35 2 August, September, October timeframe. I wasn't
12:32:40 3 really sure.
12:32:41 4 Q. Do you have any reason to doubt that's
12:32:43 5 when in fact it was provided to you?
12:32:45 6 A. I have no reason to doubt, according
12:32:47 7 to this e-mail it shows the bottom, it shows that he
12:32:54 8 sent it to me on October 7.
12:33:03 9 Q. Now, Ms. Bienvenu, at the time that
12:33:0510 you left your employment with America's Choice,
12:33:0911 did you have a copy of SB 5 and Exhibit 108? Or
12:33:1612 just SB 5, let's keep it that way, part of
12:33:2113 Exhibit 108. SB 5 is the plan, single sheet.
12:33:2614 A. I thought I had lost it which is why I
12:33:2815 asked Nick for a copy of it.
12:33:3016 Q. Had you in fact lost it?
12:33:4017 A. I don't remember if I found it or if I
12:33:4118 used the copy that he sent me. I don't recall.
12:34:1319 Q. Ms. Bienvenu, would you look with me
12:34:1520 to the next page of Exhibit 108 after SB 5?
12:34:2021 A. Yes.
12:34:2222 Q. In fact, let's do something a little
12:34:2423 bit different for half a moment. Let me mark
12:34:2724 for identification Exhibit 109. This is a
12:34:3125 10-page document -- yes, this is a 10-page

Page 111

SANDRA BIENVENU

12:34:38 2 document which is Bates labeled SB 1 through SB
12:34:41 3 10.
12:34:42 4 A. So do you want me --
12:34:44 5 Q. Put that aside for half a moment. I
12:34:46 6 just want to ask you some logistical questions.
12:34:49 7 (Exhibit 109, Document Bates Stamped
12:34:49 8 SB 001 through 0010, marked for identification)
12:35:23 9 BY MR. KARLINSKY:
12:35:2410 Q. Ma'am, take a moment and look at
12:35:2611 Exhibit 109 in its entirety. I don't know that
12:35:3012 you need to read through it in its entirety, but
12:35:3413 just read through it, tell me if you can
12:35:3714 identify it.
12:36:3115 You have done that?
12:36:3216 A. I have looked through it, yes.
12:36:3517 Q. Can you identify the document which
12:36:3618 has been marked Exhibit 109?
12:36:4519 A. By identify you mean tell me what
12:36:4820 each page was?
12:36:4921 Q. Well, why don't we do that. Let's
12:36:5022 start with the first page. The first page is an
12:36:5323 e-mail you received from Mr. Solinger?
12:36:5424 A. From Nick.
12:36:5525 Q. The same one we identified before

Page 112

SANDRA BIENVENU

12:36:57 2 dated February 10, 2007?
12:36:59 3 A. Yes.
12:36:59 4 Q. By the way, was that the date that you
12:37:04 5 had the conversation with him that you related
12:37:06 6 to us earlier in this deposition?
12:37:08 7 A. It probably was but --
12:37:10 8 Q. February 10 of 2007?
12:37:11 9 A. I can't guarantee that, no.
12:37:1610 Q. But you think it might have been?
12:37:1811 A. Might have been.
12:37:1812 Q. Second page is another e-mail from Mr.
12:37:2013 Solinger, again dated February 10, 2007?
12:37:2314 A. Yes.
12:37:2415 Q. And the third page seems to be a
12:37:2616 letter addressed to Judy?
12:37:2917 A. Yes.
12:37:3018 Q. Tell us what that is. Just identify
12:37:3419 it for us.
12:37:3520 A. It was a letter that I sent to Judy
12:37:3721 trying to get her to pay me the commissions that
12:37:4022 I felt the company owed me.
12:37:4223 Q. To Judy Codding?
12:37:4524 A. Yes.
12:37:4925 Q. The next page is another spreadsheet.

Page 113

. SANDRA BIENVENU

12:37:54 2 Can you identify that?
12:37:57 3 A. From my handwriting on it, it says
12:37:59 4 original comp plan.
12:38:01 5 Q. Yes.
12:38:02 6 A. So I must have found it.
12:38:06 7 Q. I'm not certain I understand that.
12:38:07 8 What does original comp plan signify to you?
12:38:13 9 A. It's the one that America's Choice had
12:38:1610 provided or Nick had provided in October.
12:38:2211 Q. So do you think that -- or is it your
12:38:2612 understanding that SB 4, which is the fourth
12:38:3013 page of this document, is identical to SB 5
12:38:3414 which is the next page of this Exhibit 109?
12:38:4815 A. It is identical with one caveat.
12:38:5216 Q. And what's that?
12:38:5917 A. Case eight, column eight is different,
12:39:0318 so obviously I had been putting -- trying to put
12:39:0619 sales numbers in to see how much I was going to
12:39:1020 make.
12:39:1121 Q. That's my question. In other words,
12:39:1422 this -- page 4, that is, SB 4 of Exhibit 109?
12:39:2023 A. Yes.
12:39:2124 Q. You received as an Excel spreadsheet?
12:39:2825 A. Yes.

29  (Pages 110 to 113)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 114

SANDRA BIENVENU

| | |
|---|---|
| 12:39:28 2 | Q. And you made some changes in it |
| 12:39:28 3 | yourself? |
| 12:39:33 4 | A. All of the cells are locked with the |
| 12:39:39 5 | exception of a few where I could determine how |
| 12:39:44 6 | much money I was going to make on a specific |
| 12:39:49 7 | sales number, yes. |
| 12:39:50 8 | Q. I'm not certain I really understand |
| 12:39:51 9 | that answer. What changes did you make on SB 4 |
| 12:39:5610 | as compared to SB 5? |
| 12:40:1011 | A. Case eight, sales for 2006, on SB 4 it |
| 12:40:1612 | looks like I was experimenting with 7.5 million |
| 12:40:2113 | and on SB 5 it looks like I was experimenting |
| 12:40:2614 | with 9.6 million. |
| 12:40:3415 | Q. Did you make the change in Exhibit |
| 12:40:3716 | 109, SB 5? In other words, did you change the |
| 12:40:4317 | numbers in case eight as well? |
| 12:40:4618 | A. I don't know if I did or if Nick did. |
| 12:40:4919 | Q. Was $9.6 million in sales contained in |
| 12:40:5320 | the original compensation plan that you received |
| 12:40:5321 | from Mr. Solinger? |
| 12:40:5922 | A. If I'm not mistaken, there were only |
| 12:41:0423 | seven cases on the original. I think I added |
| 12:41:1324 | the eighth one to try to experiment and see -- |
| 12:41:1625 | Q. You added the eighth case or Mr. |

Page 115

SANDRA BIENVENU

| | |
|---|---|
| 12:41:19 2 | Solinger added the eighth case? |
| 12:41:21 3 | A. One of us did, yes. |
| 12:41:22 4 | Q. Where did you get the number $9.6 |
| 12:41:24 5 | million in sales? |
| 12:41:26 6 | A. By trying to determine the Arkansas |
| 12:41:28 7 | sale and other sales that were made within my |
| 12:41:31 8 | territory during the time of this comp plan. |
| 12:41:37 9 | Q. What other sales constituted the |
| 12:41:3910 | $9.6 million? |
| 12:41:4411 | A. There were a lot -- |
| 12:41:4512 | Q. Let's start -- we start with Arkansas, |
| 12:41:4713 | correct? |
| 12:41:4814 | A. Right. |
| 12:41:4815 | Q. According to your contention? |
| 12:41:4916 | MR. BENOWITZ: Can we take a |
| 12:41:5017 | three-minute break? |
| 12:41:5718 | MR. KARLINSKY: All right. |
| 12:41:5819 | THE VIDEOGRAPHER: The time is 12:42 |
| 12:41:5920 | p.m. We are now off the record. |
| 12:42:0221 | (Recess) |
| 12:46:2222 | THE VIDEOGRAPHER: The time is 12:46 |
| 12:46:2323 | p.m. We are now back on the record. |
| 12:46:2624 | BY MR. KARLINSKY: |
| 12:46:3025 | Q. Ms. Bienvenu, I want to get some |

Page 116

SANDRA BIENVENU

| | |
|---|---|
| 12:46:35 2 | clarity. I'm not going to mark this quite yet, |
| 12:47:01 3 | I'll just refer to it by Bates numbers so we |
| 12:47:04 4 | have a clear record. |
| 12:47:05 5 | So what I am handing to you is |
| 12:47:08 6 | America's Choice, that is ACI DC 03552 through |
| 12:47:13 7 | 554, and let me give you a copy. Let's look. |
| 12:47:24 8 | together at the second page of this document. |
| 12:47:26 9 | Actually let's start -- sorry let's look at the |
| 12:47:2910 | first page. |
| 12:47:3011 | The first page is an e-mail from Mr. |
| 12:47:3312 | Solinger to you dated October 7, 2005, is that |
| 12:47:3613 | right? |
| 12:47:3614 | A. Yes. |
| 12:47:3715 | Q. And if we turn to the -- I'm sorry, |
| 12:47:4116 | stay with it for a second. It says: Subject: |
| 12:47:4317 | Sandra Bienvenu comp plan XLS and there is an |
| 12:47:4918 | indication that there is an attachment which |
| 12:47:5119 | consists of that very file, Sandra Bienvenu comp |
| 12:47:5420 | plan XLS? |
| 12:47:3621 | A. Yes. |
| 12:47:5622 | Q. Turn to the second page of this |
| 12:47:5823 | document which is ACI 0553 together? |
| 12:48:0424 | A. Yes. |
| 12:48:0525 | Q. That would appear to be the document |

Page 117

SANDRA BIENVENU

| | |
|---|---|
| 12:48:06 2 | that you have described to me and identified as |
| 12:48:08 3 | your final comp plan as given to you on October |
| 12:48:11 4 | 7 of 2005, correct? |
| 12:48:13 5 | A. Yes. |
| 12:48:13 6 | Q. Just this single page, that is, the |
| 12:48:16 7 | page 3553? |
| 12:48:25 8 | A. No, actually it appears that it is |
| 12:48:28 9 | both pages. |
| 12:48:2910 | Q. That is your recollection, in fact, |
| 12:48:3111 | that it is both pages that comprise the plan? |
| 12:48:3612 | A. I believe. |
| 12:48:3713 | Q. So there were in fact eight cases in |
| 12:48:3914 | the original final comp plan that you were |
| 12:48:4415 | given, fair to say? |
| 12:48:4516 | A. Fair to say, yes. |
| 12:48:4617 | Q. And what Mr. Solinger used as an |
| 12:48:4918 | assumption in the eighth case differed from the |
| 12:48:5219 | document we were talking about before because it |
| 12:48:5520 | included a hypothetical S5 million of sales, is |
| 12:48:5821 | that right? |
| 12:49:0322 | A. Yes, it included a hypothetical 5 |
| 12:49:0423 | million which would have been 200 percent of |
| 12:49:1124 | quota, yes. |
| 12:49:1325 | Q. Let's have the court reporter mark |

30 (Pages 114 to 117)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 118

SANDRA BIENVENU

12:49:14 2    that exhibit, hand it back to him, as Exhibit
12:49:19 3    110.
12:49:19 4        (Exhibit 110, Document Bates Stamped
12:49:19 5    ACI-DC-03552 through 03554, marked for
12:49:19 6    identification)
12:49:19 7    BY MR. KARLINSKY:
12:49:32 8        Q.  Ms. Bienvenu, so that we are clear
12:49:34 9    once again and we have a clear record, you'll
12:49:36 10   agree that Exhibit 110 is in fact in its
12:49:41 11   entirety the transmittal and the final
12:49:43 12   compensation plan you were provided by America's
12:49:45 13   Choice for fiscal year 2006?
12:49:48 14       A.  To the best of my knowledge, yes, sir.
12:50:02 15       Q.  We were in the middle of talking about
12:50:04 16   Exhibit 109, so let's go back to it.
12:50:08 17       A.  Okay.  So I don't need 110?
12:50:11 18       Q.  You can leave it right in front of you
12:50:12 19   but you don't need it right now.  Let's talk
12:50:15 20   about 109.  You were on the page that is SB 4.
12:50:23 21       Again, as I understand it, you took
12:50:24 22   the original spreadsheet that you had got at
12:50:26 23   some point and you made these modifications to
12:50:30 24   it?
12:50:31 25       A.  Yes.

Page 119

SANDRA BIENVENU

12:50:31 2        Q.  The one reflected in SB 4?
12:50:34 3        A.  Yes.
12:50:34 4        Q.  For example, I see in the left column
12:50:41 5    eight rows down, you put in the words 4/2006?
12:50:55 6        A.  I don't believe I did that.  I don't
12:51:01 7    recall doing that but I -- it's there.
12:51:07 8        Q.  It's not in the final comp plan you
12:51:11 9    got from Mr. Solinger which we have identified
12:51:14 10   as Exhibit 110, correct?
12:51:16 11       A.  It doesn't appear to be.
12:51:18 12       Q.  And, of course, there are changes as
12:51:20 13   between SB 4, part of 109 and Exhibit 110 in the
12:51:27 14   case eight column?
12:51:29 15       A.  Yes.
12:51:33 16       Q.  Let's continue with Exhibit 109.  If
12:51:38 17   we go to the page following which is SB 5?
12:51:42 18       A.  Yes.
12:51:46 19       Q.  Where did you receive a copy of SB 5
12:51:49 20   from?
12:52:00 21       A.  I believe from Nick but I'm not
12:52:03 22   absolutely positive.
12:52:04 23       Q.  Do you know when?
12:52:07 24       A.  After I left America's Choice, so I'm
12:52:12 25   assuming sometime in February.

Page 120

SANDRA BIENVENU

12:52:18 2        Q.  Of 2007?
12:52:19 3        A.  2007.
12:52:21 4        Q.  Let's turn to SB 6, the next page.
12:52:29 5    This document also came from your files?
12:52:36 6        A.  This was also from Nick because up
12:52:39 7    until that time I don't believe I had ever seen
12:52:41 8    it.
12:52:43 9        Q.  To the best of your recollection, did
12:52:45 10   you receive SB 6 from Mr. Solinger in or about
12:52:49 11   February of 2007?
12:52:54 12       A.  I can't say for certain but it could
12:53:00 13   have been part of what he sent me.
12:53:02 14       Q.  Let's look together at SB 7, the next
12:53:06 15   page.  From whom did you receive SB 7?
12:53:21 16       A.  Let me go back.  I either received
12:53:23 17   these documents directly from Nick or I received
12:53:26 18   them through my attorney and he received them
12:53:30 19   from Nick and I'm not absolutely certain which
12:53:33 20   way it was.
12:53:38 21       Q.  One way or the other, these documents
12:53:41 22   including SB 7 came from Mr. Solinger whether
12:53:43 23   they came through someone else --
12:53:47 24       A.  They came through someone else, Nick
12:53:48 25   or someone else because I would never have had

Page 121

SANDRA BIENVENU

12:53:51 2    this during my employment.
12:53:52 3        Q.  Well, can you suggest who the someone
12:53:55 4    else might be?
12:53:56 5        A.  I don't know.  It must have been Nick
12:53:59 6    or my attorney.
12:54:00 7        Q.  Is it your best recollection that you
12:54:02 8    got SB 7 from either Mr. Solinger or your
12:54:05 9    counsel?
12:54:09 10       A.  To the best of my knowledge, yes.
12:54:11 11       Q.  Ms. Bienvenu, you say that you never
12:54:15 12   saw SB 7 prior to the time you resigned from
12:54:22 13   America's Choice?
12:54:22 14       A.  No, sir.
12:54:23 15       Q.  That's correct, you did not?
12:54:24 16       A.  I did not.
12:54:24 17       Q.  And SB 7 reflects salary information
12:54:28 18   for other employees of America's Choice who were
12:54:32 19   at your level?
12:54:37 20       A.  Yes, it does.
12:54:38 21       Q.  Other business development directors
12:54:40 22   within the company?
12:54:41 23       A.  Yes, it does.
12:54:44 24       Q.  Did you understand that SB 7 was a
12:54:47 25   confidential document, Ms. Bienvenu?

31 (Pages 118 to 121)

MERRILL LEGAL SOLUTIONS
(800) 325-3376         www.MerrillCorp.com
c735a6e6-6259-4523-b112-3e9379c131a3

Page 122

| | SANDRA BIENVENU |
|---|---|
| 1 | |
| 12:54:49 2 | MR. BENOWITZ: Objection. |
| 12:54:51 3 | A. It wasn't marked confidential, so -- |
| 12:54:57 4 | Q. How about SB 8, where did you receive |
| 12:55:00 5 | that from, where or from whom? |
| 12:55:02 6 | A. Obviously from the same place. |
| 12:55:05 7 | Q. Either from Mr. Solinger or your |
| 12:55:07 8 | counsel who then received it from Mr. Solinger? |
| 12:55:10 9 | A. I would assume so, yes. |
| 12:55:15 10 | Q. And the same with respect to SB 9 and |
| 12:55:16 11 | 10? |
| 12:55:22 12 | A. Yes, sir, I couldn't figure out what . |
| 12:55:23 13 | those were. |
| 12:55:24 14 | Q. Well, join the club because I can't |
| 12:55:28 15 | either. |
| 12:56:03 16 | Ms. Bienvenu, where are you currently |
| 12:56:04 17 | employed? |
| 12:56:05 18 | A. I work for Scientific Learning |
| 12:56:06 19 | Corporation. |
| 12:56:13 20 | Q. Where are you based? |
| 12:56:14 21 | A. I work out of my home, but Scientific |
| 12:56:17 22 | Learning Corporation is actually based in |
| 12:56:19 23 | Oakland, California. |
| 12:56:21 24 | Q. Oakland? |
| 12:56:22 25 | A. Yes, sir. |

Page 123

| | SANDRA BIENVENU . |
|---|---|
| 1 | |
| 12:56:29 2 | Q. What is Scientific Learning |
| 12:56:30 3 | Corporation? |
| 12:56:32 4 | A. We provide brain fitness software for |
| 12:56:37 5 | children to improve their brain processing so |
| 12:56:43 6 | they can benefit from instruction better. |
| 12:56:51 7 | Q. When did you first interview with |
| 12:56:54 8 | Scientific Learning Corporation for a job? |
| 12:57:03 9 | A. About 2004. |
| 12:57:11 10 | Q. I take it that you did not accept |
| 12:57:13 11 | employment with that company at that time? |
| 12:57:16 12 | A. The gentleman who was vice-president |
| 12:57:20 13 | of sales was my former vice-president of sales |
| 12:57:24 14 | at Compass Learning. He had been trying to |
| 12:57:27 15 | recruit me ever since he went to there -- it |
| 12:57:34 16 | wasn't a formal interview but we talked and, no, |
| 12:57:38 17 | I did not. |
| 12:57:39 18 | Q. When was your next interview with |
| 12:57:41 19 | Scientific Learning Corporation? |
| 12:57:43 20 | A. Formal interview? |
| 12:57:44 21 | Q. Formal or informal. |
| 12:57:46 22 | A. Oh, informal, he probably called me |
| 12:57:49 23 | once every two to three months. |
| 12:57:51 24 | Q. I take it, then, he kept in contact |
| 12:57:53 25 | with you in an attempt to interest you in |

Page 124

| | SANDRA BIENVENU |
|---|---|
| 1 | |
| 12:57:55 2 | employment there? |
| 12:57:55 3 | A. Yes, and we were friends. |
| 12:57:57 4 | Q. When did you first have a formal |
| 12:57:59 5 | interview with him, him or anyone else there? |
| 12:58:09 6 | A. Around the end of December 2006 or the |
| 12:58:24 7 | first of January 2007. |
| 12:58:31 8 | Q. Where was that interview? . |
| 12:58:33 9 | A. Via telephone. |
| 12:58:38 10 | Q. Did you have an in person interview |
| 12:58:40 11 | after that? |
| 12:58:44 12 | A. I -- it wasn't really an interview. I |
| 12:58:46 13 | ran into their regional sales director at a |
| 12:58:50 14 | Florida conference. |
| 12:58:52 15 | Q. When was that? |
| 12:59:02 16 | A. That may have actually been before my |
| 12:59:04 17 | phone interview, so it was sometime in December |
| 12:59:08 18 | I ran into her and she introduced herself and |
| 12:59:14 19 | told me that she had heard about me and would I |
| 12:59:16 20 | be interested in coming to work for America's |
| 12:59:19 21 | Choice. But I don't recall exactly when that |
| 12:59:24 22 | conference was. |
| 12:59:24 23 | Q. You meant Scientific Learning |
| 12:59:25 24 | Corporation? |
| 12:59:26 25 | A. Pardon? |

Page 125

| | SANDRA BIENVENU |
|---|---|
| 1 . | |
| 12:59:28 2 | Q. Your last answer you said that she |
| 12:59:31 3 | asked you whether you would be interested in |
| 12:59:33 4 | coming to work for America's Choice? |
| 12:59:34 5 | A. No, I'm sorry, for Scientific |
| 12:59:36 6 | Learning. |
| 12:59:37 7 | Q. For Scientific Learning? |
| 12:59:39 8 | A. I'm confused, sorry. |
| 12:59:41 9 | Q. What was the conference in December in |
| 12:59:43 10 | which you ran into her? |
| 12:59:44 11 | A. It was some Florida conference, I |
| 12:59:48 12 | don't remember. |
| 12:59:49 13 | Q. What next happened in connection with |
| 12:59:52 14 | your employment by Scientific Learning |
| 12:59:54 15 | Corporation? |
| 01:00:00 16 | A. Glenn called me again in December -- |
| 01:00:04 17 | Q. Glenn's name is what? |
| 01:00:08 18 | A. Chapin, C-H-A-P-I-N. Glenn called me |
| 01:00:11 19 | in December, wanted to know if I would be |
| 01:00:13 20 | interested, and I said yes, that I wasn't really |
| 01:00:17 21 | happy where I was and I definitely would be |
| 01:00:19 22 | interested in talking to them. |
| 01:00:22 23 | I then talked with Gina Larue, their |
| 01:00:26 24 | human resources person via telephone. I don't |
| 01:00:30 25 | recall exactly when it was. Gina and I talked |

MERRILL LEGAL SOLUTIONS
(800) 325-3376              www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 126

|  | SANDRA BIENVENU |
|---|---|
| 1 | |
| 01:00:36 2 | several times on the phone. I talked several |
| 01:00:38 3 | times to Kim Whitten, several times to Glenn |
| 01:00:43 4 | Chapin. |
| 01:00:45 5 | Q. Spell Gina's name, please? |
| 01:00:48 6 | A. G-I-N-A, L-A-R-U-E. |
| 01:00:54 7 | Q. And another name that you mentioned -- |
| 01:00:55 8 | A. Kim Whitten. |
| 01:00:57 9 | Q. Kim Whitten? |
| 01:00:5910 | A. Kim Whitten, W-H-I-T-T-E-N, Tom |
| 01:01:0411 | Whitten's sister-in-law. |
| 01:01:0712 | Q. Anyone else you spoke to before you |
| 01:01:0813 | went to work there? |
| 01:01:2014 | A. You know, I don't remember -- yes, I |
| 01:01:2215 | did, yes, I did. Marty Monroe. |
| 01:01:2616 | Q. When did you accept an offer of |
| 01:01:2817 | employment from Scientific Learning Corp.? |
| 01:01:3818 | A. Sometime in the middle of January. I |
| 01:01:4519 | don't remember the exact date. |
| 01:01:4620 | Q. Was it before or after you resigned |
| 01:01:4821 | from America's Choice? |
| 01:01:5022 | A. It was all about the same time, within |
| 01:01:5223 | the same week. |
| 01:02:0924 | Q. Have you advised your current |
| 01:02:1325 | employer, Scientific Learning Corporation, about |

Page 127

|  | SANDRA BIENVENU |
|---|---|
| 1 | |
| 01:02:14 2 | the pendency of this litigation? |
| 01:02:17 3 | A. They knew about it when I was actually |
| 01:02:20 4 | interviewing -- no, they did not, not when I was |
| 01:02:27 5 | interviewing. When did I tell them? I guess |
| 01:02:29 6 | when I had to take some time off. |
| 01:02:33 7 | Q. Who did you inform? |
| 01:02:39 8 | A. Well, Glenn Chapin would have been the |
| 01:02:41 9 | first one. Glenn has since left the company. |
| 01:02:4910 | My direct boss now is Andy Myers, so I would |
| 01:02:5511 | have had to inform him while I was taking PTO |
| 01:02:5912 | especially in the last quarter of -- the last |
| 01:03:0513 | work of the quarter. |
| 01:03:0714 | Q. M-Y-E-R-S? |
| 01:03:1015 | A. I believe it is. He hasn't been with |
| 01:03:1616 | us very long, so -- |
| 01:03:1717 | Q. When did you commence your employment |
| 01:03:1918 | with Scientific Learning Corporation? |
| 01:03:2819 | A. Sometime in the second or third week |
| 01:03:2920 | of January 2007. I can't give you an exact date |
| 01:03:3321 | because I just didn't even -- I don't know. |
| 01:03:3722 | Q. All right. |
| 01:03:3723 | MR. KARLINSKY: Why don't we take our |
| 01:03:3924 | lunch break right here. |
| 01:03:4125 | THE VIDEOGRAPHER: The time is 1:03 |

