**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
AMERICA'S CHOICE, INC.,        )
                               )
              Plaintiff,       )
                               )   Civil Action No. 07-428(EGS)
         v.                    )
                               )
SANDRA BUSH BIENVENU,          )
                               )
              Defendant.       )
_____)
```

<u>**MEMORANDUM OPINION**</u>

Plaintiff America's Choice, Inc. ("ACI" or "plaintiff") is a for profit corporation in the education consulting industry. Plaintiff seeks a declaratory judgment that it does not owe defendant Sandra Bush Bienvenu ("defendant" or "Bienvenu") a commission on a sales contract. Bienvenu counterclaims for the commission. Defendant filed a motion for partial summary judgment and plaintiff cross-moved for summary judgment. Upon careful consideration of the motions, responses and replies thereto, the applicable law, the entire record herein, and for the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** defendant's motion for summary judgment, and **DENIES** plaintiff's motion for summary judgment.

**I.     BACKGROUND**

**A.     The Parties and the Education Consulting Industry**

ACI is a Delaware corporation headquartered in the District of Columbia.  Defendant's Statement of Uncontested Material Facts

("Def.'s SOF") ¶ 2.[1]  Its business involves providing curriculum materials and professional development training to struggling public schools nationwide.  Def.'s SOF ¶ 2.  ACI is a for-profit subsidiary of the National Center on Education and the Economy, a not-for-profit corporation.  Def.'s SOF ¶ 3.  ACI operates on a fiscal year ("FY") running from July 1 to June 30.  Def.'s SOF ¶ 4.

In late 2004, ACI hired Nicholas Solinger as its Vice-President of Sales and Marketing.  Def.'s SOF ¶ 13.  Solinger developed the Compensation Policy for the commissions at the heart of this dispute.  Def.'s SOF ¶ 13.  Solinger hired several Business Development Managers responsible for regions around the country.  Def.'s SOF ¶¶ 13-14.  One of those Business Development Managers was Bienvenu, who had responsibility for the Southeast Region including Arkansas, Florida, Texas, Louisiana, Mississippi, Alabama, and Oklahoma.  Def.'s SOF ¶ 24.  Bienvenu in turn hired Cecil Harris, a salesman with connections to the

---

[1] The parties each submitted statements of material facts not in dispute with their moving briefs pursuant to Local Civil Rule 7(h).  In its response to defendant's motion, plaintiff filed objections to defendant's statement of material facts not in dispute.  In her response, defendant did not file a separate objection to plaintiff's statement of facts and instead noted that she was incorporating by reference her previous statement of facts.  Unless otherwise noted, citations to the respective statements of material fact refer to facts that were not disputed by either party.

Arkansas education establishment.[2]  Def.'s SOF ¶ 25.

**B.     Contract With Arkansas Department of Education**

Through prior contacts at the Arkansas Department of
Education ("ADE"), Harris discovered that the state had certain
Title I federal education funds that he believed needed to be
committed by May 20, 2006 (i.e., in FY 2006) in order for
Arkansas to receive the federal funds.  Def.'s SOF ¶¶ 28-29.  The
prospect of a multi-million dollar contract led to marketing by
Harris, Bienvenu, and other ACI representatives in early 2006.
Def.'s SOF ¶ 30.  On March 30, 2006, the ADE issued a Request for
Proposals ("RFP") seeking bids to provide comprehensive school
reform in low-performing Arkansas public schools.  Def.'s SOF ¶
32; *see also* Def.'s Ex. L, RFP.  The RFP provided for a
"Professional Services Contract"[3] between ADE and the successful
offeror.  Def.'s Ex. L, §1.01.  The RFP also significantly
provides that, under state law, the awarded contract was

---

[2] Harris is a plaintiff with the same claims in the Middle
District of Louisiana.  Summary judgment was denied in that case,
*see Harris v. America's Choice, Inc*. No. 07-195-JVP-SCR, 2009 WL
411698 (M.D. La. Feb. 18, 2009), and the parties later settled.
*See Harris v. America's Choice, Inc.*, No. 07-195-JVP-SCR Docket
Nos. 77 and 78, Mot. to Dismiss and Order granting Mot. to
Dismiss.  Consolidation of all cases in one venue was not
appropriate.

[3]   The "Professional/Consultant Services Contract" is the
form contract document that Arkansas requires for procurement of
state contracts with a value in excess of $25,000.  Def.'s Ex. J,
Dep. of Dr. Bobbie Davis, ADE's Assistant Commissioner for Fiscal
and Administrative Services ("Davis Dep.") at 43:2-9.