Page 128

|  | SANDRA BIENVENU |
|---|---|
| 1 | |
| 01:03:42 2 | p.m. We are off the record. |
| 01:03:45 3 | (Lunch recess) |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 129

|  | SANDRA BIENVENU |
|---|---|
| 1 | |
| 01:03:47 2 | |
| 02:01:18 3 | AFTERNOON SESSION |
| 02:01:18 4 | |
| 02:01:36 5 | THE VIDEOGRAPHER: The time is 2:02 |
| 02:02:26 6 | p.m. We are back on the record. |
| 02:02:29 7 | BY MR. KARLINSKY: |
| 02:02:31 8 | Q. Ms. Bienvenu, up until the time that |
| 02:02:36 9 | you were provided with your final 2006 |
| 02:02:4010 | compensation plan by Mr. Solinger, did you have |
| 02:02:4411 | any communication with anyone at ACI on the |
| 02:02:4812 | subject of quota credit? |
| 02:02:5413 | A. Other than Mr. Solinger? |
| 02:02:5614 | Q. Other than Mr. Solinger, yes. You |
| 02:02:5715 | have told us about those already. |
| 02:03:0316 | A. Not that I specifically recall, no. |
| 02:03:0517 | Q. That you generally recall? |
| 02:03:1218 | A. Not really, no. |
| 02:03:1319 | Q. During the entire course of your |
| 02:03:1420 | employment at America's Choice, did anyone ever |
| 02:03:2021 | contradict what Mr. Solinger told you in that |
| 02:03:2322 | period from when you first began speaking to him |
| 02:03:2623 | and up until October 5 of 2005 relating to quota |
| 02:03:3024 | credit? |
| 02:03:3525 | MR. BENOWITZ: Could you read back the |

33 (Pages 126 to 129)

MERRILL LEGAL SOLUTIONS
(800) 325-3376    www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 130

SANDRA BIENVENU

```
1
02:03:36 2  question?
02:03:37 3     Q.  During the entire course of -- let me
02:03:39 4  do it a little differently.
02:03:41 5        I want to book end this period of
02:03:42 6  time.  I want to talk about the entire
02:03:44 7  employment, so we are talking about all the
02:03:49 8  discussions you had with Mr. Solinger -- let's
02:03:52 9  strike that and withdraw, let me start all over
02:03:55 10 again.
02:03:56 11       You have told us at this point that
02:03:57 12 you began having conversations with Mr. Solinger
02:03:59 13 at some point prior to April of 2005.
02:04:03 14    A.  Yes, sir.
02:04:04 15    Q.  Beginning at that period of time when
02:04:05 16 you started to have those communications with
02:04:07 17 him and right up until the time that you quit in
02:04:10 18 January of 2007, did anyone in the employ of
02:04:16 19 America's Choice contradict what Mr. Solinger
02:04:19 20 had told you about quota credit?
02:04:28 21    A.  I don't recall.
02:04:29 22    Q.  You don't recall anyone doing so?
02:04:31 23    A.  I don't recall.
02:04:40 24    Q.  Let me ask you to look at Exhibit 16.
02:04:56 25    A.  Okay.
```

Page 131

SANDRA BIENVENU

```
1
02:04:57 2     Q.  Ms. Bienvenu, can you identify Exhibit
02:05:00 3  16 for us?
02:05:01 4     A.  Yes, sir.  It is an e-mail that I sent
02:05:04 5  to Judy Aronson with a copy to Jason Dougal on
02:05:10 6  Friday, April 14th at 9:29 a.m.
02:05:15 7     Q.  And it has an attachment to it, does
02:05:18 8  it not?
02:05:29 9     A.  Yes, sir, it does.
02:05:39 10    Q.  Ms. Bienvenu, who gave that name,
02:05:43 11 newform.doc to the attachment, that file name?
02:05:53 12    A.  I honestly do not know.
02:05:53 13    Q.  Did you yourself put that file name on
02:05:58 14 it?
02:05:59 15    A.  No, sir.
02:05:59 16    Q.  So you received it in that fashion?
02:06:03 17    A.  I must have.
02:06:04 18    Q.  Next question for you, then, from whom
02:06:06 19 did you receive a copy of newform.doc?
02:06:16 20    A.  It would have been someone within the
02:06:19 21 Arkansas State Department.
02:06:21 22    Q.  Of education?
02:06:22 23    A.  Of education, I'm sorry.
02:06:24 24    Q.  Do you know who within ADE?
02:06:44 25    A.  I don't remember if Becky Dalton had
```

Page 132

SANDRA BIENVENU

```
1
02:06:47 2  started by this time.
02:06:49 3     Q.  Let's mark as Exhibit 111, a
02:06:52 4  single-page document dated April 14, 2006.  For
02:07:05 5  the record, I should identify that as ACI 02621.
02:07:09 6        (Exhibit 111, Document Bates Stamped
02:07:09 7  ACI-DC-02621, marked for identification)
02:07:21 8  BY MR. KARLINSKY:
02:07:22 9     Q.  Ms. Bienvenu, Exhibit 111 is an e-mail
02:07:26 10 message dated April 14, 2006 at 12:51 p.m. from
02:07:31 11 you to Jason Dougal.
02:07:33 12       You say in part directed to Mr.
02:07:36 13 Dougal: "Jason, I gave Dr. Becky Dalton your
02:07:40 14 cell number so she could find someone in their
02:07:43 15 legal department to talk with you."
02:07:46 16       Does that refresh your recollection --
02:07:48 17    A.  Yes, it does.
02:07:48 18    Q.  -- as to whether Dalton was employed
02:07:49 19 at ADE at that time?
02:07:49 20    A.  Yes, it does.
02:07:49 21    Q.  And she was?
02:07:50 22    A.  She was, obviously, yes.
02:07:51 23    Q.  Does looking at Exhibit 111 also
02:07:55 24 refresh your recollection that you received
02:07:56 25 newform.doc?
```

Page 133

SANDRA BIENVENU

```
1
02:07:59 2     A.  From Dr. Dalton, yes, sir.
02:08:00 3        MR. RHORER:  Marty, for the record,
02:08:03 4  that is also Exhibit 16A.  If it is not could
02:08:07 5  you tell me what -- it is the same Bates No.
02:08:13 6        MR. KARLINSKY:  Let's stay on the
02:08:13 7  record for this.  We had a problem with that.
02:08:14 8  When we looked back at our master exhibit list,
02:08:18 9  because I thought you and I talked about that,
02:08:20 10 we both thought it was 16A but we don't find a
02:08:24 11 record of that, so I wanted to mark it
02:08:26 12 separately.
02:08:27 13       MR. RHORER:  But it is the same
02:08:29 14 document?
02:08:29 15       MR. KARLINSKY:  It is the same
02:08:30 16 document.  It is the last page of Exhibit 16.
02:08:33 17       MR. RHORER:  We have agreed it is
02:08:34 18 apparently two separate documents.
02:08:36 19       MR. KARLINSKY:  That's correct, that's
02:08:37 20 why I marked it separately.
02:08:39 21    Q.  Let's stay with Exhibit 111 for a
02:08:41 22 moment, ma'am.  This was also sent on the same
02:08:44 23 Friday that you sent newform.doc to Judy Aronson
02:08:47 24 and Jason Dougal, correct?
02:08:49 25    A.  Yes, sir.
```

34 (Pages 130 to 133)

MERRILL LEGAL SOLUTIONS
(800) 325-3376            www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 134

SANDRA BIENVENU

02:08:50  2    Q.  Why did you direct it to these
02:08:52  3  particular individuals, Judy Aronson and Jason
02:08:55  4  Dougal?
02:09:02  5    A.  As I recall, Judy Aronson was special
02:09:04  6  assistant to Judy Codding and she had worked
02:09:10  7  with me for a couple of days in Arkansas and I
02:09:17  8  sent it to Judy with a copy to Jason because
02:09:20  9  Jason was the person that signed contracts.
02:09:30 10    Q.  Did you have any discussion with Ms.
02:09:32 11  Dalton about Exhibit 16, prior to the time you
02:09:37 12  sent it -- and by that I mean the attachment to
02:09:39 13  Exhibit 16 to the e-mail -- prior to the time
02:09:41 14  you sent it to Aronson and Dougal?
02:09:44 15    A.  I'm sure there was conversation.
02:09:47 16    Q.  Tell me about that conversation,
02:09:48 17  please.
02:09:54 18    A.  I don't recall the specific
02:09:56 19  conversation other than Becky needed this signed
02:10:01 20  and she wasn't sure why.  And as I recall, the
02:10:05 21  reason I hesitated to say it came from Becky,
02:10:09 22  Becky had just been hired at the Arkansas
02:10:13 23  Department of Education and I don't think she
02:10:15 24  knew what the form was intended for at that
02:10:20 25  time.  She was brand new.

Page 135

SANDRA BIENVENU

02:10:22  2    Q.  Did you know what the form was
02:10:23  3  intended for?
02:10:27  4    A.  It was a professional services
02:10:28  5  contract.
02:10:29  6    Q.  Yes, but did you know what it was
02:10:31  7  intended for?
02:10:33  8    A.  I thought I did, yes, sir.
02:10:35  9    Q.  What was that?
02:10:36 10    A.  The contract between the Arkansas
02:10:38 11  State Department of Education and America's
02:10:41 12  Choice for work that was to be done in their
02:10:46 13  schools that were in improvement years three,
02:10:51 14  four and five, I believe.
02:10:56 15    Q.  Let me just clarify for half a moment.
02:11:05 16  Did you ask Ms. Dalton why Arkansas needed the
02:11:10 17  form?
02:11:16 18    A.  I don't believe I asked her.  By this
02:11:18 19  time an RFP had been opened on April 12.
02:11:22 20    Q.  A request for proposal?
02:11:24 21    A.  A request for proposal.  I was at the
02:11:27 22  bid opening.  There were maybe two or three
02:11:31 23  additional vendors there.  They did not award
02:11:39 24  the bid or the RFP to us on that particular day.
02:11:46 25  I don't believe they could on that particular

Page 136

SANDRA BIENVENU

02:11:47  2  day, they had to get approval.  So afterwards
02:11:54  3  when she sent me this, no, I didn't ask her.
02:12:03  4    Q.  Did you assume, Ms. Bienvenu, that
02:12:05  5  this form that she sent you was in effect the
02:12:08  6  acceptance of the proposal from America's
02:12:10  7  Choice?
02:12:11  8    MR. BENOWITZ:  Objection.
02:12:17  9    A.  I honestly don't know what I assume at
02:12:18 10  that point.
02:12:19 11    Q.  Without regard to that, you did send
02:12:22 12  the form on to Aronson and Dougal, correct?
02:12:24 13    A.  I did.
02:12:26 14    Q.  With whom did you have a conversation
02:12:29 15  about the form?
02:12:30 16    MR. BENOWITZ:  Objection.
02:12:35 17    A.  I don't know what you are asking me.
02:12:36 18    Q.  Did you hear from either Aronson or
02:12:38 19  Dougal about the form that you had sent to them?
02:12:40 20    A.  I think Jason called and asked me some
02:12:43 21  questions that I couldn't answer, so I gave
02:12:52 22  Becky his cell number.
02:12:54 23    Q.  What do you recall Mr. Dougal asking
02:12:57 24  you?
02:12:59 25    A.  I don't.

Page 137

SANDRA BIENVENU

02:12:59  2    Q.  You recall nothing about it?
02:13:06  3    A.  I don't remember those -- I have
02:13:09  4  hundreds of conversations in my work.  That was
02:13:14  5  a couple years ago, three years ago.  I have no
02:13:17  6  idea.
02:13:18  7    MR. BENOWITZ:  Could you just let her
02:13:21  8  answer, please.
02:13:22  9    Q.  Do you remember anything that Mr.
02:13:24 10  Dougal said to you, Ms. Bienvenu?
02:13:39 11    A.  No.  I really don't.
02:13:40 12    Q.  Did you read Mr. Dougal's testimony
02:13:42 13  about the discussion he had with you concerning
02:13:45 14  the form document?
02:13:49 15    A.  I read his testimony, yes.
02:13:51 16    Q.  Do you have any reason to suggest that
02:13:52 17  the testimony was not accurate?
02:13:55 18    MR. BENOWITZ:  Objection.
02:13:56 19    A.  I have no reason to even know what it
02:14:00 20  was all about at that time.  It's been too long
02:14:03 21  ago.
02:14:05 22    Q.  I don't know what you are saying.
02:14:06 23  What's been too long ago, ma'am?
02:14:08 24    A.  The conversation with Jason was too
02:14:10 25  long ago.  I can't say that what he testified is

35  (Pages 134 to 137)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 138

SANDRA BIENVENU

| | |
|---|---|
| 02:14:14 | 2 |

1
SANDRA BIENVENU

02:14:14 2  true or false. I just don't know.

02:14:16 3    Q.  Well, did you understand that the

02:14:24 4  newform.doc that was sent to you was an

02:14:28 5  essential step in getting a contract in place

02:14:31 6  with Arkansas?

02:14:34 7    A.  Well, it was my understanding it was

02:14:35 8  the contract that we -- that we, meaning

02:14:39 9  America's Choice, had to sign and they had to

02:14:43 10  sign.

02:14:43 11    Q.  So you would understand and you would

02:14:45 12  agree with me that it was a critical step in

02:14:48 13  putting that contract in place, correct?

02:14:51 14    MR. BENOWITZ:  Objection.

02:14:51 15    MR. RHORER:  Object to the form.

02:14:57 16    A.  I'm really not an attorney --

02:14:58 17    Q.  I didn't ask you if you were an

02:15:00 18  attorney, ma'am.  Didn't you understand that

02:15:02 19  getting this document signed was critical to

02:15:06 20  advancing the Arkansas project?

02:15:11 21    A.  This document that you are referring

02:15:13 22  to --

02:15:14 23    Q.  The newform.doc?

02:15:16 24    A.  Says professional consultant services

02:15:19 25  contract.

Page 139

1
SANDRA BIENVENU

02:15:19 2    Q.  And my question to you, ma'am, is did

02:15:21 3  you understand that getting this document signed

02:15:25 4  was an important step in moving the Arkansas

02:15:28 5  project ahead?

02:15:30 6    MR. BENOWITZ:  Objection.

02:15:31 7    A.  It was important to get the contract

02:15:35 8  signed, yes, sir.

02:15:36 9    Q.  In part because you believed that you

02:15:39 10  would receive commission?

02:15:45 11    MR. BENOWITZ:  Objection.

02:15:45 12    Q.  If the contract was signed, correct?

02:15:49 13    MR. BENOWITZ:  Objection to form.

02:15:47 14    A.  Well, yes.  Why would I not be

02:15:50 15  working --

02:15:51 16    Q.  Ms. Bienvenu, do you not recall

02:15:52 17  anything that Mr. Dougal told you when you

02:15:54 18  talked about newform.doc with him?

02:15:58 19    MR. BENOWITZ:  Objection.  Question

02:16:01 20  asked and answered.

02:16:05 21    A.  I'm not an attorney.  I was relying --

02:16:07 22    Q.  Ms. Bienvenu, we can have a

02:16:09 23  stipulation on the record, ma'am, that you are

02:16:11 24  not an attorney.  You have now said that at

02:16:13 25  least thirty times.  I don't need to be told

Page 140

1
SANDRA BIENVENU

02:16:15 2  that.  I know very well you are not an attorney.

02:16:17 3    My question to you was, do you not

02:16:21 4  remember anything Mr. Dougal said about this

02:16:23 5  document that you sent to him?

02:16:24 6    MR. BENOWITZ:  Objection.

02:16:27 7    A.  I do not remember.

02:16:28 8    Q.  Do you remember anything that Ms.

02:16:30 9  Aronson said about this document that you sent

02:16:32 10  to him?

02:16:36 11    MR. BENOWITZ:  Objection.

02:16:39 12    A.  I don't remember whether Judy and I

02:16:41 13  even discussed this document.

02:16:42 14    Q.  Fine.  Did you have a conversation

02:16:44 15  concerning the document that you transmitted by

02:16:49 16  Exhibit 16 with Judy Codding?

02:16:59 17    A.  The only conversation I recall having

02:17:01 18  with Judy Codding about any part of this was

02:17:05 19  when I called Judy to tell her that Arkansas was

02:17:08 20  a done deal.

02:17:13 21    Q.  Ms. Bienvenu, I asked you whether you

02:17:16 22  had a discussion with Ms. Codding about the

02:17:20 23  document that you forwarded to Judy Aronson and

02:17:24 24  Jason Dougal.  That question can be answered yes

02:17:26 25  or no.

Page 141

1
SANDRA BIENVENU

02:17:27 2    Did you have such a discussion with --

02:17:30 3    MR. BENOWITZ:  Mr. Karlinsky, she has

02:17:31 4  answered the question.  You are badgering the

02:17:33 5  witness.

02:17:35 6    Q.  Did you have such a discussion with

02:17:38 7  Ms. Codding?

02:17:39 8    A.  Not that I recall.

02:17:43 9    Q.  You recall no discussion on the

02:17:44 10  telephone with Jason Dougal and Judy Codding, is

02:17:46 11  that correct?

02:17:51 12    MR. BENOWITZ:  About this document,

02:17:52 13  correct?

02:17:53 14    A.  About this document?

02:17:55 15    Q.  That's correct.

02:17:56 16    A.  I don't remember the conversation with

02:17:59 17  Jason about this document.  I don't believe that

02:18:01 18  I discussed it with Judy Codding.

02:18:14 19    Q.  What happened next after you sent the

02:18:16 20  newform.doc document to Aronson and Dougal?

02:18:26 21    A.  What happened next?

02:18:28 22    Q.  Yes.

02:18:28 23    A.  What did I do next?

02:18:31 24    Q.  What happened next?

02:18:33 25    A.  I really don't understand what you are

36  (Pages 138 to 141)

MERRILL LEGAL SOLUTIONS
(800) 325-3376              www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 142

SANDRA BIENVENU

1    SANDRA BIENVENU
02:18:37 2    asking me. I need you to be more specific.
02:18:40 3    Q. Ms. Bienvenu, I'm asking you about the
02:18:42 4    Arkansas project. What happened with respect to
02:18:45 5    the Arkansas project after you sent newform.doc
02:18:51 6    to Judy Aronson and Jason Dougal?
02:18:59 7    A. Jason signed it and sent it back. I
02:19:04 8    mean, do you have something that will refresh my
02:19:06 9    memory? I have no idea of what you are --
02:19:08 10    Q. Well, I'll ask you to look at Exhibit
02:19:10 11    16 with me. Go to the third page of Exhibit 16.
02:19:24 12    This is a copy of the document that as you have
02:19:26 13    told me you sent to Aronson and Dougal, correct?
02:19:34 14    A. Yes.
02:19:34 15    Q. It is a blank form document, is it
02:19:36 16    not?
02:19:37 17    A. Yes.
02:19:37 18    Q. Is there anything filled out in it?
02:19:43 19    A. No.
02:19:47 20    Q. Was someone responsible for filling
02:19:49 21    out this form document?
02:19:54 22    A. I would assume that Judy Aronson or
02:19:56 23    Jason Dougal or both would be responsible for
02:20:00 24    that. That's who I sent it to.
02:20:03 25    Q. Did you yourself have any involvement

Page 143

SANDRA BIENVENU

1    in filling out this form document?
02:20:05 2
02:20:08 3    A. I had no involvement in filling out
02:20:10 4    the form. I had done work before that Judy
02:20:17 5    Aronson had and I don't know if Jason did in the
02:20:21 6    form of spreadsheets, pricing, laying out of the
02:20:26 7    plan for Arkansas, etc., dating back to -- all
02:20:31 8    the way back to February.
02:20:35 9    Q. Did you receive a copy of the blank
02:20:37 10    form after it was filled out?
02:20:44 11    MR. BENOWITZ: Objection to form.
02:20:44 12    A. I think the first time I saw it after
02:20:47 13    it was filled out was after this litigation
02:20:50 14    began.
02:21:13 15    Q. Did you understand the form had been
02:21:16 16    filled out and signed and returned to Arkansas?
02:21:26 17    MR. BENOWITZ: Objection.
02:21:28 18    A. Yes.
02:21:29 19    Q. How did you learn that?
02:21:33 20    A. Because Becky and I began to plan
02:21:36 21    everything that was going on. I believe Becky
02:21:40 22    may have told me that.
02:21:41 23    Q. What next steps did you take in
02:21:44 24    connection with the Arkansas contract after you
02:21:46 25    learned that?

Page 144

SANDRA BIENVENU

1    A. We began to schedule the training,
02:21:55 2
02:22:01 3    Dottie Whitlow and Marietta Palmer put together
02:22:06 4    an advertisement for people in Arkansas to work
02:22:09 5    on the project. They hired the people. I was
02:22:21 6    back in Arkansas, and I can't remember the exact
02:22:25 7    dates, but I believe it was early May where we
02:22:30 8    actually started refining the details of exactly
02:22:35 9    what was going to happen with the project and
02:22:39 10    how it was going to be laid out. I don't
02:22:42 11    remember those exact dates.
02:22:53 12    Q. Would you look at Exhibit 23, please.
02:23:11 13    You've seen Exhibit 23 before, ma'am?
02:23:15 14    A. In preparation for this I think I did
02:23:18 15    see it.
02:23:21 16    Q. Had you not seen it before?
02:23:26 17    A. Before the litigation began?
02:23:29 18    Q. Yes.
02:23:29 19    A. It wasn't copied to me.
02:23:31 20    Q. I asked you if you had seen it before?
02:23:33 21    A. Not to my knowledge.
02:23:34 22    Q. Do you have any knowledge about Mr.
02:23:35 23    Harris getting in touch with Mr. Dougal to tell
02:23:38 24    him to contact Davis at ADE to coordinate
02:23:44 25    finalizing the America's Choice contract?

Page 145

SANDRA BIENVENU

1    A. I know that Cecil went back and spoke
02:23:50 2
02:23:54 3    with Diana Julian and Bobby Davis on his own one
02:24:00 4    time and I wasn't involved in those meetings.
02:24:10 5    In the meeting in early May there --
02:24:14 6    Q. Let me stop you right there. How do
02:24:16 7    you know that Mr. Harris went back to Arkansas,
02:24:18 8    had a meeting with Davis and the Julian?
02:24:20 9    A. Because Cecil and I talked every day.
02:24:23 10    Q. What did he tell you about that
02:24:27 11    meeting?
02:24:27 12    A. I'm trying to explain to you how this
02:24:29 13    all came about.
02:24:31 14    Q. I'm asking you a question, ma'am.
02:24:32 15    What did he tell you about that meeting?
02:24:35 16    MR. BENOWITZ: If anything.
02:24:38 17    A. I don't know that he gave me any
02:24:39 18    details about the meeting other than he went to
02:24:42 19    see Bobby Davis, I thought to go ahead and get
02:24:51 20    an invoice because Diana Julian had told us that
02:24:56 21    she had money to pay immediately.
02:25:03 22    Q. You thought Mr. Harris went to
02:25:04 23    Arkansas to get an invoice?
02:25:10 24    A. He went to Arkansas and talked with
02:25:12 25    Bobby Davis about an invoice. I don't know if

37 (Pages 142 to 145)

MERRILL LEGAL SOLUTIONS
(800) 325-3376     www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 146

SANDRA BIENVENU

01:25:16 2 that was this particular meeting. I have no

02:25:18 3 idea.

02:25:19 4 Q. Why would Mr. Harris have to go to

02:25:20 5 Arkansas to talk to Davis and Julian about an

02:25:23 6 invoice?

02:25:24 7 MR. BENOWITZ: Objection.

02:25:25 8 MR. RHORER: Object to form.

02:25:27 9 A. I don't know.

02:25:28 10 Q. What's your understanding?

02:25:30 11 MR. RHORER: Object to the form.

02:25:32 12 A. My understanding was Diana Julian had

02:25:36 13 told us in the May meeting that they had money

02:25:40 14 that they could pay upon signature on the

02:25:44 15 contract.

02:25:53 16 Q. Which May meeting are you referring

02:25:55 17 to?