contingent upon review and approval by the Arkansas Department of Finance and Administrative Office of State Procurement and the Arkansas Legislative Council. Def.'s Ex. L, §1.01.

On April 12, 2006, ACI submitted its sixty-plus page proposal for a comprehensive school improvement model for low-performing public school districts in Arkansas, which outlined its proposed programs at a projected cost of $6,095,000. Def.'s Ex. R, Proposal to State of Arkansas Department of Education ("Proposal"). The Proposal breaks down the costs of each program for 46 schools in the state, specifies the programs for each grade level, notes the materials for each program, provides for a term to begin on May 30, 2006 and end on June 30, 2007 (over two fiscal years), and is signed by Jason Dougal, ACI's Vice-President of Legal and Business Affairs. *See generally* Proposal. In other words, there are clear and detailed price, service, and time terms.

On April 17, 2006, ADE accepted ACI's proposal and the ADE Commissioner and Dougal signed a "Professional/Consultant Services Contract," ("hereinafter "April Contract"). The April Contract set forth terms from the Proposal including that ACI would provide services for 46 Arkansas schools at a cost of $6,095,000 from May 30, 2006 through June 30, 2007. *See* Pl.'s Ex. 17 at §§ 2,3,6. The April Contract also contained the following statement regarding payment: "The method(s) of

rendering compensation will be delivered in accordance with a schedule developed by the contractor and ADE." Pl.'s Ex. 17 at § 5. Pursuant to state law, the contract still had to go through the contingencies of review and approval by procurement officials. Davis Dep. at 20:1-21:15. The contract was reviewed and approved by: 1) internal ADE officials; 2) the State Director of Finance; 3) the state legislature; and 4) again by the State Director of Finance, who marked the contract as finally approved on June 2, 2006. Pl.'s Ex. G, Dep. of Estelle Mathis at 17:13-18:25; *see also* Def.'s Ex. M at 5.[4]

On July 20, 2006, ADE and ACI executed a document entitled "America's Choice, Inc. Agreement with State of Arkansas, Department of Education," (hereinafter "July Agreement") which refined certain provisions in the April Contract. Def.'s SOF ¶ 56; Pl.'s SOF ¶ 37. Specifically, the July Agreement listed which schools would receive the different programs, developed more precise budgeting, and came up with a total contract amount

---

[4] Before this final approval date, but after the Arkansas legislature approved the $6 million in funds, Bienvenu testifies that ACI had meetings with state-wide school superintendents to inform them of the services ACI would be providing. Pl.'s Ex. H, Bienvenu October 30, 2008 Dep. at 15:20-23. ACI calls these "marketing" meetings, but does not contest that the subject of discussion was the services it would provide under the contract. Pl.'s Mem. in Opp'n to Def./Counter Pl.'s Mot. for Partial Summ. J. and in Supp. of Pl./Counter Def.'s Cross Mot. for Summ. J. ("Pl.'s Mot.") at 28-29. Regardless of the nature or purpose of these meetings, however, the Court concludes that they are irrelevant to the determination of when a binding contract was formed.

– still $6,095,000, though there was discussion of reducing that total to $5,848,000. Pl.'s SOF ¶¶ 37-38. The July Agreement also included an integration clause, which states that the July Agreement "supercedes" any prior agreements. Pl.'s SOF ¶ 39. The July Agreement, however, was not processed through the state contract ratification process. Def.'s Ex. I, Dep. of Dr. Diana Julian, ADE's Assistant Commissioner at 45:13-46:15. ACI began providing services to ADE in July 2006, with ACI invoicing ADE for the first time on July 20, 2006 for half the total, or $3,047,500. Pl.'s SOF ¶¶ 40-41. ADE paid this invoice on August 10, 2006. Pl.'s SOF ¶ 42.

### C. ACI's Compensation Policy

On May 9, 2005, ACI and Bienvenu entered into an employment agreement. Def.'s SOF ¶ 18. The agreement provided that Bienvenu would work from her home in Florida, and would be responsible for developing sales in the Southeastern Region noted above. Def.'s SOF ¶¶ 18-19. Bienvenu's annual salary was $150,000 a year, but significant commissions were possible if she reached her sales quota. Def.'s SOF ¶ 19. Her sales quota for FY 2006 was $2.5 million. Def.'s SOF ¶ 23. Attached to her Employment Agreement was a commission grid specifying potential payouts, but this grid did not include any explanation of quota accrual rules. Def.'s SOF ¶ 19. Both parties agree that ACI could modify the Compensation Plan, even during the fiscal year,

with approval from ACI's Board of Directors.  Def.'s SOF ¶ 20;
Pl.'s SOF ¶¶ 5-6.  Indeed, Bienvenue was given a new FY 2006
compensation plan in the fall of 2005.  Def.'s SOF ¶ 23; Pl.'s
SOF ¶ 9.