02:25:57 18 A. It was sometime in early, mid May. It

02:26:01 19 was a meeting in the State Department. Judy

02:26:08 20 Aronson, Dottie Whitlow, Cecil and I met with

02:26:14 21 the Arkansas team. Diana Julian, Becky Dalton,

02:26:23 22 I believe Annette Barnes was there, I believe --

02:26:25 23 I think Bill Nielson was there where we were

02:26:33 24 laying out exactly how the project was going to

02:26:38 25 be run.

Page 147

SANDRA BIENVENU

02:27:01 2 Q. What did Julian say specifically in

02:27:03 3 that May meeting on the subject of having money

02:27:06 4 that they could pay?

02:27:09 5 A. She identified the funding source as

02:27:11 6 school improvement dollars, and I believe the

02:27:15 7 school improvement dollars were tied to Title I,

02:27:19 8 and I believe that she told me that they had

02:27:22 9 money that had to be encumbered within the 2006

02:27:29 10 fiscal year of the State Department and that

02:27:33 11 they needed to be invoiced immediately. That's

02:27:37 12 my recollection.

02:27:39 13 Q. What did you do in connection with

02:27:40 14 obtaining an invoice?

02:27:44 15 A. I didn't do anything.

02:27:45 16 Q. Why not?

02:27:48 17 A. Because the salesperson that I managed

02:27:51 18 who covered Arkansas was going to be in

02:27:54 19 Arkansas, and I traveled over a hundred thousand

02:27:59 20 miles anyway a year and I didn't want to be

02:28:01 21 there again.

02:28:09 22 Q. I guess I'm trying to understand

02:28:12 23 specifically what occurred, Ms. Bienvenu. You

02:28:16 24 were told that America's Choice could be paid a

02:28:20 25 substantial sum of money, is that right?

Page 148

SANDRA BIENVENU

02:28:22 2 A. Yes.

02:28:23 3 Q. If only it were to send an invoice to

02:28:26 4 the Arkansas Department of Education?

02:28:29 5 A. After the contract was signed.

02:28:32 6 Q. Which contract, ma'am?

02:28:34 7 A. The Arkansas professional services

02:28:41 8 contract.

02:28:45 9 MR. BENOWITZ: What are you referring

02:28:45 10 to?

02:28:46 11 A. Professional consultant services

02:28:47 12 contract under six, tab 16.

02:28:52 13 Q. Well, tab 16 is a blank document, is

02:28:54 14 it not?

02:28:56 15 A. Yes.

02:29:06 16 Q. When was the tab 16 document in fact

02:29:12 17 signed?

02:29:16 18 A. To the best of my knowledge, sometime

02:29:20 19 in the April timeframe after it was sent to

02:29:26 20 Jason and Judy.

02:29:28 21 Q. Well, ma'am, don't you know that it

02:29:29 22 was in fact signed and returned to the Arkansas

02:29:33 23 Department of Education on the Monday following

02:29:35 24 the Friday that you transmitted it to them? You

02:29:40 25 know that, don't you?

Page 149

SANDRA BIENVENU

MR. BENOWITZ: Objection.

02:29:41 2 A. I know that it was signed, I believe

02:29:42 3 it was April 16, 17.

02:29:44 4 Q. I'll represent to you that it was

02:29:47 5 signed on April 17.

02:29:48 6 A. Okay. I did not know that it was the

02:29:49 7 Monday after the Friday of the time that I sent

02:29:51 8 this.

02:29:53 9 Q. April 17 was before the meeting that

02:29:54 10 you have now been testifying about which you

02:29:56 11 have told me was in early to mid May.

02:29:58 12 A. Right.

02:30:01 13 Q. Okay. So this professional services

02:30:02 14 document, whatever it was, was signed at the

02:30:04 15 time of that meeting?

02:30:07 16 A. Yes, it was.

02:30:09 17 Q. And did neither you nor Mr. Harris say

02:30:09 18 at that meeting that it's already been signed?

02:30:12 19 MR. BENOWITZ: Objection.

02:30:16 20 A. Why would I say that?

02:30:22 21 Q. Well, you told me before that Ms.

02:30:24 22 Julian said that you could or America's Choice

02:30:27 23 could invoice the Arkansas Department of

02:30:30 24 Education as soon as the contract was signed?

38 (Pages 146 to 149)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 150

1            SANDRA BIENVENU
02:30:33 2    A.  I don't believe that they had signed
02:30:34 3    it by April 17.
02:30:36 4    Q.  They hadn't signed it?
02:30:37 5    A.  I don't believe. I don't know.
02:30:40 6    Q.  Do you know who had signed it?
02:30:42 7    A.  Jason Dougal.
02:30:43 8    Q.  That was it to your knowledge at that
02:30:45 9    point?
02:30:4610    A.  To my knowledge.
02:30:4711    Q.  So who else had to sign that document?
02:30:5012    A.  Someone in the Arkansas State
02:30:5213    Department in their procurement office was my
02:30:5814    understanding.
02:30:5915    Q.  Now, what if anything did you do in
02:31:0316    order to push that forward to get that document
02:31:0717    signed prior to June 30 of 2006?
02:31:1218    A.  I didn't do anything.
02:31:1419    Q.  Did you direct Mr. Harris to do
02:31:1920    anything, Cecil Harris?
02:31:2221    A.  To get the document signed?
02:31:2322    Q.  Did you direct Mr. Harris to do
02:31:2523    anything in connection with that document?
02:31:3424    A.  I don't remember directing him to do
02:31:3825    anything, but he was in the meeting also about

Page 151

1            SANDRA BIENVENU
02:31:44 2    the money being allocated being encumbered for
02:31:50 3    2006.
02:31:52 4    Q.  What is your understanding of what Mr.
02:31:55 5    Harris in fact did in order to get America's
02:31:59 6    Choice to generate an invoice?
02:32:09 7         MR. BENOWITZ: Objection to form.
02:32:10 8    A.  I'm not sure I know the details of
02:32:11 9    what he did.
02:32:12 10   Q.  Do you know anything about what he
02:32:13 11   did?
02:32:14 12   A.  I know he met with Diana Julian and
02:32:17 13   Bobby Davis but, I mean, I wasn't there so I
02:32:21 14   don't know the conversation.
02:32:23 15   Q.  And he did not report to you on that
02:32:26 16   conversation?
02:32:29 17   A.  I don't recall him giving me details
02:32:29 18   of that conversation.
02:32:33 19       MR. KARLINSKY: Stop here.
02:32:35 20       THE VIDEOGRAPHER: Here now marks the
02:32:36 21   end of tape three of the deposition of Ms.
02:32:40 22   Sandra Bienvenu. The time is 2:32 p.m. We are
02:32:44 23   now off the record.
02:32:46 24       (Pause)
02:35:59 25       THE VIDEOGRAPHER: Here now marks the

Page 152

1            SANDRA BIENVENU
02:36:00 2    beginning of tape four of the deposition of Ms.
02:36:03 3    Sandra Bienvenu. The time is 2:35 p.m. We are
02:36:07 4    now back on the record.
02:36:08 5    BY MR. KARLINSKY:
02:36:11 6    Q.  Ma'am, would you look at Exhibit 17 in
02:36:13 7    the exhibit book? Do you recognize Exhibit 17?
02:36:33 8    A.  Yes.
02:36:33 9    Q.  What is it?
02:36:38 10   A.  Looks like an e-mail from Jason Dougal
02:36:40 11   to Rebecca Dalton at the Arkansas Department of
02:36:44 12   Education on Monday, April 17, with an
02:36:50 13   attachment that says 0062-001.PDF. And it
02:37:00 14   appears to be a professional consultant services
02:37:10 15   contract that is now filled out.
02:37:16 16   Q.  And signed, is it not?
02:37:18 17   A.  And signed by Jason — well, I guess
02:37:20 18   it is Jason's signature and T. Kenneth James'
02:37:25 19   signature.
02:37:26 20   Q.  Both signatures dated April 17 of '06?
02:37:29 21   A.  Yes, it is.
02:37:29 22   Q.  Under this document that we are
02:37:31 23   looking at, what schools was America's Choice to
02:37:39 24   provide its services at?
02:37:42 25       MR. BENOWITZ: Objection to form.

Page 153

1            SANDRA BIENVENU
02:37:42 2    A.  You want me to name schools? I can't
02:37:45 3    do that —
02:37:47 4    Q.  On this document, I'm asking you,
02:37:49 5    ma'am.
02:37:55 6    A.  I can read to you paragraph six,
02:37:57 7    Q.  I'm not asking you to read it to me, I
02:37:58 8    am asking you under this document which schools
02:38:01 9    would America's Choice provide services at?
02:38:04 10       MR. BENOWITZ: Objection.
02:38:05 11   A.  The school improvement schools that
02:38:07 12   were in years three, four and five.
02:38:09 13   Q.  But the schools are not identified in
02:38:11 14   the document Exhibit 17, is that correct?
02:38:13 15   A.  That's correct.
02:38:23 16       MR. RHORER: Object to the form.
02:38:30 17   Q.  And if we had nothing else to go on
02:38:32 18   other than Exhibit 17, America's Choice wouldn't
02:38:35 19   know which schools to provide materials to or
02:38:38 20   services to, true?
02:38:40 21       MR. BENOWITZ: Objection.
02:38:48 22   A.  If there is nothing else, yes.
02:39:01 23   Q.  Please look at Exhibit 24. Exhibit 24
02:39:19 24   is an e-mail that you authored dated June 13,
02:39:23 25   2006, is that right?

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 154

SANDRA BIENVENU
1
02:39:24 2   A.  Yes.
02:39:24 3   Q.  To which is attached something, a
02:39:24 4   document called Arkansas -- ARK, rather,
02:39:31 5   proposed budget may.xls, is that right?
02:39:35 6   A.  Yes.
02:39:36 7   Q.  That's a spreadsheet that's attached
02:39:37 8   to the e-mail?
02:39:37 9   A.  Yes.
02:39:3910   Q.  And you sent the e-mail to Jason
02:39:4011   Dougal and Judy Aronson?
02:39:4212   A.  I did.
02:39:4313   Q.  For what purpose?
02:39:4814   A.  Because I started working on this
02:39:5015   particular spreadsheet way back in February,
02:39:5716   March, and we had made some changes to it.
02:40:0417   Q.  I am a little bit confused by that.
02:40:0718   You started working on this particular
02:40:0919   spreadsheet, you mean that the document that you
02:40:1120   sent to them, Dougal and Aronson, via Exhibit 24
02:40:1621   was a modification of an earlier document that
02:40:1922   you had prepared?
02:40:2023        MR. BENOWITZ:  Objection.
02:40:2424   A.  It was -- there were many variations
02:40:2825   on this spreadsheet done over the course of

Page 155

SANDRA BIENVENU
1
02:40:32 2   several months.
02:40:33 3   Q.  Over what period of time?
02:40:37 4   A.  I think the first time I started
02:40:41 5   talking with the Arkansas people about pricing
02:40:44 6   was sometime early January, February of 2006.
02:40:51 7   Q.  For how long did those discussions
02:40:55 8   continue?
02:41:01 9   A.  They went all the way through until
02:41:0810   the first week of training in July 11.
02:41:1411   Q.  So the pricing wasn't determined until
02:41:1712   July 11?
02:41:1313        MR. BENOWITZ:  Objection --
02:41:2014   A.  No.
02:41:2015        MR. BENOWITZ:  -- to form.
02:41:2116   A.  Wrong.
02:41:2217   Q.  Wrong?
02:41:2218   A.  Wrong.
02:41:2319   Q.  When was the pricing determined?
02:41:2420   A.  The pricing was determined in the RFP
02:41:2921   that was opened on April 12.  The price never
02:41:3222   changed from 6,095,000.
02:41:3723   Q.  Did the allocation of services and the
02:41:4124   pricing with respect to those allocations change
02:41:4525   during the period of time February of 2006

Page 156

SANDRA BIENVENU
1
02:41:50 2   through July of 2006?
02:41:51 3        MR. BENOWITZ:  Could you read that
02:41:52 4   back, please?
02:41:58 5   Q.  Did the allocation of services and the
02:42:00 6   pricing with respect to those allocations change
02:42:03 7   during the period of time February of 2006
02:42:04 8   through July of 2006?
02:42:07 9        MR. RHORER:  Object to the form.
02:42:1010   A.  The refinement of the details changed.
02:42:1411   Q.  What do you mean by refinement of the
02:42:1612   details?
02:42:1813   A.  Number of classrooms, number of
02:42:2014   teachers, number of DRA kids, those things.
02:42:2615   Q.  I'm sorry, you used an initial, an
02:42:2916   acronym there.
02:42:3117   A.  Directed reading assessment is I
02:42:3418   believe what DRA stands for.  That was pulled
02:42:3919   out of long term memory.
02:42:4520   Q.  So, in other words, when you first
02:42:4721   began discussions with Arkansas about the
02:42:4922   Arkansas project, you were advised that Arkansas
02:42:5423   had $6,095,000 available for the project, is
02:42:5924   that right?
02:43:0125        MR. BENOWITZ:  Objection.

Page 157

SANDRA BIENVENU
1
02:43:01 2   A.  Yes.
02:43:05 3   Q.  That number never changed?
02:43:06 4   A.  Never changed.
02:43:07 5   Q.  From beginning to end?
02:43:08 6   A.  Never changed.
02:43:09 7   Q.  Never changed.  But what did change
02:43:11 8   was how that total contract value was to be
02:43:16 9   allocated to various parts of the contract, is
02:43:1910   that right?
02:43:2211        MR. BENOWITZ:  Objection to form.
02:43:2212        MR. KARLINSKY:  What's the form
02:43:2313   objection?
02:43:2414        MR. BENOWITZ:  She never said it was
02:43:2515   part of the contract, not part of the contract.
02:43:2716        MR. KARLINSKY:  I'll take the answer.
02:43:2817   Q.  Do you want to hear it again?
02:43:3018   A.  Hm-hmm.
02:43:3319   Q.  My question was:  But what did change
02:43:3620   was how that total contract value was to be
02:43:3921   allocated to various parts of the contract, is
02:43:4122   that right?
02:43:4523        MR. BENOWITZ:  Continue the objection.
02:43:4624   A.  The refinements changed, yes.
02:43:4925   Q.  Is the answer to my question yes?

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 158

SANDRA BIENVENU

02:43:54 2 MR. BENOWITZ: Objection.
02:43:55 3 A. I think so, yes.
02:44:02 4 Q. Would you look at Exhibit 25, please.
02:44:13 5 You received a copy of Exhibit 25, ma'am?
02:44:15 6 A. I did.
02:44:17 7 Q. It is an e-mail dated June 14, 2006
02:44:19 8 from Jason Dougal to you and Cecil Harris, also
02:44:23 9 cc to Pat Whiteaker and Judy Aronson?
02:44:29 10 A. It is.
02:44:29 11 Q. At least the first document on the
02:44:32 12 page is. If you look below it appears there is
02:44:34 13 a preceding e-mail from you to Mr. Dougal, is
02:44:36 14 that right?
02:44:36 15 A. Yes.
02:44:37 16 Q. Dated June 13, 2006?
02:44:39 17 A. Yes.
02:44:44 18 Q. In this document, Exhibit 25, you --
02:44:47 19 why don't we read it for the record because it
02:44:49 20 is quite difficult to make out. On the bottom
02:44:53 21 it seems to be a -- grayed out from the e-mail
02:44:57 22 resend or something.
02:44:58 23 It says: "Jason" -- and correct me if
02:45:00 24 I'm wrong, ma'am -- "Jason, when calculating the
02:45:02 25 number of middle schools, I included the high

Page 159

SANDRA BIENVENU

02:45:05 2 schools that had the six through 12 and seven
02:45:07 3 through 12 configurations in the number and the
02:45:10 4 K through eight elementary school."
02:45:13 5 Correct?
02:45:14 6 A. Yes.
02:45:14 7 Q. Then you also said: "We are $666" --
02:45:17 8 A. No. $660.
02:45:19 9 Q. "$660 over the amount of the contract,
02:45:23 10 but I couldn't find a way to reduce it so I
02:45:26 11 leave that to you and Judy A."
02:45:28 12 A. Yes.
02:45:29 13 Q. Then there looks like a smile right
02:45:33 14 next to that, is that right?
02:45:34 15 A. Yes.
02:45:34 16 Q. That's a smile symbol?
02:45:36 17 A. Yes.
02:45:36 18 Q. "The rest of the numbers in the
02:45:37 19 additional cost section are my best educated
02:45:40 20 guesses"?
02:45:41 21 A. Yes.
02:45:41 22 Q. So you were guessing at some of the
02:45:43 23 numbers that you put in?
02:45:45 24 MR. BENOWITZ: Objection.
02:45:50 25 Q. You were making educated guesses?

Page 160

SANDRA BIENVENU

02:45:52 2 A. I was making educated guesses on the
02:45:54 3 additional cost.
02:45:59 4 Q. You said that was because you didn't
02:46:00 5 have firm numbers from Becky?
02:46:04 6 A. Yes.
02:46:05 7 Q. That was referring to Becky Dalton?
02:46:06 8 A. Yes.
02:46:07 9 Q. And Mr. Dougal responded to you by way
02:46:10 10 of his e-mail of June 14, 2006, correct?
02:46:13 11 A. Yes.
02:46:14 12 Q. In the e-mail he said, among other
02:46:16 13 things, I am actually looking at the third
02:46:19 14 sentence: "I just wanted to give you both a
02:46:21 15 heads-up because this contract is going to take
02:46:23 16 a little bit longer to get out of our offices
02:46:26 17 than I originally told Cecil."
02:46:31 18 A. That's what it says.
02:46:32 19 Q. Did you understand what contract Mr.
02:46:34 20 Dougal was referring to?
02:46:36 21 A. I understood that Mr. Dougal was
02:46:38 22 working on a scope of work to be sent to the
02:46:42 23 Arkansas State Department that would be attached
02:46:46 24 to the original contract which was their
02:46:49 25 professional services contract.

Page 161

SANDRA BIENVENU

02:46:50 2 Q. The original contract, you are talking
02:46:52 3 about the April 17 document?
02:46:54 4 A. Yes.
02:46:55 5 Q. That didn't contain a scope of work,
02:46:57 6 correct?
02:46:59 7 A. It contained a scope of work but not a
02:47:02 8 very detailed scope of work.
02:47:04 9 Q. Did it contain any detail whatsoever
02:47:06 10 with respect to the scope of work?
02:47:11 11 MR. RHORER: Object to the form.
02:47:17 12 A. That was number 16?
02:47:21 13 Q. 17.
02:47:22 14 A. 17.
02:47:26 15 Q. You know what? I'll withdraw the
02:47:28 16 question. You don't have to answer that.
02:47:30 17 A. I'll be happy to.
02:47:32 18 Q. You don't have to answer that.
02:47:34 19 Did you respond to Mr. Dougal's June
02:47:37 20 14 e-mail, Exhibit 25?
02:47:49 21 A. I don't know that I did.
02:47:50 22 Q. You didn't ask Mr. Dougal what
02:47:52 23 contract he is referring to?
02:47:54 24 MR. BENOWITZ: Objection.
02:47:57 25 A. I don't recall asking him which

41 (Pages 158 to 161)

Page 162

SANDRA BIENVENU

1
02:47:58 2    contract. I assumed that I knew that he was
02:48:02 3    working on the scope of work simply because he
02:48:08 4    mentions the scope of work in here.
02:48:11 5        Q.  Ms. Bienvenu, didn't you understand
02:48:13 6    that Mr. Dougal was working on a contract?
02:48:17 7        MR. BENOWITZ: Objection.
02:48:17 8        A.  I understood that Mr. Dougal was
02:48:19 9    working on the scope of work that would define,
02:48:2510    further define the contract, yes.
02:48:2711        Q.  Why was it necessary to further define
02:48:3012    the contract?
02:48:3113        MR. BENOWITZ: Objection.
02:48:3114        A.  Only necessary for America's Choice.
02:48:3315        Q.  Why was that?
02:48:3516        A.  Because that's what they wanted to do.
02:48:3717        Q.  Who wanted to do that?
02:48:3918        A.  America's Choice.
02:48:3919        Q.  Why did they want to do that?
02:48:4320        MR. BENOWITZ: Objection.
02:48:4521        A.  They wanted to refine the details so
02:48:4722    that they knew exactly what the scope of work
02:48:5123    would be.
02:48:5124        Q.  In order to be able to perform their
02:48:5425    obligations under the agreement with Arkansas,

Page 163

SANDRA BIENVENU

1
02:48:57 2    correct?
02:48:57 3        MR. BENOWITZ: Objection.
02:49:02 4        A.  I guess.
02:49:06 5        Q.  Mr. Jason also said -- Mr. Dougal also
02:49:09 6    said in Exhibit 25: "When I spoke to Cecil I
02:49:14 7    was under the impression that all of this work
02:49:16 8    was our boilerplate intensive design work." And
02:49:19 9    he goes on to say: "It is clear from Sandra's
02:49:2210    spreadsheet that there are some services for
02:49:2311    which we do not have boilerplate scopes of
02:49:2712    work."
02:49:2813        You see that?
02:49:2914        A.  I see that.
02:49:2915        Q.  Did you understand what he meant by
02:49:3116    that?
02:49:3117        A.  No, because I thought the boilerplate
02:49:3518    scopes of work were -- were there.  I mean, I
02:49:4019    didn't realize that there was a huge difference.
02:49:4320        Q.  Did you dispute that?
02:49:4521        A.  No.
02:49:4622        Q.  Did you respond to Mr. Dougal in
02:49:4823    respect of that?
02:49:5124        A.  I don't recall responding.
02:49:5825        Q.  You also see where Mr. Dougal says:

Page 164

SANDRA BIENVENU

1
02:50:00 2    "In addition" -- it is the fourth line from the
02:50:03 3    bottom -- "in addition, given the size of this
02:50:06 4    contract, Judy C." -- that's a reference to Judy
02:50:09 5    Codding -- "wants to give the contract a quick
02:50:11 6    once over after Judy A. has reviewed it."
02:50:15 7        A.  I see that.
02:50:16 8        Q.  Did you have any understanding as to
02:50:18 9    what he meant by that?
02:50:1910        MR. BENOWITZ: Objection.
02:50:2411        MR. RHORER: Object to the form.
02:50:2512        A.  Didn't have anything to do with me.
02:50:2913    I'm not sure I even questioned it.
02:50:2914        Q.  You didn't interpose any objection to
02:50:2915    the contract being given a quick once over?
02:50:3216        MR. BENOWITZ: Objection.
02:50:3317        A.  Judy Codding was the CEO.  I didn't
02:50:3418    question.
02:50:0319        MR. KARLINSKY: Let's mark this
02:51:0320    document, it is SB 12 through 19 as Exhibit 112.
02:51:1421    Ms. Bienvenu, if you would give a copy of that
02:51:1622    to your counsel I would appreciate it.
02:51:3923        (Exhibit 112, Document Bates Stamped
02:51:3924    SB 0012 through 0019, marked for identification)
02:51:4025    BY MR. KARLINSKY:

Page 165

SANDRA BIENVENU

1
02:51:41 2        Q.  Can you identify Exhibit 112?
02:51:43 3        A.  It looks like a form that was sent out
02:51:50 4    on a regular basis, and I don't know how often,
02:51:54 5    to the regional services directors on the
02:52:00 6    contracts that were going on in their
02:52:02 7    territories.
02:52:04 8        Q.  Exhibit 112, ma'am, was produced from
02:52:07 9    your files, was it not?
02:52:0910        A.  Right.
02:52:0911        Q.  Is this the only copy of this form
02:52:1112    that you retained?
02:52:1813        A.  I'm not sure what you --
02:52:2014        Q.  Did you keep these forms when they
02:52:2115    were sent?  You just told me that this was a
02:52:2416    report, a form of report that was sent out
02:52:2617    periodically?
02:52:2718        A.  It was sent out periodically but I
02:52:2919    wasn't always copied on it.
02:52:3120        Q.  To the extent that you were copied did
02:52:3221    you keep them?
02:52:3822        A.  This was one that I requested, I
02:52:4023    believe, of Joe Murphy, and because I was trying
02:52:4524    to figure out what contracts had been done
02:52:5025    within my territory, and at that time I covered

42 (Pages 162 to 165)

MERRILL LEGAL SOLUTIONS
(800) 325-3376    www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 166

SANDRA BIENVENU

1
02:52:54 2    both the south and the southeast.
02:53:03 3    Q.   As of what date is Exhibit 112?
02:53:07 4    A.   It says status as of June 19, 2006.
02:53:12 5    Q.   Why were you trying to determine what
02:53:14 6    sales had been done in your territory as of that
02:53:17 7    date?
02:53:18 8    A.   Because the company had no tracking
02:53:20 9    system for salespeople, did not send out any
02:53:2410    statements to salespeople, and I wanted to know
02:53:2811    what was done in June of -- in the 2006 year.
02:53:3612    Q.   Was salesforce.com used to track
02:53:3813    sales?
02:53:4014    A.   At the time that I was there,
02:53:4215    salesforce.com was used to track client
02:53:4516    relationships.
02:53:4617    Q.   Not sales?
02:53:4918    A.   You could not get the information off
02:53:5219    of salesforce.com to track the sales.
02:53:5920            MR. KARLINSKY: Let's mark as Exhibit
02:53:5921    113 this document.
02:54:0222            (Exhibit 113, Document Bates Stamped
02:54:0223    ACI-DC-02635 through 02638, marked for
02:54:0224    identification)
02:54:2625    BY MR. KARLINSKY:

Page 167

SANDRA BIENVENU

1
02:54:27 2    Q.   Ms. Bienvenu, can you identify Exhibit
02:54:28 3    113?
02:54:30 4    A.   Looks like an e-mail from me to Jason
02:54:33 5    Dougal and Rebecca Dalton, Arkansas pricing,
02:54:39 6    Arkansas schools and pricing to .xls.
02:54:45 7    Q.   This is another example of the
02:54:47 8    refinements that you were in the process of
02:54:50 9    making working with Mr. Dougal?
02:54:5410            MR. BENOWITZ: Objection.
02:54:5511    A.   This was a refinement of the schools
02:55:0012    as I was working with Rebecca Dalton.
02:55:1213    Q.   I am missing the point, I think. Is
02:55:1314    it not the work that you were doing with Dalton
02:55:1715    and Dougal --
02:55:1716    A.   Yes.
02:55:1817    Q.   -- in an effort to arrive at final
02:55:2018    pricing?
02:55:2019    A.   Not at final pricing.
02:55:2220    Q.   At the allocations of pricing? In
02:55:2421    other words, how the pricing would be spread as
02:55:2722    to the work to be done?
02:55:2923            MR. BENOWITZ: Objection.
02:55:3124            MR. RHORER: Object to the form.
02:55:3425    A.   I think I understand your question and

Page 168

SANDRA BIENVENU

1
02:55:36 2    I think the answer is yes.
02:55:40 3    Q.   With respect to salesforce.com, whose
02:55:43 4    responsibility at America's Choice was it to
02:55:45 5    enter the sales data relating to sales completed
02:55:50 6    contracts and revenue from those --
02:55:53 7            MR. BENOWITZ: Objection to form.
02:55:53 8    A.   I have no idea.
02:55:54 9    Q.   Was it not yours?
02:55:5910    A.   To say --
02:56:0011    Q.   To use salesforce.com to track
02:56:0212    revenues produced through you and your sales
02:56:0413    team?
02:56:0514    A.   No.
02:56:0315            MR. KARLINSKY: Let's mark as Exhibit
02:56:4316    114 --
02:56:4517    A.   Could I clarify the last answer?
02:56:4918    Q.   Sure, go ahead.
02:56:5219    A.   To my knowledge, salesforce.com was
02:56:5620    used to track pipeline for the salespeople. It
02:57:0121    was not my responsibility to put in there that
02:57:0622    contracts were signed or orders were placed. I
02:57:1323    would not have had that information.
02:57:5524    Q.   What do you mean by pipeline for the
02:57:5725    salespeople?