## II.    ANALYSIS

### A.  Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary
judgment should be granted if the moving party has shown that
there are no genuine issues of material fact and that the moving
party is entitled to judgment as a matter of law.  *See* Fed. R.
Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986);
*Waterhouse v. District of Columbia*, 298 F.3d 989, 991 (D.C. Cir.
2002).  In determining whether a genuine issue of material fact
exists, the court must view all facts in the light most favorable
to the non-moving party.  *See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Likewise, in
ruling on cross-motions for summary judgment, the court shall
grant summary judgment only if one of the moving parties is
entitled to judgment as a matter of law upon material facts that
are not genuinely disputed.  *See Rhoads v. McFerran*, 517 F.2d 66,
67 (2d Cir. 1975).

There are two straightforward legal issues ripe for
adjudication.  The first is whether there was an enforceable
contract between ACI and ADE as of June 2, 2006.  The second is

7

whether under ACI's Compensation Policy, Bienvenu earned her commission in connection with the contract between ACI and ADE in FY 2006 or 2007.

**B.    The Contract Between ADE and ACI.**

1. *Choice of Law*

The parties agree that Arkansas law governs the issue of whether and when there was a contract between ADE and ACI.  There is also a venue provision in the contract identifying Arkansas law as governing any disputes.  District of Columbia courts give effect to contractual choice of law provisions "as long as there is some reasonable relationship with the state specified." *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 144, 155 n.3 (D.D.C. 2008)(quotation omitted).

The Court concludes that a reasonable relationship exists and will therefore apply Arkansas law.  Arkansas law, following general contract principles, provides that the essential elements of a contract are: 1) competent parties; 2) subject matter; 3) legal consideration; 4) mutual agreement; and 5) mutual obligations.  *See Foundation Telecommc'ns., Inc. v. Moe Studio, Inc.*, 16 S.W. 3d 531, 538 (Ark. 2000); *Hunt v. McIlroy Bank & Trust*, 616 S.W. 2d 759, 761 (Ark. Ct. App. 1981).

2. *ADE-ACI Contract*

The parties agree that there was a contract between ADE and ACI to perform education consulting services; the only dispute is

when this contract became effective.[5]  On April 17, 2006 ACI and
ADE signed the April Contract.  Bienvenu argues that, despite
being further refined by the July Agreement, the April Contract
was complete and became enforceable on June 2, 2006 when the
Director of Finance gave his final stamp of approval.  ACI's
argument, however, is that the April Contract was a mere "form"
document that was only a starting point in the "contracting
process" and lacked specificity regarding the scope and details
of the programs to be implemented.  For the following reasons,
the Court finds that a binding contract existed as of June 2,
2006.

First, with regards to ACI's form contract argument, the
Court finds that the April Contract includes extensive detail
about ACI's obligations, the costs to ADE, and the time-length of
the agreement.  The subject matter of the contract is also
specified; it is a consulting contract, the nature of which
includes ACI's delivery of its comprehensive school improvement
model to Arkansas public schools through development, training,
and on-site technical assistance.

The Court is also persuaded that the April Contract contains
clear and mutual obligations and agreements: i.e., ACI must

---

[5] Neither party disputes that Dougal and the ADE
Commissioner were competent parties to sign the contract.  *See*
Def.'s Mem. Supp. of Mot. for Partial Summ. J. ("Def.'s Mot.") at
13; Pl.'s Mot. at 24.

provide education consulting services and ADE must pay ACI for those services. Under Arkansas law, mutual promises are adequate consideration to uphold a contract. *See Youree v. Eshaghoff*, 256 S.W. 3d 551, 555 (Ark. Ct. App. 2007); *see also Tyson Foods, Inc. v. Archer*, 147 S.W. 3d 681, 684 (Ark. 2004) ("[M]utuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other."); *Showmethemoney Check Cashers, Inc. v. Williams*, 27 S.W. 3d 361, 366 (Ark. 2000). The Court finds that the April Contract contemplated such mutual promises and mutual obligations and is unpersuaded that ACI was "swimming in a sea of uncertainty" until the July Agreement was signed. *See* Pl.'s Mot. at 25.