Page 169

SANDRA BIENVENU

1
02:57:59 2    A.   When salespeople are calling on
02:58:01 3    customers and they determine that it is a
02:58:05 4    customer who -- or a potential customer who may
02:58:09 5    do business with America's Choice, they were to
02:58:12 6    enter that name in there with pertinent
02:58:17 7    information, telephone numbers, contact person.
02:58:21 8            When they got to the proposal stage
02:58:24 9    they were to do a proposal for the services, the
02:58:2910    materials that were going to be delivered, and
02:58:3211    that was to be put in also.
02:58:3512    Q.   Did you record the Arkansas project in
02:58:4113    salesforce.com?
02:58:4614    A.   It would have been Cecil's
02:58:4815    responsibility to put Arkansas in. It was his
02:58:5016    account.
02:58:5217    Q.   Did he?
02:58:5518    A.   You know, I honestly don't know.
02:58:5719    Q.   Did you ever check?
02:59:0320    A.   I don't remember. But I think it was
02:59:0521    in sales force. I can't say for sure.
02:59:0922            MR. KARLINSKY: Let's mark this
02:59:1423    document as 114.
02:59:1624            (Exhibit 114, Document Bates Stamped
02:59:1625    ACI-DC-02639 through 02642, marked for

43 (Pages 166 to 169)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 170

SANDRA BIENVENU

1
02:59:16 2    identification)
02:59:40 3    BY MR. KARLINSKY:
02:59:41 4    Q.   Can you identify 114, please.
02:59:47 5    A.   E-mail from me to Becky Dalton and
02:59:50 6    Jason Dougal on June 14, looks like an hour or
03:00:00 7    so of that last one.
03:00:02 8    Q.   On the same subject of the Arkansas
03:00:05 9    schools and pricing?
03:00:0610    A.   Yes.
03:00:0611          MR. KARLINSKY: All right.  Why don't
03:00:0712    we take a break right there.
03:00:1113          THE VIDEOGRAPHER:  Time is 3:00 p.m.
03:00:1514    We are off the record.
03:00:1715          (Recess)
03:08:1416          THE VIDEOGRAPHER:  The time is 3:08
03:08:1517    p.m.  We are back on the record.
03:08:1918          MR. KARLINSKY:  Let me ask the court
03:08:2119    reporter to mark for identification as Exhibit
03:08:2220    115 an e-mail dated July 7, 2006.
03:08:4221          (Exhibit 115, Document Bates Stamped
03:08:4222    ACI-DC-02651 through 02654, marked for
03:08:4223    identification)
03:08:4224    BY MR. KARLINSKY:
03:08:4225    Q.   Ma'am, Exhibit 115 is an e-mail dated

Page 171

SANDRA BIENVENU

1
03:08:44 2    July 7, 2006, is that correct?
03:08:47 3    A.   Yes.
03:08:49 4    Q.   It is from Jason Dougal to a bunch of
03:08:52 5    people including yourself, is that right?
03:08:54 6    A.   Yes.
03:08:55 7    Q.   And among the other people it is
03:08:57 8    directed to is Cecil Harris?
03:09:00 9    A.   Yes.
03:09:0110    Q.   As well as Judy Codding, is that
03:09:0311    right?
03:09:0312    A.   Yes.
03:09:0513    Q.   The text of the e-mail reads:
03:09:0914    "Attached please find the spreadsheet for the
03:09:1015    Arkansas work as agreed to by Sandy and me.  Pat
03:09:1616    will amend the contract and get it out to
03:09:1917    Arkansas (after Judy C. reviews it) ASAP."
03:09:2418          I read that correctly?
03:09:2619    A.   You read that correctly.
03:09:2920    Q.   First of all, did you receive this
03:09:3121    e-mail?
03:09:3122    A.   I'm sure I did.
03:09:3323    Q.   Did you respond to it?
03:09:3824    A.   I honestly don't know the answer to
03:09:4025    that.

Page 172

SANDRA BIENVENU

1
03:09:40 2    Q.   Did you take exception to anything in
03:09:42 3    it?
03:09:50 4    A.   I'm not sure what you are asking me.
03:09:59 5    Did I take exception to it?
03:10:02 6    Q.   Yes, did you tell anyone that it
03:10:04 7    wasn't right?
03:10:04 8          MR. BENOWITZ:  The e-mail or the
03:10:05 9    attachment or anything?
03:10:0710          MR. KARLINSKY:  Either.
03:10:0711    A.   I am very un-- what are you talking
03:10:0912    about, which one --
03:10:1113    Q.   Did you tell anyone in writing by
03:10:1314    e-mail or otherwise that Mr. Dougal's e-mail to
03:10:1715    you was incorrect in any manner?
03:10:2516    A.   No, I don't believe --
03:10:2717    Q.   Do you know who the Pat that's
03:10:2818    referred to in the text of the e-mail is?
03:10:3119    A.   I am assuming Pat Whiteaker.
03:10:3420    Q.   What was Ms. Whiteaker's role at
03:10:3721    America's Choice?
03:10:4222    A.   I think she worked for Jason but I
03:10:4523    don't really know.
03:10:4724    Q.   Didn't you understand she was in
03:10:4925    contract administration?

Page 173

SANDRA BIENVENU

1
03:10:50 2          MR. BENOWITZ:  Objection.
03:10:53 3    A.   I thought that's what Jason did and I
03:10:55 4    thought she worked for him.
03:10:59 5    Q.   Did you know what contract Mr. Dougal
03:11:02 6    was referring to in Exhibit 115?
03:11:07 7    A.   I assumed he was talking about the
03:11:10 8    professional services professional consultant
03:11:13 9    contract that Arkansas gave to us and we signed.
03:11:1710    Q.   So you are assuming that somehow
03:11:2111    America's Choice had the right to amend that
03:11:2312    contract?
03:11:2313          MR. BENOWITZ:  Objection.
03:11:2814    A.   They did not have the right to amend
03:11:3015    the amount of the contract.  They had the right
03:11:3316    to refine the details of the contract.
03:11:3817    Q.   Where did America's Choice get that
03:11:4018    right from, ma'am?
03:11:4819    A.   I don't know.
03:11:5020    Q.   Well, how do you know that it had the
03:11:5121    right, then?
03:11:5622    A.   I don't know.
03:11:5923    Q.   Did someone tell you that?
03:12:0624    A.   I don't know.  I knew that we had
03:12:0725    to -- we had to refine the details, but I don't

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 174

SANDRA BIENVENU

03:12:11 2  know who told me that we had the right to do it.
03:12:14 3      Q. In point of fact, this effort to
03:12:17 4  refine the details of the contract took well
03:12:23 5  over a month of time, correct?
03:12:30 6      A. It's my understanding that there were
03:12:32 7  details that were refined much longer over a
03:12:36 8  longer period of time.
03:12:38 9      Q. Even than that?
03:12:39 10     A. It's my understanding that a contract
03:12:42 11  was refined even up through January of 2007.
03:12:49 12     Q. In what sense was it refined in
03:12:51 13  January of 2007?
03:12:56 14     A. I think that I heard a refinement that
03:13:01 15  was done -- and I believe I heard it in Diana
03:13:04 16  Julian's testimony.
03:13:09 17     Q. What refinement are you referring to?
03:13:18 18     A. I believe the contract was extended
03:13:23 19  through 2009.
03:13:37 20         MR. KARLINSKY: Let's mark this
03:13:38 21  document as Exhibit 116.
03:13:40 22         (Exhibit 116, Document Bates Stamped
03:13:40 23  SB 0083 through 0085, marked for identification)
03:13:59 24  BY MR. KARLINSKY:
03:14:00 25     Q. Please identify Exhibit 116 for us.

Page 175

1

SANDRA BIENVENU

03:14:04 2      A. That is the agenda for the first week
03:14:06 3  of training of the Arkansas principals,
03:14:18 4  teachers, coaches. I believe these were the
03:14:37 5  documents that I found later on.
03:14:42 6         MR. KARLINSKY: Let's mark as our next
03:14:44 7  exhibit which will be 117 a July 13 e-mail.
03:14:50 8         (Exhibit 117, Document Bates Stamped
03:14:50 9  ACI-DC-02655 through 02657, marked for
03:14:50 10  identification)
03:14:50 11  BY MR. KARLINSKY:
03:15:07 12     Q. Exhibit 117, ma'am, is an e-mail dated
03:15:10 13  July 13 of 2006 from Becky Dalton to Jason
03:15:17 14  Dougal, copied to you, is that right?
03:15:19 15     A. Yes.
03:15:20 16     Q. And there would appear to have been --
03:15:23 17  no, there is no attachment to it, I take that
03:15:25 18  back. Then there are some following e-mails,
03:15:28 19  too, is that right?
03:15:34 20     A. Yes.
03:15:35 21     Q. These were actually preceding it, at
03:15:37 22  least one of them was a preceding e-mail.
03:15:39 23     In Exhibit 117 Ms. Dalton, directing
03:15:46 24  her comments to Jason Dougal, says: "Jason, I
03:15:50 25  have reviewed everything on the agreement and

Page 176

1

SANDRA BIENVENU

03:15:53 2  talked to Sandy and Dottie about a couple of
03:15:55 3  things. Everything is fine except on page 37
03:15:55 4  under materials it lists elements of
03:16:00 5  reading-vocabulary-grades K through three twice.
03:16:06 6  I think the second one should be grades four?
03:16:09 7  It's not a big deal, I just thought you might
03:16:12 8  want to know."
03:16:12 9      Then she says: "I am sending the
03:16:14 10  document to Dr. Julian to sign and then we'll
03:16:18 11  get the accounting department to get a check
03:16:21 12  issued."
03:16:23 13     A. Okay.
03:16:23 14     Q. I read that correctly?
03:16:24 15     A. You did.
03:16:24 16     Q. And you received a copy of this?
03:16:26 17     A. I did.
03:16:27 18     Q. Did you know what agreement Ms. Dalton
03:16:29 19  was referring to?
03:16:33 20     A. It is actually the refinement of the
03:16:35 21  details, the scope of work that was to be
03:16:37 22  attached to the original contract.
03:16:44 23     Q. Were you privy to that document that
03:16:46 24  she is referring to?
03:16:50 25         MR. BENOWITZ: Did you mean --

Page 177

1

SANDRA BIENVENU

03:17:00 2      A. I don't know if I saw it before
03:17:01 3  this --
03:17:02 4         MR. KARLINSKY: I am asking her if she
03:17:04 5  has seen a copy of this.
03:17:06 6         MR. BENOWITZ: Okay.
03:17:06 7      A. I don't know that I saw it before
03:17:07 8  this, but obviously I saw it at this point if
03:17:12 9  there was an attachment.
03:17:13 10     Q. Well, there wasn't an attachment to --
03:17:15 11     A. It says attachment.
03:17:16 12     Q. That attachment is just an html copy
03:17:19 13  of the e-mail.
03:17:20 14     A. Then the answer to the question is I
03:17:21 15  don't know.
03:17:22 16     Q. You don't know. Okay.
03:17:26 17     Let's look at our next exhibit, then,
03:17:26 18  and that will be 118.
03:17:32 19         (Exhibit 118, Document Bates Stamped
03:17:32 20  ACI-DC-00234 through 00237, marked for
03:17:32 21  identification)
03:17:55 22  BY MR. KARLINSKY:
03:17:56 23     Q. Exhibit 118, Ms. Bienvenu, is an
03:17:58 24  e-mail dated July 13, 2006, from Pat Whiteaker
03:18:03 25  to Becky Dalton, copy to Elizabeth Middlemiss,

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com

c735a4a6-6259-4523-b112-3e9379c131e3

SANDRA BIENVENU

03:18:03 Sandy Bienvenu, Cecil Harris and Jason Dougal,
03:18:08 is that correct?
03:18:09 A. Yes.
03:18:09 Q. That one does seem to contain an
03:18:15 attachment which is designated
03:18:16 Arkansas424July13.pdf, correct?
03:18:21 A. It appears to be so, yes.
03:18:22 Q. If you look at the text of it, it
03:18:24 says: "Becky, you were right, the grade range
03:18:28 on the second item should read 4-5. Attached is
03:18:31 a corrected document. Sorry for the
03:18:33 inconvenience. Pat."
03:18:34 You see that correctly?
03:18:36 A. I do see that.
03:18:37 Q. That would appear to be responding to
03:18:38 the Dalton e-mail which we have marked as 117
03:18:42 which apparently was forwarded to Ms. Whiteaker?
03:18:48 It appears below on the page.
03:18:55 MR. BENOWITZ: Is that a question?
03:18:56 MR. KARLINSKY: Yes, that is a
03:18:57 question.
03:18:59 MR. BENOWITZ: Okay.
03:18:59 MR. KARLINSKY: Had a question mark at
03:19:00 the end.

SANDRA BIENVENU

03:19:00 A. I need you to repeat it because I
03:19:03 didn't take it as a question, I'm sorry.
03:19:04 Q. Sure. The Exhibit 118, the top e-mail
03:19:06 of July 13, 2006?
03:19:08 A. Yes.
03:19:09 Q. In fact responds to the e-mail which
03:19:10 we have already marked as 117 which is also
03:19:13 reprinted at the bottom of 118, do you see that?
03:19:17 A. Yes, I do.
03:19:18 Q. You would agree with me that it
03:19:20 responds to that?
03:19:21 A. Yes.
03:19:31 Q. The attachment to 118 would appear to
03:19:33 be Exhibit E, correct?
03:19:36 A. It appears to be, yes, sir.
03:19:42 Q. That would appear to be if you look
03:19:44 with me to that exhibit, page 37 and 38 of a
03:19:48 41-page document? You can tell if you look at
03:19:51 the footer?
03:19:52 A. That's what it says on the footer,
03:19:54 yes, sir.
03:19:54 MR. KARLINSKY: Let's then mark as
03:19:55 Exhibit 119.
03:19:55 (Exhibit 119, Document Bates Stamped

SANDRA BIENVENU

03:19:55 ACI-DC-02658 through 02699, marked for
03:19:55 identification)
03:20:33 BY MR. KARLINSKY:
03:20:33 Q. Okay. You have Exhibit 119 in front
03:20:35 of you?
03:20:35 A. I do.
03:20:35 Q. Exhibit 119 is an e-mail dated
03:20:38 Thursday July 20, 2006 from Pat Whiteaker to
03:20:42 Becky Dalton, is it not?
03:20:43 A. It is.
03:20:43 Q. And it was carbon copied from Mr.
03:20:47 Dougal to Ms. Middlemiss to yourself and Mr.
03:20:51 Harris, correct?
03:20:52 A. Yes.
03:20:52 Q. And there appears to be a subject line
03:20:54 on Exhibit 119 that says America's Choice
03:20:57 revised contract?
03:20:58 A. It does.
03:20:59 Q. And the attachment is indicated to be
03:21:01 Arkansas424July20.pdf?
03:21:04 A. That's what it says, yes, sir.
03:21:06 Q. And you received a copy of Exhibit 119
03:21:07 and its attachment?
03:21:10 A. According to this e-mail I did.

SANDRA BIENVENU

03:21:13 Q. Do you recall receiving it?
03:21:18 A. I don't, but I don't usually read
03:21:21 every single thing that is attached to my
03:21:23 e-mails, so.
03:21:24 Q. Do you read your e-mails?
03:21:26 A. Most of them.
03:21:31 Q. This particular e-mail had to do with
03:21:33 the Arkansas contract which was a matter you
03:21:35 were pretty keenly interested in, correct?
03:21:39 A. Yes.
03:21:39 Q. So it would be fair to say that you
03:21:41 read this one, wouldn't it?
03:21:42 MR. BENOWITZ: Objection.
03:21:42 A. It would be fair to say I probably
03:21:44 read the e-mail. I doubt that I opened the
03:21:46 attachment and read all of those pages.
03:21:48 Q. You don't think you opened the
03:21:50 attachment?
03:21:50 MR. BENOWITZ: Objection.
03:21:51 A. I might have opened it but I doubt
03:21:53 that I read it all.
03:21:56 Q. The attachment, in fact, if we turn to
03:21:58 it together beginning on the second page is a
03:22:01 document headed ACI contract 424, America's

c735a4e6-6259-4523-b112-3e9379c131e3

Page 182

SANDRA BIENVENU

03:22:06 2  Choice, Inc., agreement with State of Arkansas,
03:22:09 3  Department of Education, Little Rock, Arkansas
03:22:13 4  date May 30, 2006, correct?
03:22:15 5  A. That's what it says, yes, sir.
03:22:17 6  Q. Were you not aware that this document
03:22:19 7  was sent to the Arkansas State Department of
03:22:22 8  Education on July 20 of 2006?
03:22:29 9  A. Well, according to this e-mail, yes,
03:22:31 10  it was. It was sent to Dr. Dalton.
03:22:33 11  Q. I asked you whether you were aware of
03:22:35 12  it at the time.
03:22:39 13  MR. BENOWITZ: That it was sent to Dr.
03:22:40 14  Dalton?
03:22:41 15  MR. KARLINSKY: Yes.
03:22:42 16  A. I don't recall.
03:22:43 17  Q. You don't recall that you were aware
03:22:45 18  of it at the time?
03:22:47 19  A. I was copied on the e-mail, but if you
03:22:50 20  are asking me if I can sit here and say I
03:22:53 21  absolutely saw this document on July 20, I don't
03:22:56 22  recall.
03:22:56 23  Q. You think it more likely than not that
03:22:58 24  you did?
03:23:00 25  A. I probably did.

Page 183

SANDRA BIENVENU

03:23:01 2  Q. Without regard to the document itself,
03:23:04 3  were you aware that the document was sent to the
03:23:08 4  Arkansas Department of Education?
03:23:12 5  MR. BENOWITZ: At what time, on that
03:23:14 6  date?
03:23:15 7  MR. KARLINSKY: Yes.
03:23:15 8  A. If I opened my e-mail at that
03:23:17 9  particular time, yes, I was aware.
03:23:19 10  Q. I'm saying something a little bit
03:23:21 11  different.
03:23:22 12  A. Okay, then I am not understanding.
03:23:24 13  Q. Without regard to having seen the
03:23:26 14  e-mail, were you aware that it was being sent to
03:23:28 15  the Arkansas Department of Education at that
03:23:29 16  time?
03:23:31 17  A. I don't remember.
03:23:32 18  Q. You don't remember having a
03:23:33 19  conversation with anyone at America's Choice
03:23:35 20  about the final contract going out to the
03:23:37 21  department of education?
03:23:39 22  MR. BENOWITZ: Objection to form.
03:23:40 23  Q. On July 20?
03:23:41 24  MR. BENOWITZ: Objection.
03:23:47 25  A. I have no specific recollection of

Page 184

SANDRA BIENVENU

03:23:48 2  that, no, sir.
03:23:49 3  Q. Did you ever hear that the agreement
03:23:52 4  that accompanied Exhibit 119 was signed by
03:23:57 5  Arkansas and America's Choice?
03:24:04 6  A. I actually saw it signed I believe for
03:24:12 7  the first time, saw Dr. Julian's signature on it
03:24:18 8  during her deposition.
03:24:22 9  Q. When was the first time you heard that
03:24:23 10  it had been signed?
03:24:25 11  MR. BENOWITZ: Objection.
03:24:31 12  A. I don't know. I didn't realize that
03:24:32 13  the scope of work would have to be signed. The
03:24:37 14  contract was already signed so I don't know
03:24:40 15  that -- I just don't remember that.
03:24:43 16  Q. Were you involved in the generation of
03:25:29 17  an invoice to the State of Arkansas?
03:25:32 18  A. No, sir.
03:25:32 19  Q. Did you know that an invoice had been
03:25:34 20  generated?
03:25:40 21  A. According to this particular e-mail on
03:25:43 22  Exhibit 119: "An invoice for the first
03:25:45 23  installment will be faxed to you this
03:25:48 24  afternoon." If I read the e-mail then I was
03:25:49 25  aware.

Page 185

SANDRA BIENVENU

03:25:52 2  Q. But as you sit here now you can't tell
03:25:54 3  me whether you had read the e-mail?
03:25:56 4  A. I'm assuming that I read the e-mail.
03:25:58 5  Q. So you were aware at the time that an
03:26:00 6  invoice was going to be going out at that time?
03:26:04 7  MR. BENOWITZ: Objection.
03:26:05 8  A. According to this invoice, yes.
03:26:07 9  Q. And an e-mail had not gone out?
03:26:10 10  MR. BENOWITZ: Could you do me a
03:26:11 11  favor, just let her answer the question?
03:26:15 12  MR. KARLINSKY: I thought she had
03:26:15 13  answered the question.
03:26:17 14  Q. Had you completed your answer?
03:26:18 15  MR. BENOWITZ: Well, you cut her off,
03:26:20 16  actually.
03:26:20 17  MR. KARLINSKY: You know something? I
03:26:22 18  didn't hear her talking.
03:26:23 19  MR. BENOWITZ: That's fair, that's
03:26:23 20  fair.
03:26:23 21  A. I have a very soft voice, sorry.
03:26:25 22  Q. Had you completed your answer is the
03:26:26 23  question?
03:26:27 24  A. No.
03:26:27 25  Q. Go ahead.