ACI also argues that because the April Contract left the method of rendering compensation to a future determination, *see* Pl.'s Ex. 17 at § 5 ("The method(s) of rendering compensation will be delivered in accordance with a schedule developed by the contractor and ADE."), the contract was not valid. Along similar lines, ACI argues that the greater specificity in the July Agreement (i.e., which of the schools would receive the services and how payments would be scheduled) demonstrates that the April Contract was not enforceable. The Court finds that the refinements in the July Agreement did not change the overall objectives and scope of the April Contract and do not make the

April Contract void.  Parties may refine terms in a contract to supplement prior agreements, but that does not mean the prior agreement was never valid.  *See Foundation Telecommc'ns*, 341 Ark. at 242 (affirming trial court's decision that a contract was formed where the price terms were later revised because "agreements may be supplemented by subsequent acts, agreements, or declarations").[6]

Finally, the Court is persuaded that the April Contract is the only contract that went through the procurement process required under Arkansas law.  Arkansas State contract procurement protocol requires that a Professional Services Contract such as the April Contract progress through a multi-step approval process.  Ark. Code Ann. §§ 19-11-1006-1007.  These steps were each completed in turn and the Director of Finance gave final approval to the April Contract on June 2, 2006.  Def.'s Ex. M at 5.  In contrast, the July Agreement was not submitted for this approval process and did not contain the necessary components or approvals to be a contract under Arkansas law.

For these reasons, the Court finds that the April Contract became enforceable on June 2, 2006.  Plaintiff's commission, therefore, depends on the compensation policy in place during

---

[6]  ACI further asserts that the July Agreement contains an integration clause, which states that it supercedes any prior agreements.  While true, this does not negate the fact of a prior enforceable contract; it only means that the July Agreement now controls as between ADE and ACI.

ACI's FY 2006.

**B.   ACI's FY 2006 Compensation Policy**

1. *Choice of Law*

In diversity cases, the District of Columbia's choice of law principles call for a two-step analysis: 1) first, whether there is any conflict among the potentially applicable legal standards; and 2) if there is a conflict, the court must determine which jurisdiction has a "more substantial interest" in the governing issues.  *See YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002).  Bienvenu argues that Florida law applies to determining the terms of ACI's FY 2006 compensation policy because that is where she worked and signed the contract.  ACI persuasively responds, however, that District of Columbia law applies because Bienvenu has shown no conflict between District of Columbia law and Florida law.  Under either jurisdiction's law on employment contracts, the compensation policy controls whether Bienvenu is entitled to a sales commission.  *Compare Parkway Motor Co. v. Charles*, 39 F.2d 292 (D.C. Cir. 1930) (whether employee is entitled to commission for sales is dependent upon terms of employment contract) *with Comerford v. Sunshine Network*, 710 So. 2d 197, 198 (Fla. Dist. Ct. App. 1998) (terms of employment agreement control whether employee is entitled to sales commission).  Given the lack of conflict, the Court will apply the District of Columbia's laws; however, the analysis

would be the same under Florida law, where the Court would similarly look to the terms of the Compensation Policy.[7]

### 2. *FY 2006 Compensation Policy*

Because the Court finds that there was an enforceable contract as of June 2, 2006, the resolution of the parties' dispute depends on the terms of ACI's FY 2006 Compensation Policy.  The parties' interpretations of those terms are at complete odds with each other.  Bienvenu argues: 1) that her Employment Agreement did not contain an express provision as to the accrual of commission credit; and 2) that ACI Vice-President Solinger, the person who created the Compensation Policy, told her that commission credit would be earned when a *contract was signed*, and she would receive payment once ACI was paid by the client.  Def.'s Mot. at 4-5, 21.  She argues that this practice - commission upon signing of a contract - is consistent with industry custom and practice and further asserts that in the fall of 2005, ACI's CEO, Judy Codding ("Codding"), told her "[d]on't worry; we'll take of you" in response to her concerns about the

---

[7] ACI concedes that Bienvenu's counter-claim for attorney's fees, which follows directly from her claim of unpaid sales commissions, should be analyzed under Florida law.  The two issues are related: if Bienvenu is entitled to her sales commissions (the equivalent of unpaid wages in Florida), then she will be entitled to attorney's fees.  *See* Fla. Stat. § 448.08 (2009).  Because the Court finds that there are material issues of fact regarding whether Bienvenu is entitled to her sales commission, the Court need not address the attorney's fee issue at this time.

Compensation Policy. Def.'s Mot. at 5; *see also* Def.'s Ex. G.