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 186

SANDRA BIENVENU

03:26:28 2   A.   According to this e-mail I would have
03:26:31 3   known that an invoice was to be faxed to them
03:26:33 4   that day.
03:26:50 5   Q.   Ms. Bienvenu, you told me before in
03:26:52 6   your testimony that you had first heard about an
03:26:54 7   invoice during the course of that early May to
03:26:57 8   mid May meeting with the folks at the Department
03:27:01 9   of Education of the State of Arkansas?
03:27:04 10  A.   Yes, I did.
03:27:05 11  Q.   Ma'am, it took two months for that
03:27:07 12  invoice to be generated?
03:27:09 13       MR. BENOWITZ:  Objection.
03:27:10 14  A.   At the time of the early May meeting,
03:27:13 15  Dr. Julian said we need to get this invoiced so
03:27:19 16  that we can pay it, we have to encumber the
03:27:24 17  funds.
03:27:26 18  Q.   My question to you was from the time
03:27:28 19  you first heard about an invoice in connection
03:27:31 20  with the Arkansas project until the time that
03:27:35 21  America's Choice in fact invoiced Arkansas was a
03:27:38 22  period of about two months?
03:27:41 23  A.   Okay.
03:27:42 24  Q.   In fact, it may have been even more
03:27:43 25  than two months?

Page 187

SANDRA BIENVENU

03:27:45 2       MR. BENOWITZ:  Is that a question?
03:27:47 3   Q.   Correct?
03:27:47 4   A.   Correct.
03:27:48 5   Q.   Did you ask during that period of time
03:27:51 6   where the invoice was?
03:27:58 7   A.   I don't remember if I asked or if
03:27:59 8   Cecil asked, but I believe Cecil was taking care
03:28:01 9   of those details.  It was his account.  I was
03:28:04 10  his manager.  I didn't always get involved in
03:28:08 11  all the minute details.
03:28:09 12  Q.   Were you concerned that the invoice
03:28:11 13  had not gone out?
03:28:18 14  A.   Obviously not because you may have
03:28:19 15  e-mails from me asking about it if I were
03:28:22 16  concerned.
03:28:27 17  Q.   The answer to my question was that you
03:28:30 18  were not concerned, is that right?
03:28:36 19  A.   Obviously not.  I don't know.
03:28:38 20  Q.   Why were you not concerned?
03:28:45 21  A.   I had — let's see, at that time
03:28:51 22  either had 7 or 14 other states and other reps
03:28:55 23  to take care of.  I didn't necessarily take care
03:28:58 24  of all the minute details.
03:29:00 25  Q.   Did you know whose responsibility it

Page 188

SANDRA BIENVENU

03:29:03 2   was to generate the invoice?
03:29:10 3   A.   Someone within America's Choice.
03:29:12 4   Q.   Yes.  My question was can you identify
03:29:15 5   someone within America's Choice whose
03:29:17 6   responsibility it was to generate the invoice?
03:29:20 7   A.   I'm assuming it was Pat Whiteaker.
03:29:23 8   Q.   Why would you assume that?
03:29:24 9   A.   Because on this e-mail she said that
03:29:26 10  she would fax an invoice for the first
03:29:29 11  installment to Becky Dalton.
03:29:31 12  Q.   Do you think it was Jason Dougal's
03:29:34 13  responsibility to generate the invoice?
03:29:35 14       MR. RHORER:  Object to form.
03:29:37 15  A.   Jason or Pat Whiteaker if they were in
03:29:40 16  contracts, I would assume so.
03:29:43 17  Q.   You knew that Mr. Dougal was the
03:29:45 18  general counsel of the company, correct?
03:29:46 19  A.   I did.
03:29:55 20  Q.   Under Exhibit 17, ma'am, you want to
03:29:58 21  turn back to it for a moment?
03:30:00 22       MR. BENOWITZ:  117?
03:30:01 23       MR. KARLINSKY:  No, 17.
03:30:23 24  Q.   Before you look at that document,
03:30:24 25  ma'am, let me ask you a different question.

Page 189

SANDRA BIENVENU

03:30:27 2   You just told me before in response to
03:30:28 3   my questions about the generation of an invoice
03:30:31 4   that you didn't get involved in the minutia of
03:30:36 5   matters, and you would not regard the work that
03:30:43 6   you were doing that —
03:30:44 7       MR. BENOWITZ:  She didn't say that.
03:30:45 8   Q.   — Whiteaker and Dougal on the scopes
03:30:47 9   of work to be —
03:30:49 10      MR. BENOWITZ:  I object.
03:30:49 11      MR. KARLINSKY:  I haven't asked a
03:30:50 12  question, Mr. Benowitz.
03:30:51 13      MR. BENOWITZ:  Yes, you have.  You
03:30:53 14  said she doesn't get into the minutia.
03:30:55 15      MR. KARLINSKY:  I haven't asked a
03:30:56 16  question.
03:30:56 17      MR. BENOWITZ:  She said she didn't get
03:30:58 18  into all the minutia.
03:30:59 19      MR. KARLINSKY:  I haven't asked a
03:31:00 20  question.
03:31:01 21      MR. BENOWITZ:  Go right ahead.  So
03:31:19 22  long as you correctly characterize her
03:31:21 23  testimony.
03:31:21 24  BY MR. KARLINSKY:
03:31:35 25  Q.   In response to my question you said:

48  (Pages 186 to 189)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 190

SANDRA BIENVENU

03:31:36 2 "I didn't always get involved in all the minute
03:31:40 3 details." You were involved in all of the
03:31:43 4 details of preparing the scopes of work, did you
03:31:46 5 not?
03:31:49 6            MR. BENOWITZ: Objection.
03:31:49 7       A.   Of preparing the scope of work?
03:31:51 8       Q.   The scopes of work, ma'am, yes.
03:31:53 9       A.   No, I wasn't.
03:31:5510      Q.   You weren't involved in the minute
03:31:5711  details of preparing the scopes of work?
03:31:5912      A.   No, I was involved in the minute
03:32:0013  details of doing the price quotes and --
03:32:0414      Q.   In connection with the preparation of
03:32:0515  the scopes of work, correct?
03:32:1016      A.   Actually was in preparation for the
03:32:1217  RFP that I got really involved, yes.
03:32:1418      Q.   In connection with the RFP which
03:32:1719  reflected the scopes of work, correct?
03:32:2320      A.   The eventual project, yes.
03:32:5821      Q.   You have 117 in front of you?
03:33:0222      A.   117?
03:33:0323      Q.   Yes, I'm sorry, 17. The one I asked
03:33:0724  you to look at just before?
03:33:0925      A.   Yes, I do.

Page 191

SANDRA BIENVENU

03:33:10 2      Q.   Under Exhibit 17, ma'am, when did
03:33:16 3  America's Choice have the right to invoice the
03:33:17 4  State of Arkansas?
03:33:56 5            MR. RHORER: Object to the form.
03:34:29 6       A.   I believe in paragraph five, rendering
03:34:31 7  of compensation, is that what you are talking
03:34:33 8  about?
03:34:34 9       Q.   Yes.
03:34:3510      A.   The methods of rendering compensation
03:34:3711  and/or evaluation of satisfactory achievement
03:34:4012  toward attainment of the agreement -- I'm not an
03:34:4313  attorney so I don't really know all of this, the
03:34:4914  method of --
03:34:5015      Q.   Ma'am, looking at paragraph five, have
03:34:5216  you read paragraph five to yourself in its
03:34:5417  entirety?
03:34:5518      A.   I will right now.
03:34:5619      Q.   Read it to yourself in its entirety,
03:34:5820  please. Tell me when you are finished.
03:35:1121      A.   Okay.
03:35:1322      Q.   You have read it?
03:35:1423      A.   I am finished.
03:35:1524      Q.   Under paragraph five, what's your
03:35:1725  understanding of when ACI had the right to

Page 192

SANDRA BIENVENU

03:35:22 2  invoice Arkansas and Arkansas had the obligation
03:35:25 3  to pay ACI?
03:35:27 4            MR. BENOWITZ: Objection.
03:35:28 5            MR. RHORER: Object to form.
03:35:29 6       A.   The method of rendering compensation
03:35:31 7  will be delivered in accordance with a schedule
03:35:34 8  developed by the contractor and ADE.
03:35:37 9       Q.   Yes. And the answer to my question is
03:35:3910  what?
03:35:3911      A.   I just answered it.
03:35:4112      Q.   Is there something in what you just
03:35:4313  read that indicates when America's Choice has
03:35:4614  the right and under what conditions it has the
03:35:4915  right to invoice ADE?
03:35:5116            MR. BENOWITZ: Objection.
03:35:5417      A.   According to this, it had to be agreed
03:35:5818  upon by the contractor and ADE.
03:36:0019      Q.   Thank you.
03:36:1720            MR. BENOWITZ: Could we take a
03:36:1821  three-minute break?
03:36:2222            MR. KARLINSKY: Sure.
03:36:2323            THE VIDEOGRAPHER: The time is 3:33
03:36:2424  p.m. We are now off the record.
03:36:2725            (Recess)

Page 193

SANDRA BIENVENU

03:49:13 2            THE VIDEOGRAPHER: The time is 3:49
03:49:14 3  p.m. We are now back on the record.
03:49:17 4  BY MR. KARLINSKY:
03:49:18 5       Q.   Ms. Bienvenu, you still have a copy of
03:49:20 6  Exhibit 107 in front of you? That's your
03:49:23 7  amended counterclaims.
03:49:37 8       A.   Yes.
03:49:38 9       Q.   Would you turn to paragraph 13, page
03:49:4310  5?
03:49:4911      A.   Yes.
03:49:5412      Q.   Actually let's talk about paragraph
03:49:5613  ten for a moment.
03:49:5714            In paragraph ten you alleged among
03:50:0315  other things that "commissions were to be paid
03:50:0616  on sales generated in the sales territory," do
03:50:0917  you see that?
03:50:1418      A.   No, sir.
03:50:1419      Q.   Second sentence of paragraph ten?
03:50:1720            MR. BENOWITZ: Are you looking at the
03:50:1821  right exhibit?
03:50:1922      A.   Exhibit 107?
03:50:2223      Q.   Yes. You need to be looking at page
03:50:2324  5.
03:50:2525      A.   Oh, I'm sorry. There was another

MERRILL LEGAL SOLUTIONS
(800) 325-3376         www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 194

SANDRA BIENVENU

03:50:32 2 paragraph ten earlier.
03:50:34 3    Q. Yes, the numbering repeats itself.
03:50:37 4    You see where it says commissions were
03:50:39 5 to be paid on sales generated in the sales
03:50:41 6 territory?
03:50:42 7    A. Yes.
03:50:42 8    Q. Was it your understanding that all
03:50:44 9 sales regardless of who was responsible for them
03:50:47 10 within your territory were to be credited to you
03:50:50 11 for commission purposes?
03:50:58 12    MR. BENOWITZ: Objection to form.
03:50:58 13    A. What do you mean by regardless of who
03:51:00 14 generated the sales? I had salespeople who
03:51:03 15 worked for me.
03:51:04 16    Q. Yes, that's what I'm talking about.
03:51:05 17    A. Yes.
03:51:06 18    Q. Certainly you were entitled to receive
03:51:07 19 a commission with respect to sales generated by
03:51:11 20 the salespeople that worked for you, correct?
03:51:14 21    A. Yes.
03:51:15 22    Q. Were you entitled to be credited and
03:51:19 23 to receive a commission based on sales that were
03:51:23 24 done by people other than the salespeople who
03:51:26 25 worked for you but within your region, your

Page 195

SANDRA BIENVENU

03:51:29 2 territory?
03:51:32 3    A. In my experience in the industry, that
03:51:36 4 is a good, fair assumption, yes.
03:51:39 5    Q. I'm not asking about your experience
03:51:41 6 in the industry, though. I'm asking about your
03:51:43 7 understanding of your commission plan at ACI.
03:51:49 8    A. Since the only commission plan that I
03:51:52 9 had was that one-page spreadsheet with no
03:51:58 10 written explanations, yes, I assumed that was
03:52:04 11 true.
03:52:05 12    Q. Is your claim in this case based on
03:52:09 13 sales done by people within your sales territory
03:52:13 14 but not people who worked for you?
03:52:17 15    MR. BENOWITZ: Objection.
03:52:27 16    A. I'm not sure I know how to answer
03:52:29 17 that.
03:52:30 18    Q. I'm sorry?
03:52:31 19    A. I'm not sure I know how to answer
03:52:34 20 that.
03:52:34 21    Q. Why not?
03:52:38 22    A. There were sales that were helped
03:52:42 23 along by my sales reps that neither they nor I
03:52:49 24 have received any credit for.
03:52:52 25    Q. My question to you was, ma'am, are you

Page 196

SANDRA BIENVENU

03:52:55 2 seeking any recovery in this litigation based on
03:53:00 3 those sales?
03:53:04 4    A. I don't really know what I'm seeking
03:53:07 5 recovery for because I still have not been
03:53:09 6 provided with detailed documents from America's
03:53:13 7 Choice.
03:53:16 8    Q. We are now a year and six months or so
03:53:21 9 into this litigation.
03:53:23 10    A. Yes.
03:53:23 11    Q. You know that, right?
03:53:24 12    A. Yes.
03:53:25 13    Q. And you don't know as you sit here
03:53:26 14 today what specifically you were seeking in
03:53:30 15 damages from America's Choice?
03:53:32 16    A. I still do not have documents from
03:53:37 17 America's Choice detailing the sales that were
03:53:41 18 made in my territory.
03:53:43 19    Q. What documents are you talking about?
03:53:46 20    A. They had no form of tracking sales
03:53:51 21 that was ever revealed to me.
03:53:53 22    Q. Well, what demands have you made in
03:53:55 23 connection with this litigation to receive such
03:53:58 24 documents?
03:53:59 25    A. Well, it is my understanding that we

Page 197

SANDRA BIENVENU

03:54:01 2 asked for documents from America's Choice.
03:54:09 3    Q. Yes? And you were provided documents
03:54:11 4 from America's Choice. My question is, what
03:54:14 5 documents did you ask for?
03:54:26 6    A. I wanted the actual contracts,
03:54:32 7 purchase orders, invoices, etc., for all the
03:54:37 8 sales in my territory.
03:54:42 9    Q. Have you seen America's Choice's
03:54:44 10 production in this case, ma'am?
03:54:46 11    A. I believe I have.
03:54:48 12    Q. All four or 5,000 pages of it?
03:54:51 13    A. Oh, no, maybe not. Maybe not.
03:54:58 14    Q. Well, ma'am, I represent to you that
03:55:00 15 we have provided pursuant to request all
03:55:04 16 purchase orders, all contracts within the south
03:55:09 17 region at your request. Have you not formulated
03:55:11 18 a final position with respect to the damages you
03:55:12 19 are seeking in this case?
03:55:15 20    A. I believe it was in excess of a
03:55:17 21 certain amount of money and I don't know
03:55:20 22 exactly — it was either 900 or a million, yes.
03:55:21 23    Q. I know what you said in the
03:55:24 24 counterclaims, but the counterclaims were filed
03:55:24 25 on or about July 27 of 2007 which was about a

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 198

SANDRA BIENVENU

03:55:32 2   year ago, a little less than a year ago. What I
03:55:35 3   don't know is what specific sales you contend
03:55:38 4   you are entitled to recover a commission on.
03:55:41 5       So maybe you would tell me that?
03:55:47 6   A.   If I had the documents in front of me
03:55:49 7   I would tell you.
03:55:50 8   Q.   As you sit here you cannot provide me
03:55:52 9   information on what specific sales you claim you
03:55:56 10  are entitled to a commission on?
03:55:58 11  A.   Every single one of them?
03:56:00 12  Q.   Yes, ma'am.
03:56:01 13  A.   No, I cannot.
03:56:02 14  Q.   Can you tell me any?
03:56:05 15  A.   Yes.
03:56:05 16  Q.   Identify those, please?
03:56:07 17  A.   Arkansas, Carrollton Farmers Branch,
03:56:10 18  Grand Bend Kansas, numerous accounts in
03:56:13 19  Mississippi. Those are the ones off the top of
03:56:27 20  my head.
03:56:28 21  Q.   Any others that you know of?
03:56:31 22  A.   Not that I can specifically recall.
03:56:33 23  Q.   How would you set about specifically
03:56:35 24  identifying others?
03:56:42 25  A.   Looking at the contract or the

Page 199

SANDRA BIENVENU

03:56:43 2   purchase order and seeing who they went to and
03:56:47 3   which salesperson was responsible.
03:56:53 4       MR. KARLINSKY: Mr. Benowitz, we are
03:56:56 5   at the end of discovery in this case. We have a
03:56:58 6   26A1 specification of damages from you that says
03:57:00 7   nothing other than that your client is entitled
03:57:04 8   to damages in excess of $900,000. The witness
03:57:07 9   is telling me she can't identify the particulars
03:57:10 10  of her claim as she sits here.
03:57:14 11      I think either you give me an explicit
03:57:18 12  specification of the claim or I keep the
03:57:22 13  deposition open.
03:57:23 14      MR. BENOWITZ: I think -- and correct
03:57:27 15  me if I'm wrong because I didn't attend -- but I
03:57:30 16  believe that yesterday one of the associates of
03:57:32 17  my firm took the deposition of Mr. Wozniak, am I
03:57:36 18  correct? You were there, Mr. Karlinsky.
03:57:39 19      MR. KARLINSKY: Yes.
03:57:39 20      MR. BENOWITZ: I believe that Mr.
03:57:41 21  Wozniak was shown several hundred pages worth of
03:57:45 22  unsigned ACI contracts.
03:57:49 23      MR. KARLINSKY: 1700 plus pages of
03:57:51 24  contracts, yes.
03:57:53 25      MR. BENOWITZ: Which Mr. Wozniak was

Page 200

SANDRA BIENVENU

03:57:55 2   unable to identify.
03:57:57 3       MR. KARLINSKY: No, he wasn't unable
03:57:58 4   to identify them, he identified them as
03:58:01 5   contracts.
03:58:01 6       MR. BENOWITZ: Did he identify them as
03:58:02 7   signed contracts?
03:58:03 8       MR. KARLINSKY: They are signed
03:58:03 9   contracts, sir.
03:58:05 10      MR. BENOWITZ: Okay. Well, we didn't
03:58:06 11  know that until yesterday, did we not?
03:58:08 12      MR. KARLINSKY: You have had them well
03:58:09 13  over a year, Mr. Benowitz.
03:58:11 14      MR. BENOWITZ: I'm not going to argue
03:58:12 15  with you, I am not testifying.
03:58:14 16      MR. KARLINSKY: Okay. We are just
03:58:15 17  going to leave this deposition open specifically
03:58:18 18  on this issue, but perhaps on others as well.
03:58:19 19  Q.   Let's talk about your counterclaim.
03:58:29 20      MR. RHORER: Marty, I am okay with
03:58:31 21  your statement that you are leaving it open on
03:58:32 22  that issue and I am not necessarily opposed to
03:58:34 23  the rest of your statement.
03:58:36 24      MR. KARLINSKY: It is not your case,
03:58:37 25  actually, it wouldn't be left open in your case.

Page 201

SANDRA BIENVENU

03:58:40 2   It only applies to her case.
03:58:42 3       MR. RHORER: When you said "and
03:58:43 4   perhaps other issues" --
03:58:45 5       MR. KARLINSKY: Well, you know, we'll
03:58:46 6   see. I haven't gotten to that, but I am
03:58:50 7   specifically reserving on that point in her
03:58:52 8   case. It need not stay open in the Harris
03:58:56 9   litigation.
03:58:58 10      MR. RHORER: Fair enough.
03:59:01 11  BY MR. KARLINSKY:
03:59:09 12  Q.   In paragraph 15 of your counterclaim,
03:59:13 13  ma'am, which is on page 6, you claim, and I
03:59:17 14  quote: "Defendant is owed commissions for sales
03:59:19 15  generated in the sales territory for the second
03:59:22 16  half of calendar 2006 in an amount that is not
03:59:26 17  known at this time."
03:59:27 18      What commissions are you claiming in
03:59:29 19  that paragraph?
03:59:29 20  A.   I don't know the answer to the
03:59:59 21  question.
04:00:00 22  Q.   Would you look back at paragraph 14,
04:00:02 23  just the preceding paragraph?
04:00:04 24  A.   Yes.
04:00:05 25  Q.   In that paragraph you claim to be

51 (Pages 198 to 201)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 202

SANDRA BIENVENU

04:00:07 2    entitled to, and I'll quote: "To be paid
04:00:10 3    additional commissions for other sales generated
04:00:13 4    in the sales territory on behalf of plaintiff
04:00:15 5    for the first and second calendar quarters of
04:00:17 6    2006 including sales in the State of
04:00:20 7    Mississippi, Grand Bend, Kansas, and Carrolton
04:00:25 8    Farmers Branch, Texas"?
04:00:28 9        A.    Right.
04:00:29 10       Q.    There you claim in excess of $300,000
04:00:31 11   in commissions, correct?
04:00:33 12       A.    Yes.
04:00:34 13       Q.    Those are in the contracts that you
04:00:35 14   identified to me before?
04:00:37 15       A.    Yes.
04:00:38 16       Q.    Now, what I want to know is are the
04:00:41 17   commissions you claim in paragraph 15 the same
04:00:45 18   commissions you are talking about in paragraph
04:00:47 19   14 or are they different?
04:00:57 20       A.    Anything that was sold from the
04:01:00 21   beginning of my employment through the time that
04:01:06 22   I received a new commission plan which was in
04:01:10 23   September of 2006 should be paid under that
04:01:17 24   first plan. And I don't know the exact sales.
04:01:28 25       Q.    Ms. Bienvenu, you received a 2006

Page 203

SANDRA BIENVENU

04:01:34 2    compensation plan, correct?
04:01:38 3        A.    In October of 2005, yes.
04:01:42 4        Q.    And through what date was that 2006
04:01:45 5    fiscal year commission plan in effect?
04:01:50 6        A.    It was in effect until a new
04:01:52 7    compensation plan was approved by the board.
04:01:54 8        Q.    How do you know that?
04:02:00 9        A.    How do I know that?
04:02:01 10       Q.    Yes.
04:02:02 11       A.    I believe it says it in my employment
04:02:04 12   agreement, that everything had to be approved by
04:02:06 13   the board.
04:02:07 14       Q.    So your understanding is that the
04:02:09 15   fiscal year 2006 sales commission plan remained
04:02:13 16   in effect despite the fact that the fiscal year
04:02:19 17   2006 had terminated?
04:02:21 18           MR. BENOWITZ: Objection to form.
04:02:22 19       Q.    Is that right?
04:02:22 20       A.    Yes, because I didn't have a new
04:02:24 21   compensation plan.
04:02:25 22       Q.    And did someone tell you that?
04:02:33 23       A.    I believe in my discussions with Nick
04:02:34 24   when I was first hired that the compensation
04:02:37 25   plan would be in effect until the board changed

Page 204

SANDRA BIENVENU

04:02:41 2    for the second one.
04:02:43 3        Q.    Did you ever tell anybody at the
04:02:47 4    company that you believed your 2006 sales
04:02:50 5    compensation plan was in effect after June 30 of
04:02:53 6    2006?
04:02:58 7        A.    Yes.
04:02:59 8        Q.    Who?
04:02:59 9        A.    Tommy Harris, Tim Wozniak, Judy
04:03:02 10   Codding.
04:03:18 11       Q.    When did you tell them that?
04:03:25 12       A.    I can't be specific. Sometime in the
04:03:27 13   summer of 2006.
04:03:30 14       Q.    Tell me what you said to each of them.
04:03:33 15       A.    I don't know specifically what I said,
04:03:41 16   but we did not have a new comp plan, so I was
04:03:49 17   operating under the old one until a new one was
04:03:42 18   given.
04:03:43 19       Q.    What did they say to you when you told
04:03:45 20   them that?
04:03:46 21       A.    They were working on a comp plan.
04:03:49 22       Q.    Is that all they said?
04:03:52 23       A.    Well, they disagreed with me.
04:03:54 24       Q.    They disagreed with you?
04:03:56 25       A.    Yes.