Bienvenu June 25, 2008 Dep. at 221:15-19; Pl.'s Ex. B, Solinger

Dep. ("Solinger Dep.") at 32:1-16. Bienvenu also contends that,

despite being aware that ACI could alter her quota and commission

structure for FY 2006, at no point in time between when she was

hired in May 2005 and the summer of 2006 was she informed that

ACI intended to impose a quota credit that depended on factors

other than the execution of a binding contract. Def.'s Mot. at

6.

ACI, by contrast, argues that the signing of a contract is

insufficient to entitle Bienvenu to commission credit because its

FY 2006 Compensation Policy required that a contract be "booked"

and invoiced in the same fiscal year in order for the sales

person to receive commission credit. Pl.'s Mot. at 4-5; Solinger

Dep. at 72:6-18. The rationale behind this policy, ACI asserts,

is that in the education consulting industry, schools have often

signed contracts for services subject to future expenditures, but

then either did not receive funds or did not want to expend funds

a later time. Thus, before awarding commission credit, ACI wants

"contractual certainty" that it will receive payment for its

service, evidenced by such factors as a payment schedule and/or

invoices – events that did not occur until July 2006 (i.e., FY

2007). ACI notes that this "contractual certainty" policy was

presented to and approved by its Board of Directors in September

2005.  Pl.'s Mot. at 5.  ACI asserts that, following the adoption of this policy, Codding held a training attended by all sales personnel where they were given an "abbreviated version" of the presentation regarding the compensation policy.  Pl.'s Mot. at 5. In ACI's view, Bienvenu was thus entitled to commission credit in FY 2007, but because she had a higher sales quota to reach in that fiscal year, she is not entitled to any commission.

The key testimony on this point is that of Solinger because he created the FY 2006 Compensation Policy.  Solinger, in his deposition, testified that the general policy was to pay commissions in the fiscal year in which the contract was signed and the services were performed.  But, crucially, he also testified that there were "exceptions" to this policy.  For instance, he testified that if a service was provided over two fiscal years, the sales person would be entitled to a sales commission in the first fiscal year.  In Solinger's words (cited by both parties):

> I worked hard to find a way to represent this notion of the school district being at risk financially to America's Choice and America's Choice having certainty that a contract would produce the revenue described.  And so I looked at, you know, if there's a contractual commitment, an invoice, a commitment to a payment schedule, payments received, things like that to try to address this notion of school districts being able to wantonly cancel contracts and not pay under them.  But at the same point, a desire to compensate sales people at the time based on the contract date and trying to find something which captured the notion.

Jt. Exh. B, Solinger Dep. at 73:6-19.  ACI, of course, highlights

the words "invoice" and "payments received," while Bienvenu

focuses on "a desire to compensate people at the time based on

the contract date."  Resolution of this issue is further

complicated by the fact that the commission policy was not

written down, and apparently was still developing over FY 2006.

Moreover, Solinger also testified that he had not fully

considered the situation in which contract funds were

appropriated in one fiscal year, but services were not provided

until the following fiscal year  – the exact situation here.

Viewing these facts in the light most favorable to the non-

moving parties, there are genuine issues of material fact in

regard to: 1) the exact terms of the FY 2006 Compensation Policy

and whether they were ever modified; 2) what Solinger or other

ACI managers told Bienvenu the policy was, and when she was told;

3) if there was a general policy to apply commission credit after

services were invoiced, what the exceptions to that Policy were,

who decided whether the exceptions would apply, and whether the

ADE-ACI contract (with funding appropriated in one fiscal year

for services in the next fiscal year) falls into an exception;

and 4) what ACI meant by "contractual certainty."[8]  Accordingly,

_____

[8] The court presiding over the related case in Louisiana,
involving Cecil Harris (Bienvenu's sales person in regard to the
ADE-ACI contract), similarly denied summary judgment, finding
that there were disputed issues of fact regarding the terms and
implications of the compensation policy.  *See Harris v. America's*

both parties' motions for summary judgment on this issue are

**DENIED.**

**III.      CONCLUSION**

Accordingly, for the reasons stated, the Court **GRANTS IN**

**PART AND DENIES IN PART** defendant's motion for summary judgment,

and **DENIES** plaintiff's motion for summary judgment.  An

appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
              **United States District Judge**
              **March 26, 2010**

───────────

*Choice, Inc.* No. 07-195-JVP-SCR, 2009 WL 411698 (M.D. La. Feb. 18, 2009).