Page 205

SANDRA BIENVENU

04:03:57 2        Q.    Did you ever have discussions about
04:03:58 3    that subject with anyone else at America's
04:04:00 4    Choice?
04:04:06 5        A.    Other than the other salespeople and
04:04:08 6    the other people in my position?
04:04:10 7        Q.    Yes.
04:04:12 8        A.    I'm sure we all had those discussions,
04:04:14 9    yes.
04:04:15 10       Q.    I'm asking if you had those
04:04:17 11   discussions with anyone else?
04:04:17 12       A.    With each other, yes.
04:04:19 13       Q.    You recall those discussions?
04:04:27 14       A.    Not specifically, but Eric Hoagland
04:04:30 15   and I talked regularly, Loretta Pohill and I
04:04:33 16   talked regularly.
04:04:38 17       Q.    Ms. Bienvenu, did you speak to Mr.
04:04:40 18   Cecil Harris about that point?
04:04:43 19       A.    I believe I said earlier that with the
04:04:46 20   salespeople and the people in my position, yes,
04:04:50 21   those discussions were --
04:04:52 22       Q.    Including Cecil Harris, correct?
04:04:55 23       A.    I'm sure I did.
04:04:56 24       Q.    Did Mr. Cecil Harris agree with your
04:04:58 25   position that the 2006 fiscal year plan

52  (Pages 202 to 205)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 206

SANDRA BIENVENU

04:05:01 2  continued into fiscal year 2007?
04:05:03 3      A.  I don't know what his thoughts were.
04:05:18 4      Q.  In paragraph 16 of your counterclaim,
04:05:22 5  you say: "Plaintiff has failed to provide
04:05:25 6  defendant with either statements or payments of
04:05:29 7  commissions for the period of her employment
04:05:31 8  although the same has been duly demanded."
04:05:34 9          When did you make such demand?
04:05:3710      A.  I started asking Tommy Harris shortly
04:05:5111  after, I believe shortly -- in June, sometime in
04:05:5312  that time frame.
04:05:5413      Q.  In June of 2006?
04:05:5614      A.  Hm-hmm.
04:05:5815      Q.  Anyone else that you asked?
04:06:0116      A.  I asked for an accounting of all of
04:06:0417  the sales that had been done in our territory
04:06:0918  and I had been asked for that several times just
04:06:1219  because it was very hard to track.
04:06:1320      Q.  Of whom did you ask that?
04:06:2221      A.  I don't remember who I asked first,
04:06:2322  but it eventually got passed off to Joe Murphy.
04:06:2823      Q.  You say passed off to Mr. Murphy.
04:06:3024  What do you mean by that?
04:06:3125      A.  Joe Murphy was the person who was

Page 207

SANDRA BIENVENU

04:06:34 2  supposed to provide it to me.
04:06:35 3      Q.  So when you say passed off, you don't
04:06:37 4  mean --
04:06:38 5      A.  I don't remember who I asked the first
04:06:39 6  time.
04:06:40 7      Q.  It was his responsibility --
04:06:42 8          MR. BENOWITZ:  Could you please, Mr.
04:06:43 9  Karlinsky, you don't let her finish her answer.
04:06:4610      Q.  Let's just ask another question.
04:06:4811          Did you understand it was Mr. Murphy's
04:06:5012  responsibility to provide that information?
04:06:5513      A.  Not in the beginning.
04:06:5614      Q.  Mr. Murphy was the controller of the
04:06:5815  company, correct?
04:06:5916      A.  I believe he was new to the company.
04:07:0117      Q.  I didn't ask you that, ma'am.  I asked
04:07:0318  you if he was the controller?
04:07:0819      A.  I don't know what his title was.
04:07:0920      Q.  You really don't know who Mr. Murphy
04:07:1121  was?  You don't know what title he had at
04:07:1322  America's Choice?
04:07:1423      A.  No, I don't.
04:07:1524      Q.  Did you know that he worked for Mr.
04:07:1725  Wozniak?

Page 208

SANDRA BIENVENU

04:07:17 2      A.  I believe he did.
04:07:18 3      Q.  And you knew that Mr. Wozniak was the
04:07:20 4  chief financial officer, correct?
04:07:22 5      A.  Yes.
04:07:22 6      Q.  Did you ask Mr. Wozniak to provide you
04:07:24 7  with the financial information if you wanted?
04:07:28 8      A.  It probably was him, but I don't know
04:07:30 9  for certain.  It may have been Judy Codding.
04:07:3310      Q.  When you were told to ask Mr. Murphy,
04:07:3911  why did you think you were being asked to ask
04:07:4212  him?
04:07:4213          MR. BENOWITZ:  She never testified
04:07:4314  that she was told to ask Mr. Murphy anything.
04:07:4615  She said it was passed on to Mr. Murphy.
04:07:4916          MR. KARLINSKY:  Well, let's just find
04:07:5017  out exactly how it happened.
04:07:5118          MR. BENOWITZ:  Fine.
04:07:5119  BY MR. KARLINSKY:
04:07:5320      Q.  How did it come about that you were
04:07:5421  directed to Mr. Murphy?
04:07:5622      A.  I don't remember.
04:07:5923      Q.  You don't remember?
04:07:5924      A.  No.
04:07:5925      Q.  How did you make the request of Mr.

Page 209

SANDRA BIENVENU

04:08:01 2  Murphy?
04:08:05 3      A.  I believe it was by e-mail.
04:08:59 4      Q.  Look at Exhibit 63, please.
04:09:35 5      A.  Okay.
04:09:38 6      Q.  Identify Exhibit 63, ma'am?
04:09:42 7      A.  The top part is a message -- the top
04:09:49 8  part appears to be a message from Joe Murphy to
04:09:52 9  me on August 24 that says: "Sandy, per your
04:09:5810  request, sorry it took so long.  Joe."  But
04:10:0211  below that I had looked at a document, I guess,
04:10:0712  so it is e-mails between me and Joe Murphy.
04:10:1113      Q.  When did you first make a request of
04:10:1414  Mr. Murphy about financial information?
04:10:1915      A.  All I remember is it took a couple of
04:10:2116  months to get it, so it must have been sometime
04:10:2417  in June, July.
04:10:2518      Q.  Where is the e-mail by which you
04:10:2719  requested that?
04:10:2820      A.  I have no idea.
04:10:3521      Q.  You don't have a copy of it?
04:10:3622      A.  I didn't have access to the e-mails
04:10:4223  for production.  They were on America's Choice's
04:10:4224  server, not mine.
04:10:4225      Q.  I asked you if you had a copy of it,

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

Page 210

1                 SANDRA BIENVENU
04:10:44 2   ma'am?
04:10:45 3           MR. BENOWITZ: I think she answered
04:10:46 4   you.
04:10:46 5       Q.  I asked you if you had a copy of it?
04:10:49 6       A.  If I had had a copy I would have
04:10:51 7   submitted it to you.
04:11:26 8       Q.  Turn to Exhibit 68, ma'am. Identify
04:11:38 9   that, please.
04:11:40 10      A.  An e-mail from me to Joe Murphy in
04:11:44 11  October of 2006.
04:11:47 12      Q.  What's the subject of it?
04:11:49 13      A.  I'm still getting – trying to get an
04:11:53 14  accounting of the sales and my territory for
04:11:56 15  2006.
04:11:57 16      Q.  In this e-mail, Exhibit 68, were you
04:12:02 17  claiming credit for $2,313,145 of sales?
04:12:11 18      A.  That's what he sent me, yes.
04:12:13 19      Q.  And you were claiming credit for that?
04:12:17 20      A.  I assumed that I was since I had asked
04:12:20 21  him for the sales that were credited in my
04:12:25 22  territory.
04:12:25 23      Q.  You don't know what you were claiming
04:12:27 24  at that point?
04:12:30 25      A.  According to this e-mail it says:

Page 211

1                 SANDRA BIENVENU
04:12:31 2   "Here is what I know so far."
04:12:33 3       Q.  Yes.
04:12:34 4       A.  These are based on the spreadsheets
04:12:37 5   that he sent me --
04:12:39 6       Q.  My question to you is, were you
04:12:41 7   claiming credit with respect to the $2,313,145
04:12:47 8   of sales that are reflected in this e-mail?
04:12:44 9       A.  Yes.
04:13:46 10      Q.  In this e-mail you also said to Mr.
04:13:50 11  Murphy that the numbers he had given you don't
04:13:56 12  reflect business in the southeast region for
04:14:00 13  which you also had responsibility?
04:14:02 14      A.  Yes.
04:14:03 15      Q.  What specific sales within the
04:14:04 16  southeast region were you referring to?
04:14:14 17      A.  I can't list them off the top of my
04:14:17 18  head, but there were sales in Mississippi, there
04:14:19 19  were some sales in Florida.
04:14:35 20      Q.  Had you completed your answer?
04:14:37 21      A.  Those are all that I can recall right
04:14:39 22  off the top of my head.
04:14:47 23      Q.  With respect to the sales in Great
04:14:50 24  Bend, Kansas, and Carrollton Farmers Branch,
04:14:56 25  Texas?

Page 212

1                 SANDRA BIENVENU
04:14:57 2       A.  Yes.
04:14:57 3       Q.  Where did those fall, what region?
04:14:59 4       A.  Texas was mine and Great Bend, Kansas
04:15:03 5   was not really anybody's, so when I started
04:15:10 6   working on that I asked if I would get credit
04:15:14 7   for it if I did it and I was told yes.
04:15:15 8       Q.  Who told you that?
04:15:17 9       A.  Judy.
04:15:25 10          MR. KARLINSKY: Let's go off.
04:15:29 11          THE VIDEOGRAPHER: Here now marks the
04:15:29 12  end of tape four of the deposition of Ms. Sandra
04:15:33 13  Bienvenu. The time is 4:15 p.m. We are off the
04:15:38 14  record.
04:15:38 15          (Recess)
04:22:20 16          THE VIDEOGRAPHER: Here now marks the
04:22:21 17  beginning of tape five of the deposition of Ms.
04:22:23 18  Sandra Bienvenu. Time is now 4:22 p.m. We are
04:22:29 19  back on the record.
04:22:30 20  BY MR. KARLINSKY:
04:22:31 21      Q.  Ma'am, you still have Exhibit 68 in
04:22:33 22  front of you?
04:22:34 23      A.  Yes, sir.
04:22:34 24      Q.  You listed in Exhibit 68 the sales
04:22:37 25  within your region for which you were claiming

Page 213

1                 SANDRA BIENVENU
04:22:39 2   credit as you told me before, correct?
04:22:45 3       A.  Those are some of the sales. Those
04:22:47 4   were the sales that he had provided me on a
04:22:49 5   spreadsheet. It did not include all of them.
04:22:53 6       Q.  And you didn't in this particular
04:22:55 7   e-mail include any claim with respect to the
04:22:58 8   Arkansas contract?
04:22:59 9       A.  Because I was trying to uncover the
04:23:01 10  other contracts. I already knew about Arkansas.
04:23:04 11      Q.  Was Arkansas on the spreadsheets that
04:23:06 12  Mr. Murphy had given you?
04:23:12 13      A.  I don't know if they were or not. It
04:23:15 14  doesn't appear that it is.
04:23:15 15      Q.  So let me see if I can understand this
04:23:19 16  a little bit more fully.
04:24:01 17          You wrote to Mr. Murphy on October 30
04:24:06 18  of 2006 and in your e-mail to him you said: I
04:24:10 19  asked you for the total revenue generated for
04:24:14 20  the south region in 2006. And he, Mr. Murphy,
04:24:21 21  sent the attached spreadsheets, you see that?
04:24:23 22      A.  Yes.
04:24:24 23      Q.  And in the attached spreadsheets he
04:24:26 24  did not reflect any revenue under the Arkansas
04:24:29 25  contract?

54  (Pages 210 to 213)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 214

SANDRA BIENVENU

04:24:33 2    A.    I don't see it on these spreadsheets.
04:24:35 3    Q.    So the answer to my question is
04:24:37 4    correct, he did not reflect any of that revenue,
04:24:42 5    correct?
04:24:42 6    A.    I did not see Arkansas listed on these
04:24:45 7    spreadsheets.
04:24:45 8    Q.    The answer to my question is yes, he
04:24:48 9    did not list Arkansas revenue on his
04:24:51 10   spreadsheets?
04:24:51 11         MR. BENOWITZ: Objection.
04:24:52 12   A.    You are putting words in my mouth. I
04:24:54 13   don't see Arkansas listed on here.
04:24:56 14   Q.    When you say that you don't see
04:24:59 15   Arkansas listed on there, that means that Mr.
04:25:02 16   Murphy did not reflect any revenue from the
04:25:04 17   Arkansas contract on the spreadsheets he sent
04:25:06 18   you, is that correct, ma'am?
04:25:10 19   A.    He did not reflect Arkansas revenue on
04:25:13 20   that spreadsheet.
04:25:13 21   Q.    And in your response to him when you
04:25:16 22   asked him about the figures he had given you for
04:25:20 23   total revenue generated for the south region in
04:25:23 24   2006, in your e-mail you didn't say anything to
04:25:30 25   him about the Arkansas contract, correct?

Page 215

SANDRA BIENVENU

04:25:37 2    A.    No, I did not.
04:25:37 3    Q.    And the e-mail that you sent him,
04:25:39 4    Exhibit 68 was sent on October 30, 2006,
04:25:44 5    correct?
04:25:45 6    A.    Yes.
04:25:45 7    Q.    And certainly you know now -- well,
04:25:47 8    strike that.
04:25:47 9          Certainly you knew at that time that
04:25:49 10   monies had come in from Arkansas, true?
04:25:53 11         MR. BENOWITZ: Objection to form.
04:25:54 12   A.    I believe I did, yes.
04:25:56 13   Q.    Do you know how much money had come
04:25:57 14   in?
04:26:04 15   A.    I believe it was half.
04:26:05 16   Q.    Half of the full invoice -- half of
04:26:09 17   the full contract amount?
04:26:11 18   A.    Yes.
04:26:14 19   Q.    Or a little over $3 million?
04:26:14 20   A.    Yes.
04:26:34 21         MR. KARLINSKY: Let's mark as Exhibit
04:27:03 22   120 an e-mail dated October 30, 2006.
04:27:12 23         (Exhibit 120, Document Bates Stamped
04:27:22 24   ACI-DC-02559 through 02561, marked for
04:27:22 25   identification)

Page 216

SANDRA BIENVENU

04:27:14 2    BY MR. KARLINSKY:
04:27:28 3    Q.    Is Exhibit 120, ma'am, an e-mail that
04:27:31 4    you received back from -- I'm sorry, an e-mail
04:27:33 5    that you wrote to Mr. Murphy on -- I'm not
04:27:48 6    certain I can understand it the way it is so why
04:27:52 7    don't I just ask you to identify it.
04:27:55 8    A.    It appears that it is a reply to me
04:27:57 9    from Joe Murphy on Monday, October 30, at 1:12
04:28:02 10   that says: "Sandy, there was no billing for
04:28:05 11   Great Bend, Kansas or Carrollton Farmers Branch
04:28:09 12   in 2006, it is being picked up in 2007."
04:28:12 13         And I said: "Okay, Joe, but what
04:28:16 14   about the southeast cohort and the other
04:28:19 15   contracts?"
04:28:19 16   Q.    Which other contracts were you
04:28:22 17   referring to?
04:28:21 18   A.    Arkansas.
04:28:26 19   Q.    How would he know that?
04:28:27 20   A.    Because I asked for the total
04:28:31 21   contracts that had been done in my territory.
04:28:35 22   Q.    But I thought you knew about Arkansas?
04:28:37 23   A.    I did know about Arkansas.
04:28:39 24   Q.    So why would you be asking about
04:28:41 25   Arkansas by calling Arkansas other contracts?

Page 217

SANDRA BIENVENU

04:28:45 2          MR. BENOWITZ: Objection.
04:28:53 3    A.    Why wouldn't I call it another
04:28:55 4    contract?
04:28:56 5    Q.    Well, Ms. Bienvenu, you just told me
04:28:58 6    that you knew that by October 30 the company had
04:29:01 7    already received in excess of $3 million
04:29:03 8    pursuant to the Arkansas contract?
04:29:04 9    A.    Right.
04:29:05 10   Q.    So you weren't asking Mr. Murphy to
04:29:07 11   tell you what you already knew, were you?
04:29:10 12   A.    Not necessarily, no.
04:29:12 13   Q.    Thank you.
04:29:13 14   A.    But there were other contracts.
04:29:14 15   Q.    Aside from Arkansas, correct?
04:29:16 16   A.    Aside from Arkansas.
04:29:22 17   Q.    Did you dispute what Mr. Murphy told
04:29:24 18   you about the Great Bend, Kansas, or Carrollton
04:29:28 19   Farmers Branch contracts?
04:29:30 20   A.    Not to him.
04:29:31 21   Q.    To anyone?
04:29:32 22   A.    I believe I had discussions with
04:29:38 23   either Tommy Harris or Judy Codding because
04:29:46 24   those -- those contracts were signed in the 2006
04:29:51 25   year.

55 (Pages 214 to 217)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 218

SANDRA BIENVENU

04:29:53 2    Q. Both Great Bend, Kansas, and
04:29:56 3  Carrollton Farmers Branch were signed prior to
04:29:59 4  June 30, 2006?
04:30:00 5    A. If I am not mistaken, yes.
04:30:05 6    Q. And it was your position that you were
04:30:08 7  owed commissions with respect to those
04:30:10 8  contracts?
04:30:11 9    A. And it is my position that when a
04:30:1310  contract is signed I am owed commissions.
04:30:1611    Q. That's my question to you.
04:30:1712    A. Yes.
04:30:1713    Q. Is it your position that you were owed
04:30:1914  commissions with respect to those two contracts?
04:30:2115    A. Yes.
04:30:2216    Q. In addition to the Arkansas contract?
04:30:2317    A. In addition to the Arkansas and
04:30:2618  several others.
04:30:2719    Q. With respect to the commissions you
04:30:2920  were owed under the contracts that I have just
04:30:3121  identified, it is also your position that you
04:30:3322  were owed that commission pursuant to the terms
04:30:3923  of your fiscal year 2006 compensation plan, is
04:30:4324  that correct?
04:30:4625    A. To my compensation plan which was

Page 219

SANDRA BIENVENU

04:30:48 2  still in effect until September of 2006.
04:33:17 3    MR. KARLINSKY: Let's go off for a
04:33:20 4  second.
04:33:20 5    THE VIDEOGRAPHER: The time is 4:33
04:33:22 6  p.m. We are now off the record.
04:33:26 7    (Pause)
04:34:47 8    THE VIDEOGRAPHER: The time is 4:34
04:34:49 9  p.m. We are now back on the record.
04:34:5110  BY MR. KARLINSKY:
04:34:5211    Q. Would you turn to a copy of Exhibit
04:34:5512  37, ma'am?
04:35:2413    A. Yes.
04:35:2614    Q. Exhibit 37 is an e-mail from Tommy
04:35:2915  Harris, at least at the top of the page, Tommy
04:35:3216  Harris to John Wozniak dated November 30, 2006
04:35:3717  with an attachment, and a text that says: "This
04:35:4118  is what Sandy send to Judy"?
04:35:4419    A. Yes.
04:35:4420    Q. And then below it there is an original
04:35:4621  message printed which is a message on the same
04:35:4822  day, November 30, 2006, from yourself to Tommy
04:35:5323  Harris, is that right?
04:35:5424    A. Yes.
04:35:5425    Q. And that also appears to attach the

Page 220

SANDRA BIENVENU

04:35:58 2  document that Mr. Tommy Harris is referring to,
04:36:01 3  is that right?
04:36:02 4    A. That's true.
04:36:04 5    Q. And the attachment, the second page of
04:36:06 6  Exhibit 37 is the document that you sent to Judy
04:36:08 7  Codding on November 30 or the day before?
04:36:11 8    A. Yes.
04:36:16 9    Q. You drafted this attachment, did you
04:36:1810  not?
04:36:1811    A. I did.
04:36:1912    Q. It is not signed in any way but
04:36:2013  certainly it is your document?
04:36:2214    A. Yes, it is.
04:36:2315    Q. For what purpose did you draft it?
04:36:2616    A. To send to Judy.
04:36:2817    Q. Why?
04:36:3318    A. Because I was still trying to get paid
04:36:3519  for the work I had done and I was disputing the
04:36:4120  new 2007 contract or compensation plan that had
04:36:4521  been given to me in mid to late September for
04:36:5222  the first time.
04:36:5523    Q. Let's stay with the first of those
04:36:5724  subjects. You say you were still trying to get
04:37:0125  paid for what you had done in 2006?

Page 221

SANDRA BIENVENU

04:37:03 2    A. Yes.
04:37:03 3    Q. What conversations had you had
04:37:06 4  preceding your sending Exhibit 37 and its
04:37:10 5  attachment to Judy Codding, or rather just the
04:37:14 6  attachment to Ms. Codding?
04:37:21 7    A. Numerous conversations with Judy and
04:37:24 8  John and Tommy beginning back as early as June
04:37:32 9  of 2006 – well, probably the first one was
04:37:3510  December of 2005 when I was concerned because
04:37:3911  Nick was leaving, and we had a conversation
04:37:4412  about the state alliance and whether or not they
04:37:4713  were going to take over Arkansas and how the
04:37:5814  compensation plan for 2006 was to work.
04:38:0315    So those were the two issues that I
04:38:0516  brought up to Nick, and we had a conversation at
04:38:0817  that point with Judy and John Wozniak and that's
04:38:1118  when Judy said: "Don't worry, Sandy, I am going
04:38:1519  to take care of you."
04:38:1720    Q. Let's stop there.
04:38:1821    A. Okay.
04:38:1922    Q. Because I want to penetrate into that
04:38:2123  conversation. What specifically had you said to
04:38:2424  Nick Solinger that led to your having that
04:38:2925  conversation?

56 (Pages 218 to 221)

Page 222

SANDRA BIENVENU

04:38:30 2  A. Nick was leaving and I was very
04:38:32 3  concerned because Judy and the company had hired
04:38:37 4  a team of people — I think they were called the
04:38:42 5  state alliance team or something to that effect,
04:38:45 6  and it was Pat Harvey and I can't remember the
04:38:47 7  other woman's name who used to work in the U.S.
04:38:51 8  Department of Education, Susan somebody.
04:38:57 9     I was concerned that they were going
04:39:00 10  to try to take Arkansas away from me. And Cecil
04:39:03 11  and we had done a lot of work up until that
04:39:05 12  point so I didn't want that taken away.
04:39:07 13     Then the other —
04:39:08 14  Q. Wait, let me stay with you there.
04:39:10 15  When you say up until that point, we are talking
04:39:12 16  about early December of 2005?
04:39:14 17  A. Yes. Then I did -- I wanted to make
04:39:26 18  sure that my understanding of the comp plan,
04:39:28 19  what Nick had told me, that we got quite a
04:39:33 20  credit when orders were signed and payment when
04:39:40 21  the company got paid.
04:39:41 22  Q. I just -- I had asked you the question
04:39:44 23  just before, Ms. Bienvenu. What specifically
04:39:48 24  had you said to Nick Solinger that led to your
04:39:51 25  having that conversation, that is, led to the

Page 223

SANDRA BIENVENU

04:39:54 2  conversation among you, Solinger, Codding,
04:40:00 3  Wozniak?
04:40:01 4  A. Nick, I am concerned that you are
04:40:03 5  leaving --
04:40:03 6  Q. Well, that's what I want to ask you.
04:40:05 7  Looking to shortcut it a little bit.
04:40:08 8     You gave me an answer that wasn't
04:40:10 9  really the recitation of a conversation, it was
04:40:13 10  rather your impressions about concerns that were
04:40:16 11  in your mind.
04:40:17 12     Is that the sum and substance of what
04:40:19 13  you expressed to Nick?
04:40:21 14  A. Yes.
04:40:22 15  Q. Is there anything you recall
04:40:24 16  specifically saying to him?
04:40:28 17  A. I discussed those two issues. I was
04:40:32 18  trying to tell you the gist of the conversation.
04:40:33 19  You cut me off.
04:40:35 20  Q. So that was the gist of the
04:40:35 21  conversation —
04:40:36 22     MR. BENOWITZ: Mr. Karlinsky, you are
04:40:37 23  cutting her off again.
04:40:39 24  Q. Is that right?
04:40:39 25  A. Yes.

Page 224

SANDRA BIENVENU

04:40:40 2  Q. As you just described, it was the gist
04:40:42 3  of the conversation you had with Solinger?
04:40:46 4  A. Prior to that December meeting, as I
04:40:48 5  understand --
04:40:49 6  Q. What did he say in that conversation?
04:40:51 7     MR. BENOWITZ: Again, you are cutting
04:40:52 8  her off. Let her fully answer your question so
04:40:54 9  we have a good record.
04:40:57 10  A. Will you repeat the question, because
04:40:58 11  you were talking over me?
04:40:59 12  Q. As you just described it was the gist
04:41:01 13  of the conversation you had with Solinger?
04:41:04 14  A. Yes.
04:41:06 15  Q. What did he say in that conversation?
04:41:10 16  A. That he would bring it up to Judy and
04:41:12 17  John.
04:41:13 18  Q. Is that all he said?
04:41:17 19  A. He confirmed that Cecil and I had done
04:41:19 20  a lot of work in Arkansas, we deserved to keep
04:41:22 21  Arkansas. He also confirmed the explanation of
04:41:30 22  the comp plan.
04:41:39 23  Q. What did you say about the comp plan
04:41:42 24  at that time?
04:41:42 25  A. I wanted to make sure because he was

Page 225

SANDRA BIENVENU

04:41:44 2  the one that had been telling me all along how
04:41:50 3  the comp plan applied and I just wanted to make
04:41:54 4  sure because I had nothing in writing.
04:41:59 5  Q. Did you ask him to put something in
04:42:01 6  writing, ma'am?
04:42:02 7  A. No, I trusted Nick.
04:42:06 8  Q. My question was, did you ask him to
04:42:09 9  put something in writing on the subject of the
04:42:10 10  comp plan and how it would work?
04:42:13 11  A. And I answered you no, I had trust in
04:42:16 12  him.
04:42:16 13  Q. Is the answer to the question no?
04:42:18 14  A. The answer to the question is no.
04:42:19 15  Q. I didn't ask you why. Is the answer
04:42:21 16  to the question no?
04:42:21 17  A. No. That's three times.
04:42:38 18  Q. Did you ask anyone at America's Choice
04:42:41 19  to put something in writing that would record
04:42:43 20  what you say now is your understanding of how
04:42:46 21  the comp plan worked?
04:42:48 22  A. No, I did not.
04:42:54 23  Q. When you talked to Solinger about the
04:42:56 24  two points that you have now told me about, that
04:42:59 25  is, the state alliance question and the way the

MERRILL LEGAL SOLUTIONS
(800) 325-3376    www.MerrillCorp.com

Page 226

SANDRA BIENVENU

| | |
|---|---|
| 04:43:03 2 | comp plan worked, was it your understanding that |
| 04:43:06 3 | he was going to set up a meeting around that |
| 04:43:08 4 | question? |
| 04:43:11 5 | A. It was not my understanding, that was |
| 04:43:13 6 | not necessarily Nick's meeting that was set up |
| 04:43:17 7 | around that. |
| 04:43:17 8 | Q. Well, what was your understanding? |
| 04:43:19 9 | A. That he was going to discuss it with |
| 04:43:2110 | John and Judy and get back to me. |
| 04:43:2311 | Q. That he would convey what you told to |
| 04:43:2512 | Judy Codding and John Wozniak and get back to |
| 04:43:2813 | you? |
| 04:43:2814 | A. Yes. |
| 04:43:2815 | Q. Did he in fact get back to you? |
| 04:43:3016 | A. We all met in Los Angeles. |
| 04:43:3717 | Q. How was that meeting arranged? |
| 04:43:4018 | A. On -- either Judy, John or both called |
| 04:43:4419 | a meeting with all the business development |
| 04:43:4720 | directors and it was to be held in the ACI Los |
| 04:43:5321 | Angeles office. |
| 04:44:0422 | Q. Can you tell when that meeting |
| 04:44:0723 | occurred? |
| 04:44:1024 | A. Early December, 2005. |
| 04:44:1425 | Q. Who attended? |

Page 227

SANDRA BIENVENU

| | |
|---|---|
| 04:44:18 2 | A. Judy Codding, John Wozniak, Nick, Eric |
| 04:44:25 3 | Hoagland, Loretta Pohill, myself. There were |
| 04:44:41 4 | other people in the LA office. |
| 04:44:45 5 | Q. My question to you wasn't who was in |
| 04:44:48 6 | the office but rather who attended the meeting |
| 04:44:50 7 | that you had? |
| 04:44:50 8 | A. I'm trying to answer your question. |
| 04:44:52 9 | MR. BENOWITZ: Are we talking about -- |
| 04:44:5310 | I'm confused. Are we talking about the meeting |
| 04:44:5511 | of the business development directors or the |
| 04:44:5712 | meeting that she had with Ms. Codding and Mr. |
| 04:45:0113 | Wozniak and -- |
| 04:45:0214 | MR. KARLINSKY: I don't know. Let me |
| 04:45:0315 | see if I can clarify. |
| 04:45:0516 | MR. BENOWITZ: Great. |
| 04:45:0517 | BY MR. KARLINSKY: |
| 04:45:0618 | Q. How many meetings did you have on this |
| 04:45:0719 | occasion? |
| 04:45:0720 | A. Okay. Let me finish answering my |
| 04:45:1121 | former question. |
| 04:45:1222 | Q. I think the question was a poor |
| 04:45:1423 | question. But we'll go back and see if we can |
| 04:45:1824 | clarify. |
| 04:45:1925 | The occasion that you are talking |

Page 228

SANDRA BIENVENU

| | |
|---|---|
| 04:45:21 2 | about occurred in early December of 2005? |
| 04:45:26 3 | A. Yes. |
| 04:45:26 4 | Q. In the LA office of America's Choice? |
| 04:45:29 5 | A. Yes. |
| 04:45:32 6 | Q. Was there only one meeting with |
| 04:45:33 7 | everyone present on that occasion or were there |
| 04:45:35 8 | different meetings? |
| 04:45:36 9 | A. There was one meeting with everyone |
| 04:45:3810 | present and then individual meetings with Nick, |
| 04:45:4411 | Judy, John and individual business development |
| 04:45:4812 | directors. |
| 04:45:5213 | Q. Now, with respect to the group |
| 04:45:5314 | meeting, if I can call it that, you'll |
| 04:45:5515 | understand what I am referring to? |
| 04:45:5716 | A. Yes, I will. |
| 04:45:5817 | Q. You told me that Codding, Solinger, |
| 04:46:0215 | Wozniak, the business development directors and |
| 04:46:0519 | as well Tommy Harris attended? |
| 04:46:1020 | A. Tommy was there for part of that group |
| 04:46:1321 | meeting. I believe he was introduced at that |
| 04:46:1622 | point, and I believe Sam Esparza was there, but |
| 04:46:2123 | I can't be certain. I think he was still there. |
| 04:46:2424 | Q. Mr. Esparza was also a business |
| 04:46:2625 | development director? |

Page 229

SANDRA BIENVENU

| | |
|---|---|
| 04:46:27 2 | A. Yes, he was. |
| 04:46:28 3 | Q. How long did the group meeting last? |
| 04:46:36 4 | A. I'm not sure I can tell you that. It |
| 04:46:38 5 | was a one-day meeting, and then I believe we all |
| 04:46:40 6 | went out to dinner that evening, and the |
| 04:46:46 7 | individual meetings were maybe thirty to forty |
| 04:46:50 8 | minutes each. So however you could take that |
| 04:46:57 9 | number of hours or 45 minutes out, I just don't |
| 04:47:0010 | recall the exact number. |
| 04:47:1211 | Q. What were the topics of discussion at |
| 04:47:1412 | the group meeting? |
| 04:47:4213 | A. I believe we were talking about -- and |
| 04:47:4314 | I can't be certain because there were many |
| 04:47:4515 | meetings like this, but I believe Judy |
| 04:47:4816 | giving us her version of how presentation should |
| 04:47:5317 | be made. And if I am not mistaken, I took notes |
| 04:47:5718 | on it and gave them back to Judy so she could |
| 04:48:0519 | correct them. |
| 04:48:0620 | But she was actually telling us how |
| 04:48:0821 | she wanted us to present America's Choice to |
| 04:48:1122 | potential customers. I think eventually we got |
| 04:48:2223 | into territory planning and I believe we began |
| 04:48:3224 | to talk about the fact that the new comp plan, |
| 04:48:3725 | the one that would follow the 2006 comp plan, I |

58   (Pages 226 to 229)

Page 230

SANDRA BIENVENU

```
1
04:48:42 2   believe we even started talking about -- that
04:48:46 3   the quotas would increase. I'm just not sure of
04:48:48 4   all the details.
04:48:56 5       Q.   You have basically given me three
04:48:58 6   subjects. One is the presentation of America's
04:49:01 7   Choice to potential customers, another was
04:49:04 8   territories and territory planning?
04:49:07 9       A.   I believe I said territory planning.
04:49:09 10      Q.   When you say territory planning, are
04:49:10 11  you referring to planning prospective sales
04:49:13 12  within territories?
04:49:16 13      A.   We were planning where our focus
04:49:19 14  should be.
04:49:24 15      Q.   Okay.
04:49:25 16      A.   One other subject that was covered was
04:49:27 17  Navigator which was one of the products and very
04:49:34 18  near and dear to John Wozniak's heart, and I
04:49:37 19  believe that was covered and we -- I think that
04:49:45 20  was also how do we present it, what are the key
04:49:47 21  facts, what are the features and benefits,
04:49:50 22  things of that sort.
04:49:54 23      Q.   You confirmed the first two subjects
04:49:56 24  that I had tried to reiterate to you. You also
04:50:01 25  started talking about as a third subject the new
```

Page 231

SANDRA BIENVENU

```
1
04:50:06 2   comp plan that would be adopted and the increase
04:50:11 3   in quotas under that plan, then you gave me a
04:50:15 4   further subject which was Navigator?
04:50:17 5       A.   Yes.
04:50:17 6       Q.   Any other subjects that you recall in
04:50:18 7   the general group meeting?
04:50:23 8       A.   Tommy Harris was introduced as Nick
04:50:26 9   Solinger's replacement.
04:50:34 10      Q.   Is that it?
04:50:35 11      A.   That's as much as I can recall.
04:50:38 12      Q.   What was said to your recollection
04:50:40 13  about the new plan that would be put in place
04:50:43 14  for '07?
04:50:54 15      A.   Just that they were going to start
04:50:55 16  working on details for that, that the quotas
04:50:57 17  would probably increase. I believe we had lots
04:51:00 18  of discussion about that because all of the
04:51:03 19  business development directors had a feeling
04:51:06 20  that America's Choice was not a known entity in
04:51:09 21  the marketplace. We felt like we were having to
04:51:14 22  do marketing and sales and we wanted to have
04:51:19 23  some input into the comp plan.
04:51:22 24      Q.   Is that something that the business
04:51:23 25  development directors actually spoke to at the
```

Page 232

SANDRA BIENVENU

```
1
04:51:25 2   meeting?
04:51:26 3       A.   I believe we had discussions but I
04:51:28 4   can't be certain.
04:51:32 5       Q.   Anything else that you can recall
04:51:34 6   about the new plan?
04:51:40 7       A.   No, because I don't believe it was
04:51:42 8   finalized and -- I know it wasn't finalized at
04:51:44 9   that point.
04:51:45 10      Q.   That's not what I am asking, though, I
04:51:46 11  am asking whether anything else was discussed
04:51:49 12  concerning what would become the new plan at
04:51:51 13  that meeting?
04:51:52 14      A.   Not that I recall.
04:51:52 15      Q.   What was discussed concerning
04:51:54 16  Navigator?
04:51:55 17      A.   How to present it, what the features
04:51:57 18  and benefits were, that John thought it was the
04:52:02 19  greatest thing since sliced bread -- his words,
04:52:06 20  not mine -- that he felt like it was just going
04:52:11 21  to fly off the shelves. Those kinds of things.
04:52:15 22      Q.   Anything more particular than that?
04:52:26 23      A.   I seem to remember that he thought we
04:52:27 24  could sell $10 million in the first year.
04:52:31 25      Q.   Of that product of Navigator?
```

Page 233

SANDRA BIENVENU

```
1
04:52:33 2       A.   Of just Navigator.
04:52:34 3       Q.   Anything else you can recall?
04:52:37 4       A.   We all thought he was crazy.
04:52:39 5       Q.   Did someone tell him that?
04:52:41 6       A.   I think pretty much everybody did.
04:52:51 7       Q.   With respect -- let's just stay with
04:52:52 8   the general group meeting for a second.
04:52:54 9       With respect to that general meeting,
04:52:55 10  have you now exhausted your recollection as to
04:52:57 11  what was discussed during the course of it?
04:53:06 12      A.   Not totally.
04:53:08 13      Q.   What else do you recall?
04:53:09 14      A.   When Judy introduced Tommy Harris she
04:53:15 15  did announce that I was the only dissenting vote
04:53:17 16  in his employment.
04:53:21 17      Q.   What does that mean?
04:53:24 18      A.   I didn't want him to be hired.
04:53:27 19      Q.   How did you know he was going to be
04:53:29 20  hired?
04:53:30 21      A.   Well, I knew that they were
04:53:31 22  interviewing him.
04:53:33 23      Q.   How did you learn that?
04:53:35 24      A.   I believe Judy told me. I'm not sure.
04:53:41 25      Q.   Why didn't --
```

59 (Pages 230 to 233)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 234

SANDRA BIENVENU

1

04:53:42 2    A.   Well, actually, no, I take that back.

04:53:47 3    It wasn't Judy, I believe Nick Solinger may have

04:53:47 4    told me that Tommy was one of the candidates --

04:53:52 5    in fact, all of us knew it, so I think they

04:53:55 6    interviewed several people.  I had even

04:53:58 7    suggested some people for them to look at.

04:54:00 8    Q.   Why did you dissent with respect to

04:54:02 9    Tommy Harris?

04:54:0710    A.   His reputation as a poor manager of

04:54:10:1    people had preceded him.

04:54:1612    Q.   Had you had personal knowledge of

04:54:1813    Tommy Harris?

04:54::914    A.   No.

04:54:2015    Q.   Never worked with him?

04:54:21:6    A.   No.

04:54:2117    Q.   Never worked for him?

04:54:2218    A.   No.  Had never seen him before.

04:54:2619    Q.   Had you spoken to people who had

04:54:2820    worked either for him or with him?

04:54:2921    A.   Yes.

04:54:3022    Q.   Who?

04:54:3423    A.   I had heard about Tommy Harris for 15

04:54:3724    years through people that I had worked with

04:54:4125    before.

Page 235

SANDRA BIENVENU

1

04:54:41 2    Q.   How did you make known your dissenting

04:54:44 3    view about Tommy Harris?

04:54:47 4    A.   In discussions with I believe Judy and

04:54:53 5    John.

04:54:55 6    Q.   When were those discussions?

04:54:57 7    A.   I don't remember.  Whenever they were

04:55:00 8    interviewing.  I don't know.  Had to be prior to

04:55:03 9    December.

04:55:04:0    Q.   Do you recall what you said to them?

04:55:061:    A.   Yes.

04:55:0612    Q.   What did you say to them?

04:55:1013    A.   I don't think he would be good for the

04:55:1114    company.  He is known for not supporting his

04:55:1415    salespeople and I don't think he's a good

04:55:19:6    manager of people.

04:55:3217    Q.   What did they say to you?

04:55:2418    A.   We'll take that into consideration.

04:55:2819    Q.   Anything else?

04:55:2920    A.   Not that I recall.

04:55:3121    Q.   Let me again ask you the question,

04:55:3522    have you now exhausted your recollection as to

04:55:3723    subjects discussed during the general meeting?

04:55:4024    A.   All that I can remember at this point,

04:55:4225    yes.

Page 236

SANDRA BIENVENU

1

04:55:43 2    Q.   Are you aware of any documents which

04:55:44 3    would assist you in refreshing your

04:55:50 4    recollection?

04:55:50 5    A.   Not that I know of.

04:55:51 6    Q.   Was compensation of business

04:55:54 7    development directors or business development

04:55:56 8    managers discussed during the general meeting?

04:55:58 9    A.   The only time I recall compensation

04:56:02:0    being discussed was in our individual meetings.

04:56:0711    Q.   Was the fiscal year 2006 compensation

04:56:1012    plan discussed during the general meeting?

04:56:1613    A.   I don't remember.

04:56:1814    Q.   Were any policies respecting

04:56:2115    compensation discussed during the general

04:56:2416    meeting?

04:56:2517    MR. BENOWITZ:  Objection.

04:56:26:8    A.   I don't recall.

04:56:2719    Q.   Let's turn to the individual meetings.

04:56:3020    Are you aware of any of the

04:56:3421    discussions in the individual meetings other

04:56:36:2    than the one that you were an attendee at?

04:56:4023    A.   No.

04:56:4024    Q.   No one ever told you about those

04:56:4225    meetings?

Page 237

SANDRA BIENVENU

1

04:56:43 2    A.   No.

04:56:44 3    Q.   Let's just focus on the meeting that

04:56:45 4    you had, and so that the record is clear at this

04:56:51 5    point, obviously you attended and I believe you

04:56:53 6    told me before that Ms. Codding attended, Mr.

04:56:57 7    Wozniak attended and Mr. Solinger attended?

04:56:59 8    A.   Yes.

04:57:00 9    Q.   Just the four of you?

04:57:0110    A.   Yes.

04:57:01:1    Q.   And that lasted between 30 and 45

04:57:0412    minutes?

04:57:0513    A.   Not very long.

04:57:0614    Q.   To the best of your recollection --

04:57::015    actually, let's do a little bit differently.

04:57:1216    What subjects were discussed during

04:57:13:7    the course of that meeting?

04:57:2018    By the way, I didn't get a clear

04:57:2119    answer on the record.  My question was, that

04:57:2320    lasted between 30 and 45 minutes, is that about

04:57:2721    right?

04:57:2722    A.   I believe so.

04:57:2923    Q.   Okay.  Go ahead.  The question is,

04:57:3424    what subjects were discussed during the course

04:57:3625    of that meeting?

60  (Pages 234 to 237)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 238

SANDRA BIENVENU

04:57:41 2     A. Well, the subjects that I recall were
04:57:43 3   the two subjects that I referred to earlier,
04:57:49 4   the -- Arkansas as it related to the state
04:57:55 5   initiative and my understanding from my
04:58:04 6   conversations with Nick about how compensation
04:58:14 7   applied.
04:58:21 8     Q. Let's talk about the first of those
04:58:23 9   subjects first. Which of the four of you in the
04:58:30 10   course of that meeting addressed the first
04:58:33 11   subject, that is, Arkansas and the state
04:58:36 12   alliance or state initiative?
04:58:41 13     A. Nick really led the discussion so he
04:58:44 14   brought it up, that it was one of my concerns.
04:58:47 15     Q. What did he say?
04:58:51 16     A. Sandy is concerned that the state
04:58:53 17   alliance that you have now hired the people for
04:58:59 18   will take over the state of Arkansas. She
04:59:02 19   started working on Arkansas in July of 2005 and
04:59:07 20   she and Cecil have been working diligently in
04:59:11 21   Arkansas, they feel like they have a very, very
04:59:16 22   strong possibility of getting a contract in
04:59:19 23   Arkansas and I don't recommend that you take it
04:59:22 24   away from them.
04:59:24 25     Q. Ms. Bienvenu, are you aware of any

Page 239

SANDRA BIENVENU

04:59:26 2   documents that document the fact that you had
04:59:30 3   begun working on Arkansas in July of 2005?
04:59:39 4     A. There should have been e-mails between
04:59:41 5   me and Estelle Mathis.
04:59:53 6     Q. One e-mail or more than one e-mail?
04:59:55 7     A. I don't remember. I know there were
04:59:57 8   two phone conversations, and I could be wrong,
05:00:03 9   there were one or two e-mails at that point.
05:00:17 10   And then in October there were e-mails and phone
05:00:22 11   calls between me, Bill Mullins who was an
05:00:29 12   Arkansas department — was an Arkansas
05:00:32 13   Department of Ed employee. I believe he now
05:00:35 14   works for America's Choice.
05:00:36 15     Q. Give me his name?
05:00:38 16     A. Bill Mullins, M-U-L-L-I-N-S.
05:00:46 17     Q. Those were phone calls?
05:00:48 18     A. Phone calls and e-mails between me,
05:00:52 19   Cecil and Bill Mullins. Bill was inquiring
05:00:57 20   about one of our math — I believe either
05:01:00 21   Navigator or Ramp Up Math. And I spoke to him
05:01:04 22   first and I turned it over to Cecil since that
05:01:08 23   was his territory. And that was happening in
05:01:14 24   October. And then in early November, we began
05:01:21 25   with Jannine Riggs and the people in the State

Page 240

SANDRA BIENVENU

05:01:24 2   Department. And that's all 2005.
05:01:29 3     Q. Was it in November of 2005 that you
05:01:31 4   had a meeting with the Arkansas Department of
05:01:33 5   Education along with other personnel from
05:01:38 6   America's Choice?
05:01:39 7     A. That was about the third meeting in
05:01:41 8   the Arkansas, but, yes, we did invite others.
05:01:45 9     Q. That was the November '05 meeting?
05:01:47 10     A. It was one of the November '05
05:01:49 11   meetings.
05:01:49 12     Q. So there were some meetings that you
05:01:50 13   had that preceded that one?
05:01:52 14     A. Yes.
05:01:52 15     Q. The one I am referring to, who
05:01:54 16   attended from America's Choice?
05:01:55 17     A. The one you are referring to is when
05:01:57 18   we talked about specifics on curriculum, is that
05:02:01 19   the meeting?
05:02:03 20     Q. I believe so.
05:02:04 21     A. Dottie Whitlow was our math expert and
05:02:08 22   Linda Lewis was our literacy expert.
05:02:12 23     Q. Let me go back to the question that I
05:02:15 24   had asked before which was a discussion on the
05:02:18 25   subject at your December '05 meeting.

Page 241

SANDRA BIENVENU

05:02:21 2     A. Okay.
05:02:22 3     Q. Right? So how did this lead off, Mr.
05:02:26 4   Solinger expressed the fact that you were
05:02:28 5   concerned about this?
05:02:30 6     A. I believe he said Sandy has two
05:02:32 7   concerns that we need to address before I leave,
05:02:35 8   and the one was the Arkansas versus state
05:02:41 9   alliance staying with Sandy and Cecil, and the
05:02:45 10   second one was to reconfirm what Nick had told
05:02:49 11   me about the compensation plan.
05:02:51 12     Q. Did he say anything else other than
05:02:52 13   that when he lead off?
05:02:54 14     A. I don't remember exactly, I mean, he
05:03:08 15   said a lot of flattering things about me and why
05:03:11 16   I was hired, but other than that I don't
05:03:13 17   remember.
05:03:13 18     Q. You don't remember the flattering
05:03:14 19   things?
05:03:17 20     A. You think I should because a young man
05:03:21 21   flattered me?
05:03:29 22     Q. Did anyone respond to Nick's opening
05:03:23 23   statements?
05:03:40 24     A. After he gave the two concerns, Judy
05:03:43 25   Codding said: Sandy, I will take care of you.

61 (Pages 238 to 241)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 242

SANDRA BIENVENU

05:03:47 2    Q.    With respect to the --
05:03:49 3    A.    To the two concerns was my assumption,
05:03:52 4    yes. Because she put her hands on my shoulder,
05:03:55 5    you know, looked me straight in the face and
05:03:59 6    said: Sandy, I will take care of you.
05:04:01 7    Q.    Let me stay with Mr. Solinger
05:04:02 8    then said in connection with these opening
05:04:04 9    remarks he made.
05:04:05 10         You have told me, I think, about the
05:04:08 11   specifics of the state alliance initiative
05:04:13 12   issue. You didn't really say more than given
05:04:16 13   the work you had done to that point in Arkansas,
05:04:17 14   you were concerned about whether it would be
05:04:19 15   taken away from you?
05:04:21 16   A.    Yes.
05:04:21 17   Q.    That's a fair statement of the
05:04:23 18   substance of what he said?
05:04:24 19   A.    Well, that was the gist of it along
05:04:27 20   with he didn't think that they should take it
05:04:30 21   away.
05:04:30 22   Q.    His recommendation was it remain with
05:04:32 23   you?
05:04:32 24   A.    Right.
05:04:34 25   Q.    Let's just turn, then, to the subject

Page 243

SANDRA BIENVENU

05:04:38 2    of what Mr. Solinger said how the compensation
05:04:40 3    plan would work, and as you characterized it,
05:04:42 4    your understanding of it based on your
05:04:45 5    discussions with him.
05:04:46 6         What precisely did he say?
05:04:51 7    A.    Quota credit and commissions earned
05:04:54 8    are accrued on signing of the contract. And he
05:04:58 9    says it much more eloquently because he has one
05:05:01 10   sentence that says it all and I can't say it
05:05:03 11   that way. Payments would occur when the company
05:05:07 12   was paid. And that was different from any
05:05:11 13   company I had worked for because usually you
05:05:15 14   didn't have to wait until the company got paid.
05:05:18 15   But I was okay with that.
05:05:20 16   Q.    That's how you recall him framing it
05:05:23 17   during the course of the December '05 meeting?
05:05:27 18   A.    That's what I recall.
05:05:28 19   Q.    Anything else on that subject that you
05:05:30 20   recall him saying?
05:05:37 21        MR. BENOWITZ: At that meeting?
05:05:38 22        MR. KARLINSKY: Right then, yes.
05:05:39 23   Q.    In fact, right then, not at that
05:05:41 24   meeting generally, but right then on that
05:05:43 25   subject?

Page 244

SANDRA BIENVENU

05:05:44 2    A.    That's all I can remember.
05:05:47 3    Q.    Did anyone respond to that?
05:05:50 4    A.    Judy put her hands on my shoulders and
05:05:53 5    said: Sandy, I will take care of you.
05:05:58 6    Q.    What did you take that to mean?
05:06:03 7    A.    That she would not take Arkansas away
05:06:05 8    from us and that the compensation plan would be
05:06:07 9    as I thought it was going to be.
05:06:10 10   Q.    Did she say anything about the
05:06:11 11   compensation plan?
05:06:12 12   A.    She said: Sandy, I will take care of
05:06:13 13   you.
05:06:14 14   Q.    Did she say anything else?
05:06:15 15   A.    I value you, you have a great
05:06:16 16   reputation. I mean, things like that, but
05:06:17 17   nothing — nothing substantial.
05:06:18 18   Q.    Did Mr. Wozniak say anything?
05:06:19 19   A.    Mr. Wozniak I don't recall ever opened
05:06:20 20   his mouth very much in that meeting.
05:06:21 21   Q.    Did Ms. Codding ever mention the
05:06:22 22   phrase compensation plan?
05:06:23 23   A.    I don't remember her exact words or
05:06:24 24   exact conversations, no.
05:06:25 25   Q.    Do you recall her using the term

Page 245

SANDRA BIENVENU

05:06:57 2    commissions?
05:07:05 3    A.    I don't remember. All I remember is
05:07:06 4    her saying: I'll take care of you.
05:07:07 5    Q.    Do you recall her using any terms
05:07:09 6    relating to quota credit?
05:07:16 7    A.    No.
05:07:17 8         MR. KARLINSKY: Let's take a
05:07:18 9    two-minute break.
05:07:23 10        THE VIDEOGRAPHER: The time is 5:07
05:07:26 11   p.m. We are now off the record.
05:07:27 12        (Recess)
05:16:08 13        THE VIDEOGRAPHER: The time is 5:16
05:16:09 14   p.m. We are now back on the record.
05:16:13 15   BY MR. KARLINSKY:
05:16:14 16   Q.    Ms. Bienvenu, this line of examination
05:16:15 17   started when I asked you what conversations you
05:16:18 18   had had preceding your sending the attachment to
05:16:24 19   Exhibit 37 to Judy Codding.
05:16:27 20   A.    Yes.
05:16:28 21   Q.    One of the things you told me in
05:16:29 22   answer to that was that you had numerous
05:16:33 23   conversations with Codding and Wozniak and Tommy
05:16:37 24   Harris beginning back as early as December of
05:16:42 25   2005 concerning how the compensation plan for

62 (Pages 242 to 245)

c735a4e6-6259-4523-b112-3e9379c131e3

Page 246

SANDRA BIENVENU

2006 was to work.

Have you now told me everything you remember about the first conversation on that subject that occurred early December of 2005 in Los Angeles?

A. All that I can recall, yes, sir.

Q. When was the next conversation that you had on that subject with either Codding, Tommy Harris or Wozniak or for that matter anyone else?

A. Sometime after the Arkansas contract was signed in April, I just recall asking when we would expect payment.

Q. Can you recall -- strike that question.

When you say sometime after the Arkansas contract was signed in April, you are referring to the document we looked at earlier today, the April 17 document?

A. I am referring to that.

Q. How long after April 17 did you have that discussion?

A. I don't remember if it was May or June. It was sometime in that vicinity.

Page 247

SANDRA BIENVENU

Q. Of whom did you ask that?

A. I believe I may have started with Tommy Harris but I can't be certain.

Q. Did you ask anyone besides Tommy Harris?

A. Eventually I got to the point that I didn't ask Tommy anything because I wasn't ever sure that my questions went further than Tommy. So I did begin to ask Judy, but I don't remember exactly when.

Q. I move to strike the last answer as nonresponsive.

My question to you was, did you ask anyone beside Tommy Harris?

A. Yes, eventually.

Q. Who did you ask other than Tommy Harris?

A. To the best of my knowledge I asked Judy Codding and John Wozniak.

Q. Let me start with Tommy Harris. What precisely did you say to him?

A. I don't remember.

Q. Was it in a face-to-face conversation, in a telephone call or by e-mail?

Page 248

SANDRA BIENVENU

A. I don't recall.

Q. Do you recall whether he responded to you?

A. I believe he did.

Q. Do you recall what he said?

A. I don't recall what he said the first time I talked to him and I believe it was by telephone, but I cannot be certain.

Another conversation with Tommy was during CPD week in June at the Xerox training center. And I don't remember the city, though, it was in. I know it was dreadful.

Q. Leesburg, Virginia?

A. It was in Virginia.

Q. So you don't recall the first time -- you don't recall what he said during the first time you talked to him about this?

A. I don't remember. I believe --

Q. You did have -- did I cut you off?

A. I'm sorry, I believe I had a conversation with him via telephone.

Q. But you don't recall the substance of it?

A. Well, I remember that I was asking him

Page 249

SANDRA BIENVENU

about when Cecil and I could expect to be paid, but I don't recall what he told me.

Q. At the time you had that conversation had America's Choice received any revenue from that contract?

MR. BENOWITZ: Objection.

A. I don't think they had.

Q. Why would you be asking them when you would get paid?

A. Because in early May, Diana Julian had said that they would pay as soon as they got an invoice, so I guess I was just asking.

Q. Were you concerned as to how the 2006 compensation plan would work at the time that you had this discussion with Tommy Harris?

A. I believe I was concerned because there had been numerous conversations about developing the 2007 compensation plan.

Q. Based on your discussion with Ms. Codding in December of 2005 as you have related it to us, did you continue to have concerns as to how the 2006 compensation plan would work?

A. Not until they decided to bring an outside consultant in to develop the 2007 plan.

MERRILL LEGAL SOLUTIONS
(800) 325-3376
www.MerrillCorp.com

Page 250

SANDRA BIENVENU

05:23:01 2    Q.    Why did that give you concern about
05:23:03 3    how the 2006 compensation plan would work?
05:23:07 4    A.    I just wanted to make sure they were
05:23:08 5    going to live up to their agreement.
05:23:10 6    Q.    Well, what about their bringing in an
05:23:12 7    outside consultant would cause you to have some
05:23:16 8    question as to whether they would comply with
05:23:20 9    their agreement?
05:23:24 10    A.    I just recall having conversations
05:23:26 11    with that outside consultant and he had no
05:23:31 12    experience in the educational market. And some
05:23:33 13    of the things that he was talking about that
05:23:36 14    should be included in a 2007 plan were totally
05:23:41 15    foreign to my twenty-something years in this
05:23:44 16    business.
05:23:45 17    Q.    Who are you talking about when you are
05:23:46 18    referring to the outside consultant?
05:23:49 19    A.    It was Mercer Consulting and I believe
05:23:51 20    his name was Bacon Reece — Reece Bacon, maybe.
05:23:56 21    Q.    When did you have discussions with Mr.
05:23:59 22    Bacon?
05:24:07 23    A.    They asked me to talk to him once on
05:24:09 24    the telephone when it was just the two of us,
05:24:11 25    and I want to say that was pretty early in the

Page 251

SANDRA BIENVENU

05:24:18 2    year 2006.
05:24:20 3    Q.    2006 or 2007?
05:24:22 4    A.    Oh. Well, not 2007, I was gone.
05:24:27 5    Q.    I'm sorry, 2006, right.
05:24:30 6    A.    February, March, April, sometime in
05:24:31 7    that timeframe. So I had one conversation with
05:24:35 8    him. They scheduled another one, canceled it,
05:24:41 9    and then he attended one of our leadership team
05:24:45 10    meetings. And I want to say it was in May but
05:24:47 11    I'm not absolutely positive.
05:24:49 12    Q.    Also in 2006?
05:24:53 13    A.    Yes.
05:24:53 14    Q.    Were those the only discussions you
05:24:55 15    had with him?
05:24:56 16    A.    As far as I know, yes.
05:24:57 17    Q.    Did you not have a telephone
05:25:00 18    conversation with him in November of 2006?
05:25:02 19    A.    I did. I'm sorry, I did.
05:25:07 20    Q.    Let me just — I'm not going to be
05:25:07 21    able to exhaust that at this point, but let me
05:25:08 22    just go back and ask you the question as a
05:25:11 23    follow-up.
05:25:12 24    You had just told me that some of the
05:25:17 25    things Mr. Bacon was talking about that would be

Page 252

SANDRA BIENVENU

05:25:23 2    or should be included in the 2007 plan, and
05:25:27 3    these were your words, "were totally foreign to
05:25:30 4    my twenty-something years in this business"?
05:25:33 5    A.    Yes.
05:25:33 6    Q.    What do you mean by that? What things
05:25:35 7    was he talking about that were totally foreign
05:25:37 8    to your twenty-something years in the business?
05:25:40 9    A.    The way he wanted to structure the
05:25:43 10    commission percentages, he talked about that.
05:25:53 11    He did talk about one thing that has been my
05:25:58 12    experience which was giving quotas out six
05:26:00 13    months in advance of the fiscal year beginning.
05:26:10 14    I don't remember all the details. I mean, there
05:26:15 15    were concerns, I just remember getting off the
05:26:18 16    phone and thinking he wasn't qualified to do
05:26:21 17    this.
05:26:22 18    Q.    The subject of your discussion with
05:26:24 19    Mr. Bacon as you have related it to me was about
05:26:28 20    Mercer Consulting's and Mr. Bacon's work for
05:26:34 21    America's Choice in connection with the
05:26:35 22    development of the 2007 plan, correct?
05:26:38 23    A.    As I understand it, yes.
05:26:40 24    Q.    As you understood it, neither Mr.
05:26:42 25    Bacon nor Mercer was retained in order to deal

Page 253

SANDRA BIENVENU

05:26:47 2    with a 2006 plan, correct?
05:26:53 3    A.    I don't believe they were, but I don't
05:26:54 4    know that.
05:26:55 5    Q.    So what about this gave you -- what
05:26:58 6    about your communication with Bacon gave you
05:27:01 7    some concern about how the 2006 plan was going
05:27:04 8    to work?
05:27:10 9    A.    I'm not sure.
05:27:56 10    Q.    Let me stay with your discussions with
05:27:57 11    Tommy Harris. You told me before that you
05:28:01 12    didn't recall the subject — I'm sorry, his
05:28:06 13    response during the first telephone call you had
05:28:08 14    with him?
05:28:09 15    A.    Right.
05:28:10 16    Q.    Where you were talking about payment
05:28:11 17    under the 2006 plan.
05:28:13 18    A.    Right.
05:28:14 19    Q.    Do you recall — and you also
05:28:15 20    mentioned you had a discussion with him during
05:28:17 21    the CPD June 13 through 14, 2006.
05:28:21 22    A.    Yes.
05:28:22 23    Q.    In Virginia?
05:28:22 24    A.    Yes.
05:28:23 25    Q.    What did you say and what did he say

64 (Pages 250 to 253)

MERRILL LEGAL SOLUTIONS
(800) 325-3376          www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 254

SANDRA BIENVENU

05:28:25 2 during the course of that discussion at CPD?
05:28:41 3    A.  It was about the Arkansas contract,
05:28:42 4 and I believe he may have said at that time that
05:28:55 5 they weren't going to count Arkansas in the 2006
05:28:58 6 year.  I'm not sure.  And I argued with him and
05:29:04 7 he got up and left.
05:29:07 8    Q.  You argued with him?
05:29:08 9    A.  Hm-hmm.
05:29:09 10    Q.  What did you say to him?
05:29:11 11    A.  That the contract was signed in 2006
05:29:13 12 and it should --
05:29:16 13    Q.  What did he say to you?
05:29:17 14    A.  That he could see both sides but he
05:29:22 15 didn't think the company was going to recognize
05:29:24 16 it, I believe.
05:29:31 17    Q.  Anything else that you recall about
05:29:32 18 the discussion with him?
05:29:35 19    A.  It wasn't a very long discussion.  He
05:29:37 20 left.
05:29:45 21    Q.  Is there anything else that you recall
05:29:47 22 about the discussion?
05:29:48 23    A.  No.
05:29:52 24    MR. KARLINSKY:  We are at 5:30 and I'm
05:29:54 25 going to stop for the day.  I understand, Mr.

Page 255

SANDRA BIENVENU

05:29:57 2 Benowitz, that you would continue as long as it
05:29:59 3 was necessary to complete the deposition, but I
05:30:02 4 don't think that's reasonable in the
05:30:04 5 circumstances.  We have been going since 9:35 or
05:30:08 6 9:40 this morning and I'm not prepared to go
05:30:12 7 further.
05:30:13 8    So we will talk off the record about
05:30:16 9 continuation of the deposition.
05:30:19 10    MR. BENOWITZ:  Please note our
05:30:20 11 objection to any continuation of this
05:30:22 12 deposition.  We confirm what you said that we
05:30:25 13 are willing to stay until it is over here today.
05:30:28 14    MR. KARLINSKY:  Your objection is
05:30:28 15 noted.
16
17
18
19
20
21
22
23
24
25

Page 256

SANDRA BIENVENU

05:30:35 2    THE VIDEOGRAPHER:  Here now marks the
05:30:36 3 end of tape five of the deposition of Ms. Sandra
05:30:44 4 Bienvenu.  The time is 5:30 p.m.  We are now off
05:30:46 5 the record.
6
7
8

_____

SANDRA BIENVENU

9
10
11
12 Subscribed and sworn to before me
13 this_____ day of_____, 2008.
14 _____
15    Notary Public
16
17
18
19
20
21
22
23
24
25

Page 257

1    SANDRA BIENVENU
2 STATE OF NEW YORK
3 COUNTY OF NEW YORK
4    I wish to make the following changes, for the
5 following reasons:
6 PAGE LINE
7 ___ ___    CHANGE: _____
8 ___ ___    REASON: _____
9 ___ ___    CHANGE: _____
10 ___ ___    REASON: _____
11 ___ ___    CHANGE: _____
12 ___ ___    REASON: _____
13 ___ ___    CHANGE: _____
14 ___ ___    REASON: _____
15 ___ ___    CHANGE: _____
16 ___ ___    REASON: _____
17 ___ ___    CHANGE: _____
18 ___ ___    REASON: _____
19 ___ ___    CHANGE: _____
20 ___ ___    REASON: _____
21 ___ ___    CHANGE: _____
22 ___ ___    REASON: _____
23 ___ ___    CHANGE: _____
24 ___ ___    REASON: _____
25

65  (Pages 254 to 257)

MERRILL LEGAL SOLUTIONS
(800) 325-3376        www.MerrillCorp.com
c735a4e6-6259-4523-b112-3e9379c131e3

Page 258

```
 1                    SANDRA BIENVENU
 2
 3              C E R T I F I C A T E
 4
      STATE OF NEW YORK
 5    COUNTY OF NEW YORK
 6
 7           I, BRANDON RAINOFF, a Federal
 8    Certified Realtime Reporter and Notary Public
 9    within and for the State of New York, do hereby
10    certify:
11           That SANDRA BIENVENU, the witness
12    whose deposition is hereinbefore set forth, was
13    duly sworn by me and that such deposition is a
14    true record of the testimony given by the
15    witness.
16           I further certify that I am not
17    related to any of the parties to this action by
18    blood or marriage, and that I am in no way
19    interested in the outcome of this matter.
20           IN WITNESS WHEREOF, I have hereunto
21    set my hand this____day of_____, 2008.
22
             _____
             BRANDON RAINOFF, FCRR, CM
23
24
25
```

Page 260

```
 1                    SANDRA BIENVENU
 2
 3         QUESTION MARKED FOR A RULING
 4
 5    Page 77
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 259

```
 1              SANDRA BIENVENU
 2
 3              INDEX OF EXHIBITS
 4
 5    107 Answer to the Complaint and Amended ...........92
         Counterclaims
 6
      108 Document Bates Stamped SB 007, 2, 5, 6, 8, ...101
 7       9 and 10
 8    109 Document Bates Stamped SB 001 through 0010 ...111
 9    110 Document Bates Stamped ACI-DC-03552 ...........118
         through 03554
10
      111 Document Bates Stamped ACI-DC-02621 ...........132
11
      112 Document Bates Stamped SB 0012 through .......164
12       0019
13    113 Document Bates Stamped ACI-DC-02635 ..........166
         through 02638
14
      114 Document Bates Stamped ACI-DC-02639 ..........170
15       through 02642
16    115 Document Bates Stamped ACI-DC-02651 ..........170
         through 02654
17
      116 Document Bates Stamped SB 0083 through ...,...174
18       0085
19    117 Document Bates Stamped ACI-DC-02655 ........175
         through 02657
20
      118 Document Bates Stamped ACI-DC-00234 ..........177
21       through 00257
22    119 Document Bates Stamped ACI-DC-02658 ..........180
         through 02699
23
      120 Document Bates Stamped ACI-DC-02559 ..........216
24       through 02561
25
```

MERRILL LEGAL SOLUTIONS
(800) 325-3376                    www.MerrillCorp.com

c735a4e6-6259-4523-b112-3e9379c131e3

**From:** jkdecosta@jkdcpc.com [mailto:jkdecosta@jkdcpc.com]
**Sent:** Wednesday, July 02, 2008 5:10 PM
**To:** 'Rosans, John'
**Subject:** Bienvenu deposition

John – I received your eleventh hour Notice to continue Sandy's deposition on July 8th. Without addressing any issues arising from the untimely notice, please note that Sandy is not available. In addition, it is my understanding that Bob and Marty addressed the matter last week. Bob will touch base with Marty.

Have a good holiday.

Janet

Janet K. DeCosta, Esq.
Janet K. DeCosta, P.C.
1825 Eye Street, NW
Suite 400
Washington, DC 20006
Tel:    202-638-3344
Fax:    202-824-8126
www.JKDCPC.com


DISCLAIMER:

IRS CIRCULAR 230 NOTICE. Any advice expressed above as to tax matters was neither written nor intended by the sender to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed under U.S. tax law.

This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 638-3344 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICA'S CHOICE, INC., | ) |
| | ) |
| Plaintiff/Counter-Defendant, | ) Case No.: 07CV00428 |
| v. | ) |
| | ) Judge Emmet Sullivan |
| SANDRA BUSH BIENVENU, | ) |
| | ) |
| Defendant/Counter-Plaintiff. | ) |
| | ) |

AFFIDAVIT IN SUPPORT OF DEFENDANT/COUNTER-PLAINTIFF'S
OPPOSITION TO MOTION OF PLAINTIFF/COUNTER-DEFENDANT

STATE OF NEW YORK )
                   ) ss.:
COUNTY OF NEW YORK )

     **ROBERT J. BENOWITZ**, being duly sworn, deposes and says:

    1.     I am a partner with the firm of Rick Steiner Fell & Benowitz LLP,

attorneys for the defendant/counter-plaintiff SANDRA BUSH BIENVENU ("Ms.

Bienvenu") and make this Affidavit upon personal knowledge and in support of Ms.

Bienvenu's opposition to the motion of plaintiff/counter-defendant AMERICA'S

CHOICE, INC. ("ACI") to enlarge the discovery period. I am also admitted pro hac vice

in the above-captioned action.

    2.     Under the caption "Statement of Points" in the first full paragraph set

forth on page 4 of ACI's Motion, it states the following:

> "On July 3, 2008, counsel for ACI contacted New York
> counsel for Bienvenu by telephone. While counsel for
> Bienvenu first continued his objection to the communication

1

> of the deposition, he rapidly changed his position, agreeing
> that the deposition would continue to the 7-hour mark,
> apparently in exchange for ACI's counsel's commitment that
> the deposition would be taken in the location most
> convenient for Bienvenu.  Ultimately, counsel for Bienvenu
> indicated and agreed that he would contact his client so that
> the parties could schedule the balance (less than 2 hours) of
> her deposition at a location and time most convenient for
> her."

3.     That paragraph contains a number of grossly inaccurate representations as

to statements purportedly made by me in the telephone conversation described.  I did

not change the position that I expressed at the end of our client's deposition as

evidenced in the record of her testimony where I objected to any continuation of Ms.

Bienvenu's deposition.  I said absolutely nothing and agreed to absolutely nothing

which could possibly be construed as my consent to the continuation of our client's

deposition.  I said nothing further than I would attempt to communicate with Ms.

Bienvenu, who I understood was then traveling as is necessary in her work, solely for

the purpose of obtaining her views as to whether she would consider the continuation

of her deposition.

4.     I was ultimately able to communicate with Ms. Bienvenu and clearly stated

her position in my letter to ACI's counsel dated July 7, 2008, which was the first business

day after the July 4th holiday weekend (a copy of my July 7, 2007 letter is annexed to this

Opposition as Exhibit 4).  While ACI's counsel attempts to rely upon our e-mail

exchanges earlier on that date, before I was able to reach Ms. Bienvenu, to infer that they

evidence my consent to schedule a continuation of the deposition, I made it

clear that my sole commitment was to consult with my client on whether she would

consent. I saw no reason to comment further.


_____
ROBERT J. BENOWITZ


Sworn to me before this
18TH day of July, 2008

_____
NOTARY PUBLIC

RAYMOND W. LEW
Notary Public, State of New York
No. 02LEG074045
Qualified in Queens County
Commission Expires May 6, 2010

# RSF&B RICK STEINER FELL & BENOWITZ LLP

**A T T O R N E Y S   A T   L A W**

**NEW JERSEY OFFICE:**
111 PATERSON AVENUE, HOBOKEN, NJ 07030
TEL: 201-798-6613 • FAX: 201-798-5070

**WESTCHESTER OFFICE:**
162 ROUTE 202, SOMERS, NY 10589
TEL: 914-277-7303 • FAX: 914-243-0330

90 BROAD STREET, 25ᵀᴴ FL., NY, NY 10004 • TEL: 212-422-0488 • FAX: 212-422-0158

July 7, 2008

Martin E. Karlinsky, Esq.
Katten Muchin Rosenman LLP
575 Madison Avenue
New York, New York 10022-2585

Re:   **America's Choice Inc. v. Sandra Bush Bienvenu**
      **RSF&B File No.: 2120.001**

Dear Mr. Karlinsky:

Since our telephone discussion last Thursday concerning your Notice of Continued Deposition of Ms. Bienvenu, I reviewed the transcript of her testimony on June 25, 2008 which clearly indicates that the Deposition commenced at 9:44 A.M. and concluded at 5:30 P.M. The transcript also indicates that Ms. Bienvenu was willing to continue the Deposition in your office on June 25th to afford you the opportunity to conclude your questioning of her at that time but that you made the decision to stop questioning her at 5:30 P.M.

Accordingly, we continue our objection as I stated on the record at the conclusion of Ms. Bienvenu's testimony in response to your stated desire to arrange for the continuation of the Deposition. Under FRCP 30(d)(2) you have exceeded the one day, seven hour limitation for the Deposition.

Unless a reasonable accommodation is offered by ACI, please be advised that our client will not consent and will vigorously contest any efforts to compel the continuation of her Deposition.

Very truly yours,

Robert J. Benowitz

cc:   Janet K. DeCosta, Esq.
      John Rosans, Esq.
      Ugo Colella, Esq.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICA'S CHOICE, INC.,      ) | |
| ) | |
| Plaintiff/Counter-Defendant,      ) | Case No.: 07CV00428 |
| v.      ) | |
| ) | Judge Emmet Sullivan |
| SANDRA BUSH BIENVENU,      ) | |
| ) | |
| Defendant/Counter-Plaintiff.      ) | |
| ) | |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of July, 2008 a copy of the foregoing

**DEFENDANT/COUNTER-PLAINTIFF'S OPPOSITION TO PLAINTIFF/COUNTER-**

**DEFENDANT'S MOTION TO ENLARGE DISCOVERY PERIOD** was filed

electronically.  Notice of this filing will be sent to all parties by operation of the Court's

electronic filing system.  Parties may access this filing through the Court's system.


                                                _____ /s/ Raymond W. Lew \_\_\_\_\_
                                                Raymond W. Lew

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AMERICA'S CHOICE, INC.,** ) | |
| ) | |
| **Plaintiff/Counter-Defendant,** ) | **Case No.: 07CV00428** |
| **v.** ) | |
| ) | **Judge Emmet Sullivan** |
| **SANDRA BUSH BIENVENU,** ) | |
| ) | |
| **Defendant/Counter-Plaintiff.** ) | |
| _____ ) | |

**ORDER**

Upon consideration of Plaintiff/Counter-Defendant America's Choice, Inc.'s Motion to

Enlarge Discovery Period and to Compel Continued Deposition and Defendant/Counter-Plaintiff

Sandra Bush Bienvenu's opposition thereto and the entire record of this case, it is hereby:

**ORDERED** that the Motion to Enlarge Discovery Period and to Compel Continued

Deposition is DENIED.

_____
Hon. Emmet Sullivan
United States District Judge

Dated: July _____, 2008